**IN THE UNITED STATES BANKRUTPCY COURT**
**FOR THE DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| **ANDREW WOOLF** | ) | **CHAPTER 7** |
| **and** | ) | |
| **ANDREW KATZ** | ) | **CASE NO 18-21993** |
| **and** | ) | |
| **ELENA VAGNEROVA** | ) | **ADVERSARY NO. _____** |
| | ) | |
| **Plaintiffs,** | ) | **COMPLAINT TO DETERMINE** |
| | ) | **DISCHARGEABILITY** |
| **vs.** | ) | **OF DEBT PURSUANT TO** |
| | ) | |
| **RICHARD P. SIMONE** | ) | **11 U.S.C. § 523(a)(2)(A);** |
| | ) | **11 U.S.C. § 523(a)(2)(B);** |
| **Debtor/Defendant.** | ) | **11 U.S.C. § 523(a)(4); and,** |
| | ) | **11 U.S.C. § 523(a)(6)** |
| | ) | |
| | ) | **OR, IN THE ALTERNATIVE,** |
| | ) | **TO DENY DEBTOR'S** |
| | ) | **DISCHARGE UNDER** |
| | ) | |
| | ) | **11 U.S.C. § 727(a)(3); and,** |
| | ) | **11 U.S.C. § 727(a)(4)(A)** |

## <u>COMPLAINT</u>

Plaintiffs Andrew Woolf, Andrew Katz and Elena Vagnerova (collectively "Plaintiffs")

bring this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(2)(B),

11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6) seeking an order determining that the debt owed

to Plaintiffs by Defendant Richard P. Simone (the "Debtor" or "Simone") is excepted from

discharge, or, in the alternative, to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3)

and 11 U.S.C. § 727(a)(4)(A).

1

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2.    Venue in the District of Connecticut is proper under 28 U.S.C. § 1409(a).

3.    This Adversary Proceeding relates to *In re Richard P. Simone*., Case No. 18-21993 (Bankr. D. Conn.) now pending in this Court (the "Bankruptcy Case"). Plaintiffs hold general unsecured claims against the Debtor pursuant to what Plaintiffs contend was a fraudulent, fake and nonexistent real estate transaction that resulted in the Plaintiffs' combined loss of $495,000.00.

## PARTIES

4.    Plaintiff Woolf is a natural person and a citizen of New York, residing in New York County, New York.

5.    Plaintiff Katz is a natural person and a citizen of Florida, residing in Miami-Dade County, Florida.

6.    Plaintiff Vagnerova is a natural person and a citizen of California, residing in Los Angeles County, California.

7.    Simone is the Debtor in the Bankruptcy Case now pending before this Court.

## FACTUAL BACKGROUND AND
## DEBTOR'S CONDUCT GIVING RISE TO NONDISCHARGEABLE DEBT

### *Summary of Debtor's Fraud Scheme, Theft of Plaintiffs' Money*
### *in Fake Real Estate Transaction and Debtor's Subsequent Lies and Falsification of Evidence*

8.      The Debtor was a stock broker in the 1990's until he was disbarred by the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") for fraud, dishonesty and multiple violations of securities laws. The Debtor is prohibited from associating with any broker dealer.

9.      In 1998, the Debtor pled guilty to second-degree grand larceny for stealing over $800,000.00 of his clients' money and the Debtor was placed on five years' felony probation.

10.     While on probation, the Debtor was brought before the trial court judge on a probation violation and he swore under oath to a New York Supreme Court Judge that he was not managing money for anyone other than himself ("I swear under oath that I am not, Sir.") However, an investigation by the Manhattan District Attorney's Office revealed that the Debtor was lying and stealing again. While the Debtor was managing money for others, he was stealing his clients' money by sending wires to an international bank account that he controlled to use for his own personal everyday expenses. The Debtor systematically and regularly lied to his clients about their money. Those clients trusted the Debtor, they were the Debtor's family members.

11.     The Manhattan District Attorney's Office charged the Debtor with additional financial fraud and theft crimes, as well as perjury. In 2005, the Debtor pled guilty to attempted third degree grand larceny, his probation was revoked and the Debtor was sentenced to 18-54 months in state prison at Rikers Island.

12.     The Debtor served approximately 18 months of his prison sentence and was released in 2006 or 2007.

13.    Shortly after his release from prison, the Debtor approached each Plaintiff individually in 2007 with a "can't miss" investment proposition. The Debtor solicited investment funds from Plaintiffs for the purchase of an "entire floor" of a preconstruction building in Dubai, United Arab Emirates.  The supposed building was called "Burjside Boulevard" and it was to be built by Damac Properties, a well-known and reputable developer ("Damac" or the "Developer").

14.    The Debtor represented that he would pool the Plaintiffs' money together with other unnamed/unknown investors in a purported Belize corporate entity called "Tribeca" for the purchase or investment. Belize is over 8,000 miles away from Dubai and Belize is known to be rife with financial fraud.

15.    After receiving a total of $495,000.00, including $225,000.00 from Plaintiff Woolf, $150,000.00 from Plaintiff Katz and $120,000.00 from Plaintiff Vagnerova, the Debtor represented that he had consummated the transaction for the purchase of all nine units and the entire 16th floor of the Burjside Boulevard building. As discussed herein, Plaintiffs' $495,000.00 has gone missing while in the Debtor's custody and control.

16.    This is a familiar tale.  The Debtor's paired his theft and fraud with an array of lies and additional acts of fraud and deception.

17.    The Debtor told Plaintiffs that their money was "wired to Damac."

18.    For the next eight or nine years, through 2016 and 2017, the Debtor continued to represent to Plaintiffs that Tribeca (a nonexistent Belize entity supposedly set up by the Debtor) owned the whole 16th floor in the Burjside Boulevard building (a nonexistent building). In or around 2016, the Debtor promised that Plaintiffs would soon be receiving "rents."

19.    The entire scheme was a fraud.

20.     Bank records prove that Plaintiffs' money was not "wired to Damac."

21.     The Debtor had Plaintiffs wire their money to the Debtor's New York attorney named Tony Chang and the Debtor's friend, a German person named Stefan Bode who was stationed in Dubai. These individuals were the Debtor's accomplices in the fraud. The Debtor was, at all times, the mastermind of the scheme.

22.     The Debtor represented to Plaintiffs that the Bode's role was "very limited" and that Bode "had nothing to do with it," and Bode "introduced me to Damac, that's it."  However, those statements were lies.

23.     The Debtor never entered into a valid or legitimate contract with Damac.

24.     The Debtor produced two different versions of a three-page so-called contract dated in 2007, referred to herein as "Fake Contract #1" and "Fake Contract #2." The Debtor produced Fake Contract #1 to Plaintiff Woolf in or around 2014 before litigation began in 2016. The Debtor apparently forgot that he gave Fake Contract #1 to Plaintiff Woolf in 2014 and the Debtor produced Fake Contract #2 to Plaintiff Katz in litigation discovery in 2017.

25.     The two versions of the fake contract contain *completely different signatures and dates of the same purported parties.* Moreover, "white-out" markings are visible on the documents and the two fake versions of this document were not actually signed by Damac, the so-called Developer.

26.     There is *no documentation whatsoever* reflecting the *consummation* of a real estate transaction, no purchase and sales contract, no legal description of property, no title, no deed, no settlement statement, no lender, no mortgage, no bill of sale, no estoppel letter, no transfer tax declarations, no recording, no seller's affidavit and no escrow agent.

27.    In litigation in Miami-Dade Circuit Court which preceded this bankruptcy filing, the Debtor finally admitted that although he had consistently represented to Plaintiffs that they would soon be receiving "rents," he had never purchased any real property on behalf of Plaintiffs.

28.    Moreover, the Burjside Boulevard building was never even built.

29.    In 2017, for the first time, Debtor's story shifted from "we own the property together" to "Damac seized your money and we don't own any property." The Debtor's altered story, concocted in 2017, was that at some unknown point in 2010 or 2011, with no supporting documentation, Damac "seized" Plaintiffs' money.  The Debtor could not explain why, if this actually happened (and it did not), the Debtor did not tell Plaintiffs about the seizure of their money when it happened in 2010 or 2011.  Instead, by the Debtor's own new story, he consistently lied to Plaintiffs for at least six years.

30.    But the Debtor's lies go back further than six years. Plaintiffs' money was not even sent to Damac in the first place, as confirmed by bank records. Moreover, Damac confirmed that it received no money from the Debtor. Not only did Damac not "seize" the money, Damac never received it in the first place.

31.    Moreover, there is no documentation or evidence whatsoever of any seizure of money by Damac. Furthermore, the Debtor continued representing to Plaintiffs through 2016 that Plaintiffs owned property, he never asked for any additional investment to stave off any seizure of money and the Debtor never said anything about a purported seizure until April 28, 2017.

32.    The scant supporting documents pertaining to all the purported financial activities conducted by the Debtor consist of obvious fakes and forgeries that are refuted and debunked by

common sense, other documents, bank records and the Debtor's own conflicting and illogical statements.

33.     The random documents the Debtor produced demonstrate an absence of any meaningful communications with Damac and absolutely no property ownership. Before the Debtor's more recent lie about the "seizure of funds by Damac," when Plaintiffs pressed the Debtor to provide proof of the property ownership, the Debtor went silent and refused to communicate with Damac. The Debtor's refusal to authorize communications with Damac has persisted to this day, demonstrating the Debtor's consciousness of guilt.

34.     It later came to light that Stefan Bode, the Debtor's accomplice, had purchased a pre-construction apartment in his own name in a different Dubai building named Ocean Heights and Bode sold that property in 2014 for a profit.  It is theorized that Plaintiffs' money may have been pooled in this transaction.  Yet all of Plaintiffs' money is gone.

35.     The Burjside Building was never even actually built. A different building, called The Signature, which consists of 50 floors rather than 35 floors was built much later in a similar location by Damac.

36.     The Debtor refused to produce any legitimate or meaningful communications with Bode, although he admitted that he has recently been in touch with Bode.

37.     The Debtor also told Plaintiff Vagnerova that her ownership interest was on the 19th floor of the Burjside Boulevard Building rather than the 16th floor. This was an inconsistent lie, among many other lies and acts of fraud that will be discussed herein.

38.     The Debtor incurred the debt to Plaintiffs by false pretenses, false representations and actual fraud as provided in 11 U.S.C. § 523(a)(2)(A).

7

39.     The Debtor incurred the debt to Plaintiffs by making statements that were materially false, respecting the Debtor's or an insider's financial condition, on which Plaintiffs reasonably relied and which the Debtor made with intent to deceive as provided in 11 U.S.C. § 523(a)(2)(B).

40.     The Debtor incurred the debt to Plaintiffs through fraud and defalcation while acting in a fiduciary capacity, through embezzlement and through larceny as provided in 11 U.S.C. § 523(a)(4).

41.     The Debtor incurred the debt to Plaintiffs through fraud and defalcation while acting in a fiduciary capacity, through embezzlement and through larceny as provided in 11 U.S.C. § 523(a)(6).

**Repeat Offender of Financial Crimes:  Background of Defendant Simone**

42.     The Debtor's long-standing pattern of stealing money from people who trust him is consistent and well-documented.

43.     The Debtor was a stock broker in the 1990s before he was arrested in 1997 and prosecuted by the Manhattan District Attorney's office for stealing over $800,000.00 of his clients' money. **Ex. A** (*People v. Simone*, 771 N.Y.S.2d 469 (N.Y. Sup. Ct., New York County December 8, 2003)).

44.     In 1998, the Debtor pled guilty and was convicted of second-degree grand larceny. He was sentenced to five years' probation. **Ex. B** ((New York County, People of the State of New York v. Richard Simone, et al, Case No. 03702-1997, certified conviction, 1998).

45.     In the 1990s, for these crimes and other additional misconduct, the Debtor was disbarred by the SEC and NASD and found to be in violation of Section 17(a) and Section 10(b) of the 1934 Act. Since the late 1990s, the Debtor has been banned by the SEC and NASD from

trading securities or associating with any broker dealer. **Ex. C** (SEC and NASD sanctions, disbarment and prohibition from associating with any broker dealer).

46.    A condition of the Debtor's criminal probation was that he was barred from managing money or making trades or investments on behalf of others. At his probation violation hearing in 2003, the Debtor lied to a New York judge under oath about his business activities. The New York judge who was overseeing the Debtor's probation asked the Debtor if he was still trading money for persons other than himself while on probation, which was prohibited pursuant to the special conditions of his probation. Under oath, the Debtor stated (falsely): "I swear under oath that I am not, Sir." Ex. A (*People v. Simone*, 771 N.Y.S.2d at 472).

47.    The Debtor's false statement to the judge led to a charge of perjury and an investigation where a second set of international financial fraud crimes were uncovered. Not only was the Debtor still managing money for persons other than himself, despite an order by the Court and contrary to his false statement to the judge under oath, Defendant Simone was, again, stealing his investors' money. After an investigation by the Chief of the Proceeds of Crime Unit of the Manhattan District Attorney's Office, an expert financial crimes investigator, the New York Supreme Court made the following findings:

> Sometime between 1998 and 1999, [the Debtor] began trading securities on behalf of five companies located in the Isle of Man…[the Debtor] effectively was the custodian of money not his own, much as he had been as a broker, a position he apparently hoped to resume sometime after his probation.

> [the Debtor] employed a ruse to trick the trustees into authorizing what appeared to be routine wire transfers of money from one Isle of Man account to another. He supplied the trustees with the name of an Isle of Man account into which the money should be deposited and an account number. Unbeknownst to the trustees, defendant had supplied the account number for Simone Development at Salomon Smith Barney, not the Isle of Man account.

The financial management account at Salomon Smith Barney for Simone Development contained numerous debits for what appeared to be everyday personal expenses…For 2002, those expenses totaled $206,656.44 in withdrawals, credit card activity, and checks drawn on the account. [the Debtor] had tricked the Gubay trustees into authorizing the transfer of that money…hundreds of thousands of dollars form the Isle of Man accounts to the Salomon Smith Barney Simone Development account.

[the Debtor] employed a scheme that manipulated the trustees into wiring wire transfers that appeared on their fact to send money to an Isle of Man account at Salomon Smith Barney, but which actually routed money into the Simone Development account at the same institution. Contrary to [the Debtor]'s suggestion at the hearing, these transfers did not occur because of error. As of December 2, 2002, more than $200,000 had flowed into the Simone Development account. Yet the hearing record contains no evidence that [the Debtor] alerted the trustees to the existence of these transfers, tried to return this money from following into his account.

An honest person would have taken any one of these steps had the money found its way into that account by accident or mistake. Instead [the Debtor] commingled the Isle of Man money with the money that he used to pay his personal expenses, and used the commingled funds to pay for everyday expenses.

[the Debtor] thus had devised a scheme that was carefully crafted to provide an excuse if the transfers were discovered but which could continue as needed if not discovered…The court rejects the idea that [the Debtor], a former registered stock broker who stole hundreds of thousands of dollars from one client, genuinely believed that the court wanted information only about his own stock accounts but not about stock accounts that he managed for others…[the Debtor] also lied…[the Debtor] again lied to the court when he denied having sent money to any other "individual" except his father…And having lied earlier about the number of stock accounts under his control, [the Debtor] cannot now leverage that lie to argue that that answer was literally true for the funds contained in his own personal account. Consequently, the court is convinced that [the Debtor] lied.

*Id*. at 473-83.

48.     In essence, the Debtor stole the money of his family members which was supposed to be invested, and the Debtor instead diverted those investment funds into an account that he personally controlled to use for his own everyday personal expenses. The Debtor

attempted to argue that the investment money "found its way into that account by accident or mistake." The New York Supreme Court categorically rejected this notion and made multiple findings that the Debtor lied.

49.     Pursuant to the Debtor's second criminal case in Manhattan, the Debtor pled guilty and was convicted of attempted third degree grand larceny. His probation was revoked, and he was sentenced to 18-54 months in prison. **Ex. D** (New York County, People of the State of New York v. Richard Simone, Case No. 03328-2003, certified conviction, 2005).

50.     The Debtor served approximately 18 months in prison in New York at Rikers Island and was released in 2007. The Debtor immediately commenced upon yet another fraudulent scheme to steal money from investors who trusted him through another overseas investment scam. The third scheme, at issue here, is a fake real estate transaction purportedly for the purchase of a "whole floor" of nine residential units in a pre-construction building in Dubai.

51.     Despite the Debtor's false representations from 2007 through 2016, and beyond, the Debtor never actually purchased any real estate. The Debtor has now admitted that he never purchased any real estate despite his prior false statements. There is no purchase and sale agreement, let alone any signed purchase and sale agreement. The so-called signed "unit reservation contract" that the Debtor showed to Plaintiff Woolf has nothing to do with a closing or a consummation of a real estate transaction.  It does not even bear the name of the purported Developer named Damac.

52.     Moreover, this so-called contract is almost certainly a forgery with visible markings of what appears to be white-out. The Debtor actually produced two different versions of the same forged contract to two different people at two different times. In the two different versions, the Debtor's signature is different, the so-called counterparty's signature is different,

the dates are different and other aspects of the documents do not match. Those fake and forged documents will be further discussed herein. By definition, at least one of these contracts is a forgery. Given that the Debtor apparently forgot that he showed one version of the fake document to one person and a different version of the fake contract to another person, it is highly likely that both versions of the so-called contract are forgeries.

### The Phony Dubai Investment Scam

53.     The Debtor was released from prison on parole in 2006 or 2007.

54.     Prior to this juncture, and continuing after this juncture, the Debtor had established a fiduciary relationship with each of the Plaintiffs.

55.     The Debtor's relationship with Plaintiff Woolf dates back over 30 years to the early 1980's when the Debtor and Plaintiff Woolf attended college together at Boston University.

56.     The Debtor and Plaintiff Woolf were good friends in college and they both obtained their undergraduate degrees from Boston University in the same year, in 1985.

57.     The Debtor graduated with a degree in finance.

58.     Over the years since 1985, the Debtor established and touted his expertise to Plaintiff Woolf as an expert in matters involving finance and investments.

59.     Throughout the years, the Debtor continued to build and foster the fiduciary relationship between himself and Plaintiff Woolf.

60.     The Debtor made Plaintiff Woolf aware of his extensive experience as a stock broker at major investment banks on Wall Street in the 1980's and 1990's. The Debtor and Woolf remained good friends during this time. On many occasions, over the course of decades, the Debtor touted his knowledge to Woolf on matters pertaining to finance and investments and particularly international investments.

12

61.     Although Woolf is an attorney, Woolf does not have the decade of experience that the Debtor had working with securities on Wall Street. Based on the close nature of their friendship, Woolf's knowledge of the Debtor's experience as a stock broker on Wall Street and numerous verbal and written specific representations made by the Debtor regarding his sophistication in the realm of securities and investments, Woolf trusted the Debtor. There existed a longstanding fiduciary relationship between Woolf and the Debtor as it relates to the subject matter of this action.

62.     The Debtor publicly represented on one of his social media pages that he worked as a broker for Lehman Brothers, Deutsche Bank Alex Brown and Prudential Bache Securities.

63.     The Debtor represented that as a Stockbroker at Lehman Brothers from 1989-1992, he developed a "book of clients" of "high net-worth individuals all of the US and Great Britain."

64.     The Debtor represented that as a Vice President at Alex Brown & Sons from 1992-1995, he "developed business with executives of companies who were investment banking clients of the firm, assisted with their restricted stock transactions and managed their investments in stock and bond markets."

65.     The Debtor also represented that as a Vice President at Alex Brown & Sons as a Vice President, he "started to move from a transaction-oriented business to more of a manged [sic] money business."

66.     The Debtor represented that as a Managing Director at Rickel & Associates from 1995-1997, he continued "building my book of high net-worth clientele in a boutique firm and helped my clients with manage [sic] their portfolios in financial markets. Helped find companies

to take public, assisted with underwriting them, raised money for private placement and helped place stock for their initial public offerings."

67.  The Debtor represented that as a Head Trader at Millenium Capital Partners from 1998-2012, he "handled everything from researching the equity markets, deciding which stocks to trade, to the execution side which included buying, selling, building positions, managing risk and monitoring the positions in the portfolio. We traded both long and short positions in the markets utilizing a momentum style."

68.  The Debtor represented that his tenure as a Head Trader at Millenium Capital Partners from 1998-2012 spanned "14 years" with 1998-1999 in NYC, 2000-2005 in Miami, 2006-2007 in NYC and 2008-2012 in Dubai.

69.  In fact, however, no company named "Millenium Capital Partners" exists, or has ever been registered to exist, in New York or Florida. No company named "Millennium Capital Partners" (with an alternate spelling) exists, or has ever been registered to exist, in New York. No company named "Millennium Capital Partners" (with an alternate spelling) exists in Florida. One company named "Millennium Capital Partners" (with an alternate spelling) was established in Florida in November 1999 but was dissolved in February 2002. This company has no relationship with Defendant Simone.

70.  In fact, however, on November 4, 1999 the SEC permanently barred the Debtor from associating with any broker dealer.

71.  Moreover, the SEC's proceedings against the Debtor had only been continued from 1996 to 1999 because of the Manhattan District Attorney's investigation of the Debtor pursuant to his first criminal case, which resulted in Defendant Simone's ensuing criminal indictment and December 4, 1997 felony conviction for Second Degree Grand Larceny. Ex. B.

14

On December 6, 1996 the Securities and Exchange Commission ("Commission") issued an order postponing these proceedings at the request of the District Attorney of the County of New York to permit the grand jury impaneled by the District Attorney to complete its investigation into the conduct of the respondents in this action and to file any resulting indictments. Since that time, respondents Andrew Bressman, Roman Okin, Richard Acosta, **Richard Simone**, Mark Goldman and Jack Wolynez have been **indicted by the grand jury and criminally convicted** in connection with their activities while employed at A.R. Baron & Co., Inc.

Ex. C (emphasis added).

72. As noted above in the initial sections of this Complaint, the Debtor's five years of felony probation (that he was subsequently found to have violated and for which his probation was revoked), began on December 12, 1998. A condition of the Debtor's probation was the Court's prohibition of the Debtor from associating with any broker dealer or trading any securities or accounts on behalf of others.

73. Yet despite these actual legal prohibitions effectuated by the Supreme Court of New York, the SEC and the NASD which were put into effect in the late 1990's, the Debtor has consistently represented, and continues to represent (to this day), that as a Head Trader at Millenium Capital Partners from 1998-2012, he:

- Handled everything from researching the equity markets, deciding which stocks to trade, to the execution side which included buying, selling, building positions, managing risk and monitoring the positions in the portfolio. We traded both long and short positions in the markets utilizing a momentum style.

- Tenure as a Head Trader at Millenium Capital Partners was from 1998-2012 and spanned "14 years" with 1998-1999 in NYC, 2000-2005 in Miami, 2006-2007 in NYC and 2008-2012 in Dubai.

74. On April 12, 2008, the Debtor represented in writing that he was the "Managing Director" of "Global Capital Partners" and had been in that position for "4 years." Also on April 12, 2008, in writing, the Debtor represented that his salary after taxes as a Managing Director at

Global Capital Partners is $100,000 and that his bonus is $500,000 to 1 million, for a total income from Global Capital Partners of $600,000 to $1,100,000.

75.     However, on August 21, 2018, the Debtor admitted that he never worked for Global Capital Partners. Accordingly, the Debtor's representation that he was a Managing Director for Global Capital Partners is an admitted lie.

76.     The Debtor further touted his purported expertise and represented that as a Senior Associate at Bensen & Associates from 2012-2014, he "developed relationships with hundreds of institutional players in the NYC commercial property market ranging from real estate investment trusts, to private equity funds, to operators to family offices. I helped them raise capital and structure deals by matching aggressive operators with aggressive lenders and equity partners." The Debtor represented that as a Managing Director at Buckingham Realty Advisors from 2015-2018, he "has worked with investment sales of hotels, office buildings, development sites, multifamily, mixed use, commercial, and retail properties and has been known in the industry for his discreet way of doing business. Prior to embarking in real estate, Richard worked on Wall Street. He spent 10 years as a broker and worked for firms Lehman Brothers, Deutsche Bank Alex Brown and Prudential Bache Securities. In the late 90s, he became a trader first with his own capital and then later raised money from high net worth investors. He also lived in Dubai for 3 years where he continued to trade and also syndicated a couple real estate deals."

77.     But on August 21, 2018, the Debtor admitted that he never actually purchased property from Damac for 27,100,000 Dirham and that he never held title to any real property on the 16th or 19th floor of the Burjside Boulevard building in Dubai.

78.     Plaintiff Vagnerova and the Debtor were romantically involved. In the process of being romantically involved, on and off, Debtor established a fiduciary relationship with

Vagnerova and he subsequently used his fiduciary relationship with Vagnerova to steal Vagnerova's $120,000.00 pursuant to the Debtor's scheme.

79.     Plaintiff Vagnerova was born in the Czech Republic and she moved to New York in 1999 to study at Columbia University. She is a single mother, PhD and counselor who currently lives in Los Angeles, California with her 14 year old son. In 2002, Plaintiff Vagnerova met the Debtor in New York after being connected by a mutual friend. At times, the relationship between Plaintiff Vagnerova and the Debtor was romantic in nature. However, during the majority of the time since 2002, Plaintiff Vagnerova and the Debtor were friends.

80.     Plaintiff Woolf introduced Plaintiff Katz to the Debtor prior to 2007 and Plaintiff Katz and the Debtor became good friends. The Debtor made multiple representations to Plaintiff Katz that were false and fraudulent in nature to induce Plaintiff Katz to invest $150,000.00 in the Burjside Boulevard building.

### Debtor's False Representations to Plaintiff Woolf

81.     In 2007, the Debtor represented to Plaintiff Woolf that the Debtor knew about a very lucrative real estate investment in Dubai, United Arab Emirates.

82.     The Debtor solicited Plaintiff Woolf to invest his money with the Debtor in what the Debtor described as a joint or pooled purchase of units in a pre-construction building in Dubai.

83.     As represented by the Debtor, the building was called "Burjside Boulevard" and the developer was Damac Properties, a well-known and reputable Arab Emirates ("UAE") real estate developer.

84.     In the latter part of 2007, the Debtor represented to Plaintiff Woolf that the "investment" consists of the entirety of Floor 16, which is comprised of nine units of one, two-

and three-bedroom layouts, of the pre-construction Burjside Blvd building (the so-called "Investment").

85.     In 2007, the Debtor stated that he had invested $500,000 of his own money and that he was collecting a total of $4.5 million from various other investors for the Investment and that if Plaintiff Woolf invested $225,000.00, he would receive a corresponding share of ownership of this Investment.

86.     In 2007 and 2008, the Debtor made numerous superlative and false statements regarding the Investment, which were known to be false and which were designed to induce reliance and cause Plaintiff Woolf to invest. These false statements combined with the fiduciary relationship of trust and confidence between Plaintiff Woolf and the Debtor caused Plaintiff to reasonably rely and invest his money with the Debtor.

87.     At the Debtor's direction, and in reasonable reliance on the Debtor's false representations, on or about November 2, 2017 and March 6, 2008, Plaintiff Woolf wired and/or sent checks totaling $225,000.00 (the "Woolf Funds") to the Debtor's attorney Tony Chang in New York to hold in escrow in Tony Chang's HSBC trust account.

88.     The Debtor told Plaintiff Woolf that the Woolf Funds would be tendered to the Developer for the Investment by Chang, as the Debtor's agent. However, this representation was false. The Debtor subsequently represented that the Woolf Funds pursuant to the Investment were tendered to the Developer.  This was also a lie.

89.     The Debtor did not actually direct his attorney Chang to wire the Woolf Funds to the Developer as he said he would. Instead, the Debtor directed Chang to wire the Woolf Funds, and the funds of other investor/victims, to an offshore account controlled by the Debtor in the name of his accomplice, Bode, at Standard Chartered Bank.

90.     Bode was not the developer, owner or seller of any real estate in Dubai. Bode was the Debtor's accomplice in the scheme to defraud. The Debtor expressly represented to Plaintiff Woolf, many times up through May 2016, that Bode had virtually no involvement. However, the bank records show that Bode housed the money and the Debtor lied about it.

91.     The Debtor did not present Plaintiff Woolf with a purchase and sale agreement, condominium documents or any documents that would reflect the existence of a legitimate real estate transaction. When Plaintiff Woolf asked for these documents, the Debtor falsely represented up through 2016 that Plaintiff Woolf jointly owed the real property pursuant to the Investment. However, the Debtor represented that he supposedly didn't know where any of the purchase and sale or transaction documents were because they "may be in storage in Dubai" with "a friend."

92.     When Plaintiff Woolf asked in 2016, the Debtor couldn't even name which building the purported investment was in. This is because the Burjside Boulevard building was never built. The Debtor represented to Plaintiff Woolf and Plaintiff Katz in 2016 that they "may own" in a building called "The Signature" instead of Burjside Boulevard. This was also a lie.

93.     In fact, Plaintiff Woolf's "investment" was in neither building, as the Woolf Funds were stolen, hidden and/or laundered by the Debtor with the assistance of Bode.

94.     As time passed after November 2, 2007 and March 6, 2008, Plaintiff Woolf did not receive an equity share of real property as the Debtor had consistently represented up through 2016. For the first time in April 2017, the Debtor admitted that some investors' (the Plaintiffs') money was purportedly now completely gone.

95.     Nevertheless, from 2007 through 2016, the Debtor had told Plaintiff Woolf a variety of contradictory lies to about the nature and status of the purported investment and the Woolf Funds.

96.     The Debtor continued to represent to Plaintiff Woolf numerous times from 2007 through 2016 that "everything is fine" regarding his investment.

97.     The Debtor never told any of the Plaintiffs that their money was "seized" by the "Developer" or anything remotely similar to that story until 2017 after the Debtor was sued. The Debtor told Plaintiffs that their investments were fine all the way through May 2016. Then in April 2017, the Debtor claimed for the first time that Plaintiffs' money was supposedly "seized" by the Developer sometime before 2010.

98.     And for the first time, in August 2018, the Debtor admitted that he never owned any real estate on the 16th or 19th floor.

99.     These revelations, particularly the revelations in 2018, were monumental because through August 2018, the Debtor had maintained and consistently represented that the sales transaction had been consummated. For the first time in August 2018, the Debtor admitted that he never actually held title, which would reflect the consummation of an actual transaction.

### Debtor's False Representations to Plaintiff Katz

100.    In 2007, the Debtor told Plaintiff Katz and Plaintiff Woolf that their investment would be pooled with other investors for a $4 million or $5 million purchase of the entire "16th floor" in a preconstruction building in Dubai called "Burjside Boulevard" that was to be built by "Damac."

101.    On a telephone call with Plaintiff Katz in 2007, the Debtor stated that he had invested $500,000 of his own money and that he was collecting a total of $4.5 million from

various other investors for the Investment and that if Plaintiff Katz invested $150,000.00, he would receive a 7% share of this Investment.

102.     The Debtor's representations in this regard were false, the Debtor knew that the representations were false when he made them, the false representations were designed to induce Plaintiff Katz to provide money to the Debtor and Plaintiff Katz reasonably relied on the Debtor's false representations.

103.     As a result of the Debtor's false representations, on or about November 2, 2007, at the Debtor's direction, Plaintiff Katz wired $150,000.00 of his money (the "Katz Funds") to the Debtor's agent and attorney, Tony Chang, pursuant to the Debtor's instructions.

104.     The Debtor told Plaintiff Katz that the Katz Funds would be tendered to the Developer for the Investment by Chang, as the Debtor's agent. However, this representation was false. The Debtor subsequently represented that the Funds pursuant to the Investment were tendered to the Developer.  This was also a lie.

105.     The Debtor did not actually direct his attorney Chang to wire the Katz Funds to the Developer as he said he would. Instead, the Developer directed Chang to wire the Katz Funds to an offshore account controlled by the Debtor in the name of his accomplice, Bode, at Standard Chartered Bank.

**Debtor's False Representations to Plaintiff Vagnerova**

106.     By 2006, Plaintiff Vagnerova had moved from New York to California.

107.     Between 2006 and 2008, the Debtor came to California to visit Plaintiff Vagnerova three or four times. Beginning in 2007 and continuing into 2008, the Debtor began talking to Plaintiff Vagnerova about an investment in Dubai. Numerous times in 2007 and 2008, in person and via text message or telephone, in interstate commerce and/or through the mails, the

Debtor repeatedly solicited Plaintiff Vagnerova to "invest" money with him purportedly in a Dubai real estate transaction.

108.    Through manipulation, the Debtor preyed on Plaintiff Vagnerova's status as a single mother of a four year old boy. The Debtor told Plaintiff Vagnerova that she should "do it for her son" [i.e., invest her money with him] and to "not be stupid" because this is a "once in a lifetime opportunity." The Debtor made the following specific statements to Plaintiff Vagnerova in 2007 and/or 2008 before Plaintiff Vagnerova invested money.

- "You can triple your money in less than a year"
- "This is a huge opportunity"
- "This is a once in a lifetime opportunity"
- "Don't be stupid"
- "You can get this money to pay for your son"
- "Everybody is doubling and tripling their money in less than a year"
- "If you invest $120,000.00, you'll probably have another $200,000.00 or $400,000.00 in less than a year"

109.    When Plaintiff Vagnerova told the Debtor that she did not have $120,000.00 in cash available sitting in a bank, the Debtor told her to take out a mortgage and he was very persistent.    At certain times in 2007 and/or 2008, the Debtor called and texted Plaintiff Vagnerova every day soliciting her to invest money in the purported Dubai real estate transaction for Burjside Boulevard.

110.    On or about February, 2008, Plaintiff Vagnerova eventually relented to the Debtor's high pressure sales tactics, in part because she trusted the Debtor as a close friend and former romantic partner.

111.    At the Debtor's insistence, Plaintiff Vagnerova took out a mortgage at a very unfavorable 10% rate backed by a property she owns in the Czech Republic.

112.    On March 10, 2008, with the proceeds from her mortgage at a 10% rate, Plaintiff Vagnerova wired $120,000.00 to the Debtor's accomplice, Bode, as directed by the Debtor.

113.    The Debtor provided Plaintiff Vagnerova with Bode's bank wire information and specifically directed Plaintiff Vagnerova to wire the money to Bode. A $120,000.00 wire was sent as the Debtor directed.

114.    The Debtor sent Plaintiff Vagnerova confirmation that Plaintiff Vagnerova's $120,000.00 was received.

115.    The Debtor represented to Plaintiff Vagnerova that Bode would remit her money to Damac, the Developer, for the purchase of the entire floor 16 of the Burjside Boulevard Building.

116.    The Debtor did not present Plaintiff Vagnerova with a purchase and sale agreement, condominium documents or any documents that would reflect the existence of a legitimate real estate transaction. Multiple times, including specifically in 2014, the Debtor falsely (and illogically) told Plaintiff that she would receive documents when the deal "closes."

117.    After Plaintiff Vagnerova paid $120,000.00, the Debtor told her that he had bought the whole 9th floor for $2 million. The Debtor told Plaintiff Vagnerova that the other "investors" in the 9th floor included the Debtor's father and the Debtor's sister.

118.    The Debtor also told Plaintiff Vagnerova that Plaintiff Woolf was one of the investors on the 9th floor of Burjside Boulevard for $2 million.

119.    The Debtor had told Woolf that his investment was part of a $4 or $5 million investment in the "16th floor," not the "9th floor" of the Burjside Boulevard Building.

120.    All these representations were false and known to be false when made by the Debtor. These false representations, regarding the purchase of the "whole 9th floor" for $2 million" are inconsistent with the Debtor's other false representation to Woolf that he joined in

the purchase of the "whole 16th floor" for "$4 or $5 million." In fact, no purchase had been made whatsoever.

121.    After Plaintiff Vagnerova paid $120,000.00, the Debtor brought Plaintiff Vagnerova to Dubai and showed her a construction site which supposedly pertained to a proposed building called Burjside Boulevard.  While in Dubai, the Debtor also introduced Plaintiff Vagnerova to Bode, who the Debtor described to Plaintiff Vagnerova as his "business partner for real estate" and his "friend."

122.    Plaintiff Vagnerova knew that it would be some time before the investment yielded results because the investment supposedly pertained to a pre-construction building that was not yet built. However, over the ensuing years, the Debtor became evasive and he avoided putting updates in writing.

123.    On July 20, 2011, the Debtor sent Plaintiff Vagnerova an email where he indicated that Plaintiff Vagnerova can check the status of her investment by looking at the damacproperties.com website under "project: Burjside Boulevard."

124.    In this email, the Debtor indicated that "Damac is building this and they have pictures of progress dated July 2011."

125.    On September 16, 2011, the Debtor sent another email reply referencing the damacproperties.com website and the project name Burjside Boulevard.

126.    In or around 2014, the Debtor sent Plaintiff Vagnerova a one-page data sheet with a Google map and the Debtor represented to Plaintiff Vagnerova that the sheet reflects a part of Plaintiff Vagnerova's purported "investment." The document reflects a description and photographs of a 916 square foot one bedroom two bathroom "fully serviced 5 star apartment" in "The Signature."

127.    The Debtor had previously told Plaintiff Vagnerova, up through 2014, that her investment was in a building named "Burjside Boulevard" rather than "The Signature."

128.    Nevertheless, from 2008 through 2014, the Debtor continued to tell Plaintiff Vagnerova a variety of contradictory lies to about the nature and status of Plaintiff Vagnerova's purported investment.  But he nevertheless assured her that "everything was fine" regarding her investment.

129.    For example, Plaintiff Vagnerova visited the Debtor in New York in 2011 and the Debtor gave assurances to Plaintiff Vagnerova at that time. The Debtor represented that he would provide Plaintiff Vagnerova with paperwork regarding the deal "when it closes."

130.    The Debtor showed Plaintiff Vagnerova a computer screen indicating that he had raised the full $2 million that he needed to raise. The Debtor told Plaintiff Vagnerova that the Debtor's father invested $400,000.00 and his sister was investing $200,000.00 and with the investments from the Debtor's friends "Rodney and Andrew Woolf," he had all the money he needed and that everything was fine. The Debtor continued to make these false representations to Plaintiff Vagnerova through 2014.

131.    In or about March or April 2014, the Debtor visited Plaintiff Vagnerova in California. It had now been almost six years since the Debtor induced Plaintiff Vagnerova to provide him/his agent with $120,000.00 and Plaintiff Vagnerova had not seen any return on this purported investment, despite the numerous, consistent (and false) representations verbally and in writing from the Debtor that everything was fine with the investment.

132.    At this meeting between Plaintiff Vagnerova and the Debtor in California in March or April 2014, Plaintiff Vagnerova insisted on seeing the paperwork related to the purported transaction. The Debtor stated that the paperwork was "on its way." The Debtor

assured Plaintiff Vagnerova that the Debtor's attorney would send her the paperwork within one week.

133.     The Debtor also told Plaintiff Vagnerova that the "closing" is due at the end of the summer in 2014 and Plaintiff Vagnerova will be "paid" at that time.

134.     A week passed following the Debtor's visit in the spring of 2014, and Plaintiff Vagnerova did not receive any paperwork. Plaintiff Vagnerova reached out to the Debtor to check the status of the paperwork. But the Debtor did not reply. The Debtor and Plaintiff Vagnerova had been friends and on and off romantic partners for 12 years and now the Debtor had become completely unresponsive to Plaintiff Vagnerova.

135.     Plaintiff Vagnerova continued to reach out to the Debtor and his family members following the spring of 2014, but the Debtor remained completely unresponsive. The Debtor's purported "lawyer" did not send Plaintiff any paperwork.

### Fake Documentation and Exposure of the Scam

136.     In 2015 and 2016, Plaintiffs Woolf and Katz got in touch with each other and began posing more direct questions to the Debtor about the status of their investment money that they placed with him, supposedly for the purchase of the floor 16 in the Burjside Blvd building.

137.     Back on October 11, 2007, the Debtor provided prospective investors and members of the public, including all three Plaintiffs, through the mails and electronically, a document on the Debtor's personal letterhead entitled Term Sheet for Burjside Boulevard Investment ("Term Sheet"). **Ex. E.** (Term Sheet).

138.     The Debtor personally explained the Term Sheet to each Plaintiff in 2007 or 2008.

139.     Pursuant to this Term Sheet, the total investment amount was to be "approximately $5.0 million USD dollars" for investors to pool their money under the Debtor's

custody and control. The Debtor was acting as both the broker of a real estate transaction and the broker of a security. The Debtor was also acting as a trustee of the Plaintiffs' funds.

140.    The Debtor, a former stockbroker, however, made no disclosures of the risk or detailed nature of the Investment. The Debtor represented that the Investment was for an "entire floor" in a "super luxury service apartment." The investors' "monies will be wired to an escrow account with my US attorney but may be sent upon instruction from time to time directly to developer."

141.    The Debtor represented many times, including under oath (falsely), that this money was "wired to the developer," the well-known Dubai real estate developer named Damac.

142.    However, bank records indicate that none of the Plaintiffs' money was wired to Damac or any developer. All the money was sent to Bode, at the Debtor's direction. The Debtor directed Tony Chang to wire the money to Bode, and not Damac. After Bode received the investors' money, the Debtor and his accomplice and co-conspirator, Bode, held the money for several years after 2008.

143.    There was no legitimate, proper or lawful reason for the Plaintiffs' money to be held by Bode rather than the Developer.

144.    Bank records indicate that the Debtor collected at least $1,519,217.64 from investors by early 2008 that he funneled into an account held in Bode's name at Standard Chartered Bank. None of this money was sent by the Debtor to the developer Damac.

145.    On April 2, 2008, Bode wired $784,000.00 to himself and then proceeded to divide up that money through a convoluted sequence of complex and opaque bank transactions and smaller wires to other accounts that Simone and Bode controlled.

146.     The remaining $735,217.64 that the Debtor orchestrated to be funneled into Bode's Standard Chartered Bank account in 2007 and 2008 remained in Bode's account until 2010, long after Defendant Simone told his investors that the purchase of the real estate had been made and the investment funds had supposedly been sent to the Developer.

147.     Moreover, no "seizure" of funds by Damac could have occurred because Plaintiffs' money sat in Bode's account through 2010.

148.     Meanwhile, the Debtor told lie after lie, spanning from 2007 through 2018, including lies to the Court, that Plaintiffs' money was supposedly "wired to the Developer." As further discussed herein, in litigation, the Debtor produced fake documents purporting to show the front of "cashier's checks" supposedly paid to Damac. The Debtor's assertion that Plaintiffs' money was paid to Damac by (untraceable) purported "checks" is inconsistent with the Debtor's representations that Plaintiffs' money was "wired" to Damac. The Debtor failed to produce any bank records reflecting that any of Plaintiffs' money was paid to Damac.

149.     At some point between 2007 and 2016, Plaintiff Woolf asked the Debtor to show him a copy of the contract that the Debtor claimed he had executed with Damac, the Developer, pursuant to the so-called Investment.  At some point between 2014 and 2016, the Debtor showed Plaintiff Woolf a three-page document and the Debtor told Plaintiff Woolf that this document was the contract with Damac pursuant to the investment ("Fake Contract Version #1").  **Ex. F.**

150.     Fake Contract Version #1 is as follows, in its entirety:

212 227 0927

p.2

29 07 01:21p    Rich Simone

**Unit Reservation Contract**
Please reserve the following unit for me/us:

ARF No:

PROJECT  **BURNSIDE BOULEVARD**

Buyer's Details:
Title: MR   First Name: RICHARD P   Last Name: SIMONE

Nationality: _____   Passport No.: _____
(for individuals)

Commercial Registration No.: _____ Date: _____ Place of Registration _____
(for non-individuals)

Address for Communication: (Please give complete details, including Tel/Fax nos./email)

Correspondence Address: 50, MURRAY STREET

City: New York   Zip/Postal Code: _____   Country: USA

Alternate Address: _____
(if different from above)

City: _____   Zip/Postal Code: _____   Country: _____

Phone: 00 1 212 227-0927   Mobile: _____

Fax: _____   email: _____

Joint Buyer Details (if applicable and only if the First Buyer is an individual):

Title: _____ First Name: _____   Last Name: _____

Nationality: _____   Passport No.: _____

Unit Details:    Price Details: (in AED)

Floor: 16th   Unit Price: AED. 1900 /—
Block/Tower: POLF BER
Unit Ref. No.: SG2F FT AED 1900   Extra Options: _____
Type:
Size (sq. ft.): 9814   Total Price: AED. 18646600 /—

Permitted Use: _____   Option chosen : _____

Deposit Details:
Please note that all amounts paid against this reservation should be paid by crossed cheque/draft, credit card, TT or Wire transfer to the developer's account. However, sums up to AED 10,000 (AED Ten Thousand only) or equivalent can be paid in cash against official stamped receipt.

Receipt No.: _____   Payment Method: _____

Date: _____   Type: _____

Amount: _____   Currency: _____

I/We hereby confirm that this project has been introduced to me/us by:

Signed on behalf of the Buyer by: Name: Richard Simone   Signature: _____ Date: _____

Signed on behalf of the Joint Buyer by: Name: _____   Signature: _____   Date: _____

212 227 0927                                      p.3

07 01:22p     Rich Simone              Page - 2.
                                 Sheet:        UNIT NO.: FLOOR 16

PROJECT      BURKSIDE BOULEVARD

I/We agree to abide by all terms and conditions as applicable to units in the project.
I/We am/are aware that by signing this Unit reservation contract, I/we hereby enter into a binding contract with the Seller for purchase of the above Unit and is subject to:

1.  The payment of the outstanding balance of the deposit of AED _____ ) by not later than _____

2.  This contract shall be subject to automatic termination in the event the Buyer fails to remit the Deposit in full within the time limit stated in clause 1

3.  My/Our signing the detailed Agreement of Sale on the standard format of the Seller (a copy of which has already been provided to me/us for reference) for this Unit within one week of being provided for execution and subsequent payments as per the following payment schedule below to be remitted by me/us to the Seller's designated bank account in Dubai;

| Deposit | 10% | On reservation |
| 1st installment | 10% | Within 30 days of reservation |
| 2nd installment | 10% | Within 120 days of reservation |
| 3rd installment | 10% | Within 180 days of 2nd installment due date or completion of piling, whichever is earlier. |
| 4th installment | 10% | On completion of Podium Structure |
| 5th installment | 10% | On completion of 10th floor Structure |
| 6th installment | 10% | On completion of 20th floor structure |
| 7th installment | 10% | On completion of 30th floor structure. |
| 8th installment | 20% | On completion date |

4.  In case the payments above are not realized and/or the detailed Agreement of Sale is not signed as per clause (1) and (3) above, the penalty (2% per month for late payment shall apply. The Seller shall also have an option to terminate the reservation, and in order to mitigate the Seller's losses arising out of termination of this reservation, sell or otherwise dispose off the Unit as it deems fit without any further reference to me/us. In such an event, all monies paid by me/us, including the money in terms of clause (1) and (3) above, is also subject to forfeiture in full and shall not be refunded back to me/us.

5.  The above forfeiture and damages shall also be applicable, in case I/we decide not to go ahead with the purchase of the above Unit and request the Seller to terminate the sale transaction.

6.  The finalization of the plans and their approval by the competent authorities and other variations therein that may be necessary, I/We am/are aware that at the time of this reservation, the designs and size of the floors/units are not final. I/We hereby agree to accept the final plans and designs when available.

7.  Any change, addition/deletion of a joint buyer shall be subject to prior approval of the Seller and would be subject to the payment of the prevailing administrative fees.

8.  Any assignment of the Unit shall be subject to prior approval of the Seller and the Master Developer, if applicable and would be subject to the payment of the prevailing administrative fees and assignment fee and advance payment of the installment may due.

9.  My/Our bearing all exchange rate differences and/or bank charges, including credit card transactions charges as applicable.

10. The Buyer shall comply with terms and conditions as applicable to units in this project and/or as notified by the Master Developer or any other Competent Authority from time to time.

11. I/We shall use the Unit for the permitted use only and shall not be used  for any other activities that may be restricted by I/we and/or Master Developer.

12. For Units permitted for any use other than residential, the Buyer shall ensure that they/their tenants/authorized users obtain all required approvals and licences from relevant authorities as applicable to the permitted use of the Unit. However, if the intended use requires any specific requirements relating to power, air-conditioning, gas, drainage and exhaust, the same shall have to be discussed and agreed upon between the Buyer and Seller. Such arrangements may require additional payments for the same.

13. This reservation is legally binding on me/us and that is in no way subject to or depends upon my/our ability to secure a mortgage loan or finance from a bank or any third party. In case, I/we fail to obtain such mortgage, loan or finance and fail to honour my/our commitments under this Reservation, the monies paid by me/us shall not be refunded to us.

14. The Agreement of Sale will be issued by the Seller in due course on it's standard format. In the meantime, I/we shall continue to abide by the payment plan and other terms and conditions of the Unit Reservation Contract.

15. Once the detailed Agreement of Sale is executed, this Unit Reservation Contract shall cease to be effective.


Signed by Sole/First Buyer : Name _____ Signature _____

Signed by Joint Buyer    : Name _____        Signature _____


SUBJECT TO CONDITIONS ON PAGE 1 – 3                    (PLEASE SIGN ALL PAGES)

p. 4

212 227 0927

22p    Rich Simone

Page – 3 –

16. This contract shall be governed by the laws of U.A.E and shall be subject to the exclusive jurisdiction of the Dubai courts.
17. The area of the Unit as stated on page 1 of this reservation refers to the area of the Unit for pricing purposes only. The actual area of the Unit has been calculated to include the area of the Unit measured from the exterior walls and from the centerlines of the common walls joining two Units and across internal walls.
If there is any discrepancy between the provisions of this Unit reservation contract and the Agreement of Sale, the latter shall prevail.

Signed on behalf of the Buyer by:

Name: _Richard Simone_ Signature: _Richard Simone_ Date: _10/4/07_

Signed on behalf of the Joint Buyer by:

Name: _____ Signature: _____ Date: _____

Accepted by BIG STAR PROPERTIES (LLC) on behalf of the Seller

Signature: _Vinod kd_ Date: _____

**Mohamed R. Hegazi**
Director of Sales

ocuments required with this Unit Reservation Contract:

A.  Clear Passport copy of the buyer and the joint buyer (if any).
B.  If any of the buyer (s) is a minor, a guardian's declaration by the natural guardian of the minor, on the prescribed format along with clear passport copy of such guardian.
C.  In case the buyer is a Company: attested copies of the
    i  Incorporation Certificate
    ii. Authority of the person signing the Reservation along with passport copy of the signatory
D.  In case the reservation is signed by any person other than Buyer or the Joint Buyer, if any, a Power of Attorney in favour of the Signatory, duly notarized at its place of issue and attested by the UAE Embassy/Consulate, if POA is issued outside UAE.

SUBJECT TO CONDITIONS ON PAGE 1 – 3          PLEASE SIGN ALL PAGES

151.    The date of the Debtor's signature reflected on Fake Contract Version #1 is "10/7/07." It is not known with certainty whether 10/7/07 means October 7, 2007 or July 10, 2007.

152.    The contracting parties reflected in Fake Contract Version #1 are "Richard Simone" as the Buyer and "Big Star Properties (LLC)" as the Seller. No reference is made in any place in Fake Contract Version #1 to "Damac," the company that the Debtor identified as the Developer.

153.    Fake Contract Version #1 contains a fax stamp reflecting "October 29, 2007 1:21 pm" with a fax number "212 227 0927" and the name "Rich Simone."

| Oct 29 07 01:21p | Rich Simone | 212 227 0927 | p.2 |
| Oct 29 07 01:22p | Rich Simone | 212 227 0927 | p.3 |
| Oct 29 07 01:22p | Rich Simone | 212 227 0927 | p.4 |

154.    The Debtor provided Plaintiff Woolf with a copy of Fake Contract Version #1 in or about 2014 or 2016.

155.    In Fake Contract Version #1, no signature corresponding to the Seller counterparty exists on Page 1 and Page 2, even though the Debtor's signature is reflected in the signature blocks on those pages.

Page 1:



32

Page 2:



156.    On the third page, the Debtor's signature as the Buyer appears corresponding to the date "10/7/07," however no date corresponds to the Seller's signature.

157.    The Debtor never provided any of the Plaintiffs with any additional contract and the Debtor admits there is no other contract other than one contract. The Debtor has never stated that two versions of the same (fake) contract exist.

158.    In litigation in 2017 and 2018 (twice), the Debtor produced a different document, however, that supposedly represented the contract with Damac or the Developer (Fake Contract Version #2). **Ex. G.**

159.    Fake Contract Version #2 is different from Fake Contract Version #1. Fake Contract Version #2 is as follows, in its entirety:

ARF No: _____

**Unit Reservation Contract**
Please reserve the following unit for me/us:

PROJECT _____ | BURISIDE BOULEVARD |

Buyer's Details:
Title: __M R__  First Name: __RICHARD P__  Last Name: __SIMONE__

Nationality: _____
(for individuals)

Passport No.: _____

Commercial Registration No.: _____ Date: _____ Place of Registration: _____
(for non-individuals)

Address for Communication: (Please give complete details, including Tel/Fax nos./email)

Correspondence Address: __50, MURRAY STREET__

City: __New York__  Zip/Postal Code: _____  Country: __USA__

Alternate Address: _____
(if different from above)

City: _____  Zip/Postal Code: _____  Country: _____

Phone: __00 1 212 227-0927__  Mobile: _____

Fax: _____  email: _____

Joint Buyer Details (if applicable and only if the First Buyer is an individual):

Title: _____ First Name: _____  Last Name: _____

Nationality: _____  Passport No.: _____

**Unit Details:**

| | |
|---|---|
| Floor: __16 FL__ | |
| Block/Tower: __Suite PL R__ | |
| Unit Ref. No.: __SQT FT. AED 1900__ | |
| Type: | |
| Size (sq. ft.): __9815__ | |

Permitted Use: _____

**Price Details: (in AED)**

Unit Price: __AED. 1900 /—__

Extra Options: _____

Total Price: __AED. 18646600 /—__

Option chosen : _____

**Deposit Details:**
Please note that all amounts paid against this reservation should be paid by crossed cheque/draft, credit card, TT or Wire transfer to the developer's account. However, sums up to AED 10,000 (AED Ten Thousand only) or equivalent can be paid in cash against official stamped receipt.

Receipt No.: _____  Payment Method:

Date: _____  Type:

Amount: _____  Currency:

I/We hereby confirm that this project has been introduced to me/us by:

Signed on behalf of the Buyer by: Name: __Richard Simone__  Signature: _____  Date: 6/6/07

Signed on behalf of the Joint Buyer by: Name: _____  Signature: _____  Date:

Remarks: SUBJECT TO CONDITIONS ON PAGE 1 – 3        (PLEASE SIGN ALL PAGES)

Continued ...2

Page  2.

| PROJECT | BURSIDE BOULEVARD | Block: | | UNIT NO.: FLOOR 16 |

I/We agree to abide by all terms and conditions as applicable to units in the project.
I/We am/are aware that by signing this Unit reservation contract, I/we hereby enter into a binding contract with the Seller for purchase of the above Unit and is subject to:

1.  The payment of the outstanding balance of the deposit of AED _____
    _____ by not later than _____

2.  This contract shall be subject to automatic termination in the event the Buyer fails to remit the Deposit in full within the time limit stated in clause 1

3.  My/Our signing the detailed Agreement of Sale on the standard format of the Seller (a copy of which has already been provided to me/us for reference) for this Unit within one week of being provided for execution and subsequent payments as per the following payment schedule below to be  remitted by me/us to the Seller's designated bank account in Dubai:

| Deposit | 10% | On reservation |
| 1st installment | 10% | Within 40 days of reservation |
| 2nd installment | 10% | Within 120 days of reservation |
| 3rd installment | 10% | Within 180 days of 2nd installment due date or completion of piling, whichever is earlier |
| 4th installment | 10% | On completion of Podium Structure |
| 5th installment | 10% | On completion of 10th floor Structure |
| 6th installment | 10% | On completion of  20th floor strucure |
| 7th installment | 10% | On completion of  30th floor structure |
| 8th installment | 20% | On completion date |

4.  In case the payments above are not realized and/or the detailed Agreement of Sale is not signed as per clause (1) and (3) above, the penalty @2% per month for late payment shall apply. The Seller shall also have an option to terminate the reservation, and in order to mitigate the Seller's losses arising out of termination of this reservation, sell or otherwise dispose off the Unit as it deems fit without any further reference to me/us. In such an event, all monies paid by me/us, including the money in terms of clause (1) and (3) above, is also subject to forfeiture in full and shall not be refunded back to me/us.

5.  The above forfeiture and damages shall also be applicable, in case I/we decide not to go ahead with the purchase of the above Unit and request the Seller to terminate the sale transaction.

6.  The finalisation of the plans and their approval by the competent authorities and other variations therein that may be necessary. I/We am/are aware that at the time of this reservation, the designs and size of the floors/units are not final. I/We hereby agree to accept the final plans and designs when available.

7.  Any change, addition/deletion of a joint buyer shall be subject to prior approval of the Seller and would be subject to the payment of the prevailing administrative fees.

8.  Any assignment of the Unit shall be subject to prior approval of the Seller and the Master Developer, if applicable and would be subject to the payment of the prevailing administrative fees and assignment fee and advance payment of the installment next due.

9.  My/Our bearing all exchange rate differences and/or bank charges, including credit card transactions charges as applicable.

10. The Buyer shall comply with terms and conditions as applicable to units in this project and/or as notified by the Master Developer or any other Competent Authority from time to time.

11. I/We shall use the Unit for the permitted use only and shall not be used  for any other activities that maybe restricted by law and/or Master Developer.

12. For Units permitted for any use other than residential, the Buyer shall ensure that they/their tenants/authorized users obtain all required approvals and licenees from relevant authorities as applicable to the permitted use of the Unit. However, if the intended use requires any specific requirements relating to power, air-conditioning, gas, drainage and exhaust, the same shall have to be discussed and agreed upon between the Buyer and Seller. Such arrangements may require additional payments for the same.

13. This reservation is legally binding on me/us and that is in no way subject to or depends upon my/our ability to secure a mortgage loan or finance from a bank or any third party. In case, I /we fail to obtain such mortgage, loan or finance and fail to honour my/our commitments under this Reservation, the monies paid by me/us shall not be refunded to us.

14. The Agreement of Sale will be issued by the Seller in due course on it's standard format, in the meantime, I/we shall continue to abide by the payment plan and other terms and conditions of the Unit Reservation Contract.

15. Once the detailed Agreement of Sale is executed, this Unit Reservation Contract shall cease to be effective.

Signed  by Sole/First  Buyer :  Name _____    Signature _____    June 5 2007

Signed  by Joint Buyer    :  Name _____    Signature _____

SUBJECT TO CONDITIONS ON PAGE 1 – 3            (PLEASE SIGN ALL PAGES)

Continued ....3

Page 3 of 3

11.  This contract shall be governed by the laws of U.A.E and shall be subject to the exclusive jurisdiction of the Dubai courts.

12.  The area of the Unit as stated on page 1 of this reservation refers to the area of the Unit for pricing purposes only. The actual area of the Unit has been calculated to include the area of the Unit measured from the exterior walls and from the centrelines of the common walls joining two Units and across internal walls.

If there is any discrepancy between the provisions of this Unit reservation contract and the Agreement of Sale, the latter shall prevail.

Signed on behalf of the Buyer by:

Name: __Rukwen Simoos__ Signature: _____ Date: __Jun 5 2007__

Signed on behalf of the Joint Buyer by:

Name: _____ Signature: _____ Date: _____

Accepted by BIG STAR PROPERTIES (LLC) on behalf of the Seller

Name: __H Heya Z__ Designation: __DoS__ Signature: _____ Date: __11/6/07__

Director of Sales

**Documents required with this Unit Reservation Contract:**

A.  Clear Passport copy of the buyer and the joint buyer (if any).

B.  If any of the buyer (s) is a minor, a guardian's declaration by the natural guardian of the minor of the property along with clear passport copy of such guardian.

C.  In case the buyer is a Company: attested copies of the
    i. Incorporation Certificate
    ii. Authority of the person signing the Reservation along with passport copy of the signatory

D.  In case the reservation is signed by any person other than the buyer or the Joint Buyer, if any, a Power of Attorney in favour of the Signatory, duly notarized at its place of issue and attested by the UAE Embassy/Consulate, if POA is issued outside UAE.

SUBJECT TO CONDITIONS ON PAGE 1 - 3          PLEASE SIGN ALL PAGES

160.    Fake Contract Version #2 contains several critical differences when compared to Fake Contract Version #1.

161.    Like Fake Contract Version #1, Fake Contract Version #2 lacks any signature by the Seller on Page 1 and Page 2.

162.    However, the Debtor's signatures are different on Fake Contract Version #2 as compared with the Debtor's signatures on Fake Contract Version #1. Also, the Debtor's signatures on Fake Contract Version #2 are dated, whereas his signatures on Fake Contract Version #1 (which contains the October 27, 2007 fax stamp and the name Rich Simone) are undated.

**Page 1 Signatures**

Fake Contract Version #1



Fake Contract Version #2



**Page 2 Signatures**

Fake Contract Version #1

Fake Contract Version #2



163.    The signatures on Page 3 further demonstrate the Debtor's fraud (and potentially his fraud on the Court) and his production of fake and forged documents.

164.    In Fake Contract Version #1, the signature page in its entirety is as follows:

165. In Fake Contract Version #1, the signature page in its entirety is as follows:



166. When comparing Page 3 of Fake Contract Version #1 to Page 3 of Fake Contract Version #2, at least four sets of major differences are readily apparent.

167. Difference 1 is the Debtor's signature, his written name and the date. All three of those items are all different from one another in the two versions of the document produced by the Debtor.

**Difference 1: The Debtor's Name, Signature and Date**

Fake Contract Version #1



Fake Contract Version #2



168.     Difference 2 is the purported Seller's written name. In Fake Contract Version #1,

the name "Mohamed R. Hegazi" is typed. In Fake Contract Version #2, the name "M. Hegazi" is

handwritten. Moreover, in Fake Contract Version #2, the word "Destination" is typed and the

inscription "DOS" is handwritten.   However, in Fake Contract Version #1, the fields for the

typed word "Destination" and the handwritten inscription "DOS" do not even exist.

**Difference 2: Purported Seller's Written Name and Destination**

Fake Contract Version #1

Accepted by BIG STAR PROPERTIES (LLC) on behalf of the Seller

Mohamed R. Hegazi
Director of Sales

Fake Contract Version #2

Accepted by BIG STAR PROPERTIES (LLC) on behalf of the Seller
Name: M. Hega2c    Designation: DOS
Director of Sales

169.     Difference 3 is the purported Seller's signature itself.   In Fake Contract Version

#1, the Seller's signature contains several letters, perhaps as many as seven or eight distinct

letters and the signature appears to begin with a "V." However, in Fake Contract Version #2, the

purported Seller's signature consists solely of a small one-letter symbol and it looks nothing like

what is purportedly the same person's signature in Fake Contract Version #1. Furthermore, Fake

Contract Version #1 is undated and Fake Contract Version #2 is dated 11/6/07.

**Difference 3: Purported Seller's Signature and Date**

Fake Contract Version #1



Fake Contract Version #2



170.     The dates of the two fake contracts also make no sense.

171.     In Fake Contract Version #1, the Debtor's signature is undated on Page 1 and

Page 2 and his signature is dated "10/7/07" in Page 3. In Fake Contract Version #1, the purported

Seller's signature is undated. However, in Fake Contract Version #2, the Debtor's signature is

dated "6/6/07" on Page 1, it is dated "June 6, 2007" on Page 2 (inconsistent format) and it is

dated "June 6, 2007" on Page 3.

172.     In Fake Contract Version #2, the purported Seller's signature is dated "11/6/07."

In Fake Contract Version #2, the date of the Debtor's signatures [6/6/07 or June 6, 2007] does

not even match the date of the purported Seller [11/6/07, which is either June 11, 2007 or

November 6, 2007]. The contract parties' signature dates do not even match within the same

purported contract.

173.    Difference 4 is the lack of a seal next what is purportedly the same person's signature on behalf of the Seller in Fake Contract Version #1 as compared to Fake Contract Version #2.

**Difference 4: Inconsistency of Seal Next to Purported Seller's Signature**

Fake Contract Version #1



Fake Contract Version #2



174.    The following chart summarizes the discrepancies in the two fake contracts.

Fake Contract Version #1                              Fake Contract Version #2

175.     The Debtor testified under oath in 2017, in litigation in Miami-Dade Circuit Court Case No. 2016-015949-CA-01, styled *Andrew Katz v. Richard Simone*, that the Debtor signed Fake Contract Version #2 in person with Mohammad Hegazi on the same day on June 6, 2007.

> 17 Q.   Who signed it?
> 18 **A.   Who signed it? It was me and Mohammad**
> 19        **Hegazi**.
> 20 Q.   Right. And you said you signed this when
> 21        you were sitting down with Mr. Wael?
> 22 **A.   Wael and Hegazi work together.**
> 23 Q.   And they were both together at the time you
> 24        signed it?
> 25 **A.   Yes.**
> 1 Q.    Mr. Hegazi signed it on June 6, with him?
> 2 **A.   Yes.**

176.     Under the letter of Fake Contract Version #2, this is impossible. The Debtor testified that he signed the contract in person with Mohamed Hegazi in person on the same day on June 6, 2007.  However, Hegazi's signature is dated "11/6/07," either five days or five months after Defendant Simone's signature is dated and *not on the same day*.

177.     When the Debtor was confronted with a question regarding (a) his testimony that he and the Seller both signed the contract **in person** on June 6, 2007 and (b) the date discrepancy of his signature [6/6/07] and the purported Seller's signature [11/6/07] in Fake Contract Version #2, Defendant Simone attempted to cover as follows:

> 3 Q.    But take a look at Wael's signature block,
> 4        sir, on Page 66. What's that date?
> 5 **A.   It was June 11.**
> 6 Q.    Five days later, huh?
> 7 **A.   Yes.**
> 8 Q.    Why does it reflect a different date, when
> 9        you say he signed it on the same day with you?
> 10 **A.   He could have signed it at a later date.**

178.     The Debtor's testimony conflicts with itself regarding Fake Contract Version #2. He testified that both he and Hegazi signed the contract when they were together in person on

June 6, 2007. Then he attempted to explain the discrepancy in dates by asserting that Hegazi could have signed it at a later date. That is not possible.

179.    If Hegazi signed it at a later date, then the Debtor's testimony that both counter-parties signed the contract together on the same day in person is false. It is not possible for the Debtor to testify that Hegazi "could have signed it at a later date" unless the Debtor's testimony that both he and Hegazi signed the contract while they were together on the same date on June 6, 2007 is false. The two statements are mutually exclusive and the Debtor's testimony must be false as it relates to at least one of the two statements.

180.    Moreover, none of the Debtor's testimony accounts for Fake Contract Version #1, *which is purportedly countersigned by the same person Mohamad Hegazi and Defendant Simone*. Fake Contract Version #1 has completely different signatures and a date of "10/7/07." This date is in either July or October and completely separated in time from June 6, 2007.

181.    The Debtor testified that he signed the contract on June 6, 2007. Yet the only date reflected on Fake Contract Version #1 is "10/7/07." This date must be later than June 6, 2007 whether it is construed as July 10, 2007 or October 7, 2007.

182.    Under the Debtor's own testimony, Fake Contract Version #1 is a fake or forged document. The Debtor testified that he signed the contract for this so-called transaction on June 6, 2007. Fake Contract Version #1 is dated either July 10, 2007 or October 7, 2007. Fake Contract Version #1 contains the Debtor's signature and a fax stamp bearing the name "Rich Simone" and the Debtor provided Fake Contract Version #1 to Plaintiff Woolf. The information in Fake Contract Version #1 conflicts with the information in Fake Contract Version #2 and it conflicts with the Debtor's own testimony. Furthermore, it makes no sense for the parties to sign

45

two identical versions of the same contract and the Debtor stated that only version of the contract was signed.

183.    Moreover, the Debtor stated that he searched all his emails and he has no email correspondence with the Developer regarding either Fake Contract Version #1 or Fake Contract Version #2.

184.    In litigation, the Debtor produced nine *unsigned* "Unit Reservation Contract" documents. The Debtor referred to these documents as "ARFs." **Ex. H.** Each Unit Reservation Contract or ARF contains a unique "ARF number" in the upper left hand corner, a unique receipt number in the lower left corner and a date in the lower left hand corner reflecting 25-Jun-2007.

185.    When comparing Fake Contract Version #1 and Fake Contract Version #2 to any of the nine Unit Reservation Contracts, it is clear that Fake Contract Version #1 and Fake Contract Version #2 appear to be based on the terms of the Unit Reservation Contract. However, in Fake Contract Version #1 and Fake Contract Version #2, the ARF number and the receipt number appear to be "whited-out."

186.    An example is as follows as it relates to the ARF number.

Fake Contract Version #1 (ARF No. blank/whited-out)



Fake Contract Version #2 (ARF No. blank/whited-out)

ARF No:

Unit Reservation Contract (ARF number present)

ARF No.: 13218

187.    An example is as follows as it relates to the receipt number, date and amount.

Fake Contract Version #1 (Receipt No. blank/whited-out)



Fake Contract Version #2 (Receipt No. blank/whited-out)



Unit Reservation Contract (Receipt No. present)

```
Receipt No.      7806290
Date:            25-JUN-2007
Amount:                1,111.11
```

188.    The apparent white-out is particularly visible in Fake Contract Version #2.

189.    The Debtor produced no other documents reflecting this purported very large, multi-million dollar transaction. In a multi-million-dollar real estate transaction for the entire floor of a pre-construction building, the notion that a tiny, perfunctory three-page "unit reservation sheet" could comprises the full scope of the transaction documents is absurd. Accordingly, either more transaction documents must exist (the Debtor denied that any additional documents exist) or the transaction did not happen.

190.    As discussed above, from 2007 through 2016, the Debtor consistently represented to Plaintiffs, that the investment had been made, that the closing of the real estate transaction had been consummated (albeit in the total absence of supporting documents), that the real estate had been purchased and that the entire 16th floor was owned.

191.    The Debtor's false representations continued in litigation through 2016 and into 2017 and 2018.

192.    The Debtor represented that the real estate was purportedly held in the name of an offshore Belize entity called Tribeca Partners on Plaintiffs' behalf and on behalf of the other investors.  However, the Debtor provided absolutely no proof of the company's existence despite numerous requests and despite his numerous references to the entity.

193.    The Debtor represented to Plaintiffs, up through 2016 that they were on the verge of receiving "rents" from their ownership of the nine hotel/condo rooms on the 16th floor of the Burjside Boulevard building.

194.    Due to the Debtor's pattern of strategically not putting updates in writing, a habit he admitted to Plaintiff Woolf, the difficulty in reaching the Debtor due to his international travel and the inconsistent stories about the investment, Plaintiff Woolf, Plaintiff Katz and Plaintiff Katz's wife, Josette Wys-Katz, joined a conference call with the Debtor on May 23, 2016 (the "May 23, 2016 Call").

195.    On the May 23, 2016 Call, the Debtor made the following false and misleading representations to Plaintiff Woolf, Plaintiff Katz and Plaintiff Katz's wife:

| Question posed to the Debtor | The Debtor's statement on May 23, 2016 Call | Falsity of the Debtor's statement |
|---|---|---|
| Where has the money gone since day one? | You wired [Tony Chang] the money and then we wired that money to Dubai, the money was wired to Damac. I have shown [Plaintiff] some receipts of that. | False statement. Tony Chang never wired the money to Damac. Defendant Simone directed Tony Chang to wire the money to Bode, not Damac. |
| The money was wired to Damac? | Yeah. yes, money was wired to DAMAC. I've shown [Plaintiff Woolf] receipts, on the time that we met previously | False statement. |
| Was money wired to Damac in 2007 | Yeah, it was done in 2007, late 2007. All the monies wound up in DAMAC. | False statement. |

| and 2008? | | |
|---|---|---|
| What is Tribeca Partners? | Tony [Chang] also had made this company. He had made the company in Belize. So I'm not sure if [Tony Chang] wired to Belize and wired to DAMAC. I think he wired directly to DAMAC. And I think he had the company and the banker setup in Belize. | Upon information and belief, false. |
| How was the transaction structured? | There was 10% down which I paid for many months before you guys got involved. And then another 10% due after that, which I paid for many months before you got involved. And then when the building got to certain floors, you have to wire more. Then when I bought it originally, it was like June 2007. | The Debtor never bought any property on the 16th floor. False statement. |
| What is Stefan Bode's role? | Stefan had nothing to do with it. It's between me and DAMAC. But Tribeca in the middle. DAMAC knows me. | False statement. |
| Who owns the real estate, you or Tribeca? | Tribeca, I forgot the name. Tribeca Associates or Tribeca Partners, something like this. | Upon information and belief, false. |
| Is there a piece of paper that says that Tribeca owns the real estate? | Yes. | Upon information and belief, false. |
| Do you personally own the 16th floor? | No, I'm in that with you guys. | False statement. |
| You own the 19th floor with Bode? | No, I have the 19th. Alone. | False statement. The Debtor admitted that he never owned this real property. |
| What is Bode's role? | Stefan just introduced me to DAMAC. | False statement. |
| When are you going to call Damac to get confirmation that its giving rents owed to us? | I called them, they said they-- They gave me a few business days. The guy said he's very excited. | Upon information and belief, false. |
| What does Tribeca own? | 16th is owned by Tribeca Partners or Tribeca Holdings. | Upon information and belief, false. |
| When Plaintiffs sent the Debtor money in 2008, did it go to Damac on the same day or within a few days? | Within a few days. | False statement. |

| When did the building start? | It didn't start until late 2010. | Upon information and belief, false. |
|---|---|---|
| What were your communications with Damac? | They kept telling me it's going to be built within a few months. | Upon information and belief, false. |
| What happened the last time you spoke with Damac? | They didn't know anything about Burjside. | Upon information and belief, false. |
| Do we own in the Signature building? | I thought it was Burjside Boulevard. You go to their site. It doesn't even say anything about Burjside Boulevard anymore. I tried to match it with the design and the number of floors and Burjside was supposed to be 35 or 36 floors. And the other one [Signature] is 50 or 51 floors.  The one we were invested in was supposed to have 35 or 36. There is one existing in that area that has like 50 or 51. The Signature. | Upon information and belief, false. |
| Is this a hotel? | It's supposed to be a luxury serviced apartment which is supposed to be in between hotel and apartment. | Not known with certainty. |
| You're saying it's 100% residence not hotel and the owners can either rent it out or use it. Right? | Something like that. | Not known with certainty. Upon information and belief, false. |
| If you own the 19th floor, aren't you getting money? | I'm not getting any money. | Not known with certainty. Upon information and belief, false. |
| Who's getting the money? | No idea. | Not known with certainty. Upon information and belief, false. |
| Where is Tony Chang these days? | No idea. | Not known with certainty. Upon information and belief, false. |
| Do we know that monies were sent to Damac? | Yes. Yes. | False statement. |
| Do we have any receipts or proof that Damac received the money? | I showed [Plaintiff Woolf] some receipts. | False statement. Documents the Debtor showed to Plaintiff Woolf were fakes and forgeries. |
| All the money that was given to Chang, | Yes. | False statement. |

| | | |
|---|---|---|
| we can show that it's been sent to DAMAC. Is that correct? | | |
| What is the total price of the entire property that we own, what is the total amount? | About four and a half [million]. | False statement. |
| What was the total amount of cash that was given to DAMAC? | It was about four and a half [million] when you convert it to US dollars. | False statement. |
| Four and a half million? | Yeah. | False statement. |
| $4.5 million purchase price, correct? | Something like that. | False statement. |
| How much cash did we- the corporation give to DAMAC? | We sent them a check. That was one of the payments. Remember I told you I wired it? | False statement. |
| About 600 [thousand] | Mm-hmm. | False statement. |
| How much cash did we give up to DAMAC? | 10% down on contract, 10% to reserve it, and then another 10% 30-60 days later and then more payments as construction went on. | False statement. |
| When was the last payment, the finish payment made? | Probably sometime in 2011 or 2012. | Upon information and belief, false. |
| Do you have the purchase agreement for the 19th floor? | We don't have it. | Upon information and belief, false. |
| Did we default on the sale? | No. | False statement. Defendant Simone asserts that there was a default. |
| Do you have a contact name at Damac? | I've tried to reach out to those people and they've left. | Upon information and belief, false. |
| What is Big Star Properties? | Big Star was on some of the contracts that I saw. It said either Big Star or Big Star by DAMAC. I saw a Big Star even when I looked online recently. | Upon information and belief, false. Damac is not on Fake Contract Version #1 or Fake Contract Version #2. |
| Didn't the Signature get finished and operational in July | I know from what you told me, and I know from, what I see online. But I wasn't so sure that that's the property because of the | Upon information and belief, false. |

| 2013? | difference in floors and what not. Ours was supposed to be 35 or 36 and they were supposed to be-- and it was supposed to be like-- Ours was supposed to be 35 or 36 and it looks like they built 50 or 51 and have a different name. | |
|---|---|---|
| It puzzles me that you haven't followed up on this. Did you just let this fall through the cracks? | Uh, no. Now that I'm here and discussing these things, I mean, there's some things that look like it could be it, other things that look like it couldn't be. And I think it's probably time to make a trip over there, because I'm not getting the right answers on the phone. It looks like it could be it, then it also looks like it can't. So, I think that's it. Time will decipher this. | Upon information and belief, false. |
| When are we going to Dubai? | I don't know. Maybe in a month? | Upon information and belief, false. |
| Can you make a phone call and get some answers? | I'll call them tomorrow and will call you after I speak to them. I know the address. | Upon information and belief, false. |
| They'll ask you for your ID by email to verify that it's you to give you information. | I can call them early. I'll call them early. | Upon information and belief, false. |
| Was there a switch from your name to Tribeca's name? | When I did the AFR as they call them, when I did the AFRs with them, they was in my name. At the bottom of the form it says, "May switch, Richard may switch this to a corporate account." The corporation was Tribeca which has equity from all of us in it. Richard signed the contract and it's about, the AFR and at the bottom of the AFR it says that he may transfer this to a corporate entity. | Upon information and belief, false.<br><br>Note that the Debtor refers to "AFRs" in the plural. None of the AFRs were signed. |
| Was it transferred from your name to Tribeca? | Yes, it was. | Upon information and belief, false. |
| When was it transferred? | Probably in the first year. [2007/2008] | Upon information and belief, false. |
| When will you call Damac to get information? | I'm calling tomorrow, I'll give them my ID if necessary. | Upon information and belief, false. |

196.    On the May 23, 2016 Call, the Debtor promised to follow up with Damac and provide additional information to Plaintiff Woolf, Plaintiff Katz and Plaintiff Katz's wife.

197.    However, he failed to do so.

198.    Plaintiff Woolf and Plaintiff Katz, and particularly Plaintiff Katz's wife continued to follow up with the Debtor and the Debtor continued to make false representations.

199.    Examples of the Debtor's continued false and misleading representations are as follows, dated between May 24, 2016 and May 26, 2016. These statements and actions reflect the Debtor's continued scheme and pattern of fraudulent conduct. These statements and actions also delayed the date on which Plaintiffs discovered the Debtor's fraud, theft and other misconduct.

| **The Debtor** | **Plaintiff Katz's wife** |
|---|---|



5/24/16, 9:06 AM

Did you call?

Dubai? Damac office?

Online w secretary who is screening me now

She asked unit # and took a message for Kardous to call me back

Why didn't you tell her you own the whole floor?

I gave her 1601-1609 plus other info

What other info did they ask?

Personal info about me to make sure it is me

Ok - no passport?

She asked about pp

**The Debtor**                                                **Plaintiff Katz's wife**



> Please do this today

5/25/16, 11:30 AM

> Mohamed is very good at returning emails in 12 hours. So you obviously did not sent an email unless you show it to me

5/26/16, 8:02 AM

I called again 30 min ago. Sec said mohamed would call back in couple mins. Awaiting his call

5/26/16, 4:33 PM

> I cannot believe how non-challant you are been with 10M dollars worth of real estate that you supposedly own in Dubai. IF you do not show proof by Monday, I am going to assume you stole our money.

Yesterday, 1:38 PM

> Call me. Just left you a message

Yesterday, 5:54 PM

Hey I'm on the golf course just saw your text. I called mohammed three times this week and he has not returned my call. Therefore I have no news but if you want I can call you in an hour or two?

Today, 8:04 AM

I called him again now, receptionist knows my voice, she asked if he called me, I said no, can I speak to him? She said he is not in office and took another message

Today, 9:34 AM

> Why don't you send him an email Simone. He answered by emails within 24 hours. If you do not have time to send an email. I can do it for you.

200.    After Plaintiff Katz filed a lawsuit against the Debtor in 2016, the Debtor represented in April 2017, for the first time, that Plaintiff Katz's funds were supposedly "seized by the Developer" on an unknown date and time before 2010. Yet Defendant Simone provided no documentation regarding any purported "seizure" by the "Developer."

201.    This purported seizure of Plaintiff Katz's funds also applies to Plaintiff Woolf's funds and Plaintiff Vagnerova's funds.

202.    The debtor never asked any of the Plaintiffs for any additional investment money to avert a purported "seizure" by the Developer. Moreover, up through the summer of 2016, the debtor continued to represent that the $4.5 million transaction for the 16th floor had been consummated.

203.    Without question, the Debtor was either lying then, or lying now, or both.

204.    In litigation, the Debtor continued to manufacture false and fraudulent documentation in what appears to be fake checks reflecting the following purported payments to Damac:

| Payment | Date | Amt AED | Amt USD (Approx.) |
|---------|------|---------|-------------------|
| Expression of interest, booking toward 19th floor Burj Side Boulevard (CHQ 000555) | 3/23/08 | 2,000,000 | $600,000 |
| Burjside Boulevard 19th Floor (Cheque #106767) | 4/3/08 | 710,000 | $213,000 |

**Ex. I.**

205.    The Debtor produced in discovery in Katz's lawsuit an unsigned purported "check" selectively (and cleverly) numbered "000555" as evidence that supposedly reflects a payment of AED 2,000,000 (approximately $600,000). This check appears to be fabricated. The typed purported receipt is not corroborated by any electronic paper trail or legitimate documents of any kind.

206.    The "Customer Name" on this purported Check #555 for AED 2,000,000 (approximately $600,000) is "RICHARD SIMONE," corresponding to purported receipt of the AED 2,000,000 payment by Damac on March 23, 2008 referencing "BOOKING TOWARDS

BURJ SIDE BOULEVARD 19TH FLOOR FROM MR. RICHARD SIMONE." It is notable that this documentation reflects the 19th floor rather than the 16th floor.

207.    The Debtor testified under oath that the account was his account: "This Emirates one [account pertaining to check #555 for AED 2,000,000 on March 23, 2008] is mine."

208.    However, according to a document produced by the Debtor for the first time in March 2018, which is supposedly an email that the Debtor wrote on May 13, 2008 (two months after check #000555 was written and purportedly deposited by Damac) the Debtor stated, "I did not have a checking account because I am not a resident yet."

209.    Thus, as of May 13, 2018, *two months after* the purported AED 2,000,000 payment with Check #555 to Damac, in his own words, the Debtor stated, "I did not have a checking account because I am not a resident yet."

```
23 Q.   When did you leave the country?
24 A.   2011.
25 Q.   Okay. So you were there from 2007 to 2011?
1 A.    No. January, 2008.
2 Q.    January 2008 to 2011, you lived in the UAE.
3       Is that correct?
4 A.    Yes.
```

210.    The Debtor testified under oath that a person cannot have a checking account in the UAE for six months and until that person is a resident: "So until you're a resident for, I believe it's six months, or -- no. It took me six months to get my residency, and you cannot have a checking account in UAE unless you're a resident."

211.    The Debtor testified that he lived in Dubai from January 2008 to 2011. Thus, according to the Debtor's own sworn testimony, it would have been impossible for him to have a checking account as of March 23, 2008 because he arrived in Dubai in January 2008 and he could not obtain a checking account for six months after that time, until July 2008.

212.    Thus, the very existence of this account in the Debtor's name from which Check #555 was purportedly issued on March 23, 2008 is not possible according to the Debtor's own testimony because he could only open a checking account in July 2008 at the earliest, after living in Dubai for six months, given that he moved to Dubai in January 2008.

213.    The Debtor testified that, conveniently, he can't actually access his Dubai bank account records (if they exist) because he decided to close his Dubai bank accounts in 2011.

```
12 Q.   Did you go back and look at your bank
13        accounts?
14 A.   I don't have those bank accounts any more,
15        sir.
16 Q.   Why did you close them?
17 A.   Because I left the country.
18 Q.   Okay. These are international bank
19        accounts; not Bank of America?
20 A.   Okay. When I moved there, I opened
21        accounts in UAE. When I left the country, I closed
22        my account.
```

214.    According to another document that the Debtor produced, which is supposedly an email that Bode wrote on May 13, 2008 and copied to the Debtor, the "bankers cheque from rich's [the Debtor]'s account to make a downpayment [sic] on burjside blvd 19th floor directly to DAMAC" which was one of "2 substantial cheques [that] have been debited in march [2008]," for AED 3.473.072.

215.    This amount referenced in a purported May 13, 2008 email from Bode to Damac reflected the amount of "AED 3.473.072," corresponding to the "substantial cheque" in "march" from "rich's account" for "downpayment" on "burjside blvd 19th floor directly to DAMAC."

216.    The amount of "AED 3.473.072" is plainly inconsistent with the amount of "AED 2,000,000" reflected on the purported Check #555 and the purported receipt from Damac.

Predictably, the Debtor included no reply or response of any kind from Damac pursuant to the bizarre purported email.

217.    The Debtor produced in discovery another purported "receipt" for a supposed deposit of AED 710,000 (approximately $213,000) referencing a "Cheque #106767" dated April 3, 2008. This alleged check itself was not provided even though the account is supposedly held in the Debtor's name. If the Debtor had just moved to Dubai and just recently opened a bank account, as he stated, it would be very unlikely that he'd already be on Cheque # 106767.

218.    Moreover, there is no explanation for why one check would be Check #000555 dated March 23, 2008 and the next check, supposedly issued eight days later, would be Check #106767 dated March 31, 2008.  This does not make sense, as it would be practically impossible for the Debtor to write 106,212 checks in eight days between March 23, 2008 and March 31, 2008.

219.    At one point, the Debtor stated that this check came from Bode's account. The Debtor stated that Cheque #106767 for AED 710,000.00 "SEVEN HUNDRED TEN THOUSAND ONLY" was from Bode's account. The Debtor testified: "The 710 was Mr. Bode's."

220.    However, the purported receipt produced by the Debtor supposedly from Damac reflects that the check was "Received From Mr. Richard Simone." The Debtor provided no rationale for why the receipt would reflect that the check was received from the Debtor if the check was actually from Bode.  Moreover, the Debtor said Bode's role was "very minor" and that Bode "introduced [the Debtor] to Damac and that's it."

221.    And yet even more inconsistent is another document produced by the Debtor supposedly reflecting a May 13, 2008 Bode email, providing that "AED 776.766.17…….this

cheque i personally and directly paid DAMAC on behalf of Rich to fill up the required 10% on burjside 19th floor….i gave you the copy of the cheque and the receipt of DAMAC today….”

222.    If the Debtor was able to issue a check for AED 2,000,000 (or AED 3.473.072, depending on which fiction is to be analyzed) on March 23, 2008, then he would be able to also issue a check on March 31, 2008.  The so-called residency issue (which would supposedly account for the irregular and doctored documentation) apparently wasn't an issue after all.

223.    Moreover, the amount of AED 776.766.17 conflicts with the amount of AED 710,000.00.

224.    Furthermore, the similarly of the number "AED 776.766.17" to the number "Cheque # 106767" is interesting to note.

225.    If the "Cheque # 106767" from Standard Chartered was actually from Bode – and it doesn't match any actual transactions in Bode's Standard Chartered account – it is bizarre that Bode (who had also just recently arrived in Dubai) would have already written 106,766 checks before this check, over one hundred thousand checks.

226.    There is no reason why the Debtor's payments to Damac would purportedly have been made by check (certified/untraceable check, no less) rather than bank wire considering the Debtor's sophistication in moving money by wire from account to account. As represented by the Debtor, the money was supposedly sent by wire by the Debtor attorney Tony Chang to Damac. The Debtor never said that money was paid to the Developer by untraceable (and almost certainly fake/fraudulent) check to Damac six months after the Debtor indicated that a *wire* was sent to Damac. A wire is far more reliable, fast, commonly accepted and traceable than an unregistered and untraceable purported check.

227.    The Debtor conveniently only produced the front of the check and not the back. If Bode provided Damac with a copy of the front of the check and the check came from Bode's account, Bode could have (and logically would have) provided the back of the check reflecting an actual deposit.  This is over and above the fact that the amounts don't actually match anyway.

228.    Moreover, the Debtor *specifically told Plaintiffs* that Plaintiffs' money was *wired* by Tony Chang to Damac. The Debtor's check story/fabrication conflicts with the Debtor's other representations, all of which appear to be false.

229.    Furthermore, in 2017 and 2018, the Debtor produced undated and unsigned documents and illogical emails with time stamps that do not match.

230.    In one particular email dated September 26, 2007 (months after the purported signing of the ARF contract), produced by the Debtor in discovery, from the Debtor's lawyer to the Debtor, the Debtor's lawyer stated "I note that you…have not yet signed any agreement."

To: richsimone@hotmail.com
CC: Alexis.Waller@clydeco.ae
Subject: Re: Agreement of Sale (our ref: 0705150)
From: Catherine.Gill@clydeco.ae
Date: Wed, 26 Sep 2007 14:38:12 +0400


Dear Richard

Many thanks for your emails. Following our telephone conversation yesterday, I write to confirm that I have briefly taken a look at the reservation contracts supplied and write to confirm our initial discussions.  Please note that the comments set out are based on a high level review of the forms supplied within a limited time.  If you would like us to carry out a more detailed review, or make any enquiries of the Seller, please see my estimate below.



[I note that you have already paid a holding sum of US$2,500 and a further sum of US$100,000 to Damac **but have not signed any agreement**. I would advise that you resolve the above issues before signing these reservation agreements and making further payment.]

(Emphasis added).

231.    However, Fake Contract Version #2 reflects the Debtor's signature dated "June 6, 2007." And the Debtor testified that the contract was signed on June 6, 2007.



232.    Fake Contract Version #1 reflects the Debtor's signature dated "10/7/07." In the UAE, dates are denoted by day, month and then year. Thus, the date would likely be July 10, 2007.

233.    Therefore, as of September 26, 2007, the Debtor either (a) did not inform his purported lawyer (for some unknown reason) of the existence of Fake Contract Version #1 (dated June 6, 2007) or Fake Contract Version #2 (dated July 10, 2007) and/or (b) the documents are fraudulent.

234.    Also, the purported payment amounts that the Debtor represented to his purported lawyer reflected in her September 26, 2007 email ["holding sum of US$2,500 and a further sum of US$100,000"] don't match the likely fake email from a purported Damac representative dated September 20, 2007 which reflects ["I checked the transfers and I found out that we have

received two transfers one with 200,000 $ and one with 74,000 $"].  Those numbers $102,500 and $274,000 aren't even close.

235.    Moreover, those numbers don't match the other sets of non-matching numbers.

236.    Furthermore, the purported emails the Debtor produced in discovery are highly irregular and some are missing subject lines and email addresses. The following document, a purported email, contains no subject line or email addresses and the margins are irregular:

3/14/2018.                              Mail - richsimone@hotmail.com

# Permission for Catherine Gill to speak with Stefan Bode re DAMAC contract issues

### Rich Simone

Wed 9/26/2007 11:08 AM

Sent Items

Catherine

Please accept this as my authorization for you to speak with my friend referenced above

Stefan

I sent u an email and we tried to call u @ 6pm and a few more times between 6:45 and 7

She was leaving shortly but feel free to cal her at 971 4 331 1102

If u happen to get her anytime after 6am have her connect me in a 3 way

Thank You

Rich Simone

Invite your mail contacts to join your friends list with Windows Live Spaces. It's easy! Try it!

237.    In another irregular document that the Debtor produced for the first time in March 2018, the Debtor requested a purported Mortgage Inquiry Form in an email on Sunday April 13, 2008 at 11:11 am, he received the purported form by email on Sunday April 13 at 11:48 am and he emailed back the completed form as an attachment on Monday April 14, 2008 at 7:20 pm.

Yet, the Mortgage Inquiry Form is dated April 12, 2008, the day before the Debtor would have received the form. Thus, either the dates on the emails are fake, or the date on the document is false.

238.    Moreover, in that form, the Debtor listed Bode as his Damac salesperson. "DAMAC SALES AGENT DETAILS: Stefan Bode." But the Debtor told Plaintiffs that Bode has nothing to do with it. "Stefan had nothing to do with it. It's between me and DAMAC. But Tribeca in the middle. DAMAC knows me."

239.    Furthermore, in that document, the Debtor represented that he was the "Managing Director" of "Global Capital Partners" and had been in that position for "4 years," that his salary after taxes as a Managing Director at Global Capital Partners is $100,000 and that his bonus is $500,000 to 1 million, for a total income from Global Capital Partners of $600,000 to $1,100,000.

240.    On August 21, 2018, however, the Debtor admitted that he was lying there and that he never worked for Global Capital Partners. Global Capital Partners does not even exist.

241.    Furthermore, the questionable documents pertaining to purported check numbers "000555" and "106767" blatantly conflict with the Debtor's representations that the money was "wired to Damac" by Tony Chang. If Chang wired Plaintiffs' money to Damac, as the Debtor represented, numerous times to numerous people, there would be no need for these purported checks.

242.    If the Debtor had been involved in the production of very large checks from Bode's account and the issuance of very large checks from his own Dubai account (AED 2,000,000, approximately $600,000), as the documents he produced indicate, then the Debtor's repeated and consistent representations that "Tony Chang wired the money to Damac" indicate

that the Debtor either has a catastrophically horrendous memory about the manner, mode, date and denominations in which his "investors'" money is transmitted or -- much more likely, the Debtor lied.

243.    In addition, it is highly illogical and obviously commercially unreasonable for a business person to use an untraceable certified check with purportedly cleared and untraceable funds (with no actual proof of deposit) instead of a bank wire or traceable check to make a payment pursuant to a real estate transaction.

244.    A reasonable person representing a buyer or an investor would want all payments to a developer or seller to be traceable and documented.

245.    The Debtor represented in another email produced in March 2018, that he supposedly used checks because he was in hurry to pay the money to Damac or that there was some kind of dispute about the price. Yet the Debtor provided no explanation for why he could not have sent a wire, which would have been faster, more reliable and more traceable. Moreover, these purported payments in the spring of 2008 were nearly a year after the execution of the so-called contract.  Thus, a dispute on the price at this time is illogical.

246.    It is also illogical that the Debtor for some reason would have possession only of the front of two checks with no corresponding documentation *or invoices* to correspond with the purported payments.

247.    As to the suggestion that the Debtor was in a rush to make a payment, these payments were made in March and April 2008, nearly a year after the purported contract was signed in June 2007 and after the Debtor had ostensibly made numerous other prior payments. There is no evidence or documentation whatsoever to support a notion that those other 10% payments were ever made (denominations of approximately $559,398).

248.    The purported payments reflected in the documentation provided by the Debtor drastically conflict with the payment schedule set forth in the Fake Contract Version #1 and Fake Contract Version #2.

249.    All of the representations are inconsistent with themselves.

250.    The following chart is a schedule of the payments owed pursuant to Fake Contract Version #1 and Fake Contract Version #2.

| Payment | Due Date | Amt AED | Amt USD (Approx.) |
|---|---|---|---|
| Deposit (on reservation) | 6/7/07 | 1,864,660 | $559,398 |
| Pmt. 1 (w/in 30 days of reservation) | 7/7/07 | 1,864,660 | $559,398 |
| Pmt. 2 (w/in 120 days of reservation) | 10/5/07 | 1,864,660 | $559,398 |
| Pmt. 3 (w/in 180 days of second installment or completion of piling, whichever is earlier) | 1/3/08 | 1,864,660 | $559,398 |
| Pmt. 4 (on completion of podium structure) | 2012 | 1,864,660 | $559,398 |
| Pmt. 5 (on completion of 10th floor) | 2012 | 1,864,660 | $559,398 |
| Pmt. 6 (on completion of 20th floor) | 2013 | 1,864,660 | $559,398 |
| Pmt. 7 (on completion of 30th floor) | 2013 | 1,864,660 | $559,398 |
| Pmt. 8 (on completion date) | 2013 | 3,729,320 | $1,118,796 |
| TOTAL | | 18,646,600 | $5,593,980 |

251.    The purported records the Debtor produced, correlating to an alleged $600,000.00 payment in March 2008 and a $213,000.00 payment in April 2008, do not even match up with the payment schedule above pursuant to Fake Contract Version #1 and Fake Contract Version #2.

252.    The actual payment due dates and amounts also do not match the Debtor's representations to his lawyer or any of the documents he produced in discovery.

253.    Per Fake Contract Version #1 and Fake Contract Version #2, the due dates of the first four payments were as follows:

| Payment | Due Date | Amount |
|---|---|---|
| Deposit: | June 7, 2007 | $559,398 |
| Payment 1: | July 7, 2007 | $559,398 |
| Payment 2: | October 5, 2007 | $559,398 |
| Payment 3: | January 3, 2008 | $559,398 |

**TOTAL**                                                  **$2,237,592  | 7,458,640 AED**

254.    Payment 4 was not due until "on completion of podium structure."

255.    The Debtor represented, and the Damac website and contemporary news reports confirm, that construction of the Signature building did not begin until around 2012. Thus, Payment 4 was not due until 2012 at the earliest. And the Burjside Boulevard building was never even built.

256.    Unambiguously, pursuant to the plain terms of Fake Contract Version #1 and Fake Contract Version #2, no payments were due in March or April 2008.

257.    The Debtor stated under oath that Fake Contract Version #2 is the only contract between himself and Damac. Yet the purported receipt documentation that was supposedly received from Damac reflects purported payments for floor 19 of Burjside Blvd rather than floor 16. There is no contract whatsoever, not even a fake or forged contract, corresponding to floor 19. Yet the purported receipt documentation reflects floor 19 rather than floor 16.

258.    If the Debtor had been making his payments pursuant to the Deposit (June 7, 2007, $559,398), Payment 1 (July 7, 2007, $559,398), Payment 2 (October 5, 2007, $559,398) and Payment 3 (January 3, 2008, $559,398) on time and properly, as he represented that he had, there should have been no problem.

259.     The Debtor purported to have contributed $500,000.00. The Debtor convinced his father to contribute $600,000.00 from the family trust. Plaintiffs contributed another $495,000.00. Other investor/victims also made contributions that flowed through Chang's account and into Bode's account.  This money is not accounted for.

260.     The Debtor never asked for any additional contributions from Plaintiffs. There should have been no reason for a "default" on a "payment plan" as the Debtor now proffers as an explanation for the missing money.

261.     Moreover, if there was a risk for a "default," and the Debtor had actually paid Damac $1.5 million, or $2.2 million, or even $813,000.00, (including $500,000.00 of his "own money"), a person acting in a commercially reasonable and non-reckless manner would have negotiated, or at least attempted to negotiate, the purchase of a smaller quantity of real property, or perhaps only two or three condo units rather than nine units.  It would have been better to purchase only a few units than lose all the money, including all the investors' money.

262.     Moreover, even according to Fake Contract Version #1 and Fake Contract Version #2, as noted by the Debtor's lawyer on September 26, 2007, the Debtor was required to "sign the detailed Agreement for Sale within a week of receiving the same…it is imperative that you review a copy of the Agreement for Sale before making any further payments or signing these reservation contracts. Damac should provide you with this upon request (clause 2 of the contract states that you have already been provided with a copy)."

3.  Under clause 3, you are obliged to sign the detailed Agreement for Sale within a week of receiving the same.  If you do not meet this deadline and if you fail to meet any of the payment instalments on time, the Seller shall have the option to either charge you a penalty or terminate the reservation.  If the reservation is terminated, the Seller reserves the right to retain all monies paid to it.  It is imperative that you review a copy of the Agreement of Sale before making any further payments or signing these reservation contracts.  Damac should provide you with this upon request (clause 2 of the contract states that you have already been provided with a copy).

263.     Yet, the Debtor never signed an Agreement for Sale. According to his lawyer, he never even signed a reservation agreement as of September 26, 2007. The Debtor testified that the three-page document reflected in Fake Contract Version #1 and Fake Contract Version #2 was the only contract he purportedly signed with Damac. The Debtor does not even have possession of a detailed Agreement for Sale, let alone a signed Agreement for Sale. Thus, no transaction could possibly have been consummated, despite the Debtor's false representations for years up through May 2016 that Plaintiffs owned their share of the jointly-owned floor 16 in the Burjside/Signature building.

264.     In addition, the Debtor's excessive focus on whether he could "switch" the "investment" to a "corporate name," is another badge of fraud.  The seller in a real estate transaction is not concerned about how the buyer will hold title after the property is sold.  Thus, the Debtor's excessive focus on "putting the investment in a corporate name," is not commercially reasonable and it is irrelevant.  Moreover, there is no legitimate, lawful or proper reason to "put the investment" in the "name" of a shadowy (at best) purported Belize corporate entity named Tribeca.

265.     Moreover, the Debtor failed to produce any documentation whatsoever regarding the so-called company Tribeca or Tribeca Partners.

266.    Over and above the fact that the Debtor produced no documentation regarding whether Tribeca Partners even exists and has always been all over the map about this purported entity, there is no reason for a "switch" to hold property in the name of this entity.  There is no evidence that any bank account was set up in Dubai under that name. Most likely, the Debtor set up a nebulous and opaque corporate form in Belize (perhaps Tribeca Partners) to shroud his illegal actions, theft and conversion of Plaintiffs' money.

267.    While the Debtor was in Dubai from 2008-2011, there is no record of him actually working any job where he actually earned any money or actual income. His only "work" was as a purported "trader" and money manager for a non-existent company named Millenium Capital Partners. The Debtor admits to lying about another fake company named Global Capital Partners. And yet, since 1998, the Debtor has been prohibited from trading securities or associating with any broker or dealer. However, securities trading activity is exactly what the Debtor purports to have done since that time.

268.    Plaintiffs' money, which is all gone without any proper explanation or accounting, probably funded the Debtor's international lifestyle for several years.

269.    The money may also have been misappropriated by the Debtor to "invest" with, or gamble away through purported (and undisclosed) trading in securities or the purchase of a different property in Dubai in the Ocean Heights building in Bode's name.

270.    The records produced by the Debtor reflecting purported payments don't match up. The records the Debtor produced demonstrate payments of approximately $813,000.00, far less than the $2,237,592 owed as per Fake Contract Version #1 and Fake Contract Version #2, far less than $4.5 million as represented by Defendant Simone in 2016 and far less than the $5,593,980 purchase price as represented in Fake Contract Version #1 and Fake Contract

Version #2.  It is also far less than the documented $1,595,000.00, consisting of $500,000.00 from the Debtor, $600,000.00 from the Debtor's family trusts and $495,000.00 from Plaintiffs. Even according to the Debtor's own fictional story, $782,000.00 in investor money is completely unaccounted for.

271.     The Debtor provided no legitimate proof whatsoever of any actual payment to Damac.

272.     The Debtor stated that he contributed his own money to the purchase of floor 16 in the Burjside Blvd building. But the Debtor produced no actual or verifiable record of any actual payment.

273.     The Debtor provided no proof whatsoever of any purported payment to Damac other than the alleged $600,000.00 payment in March 2008 and the alleged $213,000.00 payment in April 2008. Beyond all doubt and without question, these purported payments do not match up at all with the payment schedule pursuant to Fake Contract Version #1 and Fake Contract Version #2.

274.     Moreover, these documents seem to reflect only the front of purported "cashier's checks" which are untraceable and the purported documentation does not even demonstrate that these purported checks were ever deposited by anyone. Furthermore, no bank records or email traffic supports the legitimacy of these documents. It is highly likely that these purported checks are fakes or forgeries.

275.     And moreover, the purported documentation the Debtor produced reflects floor 19, rather than floor 16. The Debtor admits that he has absolutely no contractual documentation pertaining to floor 19. The Debtor admits that he has no purchase and sale agreement, signed or

unsigned, for any floor. He admits that he does not even have a unit reservation contract, signed or unsigned, for floor 19.

276.   It would make no sense for the Debtor to have supposedly paid an entity over a million dollars of investor money, including supposedly his own money, pursuant to a purported transaction in a foreign country where no building exists and no contract exists.

277.   In fact, the Debtor's actions were undertaken with willfully and with malice and bad faith and intentional disregard of Plaintiffs' rights.

278.   If construction was completed in 2012 or 2013, then payments would have been made at this time. This includes a $1.1 million payment on the project's completion date in 2013. Other than the two payments totaling $813,000.00 in March/April 2008, the Debtor produced no other records of any other purported payments to Damac. This computation reflects that undisputedly, a substantial amount of investor money is missing and completely unaccounted for.

279.   The only records the Debtor has of any purported payments to Damac are the abovementioned purported and likely fake checks reflecting purported payments made in March 2008 and April 2008. The Debtor produced absolutely no record of where Plaintiffs' money went. The Debtor has no legitimate, legal or lawful explanation for the path in which Plaintiffs' funds traveled and the ultimate destination of the funds.

280.   At all times up through April 2017, the Debtor continued to represent to Plaintiffs that the transaction was consummated, that Plaintiffs were part owners in Tribeca, which owned the 16th floor of the Burjside Blvd building, built by Damac in Dubai. In May 2016, the Debtor and slightly changed his story, and then represented that Plaintiff's holdings were in the Signature building, built by Damac, in Dubai.

281.    The Debtor then admitted for the first time in August 2018 that he never owned title to any real property on the 16th or 19th floor.

282.    The purported (likely fake) checks produced by the Debtor starkly conflict with the bank records.

283.    The bank records show that Tony Chang made six wire transfers to Bode's account totaling $1,519,217.64 between November 5, 2007 and April 2, 2008. This money did not move from Bode's account until April 10, 2008, when Bode wired $784,000.00 to himself.

284.    None of these documented bank actions match the questionable documentation of untraceable and unverifiable checks that the Debtor produced dated March 23, 2008 ($600,000.00) and April 3, 2008 ($213,000.00). That documentation purportedly shows *receipt of money by Damac*. If the funds remained in Bode's account until at least April 10, 2008, it is impossible for Damac to have received payments on March 23, 2008 ($600,000.00) and April 3, 2008 ($213,000.00).

285.    The evidence demonstrates that the Debtor not only committed fraud and theft, it shows that the Debtor continues to commit fraud in furtherance of, and to cover up, his other acts of fraud and theft.

286.    The Debtor is acting in bad faith, recklessly, wantonly and callously and he has intentionally misrepresented the status of, and his actions related to, the investment in order to fraudulently obtain and illegally retain Plaintiffs' money.

287.    Through false representations, as set forth herein, and brazen deceit that continues unabated, the Debtor has delayed the date on which Plaintiffs became aware of these claims. It was not until the timeframe following the May 23, 2016 Call and Plaintiffs' realization that the Debtor's failure to follow up with the documents he promised to provide meant that the Debtor

had been lying when he represented that the investment was fine and that rents should be coming shortly.

288.    Moreover, it was not until litigation began that the Debtor's story changed and morphed in 2017 and 2018 into the assertion that Damac supposedly "seized" Plaintiffs' investment funds in 2007 or 2008.

289.    It was not until August 21, 2018 that Plaintiff discovered additional material facts, including but not limited to the fact that the Debtor never owned any real property on the 16th or 19th floor.

290.    Plaintiffs' causes of action did not accrue until the timeframe between 2016 and 2018. Furthermore, the Debtor's story continues to change and mutate, and the Debtor tells more lies each time he is caught in more lies.

291.    Because of the delay in the construction of the Burjside Blvd or Signature building until 2012 or 2013 and the Debtor's numerous misrepresentations up through and after the May 23, 2016 Call, and afterward in April 2017 and August 2018, Plaintiffs became aware of their claims for the first time between 2016 and 2018 pursuant to delayed discovery. Plaintiffs became aware of additional and new material information pertaining to their claims in 2017 and 2018 as the Debtor continues to make false representation after false representation.

292.    The Debtor's production of documents in March 2018, and his discovery responses, provided August and September 2018 are the dates of discovery for facts supporting the claims set forth in this Complaint.

293.    For the first time in April 2017, the Debtor admitted that Plaintiff Katz's $150,000.00 investment had been lost pursuant to a purported default that supposedly occurred before 2010. Yet the Debtor admits that he never told Plaintiff Katz about the purported default

until after Plaintiff Katz sued the Debtor and that he never even asked Plaintiff Katz for an additional investment to avoid a purported default.

294.    In further perpetuating his fraudulent scheme, Defendant Simone made additional false representations to Plaintiff Woolf up through at least 2016, which caused Plaintiff Woolf to expend an additional $16,304.99 in money out of pocket maintaining the UAE corporate registrations of Soho Capital Partners Ltd. for the purpose of the fake investment in the Burjside Blvd building.  While the Debtor made these false representations about the existence and continued viability of the investment, the Debtor knew that the investment was a fraud and did not exist.

295.    Plaintiffs have been forced to engage counsel and to incur attorney's fees as a result of the Debtor's wrongful acts.

296.    The Debtor's wrongful actions involve a violation of a duty springing from a relationship of trust and/or confidence.

297.    The Debtor abused his professional status by making repeated fraudulent representations.

298.    The Debtor acted with a high degree of malice and premeditation, intent, bad faith, wanton recklessness, scienter and moral turpitude in planning, carrying out and concealing his fraudulent scheme.

299.    The Debtor engaged in egregious conduct as described herein that was part of a pattern of similar conduct, as shown in his prior convictions, to which there was apparently no deterrent effect, directed at those with whom the Debtor had a fiduciary relationship.

### COUNT I – NON-DISCHARGEABILITY OF DEBTS OWED TO PLAINTIFFS UNDER SECTION 523(a)(2)(A) OF THE BANKRUPTCY CODE

300.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 299 as fully set forth herein.

301.     Bankruptcy Code § 523(a)(2)(A) provides as follows in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> (A) false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

302.     All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt for money, property, services, or an extension, renewal, or refinancing of credit, that was obtained by false pretenses, a false representation, or actual fraud within the meaning of Bankruptcy Code § 523(a)(2)(A).

### COUNT II – NON-DISCHARGEABILITY OF DEBTS OWED TO PLAINTIFFS UNDER SECTION 523(a)(2)(B) OF THE BANKRUPTCY CODE

303.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 299 as fully set forth herein.

304.     Bankruptcy Code § 523(a)(2)(B) provides as follows in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> (B) use of a statement in writing—
>     (i) that is materially false;
>     (ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive; or

305.   All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt for money, property, services, or an extension, renewal, or refinancing of credit, that was obtained by use of a statement in writing that is materially false, respecting the Debtor's or an insider's financial condition on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied and that the debtor caused to be made or published with intent to deceive within the meaning of Bankruptcy Code § 523(a)(2)(B).

### COUNT III – NON-DISCHARGEABILITY OF DEBTS OWED TO PLAINTIFFS UNDER SECTION 523(a)(4) OF THE BANKRUPTCY CODE

306.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 299 as fully set forth herein.

307.   Bankruptcy Code § 523(a)(4) provides as follows in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny,

308.   All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt incurred through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of Bankruptcy Code § 523(a)(4).

### COUNT IV – NON-DISCHARGEABILITY OF DEBTS OWED TO PLAINTIFFS UNDER SECTION 523(a)(6) OF THE BANKRUPTCY CODE

309.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 299 as fully set forth herein.

310.   Bankruptcy Code § 523(a)(6) provides as follows in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

311.     All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt incurred through willful and malicious injury by the Debtor to another entity or to the property of another entity within the meaning of Bankruptcy Code § 523(a)(6).

## COUNT V – NON-DISCHARGEABILITY OF DEBTS OWED TO PLAINTIFFS UNDER SECTION 727(a)(3) OF THE BANKRUPTCY CODE

312.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 299 as fully set forth herein.

313.     Bankruptcy Code § 727(a)(3) provides as follows in relevant part:

(a) The court shall grant the debtor a discharge, unless . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . .

314.     Debtor, in his operation of his fraudulent scheme, concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained.

315.     By virtue of the foregoing, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(3).

**COUNT VI – NON-DISCHARGEABILITY OF DEBTS OWED TO PLAINTIFFS
UNDER SECTION 727(a)(4)(A) OF THE BANKRUPTCY CODE**

316.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 299 as fully set forth herein.

317.    Bankruptcy Code § 727(a)(4) provides as follows in relevant part:

(a) The court shall grant the debtor a discharge, unless . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case –
   (A) made a false oath or account

318.    Debtor, knowingly and fraudulently, in or in connection with the case, made a false oath or account.

319.    By virtue of the Debtor's false representations and omissions, and the oath he took concerning the veracity of his submissions, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(4)(A).

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a Judgment determining that the debts owed by the Debtor to Plaintiffs Andrew Woolf, Andrew Katz and Elena Vagnerova are non-dischargeable under Bankruptcy Code § § 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)6) or, in the alternative, denying the Debtor's discharge under Bankruptcy Code § § 727(a)(3) and 727(a)(4)(A), and granting Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

PULLMAN & COMLEY, LLC

By:    */s/ Elizabeth J. Austin*
    Elizabeth J. Austin (ct04384)
    Pullman & Comley, LLC
    850 Main Street
    Bridgeport, CT 06601
    Tel: (203) 330-2243
    Fax: (203) 576-8888
    Email: eaustin@pullcom.com

CHASE LAW, LLC

By:    */s/ Kenneth E. Chase*
    Kenneth E. Chase
    Admitted *Pro Hac Vice*
    Chase Law, LLC
    1509 16th Street NW, Suite 500
    Washington, DC 20036
    Tel: (202) 365-5130
    Fax: (202) 379-9550
    Email: kchase@chaselaw.com

## CERTIFICATE OF SERVICE

I, Elizabeth J. Austin, hereby certify that I served the foregoing on the via the CM/ECF

on March 15, 2019, which sends notice electronically to all counsel of record.

By:    */s/ Elizabeth J. Austin*
    Elizabeth J. Austin