**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **RICHARD P. SIMONE,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | **Case No. 18-21993** |
| | ) | |
| _____ | ) | **Adv. Proceeding No. 19-2005** |
| | ) | |
| **ANDREW WOOLF, ANDREW KATZ,** | ) | |
| **and ELENA VAGNEROVA** | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| **vs.** | ) | |
| | ) | |
| **RICHARD P. SIMONE,** | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S LOCAL RULE 56(a)(2) STATEMENT IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)(2) of the United States District for the District of Connecticut, Defendant Richard P. Simone hereby submits his Statement of Facts in Opposition to the Plaintiffs Andrew Woolf, Andrew Katz and Elena Vagnerova (collectively, "Plaintiffs") motion for summary judgment. There are genuine issues of material fact that preclude the entry of summary judgment on each and every count of Plaintiffs Six Count Complaint. In addition to disputing and responding to Plaintiffs' statements, on a statement by statement basis, the Defendant also submits Additional Material Facts not previously set forth in responding to the Plaintiffs' Local Rule 56(a)(1) statement, that establish genuine issues of material fact precluding judgment in favor of the movants.

**<u>DEFENDANT'S PARAGRAPH BY PARAGRAPH RESPONSE TO PLAINTIFFS LOCAL RULE 56(A)(1) STATEMENT</u>**

1.    The Debtor was a stock broker in the 1990's, was arrested in 1997, prosecuted by the Manhattan District Attorney's office and he "admitted stealing more than $800,000 from one

client of the firm. He pleaded guilty to one count of Grand Larceny in the Second Degree and was sentenced to serve five years of probation and to pay a $5,000 fine." (Case No. 3702-1997); Ex. P1 at 3; *People v. Simone*, 771 N.Y.S. 2d 304, 306 (2003); Ex. P3 at 1 (certified conviction).

**Response:**    The Defendant Objects to Paragraph 1 of the Plaintiffs' Statement.    The documentation supplied by the Plaintiff in support of Paragraph 1 does not contain a copy and specification of the indictment that was the subject matter of that prosecution.    Absent the actual indictment in the record, there is insufficient evidence in Plaintiffs' submission from which the Court could make the finding contended for by the Plaintiffs herein.    A statement in a judicial opinion approximately five years after the conviction by guilty plea does not suffice to establish the specification of the indictment to which the Defendant pled guilty.    Further, the Defendant objects to the admissibility of this evidence under Fed. R. Evid. 404.    If the court were to find a basis to permit evidence of past criminal conduct under Fed. R. Evid. 404, then the Defendant's further response would be as follows:    The Defendant, in 1998, pled guilty to grand larceny in the second degree, receiving a $5,000 fine and 5 years of probation.    The transaction that was the subject matter of the guilty plea is believed by the Defendant to have been an "unauthorized trade" done by the chairman (Andrew Bressman) of the brokerage firm at which the Defendant worked, with respect to a client account for which the Defendant had managerial responsibility. Declaration of Richard P. Simone dated March 12, 2020 (Simone Decl.) at ¶ 46.

2.    For these actions and others, the Debtor was sanctioned by regulators, disbarred by the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") and as of 1997, prohibited from associating with any broker deal that sells securities to the public. Ex. P2; Ex. 46, 71:17-72:11.

**Response:**  The Defendant objects to Paragraph 2 of the Plaintiffs' Statement.  The SEC order provides as follows: Solely for the purpose of this proceeding and any other proceeding brought by or on behalf of the Commission, or in which the commission is a party, and without admitting or denying the findings contained herein, except as to jurisdiction of the Commission over the Respondent and the subject matter of this proceeding, and as to the entry of the conviction set forth in paragraph II.B.1. and II.D. below, which are admitted.  See Doc 107-2 at pp. 12 14-15.  The conviction refers to the Defendant "allowing Bressman to execute the unauthorized purchases of 104,000 Cypros shares for the Fiduciary account."  Further, the Defendant objects to the admissibility of this evidence under Fed. R. Evid. 404.

3.     While on probation, the Debtor again stole money from his clients (this time his wealthy uncle's trustees) through a "sleight of hand" in sending bank wires to offshore bank accounts that he controlled. Ex. P1 at 3, *People v. Simone*, 771 N.Y.S. at 306.[1]

**Response:** The Defendant objects to this Statement for the following reasons: First, the matter to which the Defendant pled was an unauthorized trade, as stated in response to Paragraph 1. Therefore, the Defendant disputes that he stole money in connection with that conviction. Second, the Defendant objects to the admissibility of this evidence under Fed. R. Evid. 404. Otherwise, the findings by the New York Supreme Court in connection with a hearing to determine whether the Defendant's parole should  be revoked are consistent with the Plaintiffs' characterization of them.

---

[1]  The New York Supreme Court found as follows:

> Defendant employed a ruse to trick the trustees into authorizing what appeared to be routine wire transfers of money from one Isle of Man account to another. He supplied the trustees with the name of an Isle of Man account into which the money should be deposited and an account number. Unbeknownst to the trustees, defendant had supplied the account number for Simone Development at Salomon Smith Barney, not the Isle of Man account. Based on the information supplied by defendant, the trustees prepared a wire transfer that named an Isle of Man account as the recipient of the transfer, but which contained the account

number for Simone Development.

Contrary to defendant's suggestion at the hearing, these transfers did not occur because of error. As of December 2, 2002, more than $200,000 had flowed into the Simone Development account. Yet the hearing record contains no evidence that defendant alerted the trustees to the existence of these transfers, tried to return this money to the Isle of Man companies, or took steps to prevent additional money from flowing into his account. An honest person would have taken any one of those steps had the money found its way into that account by accident or mistake. Instead, defendant commingled the Isle of Man money with the money that he used to pay his personal expenses, and used the commingled funds to pay for everyday expenses.

Defendant's scheme also provided him with a ready-made excuse for the transfers if they had been discovered at an early stage of the scheme. In each instance,

4.        After another criminal indictment and a violation of probation proceeding on his

1997 case, on February 10, 2004, the New York Supreme Court resentenced the Debtor to 18 to

54 months in state prison, on April 15, 2004, the Debtor pled guilty to new charges and

was convicted of Attempted Grand Larceny Third Degree (Case No. 3328-2003) and on

March 31,

2005, the Debtor was sentenced to a prison term of 18 to 36 months pursuant to the new charges.

*Id*.; Ex. P50 at 50:10-15; Ex. P3 (certified conviction).

**Response:**  The Defendant objects to the admissibility of this evidence under Fed. R. Evid.

404.   In the event that the Court finds a basis to admit that evidence, Paragraph 4 of the

Statement is true.

5.        In parts of 2005 and 2006, the Debtor was incarcerated for approximately one

year, for a total of 15 months of incarceration including time in 2003. Ex. P50 at 116:11-

118:17.

**Response:**  The Defendant objects to the admissibility of this evidence under Fed. R. Evid.

404. In the event that the Court finds a basis to admit that evidence, Paragraph 5 of the Statement is true.

> 6. The Debtor was released from prison in 2006 on parole. P46 at 120:23-25.

**Response:** The Defendant objects to the admissibility of this evidence under Fed. R. Evid. 404. In the event that the Court finds a basis to admit that evidence, Paragraph 5 of the Statement is true.

> 7. The Debtor had never visited the United Arab Emirates until 2007. *Id*. at 120:14-22; 123:8-10.

**Response:** Paragraph 7 is admitted.

---

> defendant purportedly had directed the money to be deposited in an Isle of Man account at Salomon Smith Barney, the same place where defendant had his Simone Development account. If the transfers had been discovered the first time or soon thereafter, defendant plausibly could have claimed that he had given the trustees the wrong Salomon Smith Barney account number or that the transfer resulted from an internal mistake at Salomon Smith Barney. Defendant thus had devised a scheme that was carefully crafted to provide an excuse if the transfers were discovered but which could continue as needed if not discovered.

> Taking into account defendant's motive to lie, the court concludes that defendant did, in fact, lie when he stated that he had four or five stock accounts…Defendant also lied when he stated that he was trading securities exclusively for himself…Defendant again lied to the court when he denied having sent money to any other "individual" except his father.

> And having lied earlier about the number of stock accounts under this control, defendant cannot now leverage that lie to argue that the answer was literally true for the funds contained in his own personal account. Consequently, the court is convinced that defendant lied.

*Id*. at 309, 313-14.

> 8. In 2007, the Debtor represented to Plaintiff Woolf, his friend from college, that the Debtor knew about a very lucrative real estate investment in Dubai, United Arab Emirates.

ECF No. 1 at ¶ 56,81; ECF No. 31 at ¶ 56,81. In 2007 and 2008, the Debtor solicited and obtained an investment of $225,000.00 from Plaintiff Woolf, $150,000.00 from Plaintiff Katz and $120,000 from Plaintiff Vagnerova. P56 at 64, 66; Ex. P56 at 81; Ex. P59 at 23; Ex. P63 at 5-6; Ex. P46,

140:8:18. The Debtor solicited Plaintiff Woolf to invest his money with the Debtor in what the Debtor described as a joint or pooled purchase of units in a pre-construction building in Dubai. ECF No. 1 at ¶ 82; ECF No. 31 at ¶ 82.

**Response:** The first sentence and the last sentence of Paragraph 8 are admitted. The Defendant objects to the middle sentence of Paragraph 8 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence. In particular Plaintiff's Exhibit 56 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 56 are inadmissible on this motion. Likewise, Plaintiff's Exhibit 59 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 59 are inadmissible on this motion. So, too, Plaintiff's Exhibit 63 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 63 are inadmissible on this motion. Additionally, all of the exhibits identified in support of the middle sentence of Paragraph 8 are objected to on hearsay grounds.

9.      As represented by the Debtor, the building was called "Burjside Boulevard" and the developer was Damac Properties, a well-known and reputable Arab Emirates ("UAE") real estate developer ("Damac"). ECF No. 1 at ¶ 83; ECF No. 31 at ¶ 83.

**Response:** Paragraph 9 is admitted.

10.      In the latter part of 2007, the Debtor represented to Plaintiff Woolf that the "investment" consists of the entirety of Floor 16, which is comprised of nine units of one, two-

and three-bedroom layouts, of the pre-construction Burjside Blvd building (the so-called "Investment"). ECF No. 1 at ¶ 84; ECF No. 31 at ¶ 84.

**Response:** Paragraph 10 is admitted.

11.    On or about October 11, 2007, the Debtor circulated a "Term Sheet" setting forth the proposed Investment. Ex. P34.

**Response:** The Defendant objects to Paragraph 11 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's, have neither authenticated the exhibit or established the evidentiary basis for their contention that the document was "circulated."  The Defendant does not dispute that a Term Sheet was provided to the Plaintiffs and the Defendant laid a foundation for the admissibility of the Term Sheet affixed to his Declaration.

12.    The Debtor made the following representations in the Term Sheet:

   a.  The Investment is approximately **11,000** square feet per floor.

   b.  The developer is currently offering these apartments out at **2500 to 2900** (AED) per square foot if purchased individually.

   c.  The Emirates Mall is the **largest** shopping mall in the world.

   d.  The property is currently **under construction**; the property is in the **construction phase**.

   e.  The purchase price will be approximately **$5.0 million USD**.

   f.   Investors will invest 30 percent or $1.5 million USD. **We will finance 70%** or $3.5 million USD.

   g.  Monies will be **wired to my US attorney** but may be sent upon instruction from time to time **directly to developer**.

*Id*. (emphasis added).

**Response:**  The Defendant objects to Paragraph 12 to the extent the Plaintiffs contend that all of the statements contained therein constitute, and rise to the level of, a representation on which a

decision-maker should base his or her decision.

13.    As shown further herein, in this term sheet, the Debtor falsely represented material terms to at least Plaintiff Katz to induce investments. Ex. P11, Ans. 6 (Plaintiff "Katz made his investment based upon the terms proposed in a term sheet.")

**Response:**  The Defendant denies Paragraph 13.  Simone Decl. ¶¶ 6-8, 25 and <u>Exhibit A</u> (at pp. 1-4) <u>and BB</u> (at p. 1) and <u>Exhibit I</u> (at p. 3) thereto.

14.    The term sheet's misleading representation that the Emirates Mall is the "largest shopping mall" in the world is provably false at the time, as it was not even among the top 10 largest malls in the world as of October 11, 2007. "List of largest shopping malls," *available at* https://en.wikipedia.org/wiki/List_of_largest_shopping_malls.

**Response:**  The Defendant denies Paragraph 14, inasmuch as the ranking of the size of the area encompassed by the Emirates Mall was not a material term or focal point of the Term Sheet. Simone Decl. ¶¶ 6-8, 25 and <u>Exhibit A</u> (at pp. 1-4) <u>and BB</u> (at p. 1) and <u>Exhibit I</u> (at p. 3) thereto.

15.    On or around October 31, 2007, at the Debtor's direction, Plaintiff Katz wired $150,000.00 to the Debtor's attorney Tony Chang in New York to hold in escrow for the Investment. Ex. P56 at 81; Ex. P59 at 23.

**Response:**  The Defendant objects to Paragraph 15 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 56 is a page hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 56 are inadmissible on this motion.  Likewise, Plaintiff's Exhibit 59 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 59 are inadmissible on this motiony.

16.     On or about November 2, 2007 and on February 6, 2008, Plaintiff Woolf sent

Chang a wire and checks totaling $225,000.00, with $150,000.00 paid on November 2,

2007 and

$75,000.00 paid on February 6, 2008. Ex. P56 at 64, 66.

**Response:** The Defendant objects to Paragraph 16 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence.  In particular Plaintiff's Exhibit 56 is a hodgepodge of documents that

have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and,

accordingly, the contents of Exhibit 56 are inadmissible on this motion.

17.     On or about March 10, 2008, Plaintiff Vagnerova wired $120,000.00 to
the

Debtor's German friend named Stefan Bode ("Bode") per the Debtor's instructions. Ex. P63 at 5-

6; Ex. P46, 140:8:18.

**Response:** The Defendant objects to Paragraph 17 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence.  In particular, Plaintiff's Exhibit 63 is a hodgepodge of documents that

have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and,

accordingly, the contents of Exhibit 63 are inadmissible on this motion. Additionally, all of the

exhibits identified in support of the Paragraph 17 within Exhibit 63 are objected to on hearsay

grounds.

18.     The Debtor told Plaintiff Woolf that his investment would be tendered to
the

Developer for the Investment by Chang. ECF No. 1 at ¶ 88; ECF No. 31 at ¶ 88.

**Response:** The Defendant admits Paragraph 18.

19.     On November 2, 2007, the Debtor directed his attorney Chang to obtain

Woolf's written consent to wire Woolf's $150,000.00 to "Damac Properties Co., LLC" (the would-be Developer). Ex. P56 at 64.

**Response:** The Defendant objects to Paragraph 19 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence. In particular Plaintiff's Exhibit 56 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 56 are inadmissible on this motion.

20.      However, on the same day, November 2, 2007, the Debtor directed his attorney Chang in an email to wire Woolf's $150,000.00 to a bank account that did not belong to Damac, rather the Debtor directed Chang to wire Plaintiff Woolf's funds to Standard Chartered Bank New York Account No. xxxx-xxxx-78001, of Standard Chartered Bank Dubai Account No. xxxx-xxx-

2701, which belonged to a German friend of the Debtor named Stefan Bode. Ex. P56 at 64; Ex. P59 at 4.

**Response:**  The Defendant objects to Paragraph 20 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence. In particular Plaintiff's Exhibit 56 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 56 are inadmissible on this motion. Likewise, Plaintiff's Exhibit 59 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 59 are inadmissible on this motion.

21.      In the Debtor's November 2, 2007 email to Chang, the Debtor did not state

that Bode was the account holder of the recipient bank, rather the Debtor stated that the wire to

Bode's account was to be "reference Bode/ for Burjside Blvd floor 16." Ex. P59 at 4.

**Response:**  The Defendant objects to Paragraph 21 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence.  In particular Plaintiff's Exhibit 56 is a hodgepodge of documents that

have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and,

accordingly, the contents of Exhibit 56 are inadmissible on this motion.  Likewise, Plaintiff's

Exhibit 59 is a hodgepodge of documents that have not been authenticated or otherwise proven to

be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 59 are inadmissible on

this motion.


22.      The New York Supreme Court had previously made an express finding that
the

Debtor had engaged in this "sleight of hand" conduct with international bank accounts:

> Defendant was effectively the custodian of money not his own, much as he
> had
> been as a broker…Documentary evidence established that hundreds of
> thousands
> of dollars had been transferred from the Isle of Man brokerage accounts to
> a
> Financial   Management   Account   belonging   to   Simone
> Development.
>
> Defendant employed a ruse to trick the trustees into authorizing what appeared
> to be routine wire transfers of money from one Isle of Man account to another.
> He supplied the trustees with the name of an Isle of Man account into which the
> money should be deposited and an account number. Unbeknownst to the
> trustees, defendant had supplied the account number for Simone Development at
> Salomon Smith Barney, not the Isle of Man account. Based on the information
> supplied by
> **\*475** defendant, the trustees prepared a wire transfer that named an Isle of Man
> account as the recipient of the transfer, but which contained the account number
> for Simone Development.

Ex. P1 at 3, *People v. Simone*, 771 N.Y.S. at 308-09.

**Response:**  The Defendant objects to Paragraph 22 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  This is because Paragraph 22 is predicated upon the admissibility of Paragraphs 20 and 21, to which the Defendant has objected for the reasons set forth in the responses to those paragraphs.

23.       In 2007, the Debtor told Plaintiff Katz and Plaintiff Woolf that their investment

would be pooled with other investors for a $4 million or $5 million purchase of the entire "16th floor" in a preconstruction building in Dubai called "Burjside Boulevard" that was to be built by "Damac." ECF No. 1 at ¶ 100; ECF No. 31 at ¶ 100.

**Response:** The Defendant objects to Paragraph 23 to the extent that it may be construed to mean that the collective investors would themselves supply the $4 million or $5 million approximate purchase price, to the exclusion of financing (which, per the Term Sheet was to be approximately $3.5 million of said purchase price); otherwise, admitted.

24.       The Debtor told Plaintiff Katz that his money would be tendered to the Developer for the Investment by Chang. ECF No. 1 at ¶ 104; ECF No. 31 at ¶ 104.

**Response:**  Paragraph 24 is admitted.

25.       By early 2008, Debtor effectuated the transfer or direct payment of the entirety of Plaintiffs' $495,000.00 to *Bode's* Standard Chartered Bank account and not to any account of *Damac*. Ex. P46 at 152:17-161:17; P51.

**Response:**    The Defendant denies Paragraph 25 on the following grounds: The respective plaintiffs authorized the transfer of their respective funds to Bode's bank account, to be subsequently used in the Burjside Boulevard project purchase of a floor.  Deposition of R. Simone at (P46 at 152:17-161:17).  Defendant also objects on the grounds that Standard Charter Bank in America, which complied with the Subpoena, does not have access to the records to the extent that the Plaintiffs contend.  Defendant's Trial Exhibit 1 (Declaration (and

Certification) of Donna Hill dated December 16, 2019 at ¶¶ 2-6 and Exhibit B thereto at p. 1);

Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit

O (at p. 1) thereto; and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf)

at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.  Defendant objects further on the

grounds that there has been no authentication of Exhibit P51, nor any qualification of Exhibit

P51 as records of regularly conducted activity under Fed. R. Evid. 803 (6), making Exhibit P51

inadmissible under Fed. R. Evid. 802.


26.        For the next nine years, the Debtor lied to Plaintiffs about their

investments, claiming that the investment was successful; however, the Debtor now claims that

there was a so- called "default" and all of Plaintiffs' money is now supposedly all gone:

Q   Okay. Well, did you tell her that there was a, quote/unquote,
default? A   I did not.
Q   Okay. Why
not? A   I don't
know.
Q   You don't know why you lied?
        MR. GILMORE:
            Objection.
A   When you say don't know why I lied
    -- BY MR. CHASE:
Q   Did you lie to Elena in 2014 with respect to her
investment? A   I didn't tell her that there was a default.
Q   And so now you're saying there was a default
-- A   Uh-huh.
Q   -- correct? Is that a material
issue? A   I would imagine it is.
Q   Well, you'd imagine it is, or it isn't, or it is? Whether the money's gone or
    not, is that material or not?
A   It's material.
Q   You didn't tell her that in 2014,
correct? A   I did not tell her.
Q   You are either lying now or lying then, correct? Or both?

  MR. GILMORE: Objection.
  Form, foundation.
A   I didn't tell her back
  then. BY MR. CHASE:
Q   You didn't tell her the truth back then?
A   I didn't tell her that there was a default back
then. Q   Did you tell her the truth in 2014?

- 21 -

MR. GILMORE: Objection. Asked and
answered. A  I didn't tell her about the default.
   BY MR. CHASE:
Q  Sir, my question is: Did you tell her the truth in 2014; yes or
no? A  I did not.
Q  You lied to her, correct?
A  I didn't tell her about the default. The topic didn't come
up. Q  Oh, it didn't come up?
A  Right.
Q  Didn't she ask you about what the status was
   of her investment? Isn't that bringing up the
   topic?
A  The topic of the default did not come

up. Ex. P48 at 399:4-400:25.

Q.  So you knew that their money was gone in 2016?
A.  I knew it was less likely that we were going to be able to do
something. Q.  And you lied to them?
A.  I was not honest with them.
Q.  You lied to Andy Woolf; correct?
A.  I was not honest with them about the
default. Q.  You lied to Katz.
A.  I was not honest with
him. Q.  You lied to Elena
as well.
A.  I didn't speak to Elena in 2016.

*Id.* at 258:13-24.

**Response:**  The Defendant admits that for many years he did not inform the Plaintiffs that the

developer had declared a default, terminated the agreement and retained the monies paid as contract

damages and, that he led them to believe that the project and their investment therein was

progressing.  The Defendant objects to the extent that the Plaintiffs claim that the period of such

time was nine years, as the same being without proof as to the actual length of time before the

Defendant told the Plaintiffs the truth that the investment had been lost through said default and

termination.  The Defendant also denies that he stated the investment was successful.   Simone

Decl. ¶ 59.

27.      On May 23, 2016, Plaintiff Woolf, Plaintiff Katz and Plaintiff Katz's wife

Josette Wys-Katz conducted a call with the Debtor that was recorded and the Debtor did not say

anything about a "default." Ex. P62.

**Response:** The Defendant objects to Paragraph 27 on the following grounds: First, there is no Exhibit 62 filed with the motion for summary judgment.  Therefore this paragraph violates L.Civ.R. 56(a)(3).  To the extent that the Plaintiffs mean to refer to proposed trial Exhibit 62, the recording of the conversation violated the Florida Security of Communications Act, Fla. stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard.  Simone Decl. at ¶ 47.  Therefore, the recording is inadmissible as evidence.

      28.     On the May 23, 2016 call, the Debtor stated as follows:

      a.   The money was wired to Damac," wired "directly" from "Tony to Damac." *Id*. at 3,
          4.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      b.   "Tribeca Partners" is the official owner of Burjside 16th Floor. *Id*. at

      3.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      c.   "Stefan [Bode] had nothing to do with it." *Id*. at 6.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph

27.   Defendant denies paragraph 28 (c).  Simone Decl. ¶ 66.

      d.   The Debtor personally owns the 16th floor "with you guys [Plaintiffs]." *Id*. at 7.
**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      e.   The Debtor personally owns the 19th floor by himself "alone."

*Id.*

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      f.     The 16th floor is owned "by Tribeca." *Id*. at 8.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      g.  Maybe the building is called "the Signature" instead of "Burjside." *Id*. at 15.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      h.  The contract "could be in storage, it could be- I don't know. It could still be in Dubai…In a storage in my friends apartment. In storage downstairs from my friend's apartment." *Id*. at 17.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      i.   The price of the property that we own is "Um, about four and a half [million]." Id. at 18.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      j.   Four and a half million in cash was given to Damac. *Id*.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      k.   "We sent them a check. Remember I told you about that? . . . That was one of the payment. Remember I told you we wired it?" *Id*. at 19.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      l.   "I wired him [Bode] a lot of money." *Id* at 20.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

      m.  The last payment to Damac was "probably sometime in 2011 or 2012." *Id*. at 22.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

n.  When asked when he was going to Dubai to find out more information, the Debtor stated, "I don't know. Maybe in a month?" *Id*. at 26.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

o.  The Debtor stated that he would call Damac "tomorrow." *Id*. at

27.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

p.  Tribeca "is- got equity from all of us in it." *Id*. at 31.

**Response:** Defendant Objects to the admissibility of this statement, per the objection to paragraph 27.

29.    The above-referenced statements made by the Debtor on the recorded call are all false as discussed herein.

**Response:** Defendant objects to Paragraph 29 for the same reasons as the objection to Paragraph 29.  Further, Paragraph 29 is denied.  Some of the statements are not true, but all of them are not untrue.  Simone Decl. at ¶ 33, 48;   Deposition of R. Simone at (P46 at 152:17-161:17); Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O thereto; and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B thereto.

30.    Following the May 23, 2016 call, the Debtor failed to follow up with Plaintiffs or provide substantive information pertaining to Damac or Plaintiffs' investments. P58, P70.

**Response:** The Defendant objects to Paragraph 30, as it is based on documents (P58 and P 70) for which no foundation has been laid for their admissibility; further, P70 is entirely hearsay with no applicable exception to the hearsay rule, and much of P58 is hearsay, and they therefor are inadmissible under Fed.R.Evid. 802.

31.     On June 22, 2016, Plaintiff Katz sued the Debtor in Miami-Dade Circuit Court (Case No. 2016-15949).

**Response:** The Defendant Admits Paragraph 31.

32.     Even though the Debtor now claims that Bode received all of Plaintiffs' money, in the Debtor's April 26, 2017 Answers to Plaintiff Katz's First Set of Interrogatories, the Debtor failed to identify Bode as a person who "may have facts, documents, or information relating to the claims and allegations made by Plaintiff or defendant in this matter." Ex. P11, Ans. 3.

**Response:** The Defendant Admits Paragraph 32.

33.     In the Debtor's deposition, upon questioning, the Debtor was very reluctant to discuss his communications with Bode. Eventually, on October 23, 2019, 13 days *after* his deposition, the Debtor produced Whatsapp messages with Bode, showing consistent communications dating back from July 2, 2013 through October 5, 2019. Ex. P29 at 1-23.

**Response:** The Defendant denies that he was reluctant to discuss Bode's level of involvement with the Defendant's interactions with Damac and the role Bode played in handling monies.  The Defendant objects further to the extent that plaintiffs' claims, without foundation, that the 13-day period of time for producing a record of the Whatsapp messages was the responsibility of the Defendant.  The defendant objects further on the grounds that proposed Trial Ex. P29 is hearsay and, insofar as they pertain to Stefan Bode, there is no applicable exception to the hearsay rule. Fed. R. Evid. 802, 803. Further, the Defendant objects to Paragraph 33 on the grounds of relevancy under Fed. R. Evid. 402.  Lastly, there is no exhibit filed with the motion for summary judgment labeled and identified as Exhibit 29, and, for that reason, the paragraph fails to comply with L.Civ.R. 56 (a)(3).

34.     In the communications the Debtor produced, the Debtor did not ask Bode for any paperwork related to Plaintiffs' money, Damac, Dubai, Ocean Heights, Burjside Boulevard or the Signature. *Id.*

**Response:** The Defendant objects to Paragraph 34 on the grounds of relevancy under Fed. R. Evid. 402.

35.     Moreover, this time frame includes the timeframe from June 22, 2016 to November 2019, wherein the Debtor was engaged in litigation with Plaintiffs. Bode failed to produce an affidavit, a single email, a single document, or any phone records. Nothing Bode provided (as he provided nothing despite being in consistent communication with the Debtor) corroborated the Debtor's story/stories in any way. *Id.*

**Response:** The Defendant objects to Paragraph 34 on the grounds of relevancy under Fed. R. Evid. 402.   Further, the Defendant objects on the grounds that Bode is neither a party to the action, nor subject to the subpoena power of this court, as he lives in the country of Monaco.  It is not within the power of the Defendant to make any demands upon Bode.  Nor have the Plaintiffs made any showing that Stefan Bode would have documents in 2019 relating to activities with the Defendant in 2007 and/or 2008.

36.     Regarding the so-called Burjside Blvd "transaction/transactions," the Debtor stated in his first set of interrogatory answers on April 26, 2017 that he had a so-called "future ownership interest" from "summer of 2007 until we defaulted to DAMAC" on an unknown date, even though the Debtor previously claimed (up through 2016) that he actually owned floor 16 and floor 19 of the Burjside Boulevard building in his statements to Plaintiffs. *Id*., Ans. 5; Ex. P62.

**Response:** The Defendant objects to Paragraph 36 on the following grounds: The recording of the conversation violated the Florida Security of Communications Act, Fla. stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard.   Simone Decl. at ¶ 47.   Therefore, the recording (Exhibit 62) is inadmissible as evidence.

37.     The Debtor stated that "Tony Chang set up a company named Tribeca" and "Tony received the monies from investors. Monies were sent to the developer." Ex. P11, Ans. 5(e).

**Response:** The Defendant objects to Paragraph 37 because it is an incomplete statement of the Defendant's response.   To the extent stated, it is admitted that the Defendant made those statements in response to discovery in litigation in Florida.

38.     "I believe he [Plaintiff Katz] wired it Tony Chang. I believe these funds were sent to the developer, Damac Properties. Damac Properties kept our monies for default." *Id*., Ans. 7.

**Response:** The Defendant objects to Paragraph 38 because it is an incomplete statement of the Defendant's response, and the quotation is not stated correctly, leaving out words and not even using an ellipses.  To the extent stated, it is admitted that the Defendant made the statement that he believed [Plaintiff Katz] wired [his money] to Attorney Tony Chang and, further, that the Defendant stated that these funds were sent to the Developer, Damac Properties, and that Damac Properties kept our monies for default.

39.     The Debtor stated "[a]ll other documents in my possession or under my control that may be construed as being an agreement between myself and the developer have been produced to Plaintiff." *Id*., Ans. 6(e). At this time, the Debtor had produced just one contract – Ex. P4, which was a three-page "Unit Reservation Contract" dated June 6, 2007 (and 11/6/07) ("Contract 1"). Ex. P9 at 64-66.

**Response:** The Defendant objects because he cannot state confidently the entirety what documents were provided to Plaintiff Katz by attorneys from Florida who no longer are in his legal counsel. Furthermore, the Defendant objects on relevancy grounds, as the Federal Rules of Civil Procedure specifically contemplate, and make provision for, supplemental production as additional documents and information is discovered by a party litigant.  See, Fed.R.Civ. P. 26.

40.     Although the Debtor will later assert that hundreds of thousands of dollars of Plaintiffs' money actually went into his personal bank account at Emirates Bank in Dubai, and that

he purportedly made a payment to Damac with Plaintiffs' money, in his April 26, 2017 sworn interrogatory answers, the Debtor stated, "I did not handle plaintiff's investment funds so I did not make any payments on his behalf." Ex. P11, Ans. 6(e).

**Response:**    The Defendant admits that his understanding and belief is that a portion of the 2,000,000 AED payment made to Damac Properties in March of 2008 is composed of $150,000 each from Plaintiffs' Katz and Woolf.  He further admits that he now believes that the statement he made in 2017 was inaccurate, but he does not deny making that statement.

41.    Although the Debtor now claims that Damac is supposedly in possession of all $495,000.00 belonging to Plaintiffs (with no zero to show for it), Debtor never told Plaintiffs about any purported so-called seizure until 2017 *after* he was sued, and yet Debtor never hired a lawyer to attempt to recover Plaintiffs' money, or any of his other "investors'" money, or his own money. Ex. P46 at 174:16-176:2; 182:1-183:15; 248:15-17; Ex. P47 at 359:12-360:15.

**Response:**  The Defendant admits Paragraph 41.

42.    Although the Debtor will later say that he signed at least four contracts with Damac, and the Debtor produced three of the four contracts, Debtor testified under oath on April 9, 2018 that "there's only one contract" that he signed that "he was able to find" and that Contract 1 is the "full scope" of the contract he signed for Burjside. Ex. P44 at 59:17-25.

**Response:**  The Defendant admits Paragraph 42.

43.    Although the Debtor will later say that he defaulted on multiple Damac contracts, hundreds of thousands of dollars of investor money disappeared, the Debtor never closed on, or actually purchased, *any* real property in Dubai, the Debtor testified under oath on April 9, 2018 that he "bought a place in another building called Ocean Heights; has nothing to do with Mr. Katz." *Id*. at 64:4-23.

**Response:**  Paragraph 43 is denied, insofar as it alleges that investor money disappeared.  Damac terminated the agreement and retained the payments made thereon under the stated terms of the

agreement.  Simone Decl. ¶ 39.

44.     While the Debtor produced only Contract 1 in discovery, he had provided Plaintiff

Woolf with a different contract years ago that the Debtor failed to produce ("Contract 2"). Ex. P5.

**Response:** The Defendant objects to Paragraph 44 on the following grounds: The Plaintiffs have

not shown by admissible evidence, or provided the basis for, their claim that none of the discovery

produced by the Defendant in either the Florida litigation or this case contained both of two

versions of a manual contract that have the same operative terms, and that only one was produced.

Furthermore, it is entirely possible that years later, the Defendant in fact only had one version of

the manual contract (with the same operative terms) in his possession.  The Defendant also objects

to this paragraph on relevancy grounds (Fed.R.Evid. 402), as the existence of two versions of a

manual contract with the same operative terms does not tend to prove that either is not authentic.

45.     The Debtor never produced Contract 2 or even acknowledged its existence until

after Plaintiffs produced it in discovery. Ex. P44 at 59:17-25; Ex. P35, Ans. 1.

**Response:** The Defendant objects to Paragraph 45 on the following grounds: The Plaintiffs have

not shown by admissible evidence, or provided the basis for, their claim that none of the discovery

produced by the Defendant in either the Florida litigation or this case contained both of two

versions of a manual contract that have the same operative terms, and that only one was produced.

Furthermore, it is entirely possible that years later, the Defendant in fact only had one version of

the manual contract (with the same operative terms) in his possession.  The Defendant also objects

to this paragraph on relevancy grounds (Fed.R.Evid. 402), as the existence of two versions of a

manual contract with the same operative terms does not tend to prove that either is not authentic.

46.     In trying to explain why there are two similar contracts for the same real property,

both supposedly signed by the Debtor, and yet signed on different dates with different

countersignatures, by different countersignature parties, and a different page 3, in the Debtor's

Interrogatory answers dated July 31, 2019, the Debtor claimed that Contract 1 was "not countersigned" when he signed it, and that he subsequently received a countersigned version (undated) that was "unsigned by me" but signed by "Vinod Kumar" (even though the name "Mohamed R. Hegazi" was typed into the signature area where "Vinod Kumar" signed). (Contract 2). Ex. P35, Ans. 1; Ex. P5 at 3.

**Response:** The Defendant denies Paragraph 46 on the following grounds: (1) it is not the full explanation that he then was able to provide in responding to the interrogatory (P35); and (2) it inaccurately states that the name Mohamed R. Hegazi was typed, when it appears to be more in the nature of having been word-processed (the name Mohamed R. Hegazi is in larger font than any other words on the page, and his title appears beneath his name) (Ex. P5 at 3).

47.    The Debtor claims that he then subsequently signed Contract 2 (apparently failed to return it to anyone) and purportedly dated it (only on the third page rather than all three pages like Contract 1) "10/7/07." Ex. P35, Ans. 1; Ex. P4; Ex. P5 at 3. The date would be either July 10, 2007 or October 7, 2007.

**Response:**  The Defendant objects to Paragraph 47 on the following grounds: The Plaintiffs have not shown by admissible evidence, or provided the basis for, their claim that the Defendant did not return the second version of the manual contract to anyone.  The Defendant denies that he did not return signed contracts to Damac.  Simone Decl. ¶11-19 and Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37)..

48.    The Debtor claims that "around this time" (July 10, 2007 or October 7, 2007) he also received a copy of the contract that he "previously signed" (Contract 1) (ostensibly by mail since no emails corroborate this) purportedly countersigned by "Moha<u>mm</u>ed" (aka "Moha<u>m</u>ed") (two mm's v. one m) Hegazi, Director of Sales of Damac dated "11/6/07." Ex. P35, Ans. 1. The date would likely be June 11, 2017, it could be November 6, 2007.

**Response:** The Defendant objects to Paragraph 48 on the following grounds: The Plaintiffs have not shown, and cannot show, by admissible evidence that these contracts were not received by the Defendant from Damac.  Further, an examination of the contract signed by Damac through Hegazi on 11/6/07 does not have a spelling of the name Mohamed.  In his answer, the Defendant obviously mis-spelled Mr. Hegazi's last name.

49.    The Debtor failed to produce a single original document, contract, purported "receipt" or anything else, in this litigation or in any other litigation with Plaintiffs, dating back to 2016.

**Response:** The Defendant objects to Paragraph 49 to the extent that it purports to require the Defendant to evaluate and speak to what was produced in connection with work done by attorneys in Florida who no longer are retained by him, in another lawsuit.  The Defendant admits that documents produced by him in this Adversary Proceeding are copies of documents, and that he does not currently possess original documents.

50.    The Debtor did not explain, *inter alia*, how June 11, 2007 and July 10, 2007 are "around the same time," why Damac would sign two different contracts by two different people (on a three-page white-out marked purported document for millions and millions of dollars, which does not even contain the word Damac anywhere on it), why there are no originals, or emails with attachments, or faxes reflecting receipt of any of these documents from their purported original source, or why page 3 of the Unit Reservation Contract is actually a different document:

Contract 1 (Ex. P4 at 3):
Debtor produced in discovery
Claims he signed originally and then received in the mail

Contract 2 (Ex. P5 at 3)


Debtor provided to Plaintiff Woolf
Claims he received in the mail unsigned (and **undated**) and then subsequently signed



**Response:**  The Defendant objects to Paragraph 50 because it violates L.Civ.R. 56(a)(3). Additionally, the Defendant denies Paragraph 50.  Simone Decl. ¶¶ 11-19 and Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37).


51.    The Debtor failed to explain why this three-page contract looks like white-out was used on it, and yet this supposedly relates to a $5 million+ dollar (AED 18,646,600.00 / USD $5,077,469.18) purchase of the entire 16th floor of the preconstruction Burjside boulevard building.

**Response:**  The Defendant objects to Paragraph 51 on the following grounds: The Plaintiffs have not shown by admissible evidence, or provided the basis for, their claim that the document looks like white-out was used on it (a characterization with which the Defendant disagrees).  Additionally, the defendant denies Paragraph 51.  Simone Decl. ¶¶ 11-19 and Exhibit

C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37).  Simone Decl. ¶¶

11-19 and Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37).

52.     However, neither contract bothers to reference Damac or Damac Properties, the so-

called "developer" according to the Debtor, or specifies where to send money, or how to make it

payable, and no paper trail shows actual payment of money. Ex. P4; Ex. P5.

**Response:** The Defendant objects to Paragraph 52 because it violates L.Civ.R. 56(a)(3).

Additionally, the Defendant denies Paragraph 52.  Simone Decl. ¶¶  11-19, 21-22, 26, 32-35.

Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37), Exhibit G

(at p. 1), Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit P (at p. 1)  Exhibit S (at p.1)

53.     The actual date of execution (whenever that happened, if that happened – two

different dates in Contract 1 and undated for the purported "seller" in Contract 2) should be noted,

among other things, because of the payment schedule, whereby pursuant to both contracts, 10% of

the purchase price ($507,746.92) is due "on reservation" and then the first four payments must be

made pursuant to the following schedule:

| | |
|---|---|
| June 6, 2007 (on reservation): | $507,746.92 (10%) |
| July 6, 2007 (within 30 days): | $507,746.92 (10%) |
| October 6, 2007 (within 120 days): | $507,746.92 (10%) |
| January 6, 2008 (within 180 days): | $507,746.92 (10%) |
| **Total:** | **$2,030,987.67** |

Ex. P4 at 2.

**Response:**  The Defendant denies Paragraph 53.  Simone Decl. ¶¶ 11-19 and Exhibit C (at

pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37).  Simone Decl. ¶¶ 11-19

and Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37).

54.     The Debtor contends that June 6, 2007 is the date of reservation and that Contract

1 is the operative contract. Ex. P46 at 252:24-253:3.

**Response:** The Defendant objects to Paragraph 52 because it violates L.Civ.R. 56(a)(3).

Additionally, the Defendant denies Paragraph 52.    Simone Decl. ¶¶ 11-19, 21-22, 26, 32-37.

Simone Decl. ¶¶ 11-19, 21-22, 26, 32-35. Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E

(at pp. 1-4), Exhibit F (at 1-37), Exhibit G (at p. 1), Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit P (at

p. 1), Exhibit Q (at pp. 1-5),  Exhibit S (at p.1).

55.    The Debtor has not produced any letters of default from Damac, or any invoices

pursuant to any actual payment plan.

**Response:**  The Defendant admits Paragraph 55 insofar as it states that he has not produced any

letters of default from Damac (none could be found), except to the extent that Exhibit G (at p. 1) to

the Simone Declaration may be an early notice of default, but it is not a notice of termination and

exercise of rights to retain payments.  As to the balance of the paragraph, the Defendant objects

thereto because it violates L.Civ.R. 56(a)(3).

56.    When asked if there were two different contracts, the Debtor admits he never said

anything to Plaintiffs about two different "versions" of the contracts. *Id.* at 252:24:253:24.

**Response:**  The Defendant admits Paragraph 56 insofar as it states that he did not mention to the

Plaintiffs that the same contract was signed at two different times between the parties thereto.

57.    Contract 1 and Contract 2 (which have different dates, yet are supposedly for the

same 16th floor of Burjside Blvd) provide that a "detailed Agreement of Sale" must be signed

within one week of reservation. Ex. P4 at 2; Ex. P5 at 2.

**Response:** The Defendant denies Paragraph 57.  Simone Decl. ¶¶ 14-16, Ex. D thereto at p. 2 Ex.

E thereto at p. 4 (¶¶ 3, 14 in each exhibit).

58.    Contract 1 and Contract 2 provide further provide that if any payments are not made

pursuant to the schedule or if the Agreement of Sale is not signed within a week, then the

Developer can retain all money paid up through that time. *Id.*

**Response:** The Defendant denies Paragraph 58.  Simone Decl. ¶¶ 14-18, Ex. D thereto at p. 2 Ex.

E thereto at p. 4.

59.    When asked if he made the four $507,746.92 progress payments owed before January 6, 2008, the Debtor first testified: "I think I paid close to that number, somewhere between 4 and 500." Ex. P46 at 210:24-212:1.

**Response:** The Defendant denies Paragraph 59. Ex. P46 at 210:24-212:1.

60.    However, the Debtor could not point to any documentation reflecting even one $507,746.92 payment (let alone four payments), or anything in that range, and as the only evidence of any payment before March 23, 2008 (that date will be discussed later), the Debtor referred to a purported September 20, 2007 email from "Mohammed Wael" where Wael purportedly "checked the transfers" and "found out" that "we" have received two transfers, one with "200,000 $ and one with 74,000 $." Ex. P10 at 6.

**Response:** The Defendant objects to Paragraph 60 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence. In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

61.    In this same purported email, Wael asked the Debtor for the name of his company, apparently the Debtor did not respond to this purported email or send the 758,136 $ that was apparently owed. *Id*.

**Response:** The Defendant objects to Paragraph 60 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence. In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

62.     Debtor reiterated that he has no other evidence to support making payments to Damac other than the email from Wael, alleging "transfers" totaling $274,000. Ex. P46, 316:9-317:4.

**Response:** The Defendant objects to Paragraph 62 because it violates L.Civ.R. 56(a)(3). Additionally, the Defendant denies Paragraph 62. Simone Decl. ¶¶  11-19, 21-22, 26, 32-35. Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37), Exhibit G (at p. 1), Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit P (at p. 1)  Exhibit S (at p.1).

63.     On September 26, 2007 at 9:04 AM, the Debtor supposedly forwarded this email (pertaining to the Debtor's purported $274,000.00 in payments) to a lawyer named Catherine Gill at Clyde & Co. Ex. P10 at 6.

**Response:** The Defendant objects to Paragraph 63 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

64.     The documents reflect a reply from Ms. Gill on September 26, 2007 at 14:38 +0400, noting that she reviewed "the reservation contracts," i.e., the typed-up versions of each individual unit on the 16th floor (and not any signed contract) (Ex. P9 at 3-38). Ex. P10 at 3.

**Response:** The Defendant objects to Paragraph 64 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

65.    On September 26, 2007, more than three months after the purported June 6, 2007 reservation was signed (Contract 1) and two months after July 10, 2007 when Contract 2 was supposedly signed, Ms. Gill remarked "you have already paid a holding sum of US$2,500 and a further sum of US$ 100,000 to Damac **but have not yet signed any agreement**." *Id*. at 4 (emphasis added).

**Response:** The Defendant objects to Paragraph 65 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

66.    Ms. Gill referenced that $102,500.00 in payments had been made, and this conflicts with the Debtor's reference to a document reflecting Wael's assertion of $274,000 in (unspecified person's so-called) "transfers." Ex. P10 at 6. Either the Debtor did not reply to this email or he otherwise failed to produce his response. Ex. P10.

**Response:** The Defendant objects to Paragraph 66 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

67.    Ms. Gill stated that she could further review the matter for an estimated AED 10,000 ($2,723.00). Despite referencing Ms. Gill 23 times in his deposition, the Debtor testified that he did not actually retain her services:

Well, Kathy Gill was involved in 2008, and when I say -- when you say hired, I'm not sure I even hired her. I looked at the e-mail to her, and at the end of the e-mail

she requested like a 10,000 dirham, or something, retainer fee to go forward with something. I'm not sure I retained her or not. I may have paid her something to do the review, but I can't remember.

P46 at 174:25-175:6.

**Response:** The Defendant denies Paragraph 67.  The paragraph is inconsistent with the quoted text from the deposition.

68.     However, the Debtor previously testified on April 9, 2018 that he *had* hired Ms. Gill:

A. There was a dispute on that, too, because if you total all of these, it totals 23.5 millions, whereas the original one that I signed was before 18.6 million, so that was one of the issues that was discovered **when I brought the case to Clyde & Co.**

Q. Okay. Did you sign one of the documents that you received by e-mail from Mr. Wael? Did you sign one of these?

A. I don't think I did, because we had that dispute and, then, secondly, we wanted to put this in the corporate name, Tribeca, **so I hired Clyde & Co. to discuss this with Damac.**

Ex. P44 at 66:10-20 (emphasis added).

**Response:** The Defendant admits Paragraph 68.

69.     Although Contract 1 and Contract 2 call for $507,746.92 to be paid on reservation, the Debtor claimed he paid "[p]robably 5 or 10 grand" on a credit card to the developer while at the pool on June 6, 2007 when he signed the reservation "just to start the deal." Ex. P46 at 213:4-22. However, the Debtor did not produce any evidence of any credit card payment. *Id.* at 251:21-252:6.

**Response:** The Defendant denies Paragraph 69.  Simone Decl. ¶¶ 11-19 and Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37) thereto: Tr. Simone Depo. Oct. 9, 2019 at pp. 254-56.

70.    The Debtor admitted that he has not looked for the credit card statement. *Id.* at 307:21-25.

**Response:** The Defendant objects to Paragraph 70 because it violates L.Civ.R. 56(a)(3).

71.    When asked which credit card he gave Damac, he stated that he did not know because it was a credit card from over 12 years ago. *Id.*

**Response:** The Defendant objects to Paragraph 71 because it violates L.Civ.R. 56(a)(3).

72.    He then admitted that he "was not truthful" given the fact that he lied to people for over a decade. *Id.* at 312:18-313:4.

**Response:** The Defendant objects to Paragraph 72 because it violates L.Civ.R. 56(a)(3).

73.    Specifically, the Debtor admitted that he lied to Plaintiffs multiple times for over a decade and that he had falling outs with many more people over the years. *Id.* at 263:16-264:6; 279:17-280:7.

**Response:** The Defendant objects to Paragraph 73 because it violates L.Civ.R. 56(a)(3), to the extent that said paragraph asserts that the Defendant lied to the plaintiffs for an entire decade (it is not disputed that the Defendant did not inform the plaintiffs about the default and termination of the agreement with Damac, and the resulting loss of the payments made to Damac, until many years after the fact).

74.    Additionally, the Debtor failed to produce any of his bank statements, nor any documentation showing that he requested any statements from his banks. Ex. P47 at 330:17-332:3. All records received from banks in this litigation (to find out what Debtor did with Plaintiffs' money, and at the end he finally admitted that Plaintiffs' money went into his personal account) were obtained by Plaintiffs and provided to the Debtor. Exs. P51, P52, P53, P54, P55.

**Response:**  The Defendant denies Paragraph 74.  Simone Decl. ¶ 32-33, Exhibit O thereto, at pp. 3,4.

75.    The Debtor admitted that he failed to make any of the $507,746.92 progress

payments. He testified as follows in his deposition.

> Q.  And so when you read the contract, you saw that the first installment of
> another 10 percent was due within 30 days of reservation.
> A.  Mm-hmm.
> Q.  You read that;  right?
> A.  Mm-hmm.
> Q.  And so that you knew by July 7th another $500,000 was due. You knew that;
> right?
> A.  Yeah.
> Q.  And you didn't pay it.'
> A.  Well, we had a dispute with DAMAC, which you saw in the letter to Kathy
> Gill, at the end of the summer in 2007.
> Q.  The answer is yes or no, did you pay it or not?
> A.  I don't think I paid  it.
> Q.  Okay. And then 120 days of reservation that would be four months after June,
> that puts us not in October, October 6th, another 500,000. You didn't pay that.

Ex. P46 at 218:4-23.

**Response:** The Defendant admits that the full amount of a progress payment was not made on

Floor 16 when due, but he denies plaintiffs' contention that no ten percent payments were ever

made concerning a Burjside Blvd. floor acquisition for the pooled (group) purchase, or that other

substantial payments were not made towards the purchase.  Simone Decl. ¶¶ 21-22, 32, 33 and

Exhibit G (at p. 1), Exhibit O (at pp. 2, 3, 4, 5, 7, 8) thereto.


76.    The Debtor then asserted that his failure to make the four $507,746.92 progress

payments to Damac was due to a so-called "dispute":

> Okay. Okay, sir, I had this dispute with DAMAC over the issues that I mentioned
> this morning. One was the 18.6 million versus the 23 million that they wanted on
> the printed out versions of the contracts. Um, the other one was putting it in
> corporate name. They weren't so quick to put it in corporate name, and I had some
> issues with them, and that's why I initiated that letter to Kathy -- you saw the Kathy
> Gill letter. She brought up a few more points in that.

*Id*. at 219:1-9.

**Response:**  The Defendant admits that, with respect to Floor 16, the progress payments two, three

and four were not made, but he denies plaintiffs' contention that no ten percent payments were

ever made concerning a Burjside Blvd. floor acquisition for the pooled (group) purchase, or that

other substantial payments were not made towards the purchase.  Simone Decl. ¶¶ 21-22, 32, 33

Exhibit G (at p. 1), Exhibit O (at pp. 2, 3, 4, 5, 7, 8) thereto.

77.    The Debtor's reference to "the 18.6 million versus the 23 million" is his assertion

that the nine individual typed (non white-out marked) "ARF" unit reservation contracts

purportedly emailed to him on July 10, 2007 (the day the Debtor signed Contract 2), one for each

of the nine units on the 16th floor (and that he didn't sign), totaled AED 23,483,000 ($6,394,420.90)

rather than the AED 18,464,600 ($5,077,469.18) as reflected in Contract 1 and Contract 2.

Although the Debtor referenced this so-called "dispute," the Debtor produced no documentation

reflecting correspondence with Damac in an attempt to resolve (or even raise, or reference) this

so-called dispute on the millions of dollars of purported real property. The Debtor admitted that

the so-called "price dispute" was never resolved. *Id.* at 220:3-9.

**Response:**  The Defendant objects to Paragraph 77 on the following grounds: The Plaintiffs have

not shown by admissible evidence, or provided the basis for, their claim that the document looks

like white-out was used on it (a characterization with which the Defendant disagrees).

78.    In the Term Sheet that the Debtor sent to Plaintiffs, the Debtor represented that

"[t]he developer is currently offering these apartments out at **2500 to 2900** (AED) per square foot

if purchased individually." Ex. P8 at 2. However, per the ARF contracts, each unit was priced at

between **2361** and **2435** per square foot for an average price of **2402** per square foot. Ex. P9 at 3-

38.

**Response:**  The Defendant admits Paragraph 78.

79.    Furthermore, the so-called price issue, which was the Debtor's purported "dispute"

in the Burjside Blvd 16th floor so-called deal (whereby the Debtor objected to purchasing 9,814

square feet for 23,483,000 AED rather than 18,646,600 AED) vanished as an issue, given that the

so-called price of the 19th floor (which the Debtor then contended that he bought) was much higher

at 27,109,800 AED. Ex. P4, P6.

**Response:** The Defendant denies Paragraph 79.  Simone Decl. ¶¶ 31-32.

80.    The 19th floor Burjside "purchase" price (which the Debtor now says corresponds to Plaintiffs' money, amid his shifting stories) was 27,109,800 AED—45% higher than the purported original 16th floor amount and 15% higher than the 23,483,000 AED amount that the Debtor claimed was too high and therefore in "dispute." Exs. P4, P6.

**Response:** To the extent that the stated face amount on the manual 19th Floor contract states a Floor price of 27,109,800 and that said figure has the percentage relationships stated in paragraph 80, the same is admitted; otherwise the paragraph is denied, and it is expressly denied that the final floor price for the 19th Floor was to be 27,109,800.  Simone Decl. ¶¶ 31-32.

81.    The difference in US dollars between 27,109,800 AED (19th floor) and 23,483,000 AED (higher 16th floor contract) (3,626,800 AED) is $987,577.64. Exs. P4, P6.

**Response:** To the extent that the stated face amount on the manual 19th Floor contract states a Floor price of 27,109,800 and that said figure has the dollar value differentiation stated in paragraph 81, the same is admitted; otherwise the paragraph is denied, and it is expressly denied that the final floor price for the 19th Floor was to be 27,109,800.  Simone Decl. ¶¶ 31-32.

82.    The difference in US dollars between 27,109,800 AED (19th floor contract) and 18,646,600 AED (lower 16th floor contract) (8,463,200 AED) is $2,304,529.36. Exs. P4, P6.

**Response:** To the extent that the stated face amount on the manual 19th Floor contract states a Floor price of 27,109,800 and that said figure has the dollar value differentiation stated in paragraph 81, the same is admitted; otherwise the paragraph is denied, and it is expressly denied that the final floor price for the 19th Floor was to be 27,109,800.  Simone Decl. ¶¶ 31-32.

83.    The 19th floor Burjside contract was for $2,775.94 per square foot—46% higher

than the quoted price of $1,900 per square foot that the Debtor represented to Plaintiffs in the term sheet dated October 12, 2007. Exs. P4, P6, P8.

 **Response:** The Defendant objects to Paragraph 83 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). Additionally, the Defendant denies Paragraph 83. Simone Decl. ¶¶ 31-32 and Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p.1) and Exhibit T (at p. 1) thereto.

 84. Moreover, the 19th floor Burjside transaction was for $7,381,998.54—a price 48% higher than the "approximately $5.0 million USD" price that the Debtor represented to Plaintiffs. Exs. P4, P6, P8.

**Response:** To the extent that the stated face amount on the manual 19th Floor contract states a Floor price of 27,109,800 and that said figure has the dollar value differentiation stated in paragraph 84, the same is admitted; otherwise, the paragraph is denied, and it is expressly denied that the final floor price for the 19th Floor was to be 27,109,800. Simone Decl. ¶¶ 31-32.

 85. And yet the Debtor maintains that the 27,109,800 AED was apparently such a good deal (as offered by Mohamed Wael, who had supposedly just recently lied to him) that the Debtor felt "pressured" and he supposedly rushed to obtain a cashier's check (which he never produced and which is the least traceable form of purported payment) in order to close (which he never did). The Debtor's only explanation for why it was supposedly done this way (in lieu of, for example, sending a wire, which could be traced and confirmed) was that there is supposedly "more than one way to skin a cat." Ex. P46 at 230:5-231:3.

 **Response:** The Defendant denies paragraph 85. Simone Decl. ¶¶ 30-34 and Exhibit O at pp. 2, 3, 4, 5, 7, 8) and Exhibit T (at p. 1) thereto.

86. The second so-called "dispute" was the Debtor's assertion that Damac was

supposed to have "put it [the contract?] in corporate name." Ex. P46 at 146:13-147:21; 219:1-9.

**Response:**  The Defendant admits paragraph 86.

87.    But the Debtor could have "put it in a corporate name" himself since he filled out his own customer information in Contract 1 and Contract 2 himself and he does not recall ever asking for an agreement of sale. *Id.* at 415:4-10.

**Response:**  The Defendant objects to Paragraph 87, as the plaintiffs have failed to specify evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

88.    The Debtor testified that he was aware of the requirement, per the unit reservation contract, that he enter into an Agreement of Sale within one week following his purported execution of a unit reservation contract. Ex. P48 at 415:12-23. Despite the Debtor's admitted knowledge of the requirement that the buyer must enter into an Agreement of Sale within one week or else the buyer would forfeit any money paid to Damac, (dating back to at least September 26, 2007, in writing, before any of the Plaintiffs invested money), the Debtor failed to enter into any Agreement of Sale for either the 16th or the 19th floor of the Burjside Boulevard building, thus virtually ensuring that anything paid would be lost. *Id.* at 414:6-415:22.

**Response:**  The Defendant objects to Paragraph 88, as the plaintiffs have failed to specify evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).    Additionally, the Defendant denies Paragraph 88.  Simone Decl.  ¶¶ 14, 16, 18 and Ex. D (at pp. 1-3) and Ex. E(at pp. 1-5) thereto.

89.    Not only did the Debtor fail to enter into any Agreement of Sale for the Burjside Boulevard building, the Debtor could not even state that he *requested* an Agreement of Sale from Damac for the Burjside Boulevard building (even for the 19th floor, which has congealed as supposedly the transaction corresponding to Plaintiffs' money, months after the Debtor was well aware of the Agreement of Sale requirement). *Id.* at 415:12-23.

**Response:**  The Defendant objects to Paragraph 89, as the parenthetical statement is argumentative.  To the extent that Paragraph 89 states that the Defendant never entered into an

Agreement of Sale for 9 Units of a Floor of the Burjside Boulevard project, the same is admitted.

90.    The Debtor's quasi-explanation for failing to request an Agreement of Sale was his so-called "dispute" regarding the price of the 16th floor of the Burjside Boulevard building. *Id.* at 414:6-17.

**Response:**  The Defendant objects to Paragraph 90 as being argumentative, with the use of the term quasi-explanation.  The Defendant admits that a floor/unit pricing dispute was a reason why the transaction did not progress to the Agreement for Sale stage.

91.    But despite this so-called "dispute" about the price, which dated back to July 2007 (supposedly) the Debtor date on the term sheet provided to Plaintiffs is October 11, 2007, four months after he purportedly entered into the unit reservation sheet and subsequently failed to sign (or even request) an Agreement of Sale. Ex. P8.

**Response:**   The Defendant objects to Paragraph 91 as being unintelligible, and therefore not supported by a specific citation; further, there is no Exhibit 8 identified and labeled in the filings in support of the motion, a violation of L.Civ.R. 56(a)(3).

92.    The Debtor did not explain why he would have undisputedly known about the requirement to enter into an Agreement of Sale as of September 26, 2007 as of his email with Ms. Gill (Ex. P10 at 3-4), and yet then supposedly fail to enter into (or even ask for) an Agreement of Sale pertaining to the 19th floor of the Burjside Boulevard six months after he purportedly entered

into the 19th floor contract on March 23, 2008, and yet pay money that was sure to be lost because the Debtor failed to enter into, or even request, an Agreement of Sale. *Id.* at 414:6-415:22; Ex. P6.

**Response:** The Defendant objects to Paragraph 92 on the following grounds: Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion. Additionally, the Defendant denies Paragraph 92. Simone Decl. ¶ 49.

93.    The purported 19th floor Burjside contract—about which the Debtor inexplicably produced only one of three pages, and which did not contain a single signature of any purported seller or any person associated with any seller—is the contract pursuant to which the Debtor claims that he paid 2,000,000 AED ($544,600) with a purported (and untraceable) so-called "bank check" (which he failed to produce) and a 710,000 AED ($193,333) purported personal check from Bode (the back of which the Debtor did not produce or even request from Bode, despite being in regular contact with Bode through at least October 2019). Exs. P6, P30, P31.

**Response:** The Defendant objects to Paragraph 93 as being in violation of L.Civ.R. 56(a)(3), inasmuch as there are no Exhibits P6, P30 or P31 identified and labeled as such in the Plaintiffs' filings in support of the motion. Further, the paragraph is argumentative, with usage of words such as inexplicable and purported, untraceable and so-called, and is objectionable on those grounds.

94.    Moreover, as previously noted, the so-called payment amounts of 2,000,000 AED (March 23, 2008) and 710,000 AED (March 31, 2008) asserted by the Debtor conflict with the so-called payment amounts asserted by Bode in an email on May 13, 2008, whereby Bode referenced March 2008 checks of 3,473,072 (so-called "bankers cheque from rich's [Debtor]'s account") and 776,166.17 (supposedly from Bode's account) as set forth in Bode's purported email to Ms. Mezqueldi on May 13, 2008 (the amounts in Bode's purported email do not even match the

amounts in the purported checks). Ex. P10 at 35.

**Response:** The defendant denies Paragraph 94.  Simone Decl. ¶¶ 31-33, 51-52 Exhibit O (at pp. 3, 4, 5) and Exhibit Z (at p. 1) thereto.

95.     Yet on May 14, 2008, the Debtor purportedly emailed Ms. Mezqueldi and stated "Now that we have proved that **all monies in this deal just came through Stefans account**, (except the Debtor now claims that a 2,000,000 AED / $544,600 phantom bank check came from his personal account) I would like to explain to you the story behind djamels non cashable cheque . . . ." (the Debtor failed to explain the definition of a "non-cashable check") Ex. P10 at 36 (emphasis added).

**Response:**  The Defendant objects to Paragraph 95 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.  The Defendant objects further to Paragraph 95 as being argumentative, in addition to not being supported by authenticated and evidence shown to be admissible.   Additionally, the Defendant denies Paragraph 95.  Simone Decl. ¶¶ 32, 33, 51 and Exhibit O thereto (at pp. 3-5 of said exhibit).


96.     Meanwhile, the Debtor was aware of the difficulty (or, more accurately, the impossibility) in obtaining a purported "mortgage" for the purported millions and millions of dollars of investments with Damac as earlier as January 23, 2008, when he told Antonia Kulman (antonia.kulmann@nbad.ae) in an email entitled "mortgages" that he "saw several banks yesterday" and is running out to see other mortgage cos at the moment." Ex. P10 at 14.

**Response:** The Defendant denies Paragraph 96.  Simone Decl. ¶¶ 28, 29, 32 and Exhibits K (at pp. 1-6), Exhibit  L (at pp. 1-5), and Exhibit M (at p. 1) thereto.

97.     The notion of the Debtor telling Plaintiffs that he intended to obtain a "mortgage"

for $5 million, $6 million or $7 million in a foreign country where he had never been, with no actual property ownership, no legitimate non-white out or legitimately signed contract, no Agreement of Sale, no proof of a single payment made as it was supposed to be made (or likely at all), no legal occupation, no business, no established residence, no verifiable income, likely no income at all, two felony convictions for fraud and theft from investors, and recent parole from a 15-month prison sentence is interesting, however, to put crescendo on this absurdity, the Debtor admits that he has not paid any income taxes, or even filed any income tax returns dating back to at least 2007. Ex. P66.

**Response:** The Defendant objects to Paragraph 97 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Additionally, the Defendant submits that it was reasonable for him to expect that with the pooled investment funds and with a favorably-priced acquisition cost of a Floor in Burjside Boulevard, an appropriately structured acquisition transaction would qualify for mortgage financing.  Simone Decl. ¶¶ 25, 26, 53 and Exhibit G (at p. 1) and Exhibit F (at pp. 1-37) thereto.

98.    In fact, the Debtor cannot recall the last year he actually filed a federal or state tax return, or whether he ever filed a tax return after the year 2000. Ex. P46 at 16:2-17:17.

**Response:**  The Defendant objects to Paragraph 98 on the following grounds: the income of the Defendant at any point in time after the failure of the transaction with Damac to purchase a floor of the Burjside Boulevard project is irrelevant to the claims of the Plaintiff in this adversary proceeding.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Included among those claims is whether the Defendant's records concerning that transaction are sufficient or not and, if not, whether any such insufficiency constitutes a failure to keep or

preserve recorded information from which the Defendant's financial condition or business transactions might be ascertained (and, if not, whether any such failure is justified under all of the circumstances of the case). Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, that the Defendant's financial condition or business transactions for at least the last six or seven years preceding the filing of the bankruptcy petition are in issue in this case and are being asserted as grounds for objecting to the Defendant's discharge. The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the Defendant's financial circumstances and business transactions over at least the last six or seven years preceding the filing of the petition. Therefore, issues relating to the income and/or financial circumstances or business transactions of the Defendant within at least the last six or seven years are irrelevant to this adversary proceeding. Fed.R.Evid. 402.

99.    The only reason the Debtor could advance for why he failed to file tax returns for all those years is that he was not receiving income or all those years. P46 at 21:4-8.

> Q. So the only reason that you would not file
> a tax return is because you were not receiving income;
> is that true?
>     MR. GILMORE: Objection. Relevancy.
> A. That's correct.

P46 at 21:4-8.

**Response:** The Defendant objects to Paragraph 99 on the following grounds: the income of the Defendant at any point in time after the failure of the transaction with Damac to purchase a floor of the Burjside Boulevard project is irrelevant to the claims of the Plaintiff in this adversary proceeding. The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss. Included among those claims is whether the Defendant's records concerning that transaction are sufficient or not and, if not, whether any such insufficiency constitutes a failure to keep or

preserve recorded information from which the Defendant's financial condition or business transactions might be ascertained (and, if not, whether any such failure is justified under all of the circumstances of the case).  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, that the Defendant's financial condition or business transactions for at least the last six or seven years preceding the filing of the bankruptcy petition are in issue in this case and are being asserted as grounds for objecting to the Defendant's discharge.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the Defendant's financial circumstances and business transactions over at least the last six or seven years preceding the filing of the petition.  Therefore, issues relating to the income and/or financial circumstances or business transactions of the Defendant within at least the last six or seven years are irrelevant to this adversary proceeding.  Fed.R.Evid. 402.

100.    Yet the Debtor never asked Plaintiffs for any additional investment money before or after supposedly paying all their money to Damac on March 23, 2008 and March 31, 2008. Ex. P46 at 260:5-10.

**Response:**  The Defendant objects to Paragraph 100, as there is no evidence in the record that March 31, 2008 is one of the payment dates (although a check was dated that date, the receipt is dated April 3, 2008).  Therefore, the paragraph fails to meet the requirements of Fed. R. Civ. P. 56(c).  The Defendant does admit that he did not ask the plaintiffs', who collectively paid $495,000 into the pooled asset acquisition, for an additional $3,500,000.00.

101.    Since the Debtor was supposedly "tapped out" by early 2008, he apparently had no plan for paying the next (or the original, or any) $738,199.85 tranche due to Damac within 30 days on April 23, 2008 and the next $738,199.85 tranche 90 days after that. And somehow the Debtor managed to stay in Dubai for the next three years until 2011. Ex. P47 at 301:8-9.

**Response:** The Defendant objects to Paragraph 101 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3), with the exception that the Defendant left Dubai and moved back to the United States in 2011.  Additionally, the Defendant denies Paragraph 101.  Simone Decl. ¶¶ 38, 55.

102.    The Debtor testified that, while living in Dubai, he rented multiple apartments, had an office space, and employed two different secretaries. Ex. 338:4-341:9.

**Response:** The Defendant objects to Paragraph 102 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3) (there is no exhibit designation).

103.    Since the Debtor was not filing tax returns since at least dating back to 2007, and the Debtor testified that the only reason he does not file tax returns is because he has no income, and therefore the Debtor would have had no income dating back to at least 2007.

**Response:**  The Defendant objects to Paragraph 103 on the following grounds: the income of the Defendant at any point in time after the failure of the transaction with Damac to purchase a floor of the Burjside Boulevard project is irrelevant to the claims of the Plaintiff in this adversary proceeding.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Included among those claims is whether the Defendant's records concerning that transaction are sufficient or not and, if not, whether any such insufficiency constitutes a failure to keep or preserve recorded information from which the Defendant's financial condition or business transactions might be ascertained (and, if not, whether any such failure is justified under all of the circumstances of the case).  Absolutely no claim has been made by the plaintiffs, under any

reasonable reading of the allegations of the complaint, that the Defendant's financial condition or business transactions for at least the last six or seven years preceding the filing of the bankruptcy petition are in issue in this case and are being asserted as grounds for objecting to the Defendant's discharge. The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the Defendant's financial circumstances and business transactions over at least the last six or seven years preceding the filing of the petition. Therefore, issues relating to the income and/or financial circumstances or business transactions of the Defendant within at least the last six or seven years are irrelevant to this adversary proceeding. Fed.R.Evid. 402.

104.    Yet the Debtor failed to explain how he afforded to pay his apartment's rent in an expensive city like Dubai, his office rent (for whatever he was supposedly doing in an office), and his secretary's salary (and he produced no emails from or to any of his secretaries in Dubai, or anywhere else) after he was "tapped out" of investment money in 2007 or 2008. *Id.* at 342:1-13.

**Response:** The Defendant objects to Paragraph 104 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3) (there is no exhibit designation). Additionally, the Defendant denies Paragraph 4. Simone Decl. ¶ 55.

105.    The Debtor stated that he had "between 100 and 150 grand" in funds in "various other accounts," but failed to explain the sources of these purported funds or which "accounts" at which banks or institutions. *Id.* at 343:1-15. When asked where these purported funds came from, the Debtor responded, "I had money." *Id*. at 16-17.

**Response:** The Defendant objects to Paragraph 105 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3) (there is no exhibit designation).  Additionally, the Defendant denies Paragraph 105.  Simone Decl. ¶ 56.

106.    When asked how he supported his lifestyle in Dubai after he was "tapped out" of money in 2008, the Debtor responded by saying that he "had funds that were loaned to [him] by [his] parents." *Id.* at 342:15-18.

**Response:** The Defendant objects to Paragraph 106 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3) (there is no exhibit designation).

107.    However, the Debtor's parents both testified under oath that they never made any loans to their son. Ex. P74 at 108:17-18; *see also* Ex. P75 at 36:4-37:15. The Debtor's father confirmed at his deposition that he never asked his son to pay him back for any money. Ex. P75 at 36:10-17.

**Response:**  The Defendant denies Paragraph 107.  Depo. Tr. Irene Simone dated Nov. 15, 2019 at pp. 132-135.

108.    The Debtor has not explained why he did not ask his parents for additional contributions to avoid defaulting on his investments. The Debtor also has not explained why he did not ask his parents to help with any credit or mortgage applications once he learned in January 2008 that he would be unable to obtain financing for his investments and was at risk of default.

**Response:** The Defendant objects to Paragraph 108 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).  In addition, the Defendant denies paragraph 108.  Simone Decl. ¶¶

28, 29, 32, 38, 53 and Exhibits K (at pp. 1-6), Exhibit  L (at pp. 1-5), and Exhibit M (at p. 1), and

Exhibit R (at p. 1) thereto.

109.    Moreover, the Debtor failed to disclose to Plaintiffs that he could not obtain a

mortgage, which he knew (or should have known) at least as early of January 23, 2008 (if not long

before); and yet the Debtor continued collecting money from Plaintiffs after that time ($75,000.00

from Plaintiff Woolf on February 6, 2008 and $120,000.00 from Plaintiff Vagnerova on March

10, 2008). Ex. P63 at 5-6; Ex. P46 at 140:8:18.

**Response:** The Defendant objects to Paragraph 109 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).  Plaintiff's Exhibit 63 is a hodgepodge of documents that have not

been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the

contents of Exhibit 63 are inadmissible on this motion.  In addition, the Defendant denies

paragraph 109.  Simone Decl. ¶¶ 28, 29, 32, 38, 53 and Exhibits K (at pp. 1-6), Exhibit L (at pp.

1-5), and Exhibit M (at p. 1), and Exhibit R (at p. 1) thereto.

110.    The Debtor's "Plan A" scheme (the "sleight of hand," whereby he would claim that

Tony Chang wired money to Damac but the money really was wired by Chang to Bode – as the

Debtor provided Chang with the bank account number for Bode but made it seem like it was

Damac's account) was foiled when Plaintiffs obtained the Standard Chartered Bank records of

Bode and the emails of Chang and matched it up- showing that the Debtor was lying when he was

telling Plaintiffs (up through 2016) that Chang "wired the monies to Damac."  In fact, Chang had

not wired any of Plaintiffs' money to Damac, it was all wired to Bode. Ex. P59 at 4; Ex. P51.

**Response:** The Defendant objects to Paragraph 110 on the ground that it violates Fed.

R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form

that would be admissible in evidence. In particular Plaintiff's Exhibit 59 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 59 are inadmissible on this motion. Paragraph 110 also violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). Specifically, there is no Exhibit 51 identified and labeled in the filings in support of the motion. Defendant also objects on the grounds that Standard Charter Bank in America, which complied with the Subpoena, does not have access to the records to the extent that the Plaintiffs contend. Defendant's Trial Exhibit 1 (Declaration (and Certification) of Donna Hill dated December 16, 2019 at ¶¶ 2-6 and Exhibit B thereto at p. 1). In addition, the Defendant denies Paragraph 110. Simone Decl. ¶¶ 32-35, 51-52 and Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2) thereto; Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto; and Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.

111.    Once the cover was blown on "Scheme A," engulfed in "Scheme B," the Debtor attempted to explain why Bode was acting as the purported "escrow" in late 2007 and early 2008 when the investment money should have been sent to Damac – since after all – the Debtor's current

fable is that Damac "seized" Plaintiffs' money due to a default in the payment plan. Ex. P11, Ans.

7.

**Response:** The Defendant objects to Paragraph 109 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).  In addition, the Defendant denies Paragraph 111.  Simone Decl. ¶¶

32-35, 39, 41, 42, 51-52 and Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1)

and Exhibit AA (at pp. 1-2) thereto;  Defendant's Proposed Trial Exh. 33 (Testimony of Elena

Vagnerova at pp. 64-65) and Exhibit O thereto (at p. 1); and Defendant's Proposed Trial Exhibit 29

(Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B thereto (at p. 1).

112.     In trying to justify the faux so-called "escrow" with Bode, the Debtor had to admit that he

never told Ms. Gill *or Damac* about a so-called escrow with Bode (thus defeating the entire point).

Ex. P46 at 148:16-150:18.

**Response:** The Defendant objects to and denies Paragraph 112, as it does not fairly capture or

characterize the testimony, particularly as it relates to Damac.  The Paragraph therefore does not

comport with Fed.R.Civ. P. 56(c) or L.Civ.R. 56(a)(3).

113.     The Debtor theorizes that Bode "may have" verbally told Damac that he was an

escrow, however the Debtor produced no documents reflecting that. *Id*. at 150:15-18.

**Response:**  The Defendant admits Paragraph 113.

114.     Grasping for a talking point (or an "idea" as the Debtor sometimes calls it), the

Debtor attempted to explain Bode's purported role as an "escrow" (instead of the normal thing

which would have been Plaintiffs' money having been sent to Damac like the Debtor falsely

claimed it had for nine years through 2016) the Debtor spun a yarn that, due to Dubai's "strict"

banking laws, he had to be a "resident" in Dubai (where he moved in January 2008) for some

(varying and shifting) period of time before he could open a "checking account." *Id.* at 150:19-24.

**Response:** The Defendant objects to and denies Paragraph 114, as it does not fairly capture or characterize the testimony. The Paragraph therefore does not comport with Fed.R.Civ. P. 56(c) or L.Civ.R. 56(a)(3). In addition, the Defendant denies Paragraph 114. Simone Decl. ¶¶ 32-35, 39, 41, 42, 51-52 and Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2) thereto; Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto; and Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.

115.    The Debtor failed to explain the connection that his timeframe for obtaining a checking account has with his decision to tell Chang to wire the money to Bode instead of Chang wiring the money to Damac as the Debtor said for nine years.

**Response:** The Defendant objects to Paragraph 115 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

116.    If Chang wired the money to Damac, as the Debtor falsely claimed and as he should have done if the Debtor had been dealing above board and not stealing Plaintiffs' money pursuant to this absurd scheme, it wouldn't matter if the Debtor had a porcelain piggy bank, a hole behind the picture frame in the hall or an account at Goldman Sachs. The Debtor's type of bank account is irrelevant to the Debtor's decision to divert the money to Bode as an escrow.

**Response:** The Defendant objects to Paragraph 116 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). In addition, the Defendant denies Paragraph 16. Simone Decl. ¶¶ 32-35, 39, 41, 42, 48, 51-52 and Exhibit O at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at

p. 1) and Exhibit AA (at pp. 1-2) thereto;  Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto; and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.

117.    Chang could just wire directly to Damac (which is the story the Debtor told for nine years before changing his story).

**Response:** The Defendant objects to Paragraph 117 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  In addition, the Defendant denies Paragraph 16.  Simone Decl. ¶¶ 32-35, 39, 41, 42, 48, 51-52 and Exhibit O (at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2) thereto;  Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto ; and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.


118.    In addition, the Debtor claims (without any corroboration) that he purportedly wired money to Damac from his domestic Bank of America account or his domestic "Oakwood" account. Ex. P47, 328:21-332:3.

**Response:**  The Defendant denies Paragraph 118, to the extent that it claims that there is no corroboration that the Defendant put personal funds into the project at Damac.  Simone Decl. ¶¶ 21, 22 and Exhibit G (at p. 1) thereto.

119.    Therefore, if the Debtor can wire money to Damac from his domestic accounts, the Debtor's status of having a checking account in Dubai, or not, would not have any bearing on designating Bode as an "escrow" for payments to Damac (which were likely never made).

**Response:** The Defendant objects to Paragraph 119 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).  In addition, the Defendant denies that payments were never made to Damac.  Simone Decl.  ¶¶ 21, 22, 32, 33, 34, 35 Exhibit G (at p. 1), Exhibit O (at pp. 1, 2, 3, 4, 5, 7, 8) thereto.

120.    Moreover, regarding the "checking account" rationale for Bode's role as an escrow, the Debtor had a savings account at Emirates Bank in Dubai, from which he can send a wire, and he purports to have sent a wire to Damac from a domestic account; therefore the checking account would have no effect on the Debtor's ability to send bank wires. Ex. P46 at 150:25-151:10; 162:19-165:19.

**Response:**  The Defendant admits that the lack of a checking account alone would not create a need to make Stefan Bode an escrow agent.

121.    Furthermore, the Debtor purported to have obtained a "manager's cheque" from his Emirates Bank savings account (which he failed to produce, or apparently even request), and so therefore because the Debtor could send wires and obtain checks for issuance, the need for a checking account is the reddest of red herrings. *Id*. at 162:19-165:19.

Q. Okay. My question was not what you say I saw, my question was you were able to. That's just my question. Okay? So you were able to obtain a check, according to your testimony; correct?

A. Correct.

Q. All right. And so the rationale of oh, Bode had to be the escrow because I couldn't get a checking account, you didn't really need a checking account because you had a savings account where you could get a check if you needed, and you could also send a wire; correct?

A. There's more than one way to skin a cat.

*Id.* at 165:7-18.

**Response:**  The Defendant admits that the lack of a checking account alone would not create a need to make Stefan Bode an escrow agent.

122.    It was essentially established that the Debtor had not made any meaningful payments to Damac in 2007—or perhaps ever, given the Debtor's purported unsolved "disputes." And the Debtor failed to enter into any Agreement of Sale for any of the three purported Burjside unit reservation contract. But, however, the Debtor still continued to solicit investment money from Plaintiffs in late 2007 and early 2008.

**Response:** The Defendant objects to Paragraph 122 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  In addition, the Defendant denies Paragraph 122.   Simone Decl. ¶¶ 21, 22, 32, 33, 34, 35 Exhibit G (at p. 1), Exhibit O (at pp. 1, 2, 3, 4, 5, 7, 8) thereto.

123.    The Debtor collected the final $120,000.00 from Plaintiff Vagnerova on March 10, 2008 and the Debtor diverted the funds directly to Bode. Ex. P63 at 5-6; Ex. P46, 140:8:18. This was long after these unsolved "disputes" with Damac were in full bloom, so it is unclear why the Debtor would still be soliciting investment money from Plaintiffs when he claims that he was at loggerheads with Damac over the price and the other various rationales.

**Response:** The Defendant objects to Paragraph 123 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). Additionally, the Defendant denies paragraph 123.  Simone Decl. ¶¶ 21, 22, 32-35, 39, 41, 42, 48, 51-52 and Exhibit O (at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2)  thereto;  Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O thereto (at p. 1); and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1).

124.    The Debtor's story marched on, he next claimed that on or around February 25,

2008, a person or persons at Damac told him that the Burjside "floor 16 deal had been cancelled."

Ex. P10 at 34; Ex. P46, 203:21-204:17.

**Response:**  The Defendant objects to this paragraph as argumentative (as made evident by the first clause). The Defendant admits that a representative of Damac made that statement around that time, though.

125.    Given the so-called unsolved "disputes," and non-payment, the failure to abide by any payment plan, the failure to sign (or obtain or ask for) an Agreement of Sale (despite the Debtor's very smart and successful friend Mr. Bode's guidance- and Bode- the person who actually received Plaintiffs' money- and actually bought a Damac property), and all the missed payments, (not to mention the white-out marred purported unit reservation contract/contracts signed by different people on different days, with different signatures, at pools, or not at pools, with credit cards or not with credit cards) this should have been no surprise.

**Response:** The Defendant objects to Paragraph 125 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). Additionally, the Defendant denies paragraph 125.  Simone Decl. ¶¶ 11-28, and Exhibit C (at pp. 1-2), Exhibit D (at pp. 1-3), Exhibit E (at pp. 1-4), Exhibit F (at 1-37),Exhibit G (at p. 1) Exhibit H (at pp. 1-2), Exhibit I (at pp. 1-4), Exhibit J (at p. 1) Exhibits K (at pp. 1-6) thereto; Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto; and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.

126.    The Debtor then stated that Damac told him that they were no longer planning to build the Burjside building because supposedly "the master developer took back the plot." Ex. P46 at 225:11-17; Ex. P10 at 34.

**Response:** The Defendant objects to Paragraph 126 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.  That said, the statement was made to the Defendant by Damac.

127.    That should have been good news to the Debtor since he apparently could not keep up with the payment plan.

**Response:** The Defendant objects to Paragraph 127 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

128.    The Debtor then testified under oath that, in March 2008, he negotiated with Mohammed Wael, the person who he claims had just recently lied to him about a cancellation of Burjside (which apparently was not cancelled), for the purchase of all nine units on floor 19 (not floor 16) of the Burjside Boulevard building. Ex. P10 at 34.

**Response:**  The Defendant admits Paragraph 128.

129.    The Debtor testified as follows:

Here's what had happened after that. I got a call -- I either saw it in the paper or got a call from DAMAC inviting me to a prelaunch party on a new building. I think I saw it in the paper, called DAMAC, and then somebody called me back, or DAMAC knew my name and somebody just called me and they said there's a prelaunch party, and I said, "What building?" They said Bird Side [Burjside] Boulevard.

At that point I got back to Waiel. I said to him, "Listen, this property was not canceled. They just invited me to a prelaunch party." Okay? So at that point was March 2008, and I said to him, "That's the building I want. I don't want this portfolio of properties that you're proposing to me. I want this Bird Side Boulevard and you should guarantee me the price of -- excuse me, we should build in the profits that I would have had from my purchase of last year." He said, "Let's put in a reservation for that," and **that's when I gave him the two checks for two million**

**and 700,000**.

Ex. P46 at 225:20-226:14.

**Response:**  The Defendant admits Paragraph 129.

130.    As the Debtor was telling the tale referenced above at his October 9, 2019 deposition segment [insisting and imploring- "Burjside- *That's the building I want*"], he had not yet produced the "Ocean Heights" contract which he had been withholding and concealing and which he finally produced on November 12, 2019.   As he described the vigor with which he expressed how his "heart was set" on Burjside Blvd in March 2008, the Debtor must have forgotten that the date of his so-called Ocean Heights contract was February 26, 2008 (of course, the Debtor claims he made some payments pursuant to this contract too, and then defaulted. His appetite for getting into huge contracts, and then supposedly squandering a few hundred thousand dollars here, and a few hundred thousand dollars there- absent legitimate proof of the payments- is voracious).

**Response:** The Defendant objects to Paragraph 130 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

131.    Inconsistent with the above testimony, the Debtor represented in a 2011 email to a purported person named "Tarek Lawyer" (who the Debtor did not actually hire) that it was *Hegazi* (not *Wael*) who informed him that the deal for the 16th floor of Burjside had purportedly been cancelled in 2008. Ex. P10 at 34.

**Response:** The Defendant objects to Paragraph 131 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

- 48 -

132. In the same email from 2011, the Debtor claimed that Mohamed *Haridy* informed him via phone on March 2, 2008 that the "deal had been cancelled because the master developer Dubai properties had taken back the plot." *Id.* The Debtor failed to explain why, if the Burjside project really was cancelled, he never asked for his investment funds to be returned or sought legal recourse.

**Response:** The Defendant objects to Paragraph 132 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

133. The Debtor also did not provide any explanation or produce any documentation of the so-called "nonbinding check" that a person named Djamel supposedly said "he would make" on the Debtor's behalf when Djamel and the Debtor had one of their "meetings" with Damac in March 2008 (the purported "escrow," Bode, was missing from the meeting). *Id.* at 34.

**Response:** The Defendant objects to Paragraph 133 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence. In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

134. Moreover, the Debtor further stated as follows to "Tarek Lawyer" in 2011:

1) *I purchased both properties* in the spring of 2008
2) made 10 pct deposit on Burjside Blvd (BSB) 27 million x 10% paid 2.7 Million AED
3) made 20 pct deposit in Ocean Heights (OH) 9.4 million x 20% paid 1.8 million Payments total 4.5 million AED

Ex. P10 at 39.

**Response:** The Defendant objects to Paragraph 134 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

135.     To the Debtor, "purchase" apparently means "sign purported contract, make purported payment (likely not), never sign Agreement of Sale, then default, and tell Plaintiffs that all is well until 2016). In this email, the Debtor failed to mention that he purportedly "purchased" the 16th Floor of the Burjside Boulevard building in June 2007, as he had represented to Plaintiffs. He also stated that he purchased the unit in Ocean Heights, but has not produced a signed agreement by all parties to that sale nor evidence that he made *any payment whatsoever* for the Ocean Heights property.

**Response:** The Defendant objects to Paragraph 135 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

136.     There is also is no mention to Tarek Lawyer of the alleged $274,000 in previous payments to Damac that were "acknowledged by Wael" in September 2007 for the 16th floor of Burjside. If the Debtor's definition of "purchase" is to default, he has not explained why he failed to list the only payments to Damac that he has submitted any semblance of evidence for in this litigation.

**Response:** The Defendant objects to Paragraph 136 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3). Additionally, the Defendant denies Paragraph 136.  Simone Decl. ¶¶

32-35, 51-52 and <u>Exhibit O</u> (at pp. 2, 3, 4, 5, 7, 8), <u>Exhibit S</u> (at p. 1), <u>Exhibit Z</u> (at p. 1) and

<u>Exhibit AA</u> (at pp. 1-2) thereto;  Defendant's Proposed Trial Exh. 33 (Testimony of Elena

Vagnerova at pp. 64-65) and <u>Exhibit O</u> (at p. 1) thereto; and  Defendant's Proposed Trial Exhibit

29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and <u>Exhibit B</u> (at p. 1) thereto.

     137.    The Debtor also failed to explain why he would be buying *two* more multi-million

dollar properties in February/March 2008 when he had just defaulted on a prior one (at least

$274,000 lost, and maybe up to $500,000 lost), when the Debtor doesn't have the money to pay it,

can't obtain a mortgage, and never asked his parents or Plaintiffs for a follow up investment or

any help with financing.

**Response:**  The Defendant objects to Paragraph 137 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).

     138.    The Debtor also indicated that Hegazi and another Damac salesman offered him an

alternative investment to the 16th floor of Burjside, albeit at a lower cost (18 million AED versus

27 million AED), by way of a portfolio of apartments in Jumeriah South and other areas. The

Debtor responded to the offer by balking ("I told them NO"),yet the Debtor failed to ever mention

this opportunity to Plaintiffs even though their investment funds were at issue.

**Response:**  The Defendant objects to Paragraph 138 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).

     139.    In "2008-ish," the Debtor claimed that *Bode made a loan* to the Debtor, on a "short

term basis," while the Debtor was "waiting for some money to come from the states." Ex. P47 at

360:23-362:25.

**Response:**  The Defendant admits Paragraph 139.

140.    Although the Debtor "can't remember" the amount, he testified "yeah" to a question of whether the loan amount was for "hundreds of thousands of dollars." *Id.* at 363:13-17.

**Response:**  The Defendant admits Paragraph 140.

141.    According to the Debtor, the loan outlay was Bode having "made a check to Damac" (ostensibly on the Debtor's behalf) "pending money coming from the states." *Id.* at 361:19-21.

**Response:**  The Defendant admits Paragraph 141.

142.     When asked if it was the AED 710,000 check that the Debtor said contained Plaintiffs' money, the Debtor stated: "I think it was a different one," but the Debtor did not ask Bode for a copy of the unknown purported check and the Debtor otherwise could not provide any information or details. *Id.* at 361:22-362:14.

**Response:**  The Defendant admits Paragraph 142.

143.    Although the Debtor says Bode fronted him money, the Debtor denied partnering with Bode on any Damac transactions, including in Ocean Heights where Bode purchased a unit. Ex. P62 at 8.

**Response:** The Defendant objects to Paragraph 143 on the following grounds: First, there is no Exhibit 62 filed with the motion for summary judgment.  Therefore this paragraph violates L.Civ.R. 56(a)(3).  To the extent that the Plaintiffs mean to refer to proposed trial Exhibit 62, the recording of the conversation violated the Florida Security of Communications Act, Fla. stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard.  Simone Decl. at ¶ 47.  Therefore, the recording is inadmissible as evidence.

144.    The Debtor stated later that he "split" the cost of his "two-man" office and his purported assistant with Bode. *Id.* at 304:6-10; 339:16-340:16.

> Q. How much was your office a month?
> A. Um, I can't remember. I would say
>     somewhere in the neighborhood of 700-ish.
> Q. 700 a month for a two-person office in
>     Dubai?
> A. Mm-hmm.
> Q. Okay. And how much was the salary of your
>     assistant?
> A. Um, I can't remember. I think she got --
>     I can't remember. It would have been less than -- and I
>     split the assistant with somebody else.
> Q. Who?
> A. Um, I split the assistant with, um,
>     Stefan. I can't remember what she was paid. Probably
>     less than a grand. Probably less than a grand for each
>     of us.
> Q. Per month?
> A. Probably less.
> Q. Less than a grand per month for a
>     full-time assistant?
> A. Mm-hmm.
> Q. So you're paying her, what, like $9,000 a
>     year?
> A. No. I said less than a grand for each of
>     us. So she was probably on 15 grand, something like
>     that.

**Response:**  The Defendant objects to Paragraph 144 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Exhibit 62 is purportedly a transcript of a telephone conversation, not a deposition transcript.


145.    The Debtor says the original documents "would have been in Dubai" as no original documents were produced. *Id.* at 304:11-17.

**Response:**  The Defendant objects to Paragraph 144 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Exhibit 62 is purportedly a transcript of a telephone conversation, not a deposition transcript.

146.    The Debtor stated that the timing of Bode's loan to him was after he fell behind on payments, but the Debtor could not recall how much money he borrowed from Bode. *Id.* at 435:10-24.

**Response:**  The Defendant objects to Paragraph 146 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Exhibit 62 is purportedly a transcript of a telephone conversation, not a deposition transcript.

147.    Regarding a unit reservation contract for Ocean Heights, the Debtor stated that there "probably would have been" a contract, but he "hasn't looked for it." *Id.* at 61:17-23.

**Response:**  The Defendant objects to Paragraph 147 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Exhibit 62 is purportedly a transcript of a telephone conversation, not a deposition transcript.

148.    The 24 pages of the Debtor's Whatsapp communications with Bode do not whatsoever corroborate the Debtor's assertion that: (a) the Debtor borrowed money from Bode; (b) the Debtor paid money back to Bode; (c) Plaintiffs' money was transferred from Bode to the Debtor; or (d) the Debtor's money was paid by Bode to Damac. Ex. P29 at 1-24. Moreover, the

communications do not indicate which contract (or building) corresponds to Bode's so-called payment on the Debtor's behalf. *Id*.

**Response:** Defendant objects to Paragraph 148, as any statements by Stefan Bode in Whatsapp messaging are hearsay. Fed.R.Evid. 802.

149. The Debtor also failed to explain why he never considered or even asked Bode for a loan or additional funds when the investments on Dubai properties were in danger of defaulting.

**Response:** The Defendant objects to Paragraph 149 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

150. The "two checks" that the Debtor referred to in connection with the prelaunch party are (1) the front (only the front) of an AED 710,000 ($193,333.00) check purportedly signed by Bode from Bode's Standard Chartered Bank account ending in 2701, and (2) an AED 2,000,000 ($544,600.00) "customer advice" referencing the Debtor's Emirates Bank account (no check). Ex. P26 at 4, 7.

**Response:** The Defendant objects to Paragraph 150 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). There is no Exhibit P 26 identified and labeled in the filing in support of the motion. In addition, the Defendant denies the statement that there was no check payable to Damac in the amount of AED 2,000,000. Simone Decl. ¶¶ 32-35, 39, 41, 42, 48, 51-52 and Exhibit O (at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2); Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto [which is in trial exhi. 34]; and Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.

151.    The Debtor's emails indicate that the "prelaunch party" was Monday, March 24, 2008. P10 at 36. (In 2008, the Prophet's birthday was Thursday, March 20).

> I sat on wednesday 19/3 with wael after all his story with cancelling burjside…..He presented to me a sudden change, which is the relaunch of the product (burjside) in only 4 days, after the prophets birthday, and pushed me for a non-binding cheque immediately, which will not be cashed and just used for reserving the floor, as he (wael) confirmed.

*Id.*

**Response:** The Defendant objects to Paragraph 151 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

152.    Debtor stated that he brought **both checks** with him at the prelaunch party.

> It's like a big luncheon sort of thing, and everybody is excited about the new property, so Muhammad Waiel had accompanied to the prelaunch party, **and I had the checks. I had a check for 2 million, and then there was another check for 710**."

Ex. P46 at 232:20-25 (emphasis added).

**Response:** The Defendant objects to Paragraph 152, as the record of the deposition is subject to an alternative construction than what plaintiffs contend.  The statement, "I had a check for 2 million, and then there was another check for 710," may mean, given that a definition of "then" is "after that; next, afterward" (Oxford Online Dictionary).  Otherwise, the Defendant would have been mistaken about having both checks at a prelaunch party, because the record of the date of the 710,000 AED check payable to Damac Properties, and the issuance by Damac Properties of its receipt for that check, show that the check was made on March 31, 2008 and tendered to Damac Properties on April 3, 2008.    Simone Decl. ¶¶ 32-37 and <u>Exhibit O</u> (at pp. 2, 3, 4, 5, 7, 8), Exhibit Q (at pp. 1-5), <u>Exhibit S</u> (at p. 1) thereto.

153.    The Debtor's story falls apart because the 710,000 AED check is dated **March 31, 2008**, seven days **after** the prelaunch party. Ex. P31.

**Response:**  The Defendant denies Paragraph 153, except that the 710,000 AED check is dated March 31, 2008.  Simone Decl. ¶¶ 32-37, 39, 41, 42, 48, 51-52 and Exhibit O (at pp. 2, 3, 4, 5, 7, 8), Exhibit Q (at pp. 1-5), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2)thereto; Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto; and  Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto.


154.    In an email to Mido Mezqueldi on May 14, 2008, the Debtor stated that he "could do a bankers cheque the same day of the relaunch." (March 24, 2008). Ex. P10 at 36.

**Response:** The Defendant objects to Paragraph 154 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.  Nor have the Plaintiffs furnished evidence of the Prophet's birthday in 2008, or why possibly being one day off in stating the date of an event is probative of anything.


155.    But the receipt for the 2,000,000 AED "check" (which was never produced) is dated March 23, 2008, which conflicts with the Debtor's testimony that he handed the check to "somebody at Damac" at the prelaunch party, which did not take place until March 24, 2008. *Id.*; Ex. P46 233:4-25.

**Response:** The Defendant denies Paragraph 155, to the extent that it contends that the party at

which the Defendant delivered the 2,000,000 check did not take place until March 24, 2008.

Simone Decl. ¶¶ 32-37 and <u>Exhibit O</u> (at pp. 2, 3, 4, 5, 7, 8), Exhibit Q (at pp. 1-5), <u>Exhibit S</u> (at p. 1).

156.   The receipts for each check are also inconsistent, as they are signed by different people from Damac and dated more than a week a part. Exs. P30, P31.

**Response:**  The Defendant denies paragraph 156; the receipts are not inconsistent – they're consistent with their respective checks.  Simone Decl. ¶¶ 32-37 and <u>Exhibit O</u> (at pp. 2, 3, 4, 5, 7, 8), Exhibit Q (at pp. 1-5), <u>Exhibit S</u> (at p. 1).

157.   While the Debtor submitted alleged receipts for the 2,000,000 AED check and 710,000 AED check from March/April 2008, he failed to produce any receipt for the purported $274,000 in "transfers" to Damac that Wael supposedly acknowledged nearly six months earlier.

**Response:**  The Defendant admits that he does not have a receipt for the $274,000 in transfers that occurred before September 20, 2007; he has an acknowledging email from Damac with respect to them.

158.   As to the 710,000 AED check, the back was never produced and the Debtor says he never requested it; the other paper is not even a check (although the Debtor testified that it was a check, for some reason), as no front or back was produced and supposed this "check" came from the Debtor's bank account:

> Q.  Where's the back of the check?
> A.  The back of the check? It's a bank check, cashier's check from the bank's ledger. I do not get the back of a check.
> Q.  Could you have requested it?
> A.  Probably.
> Q.  You just didn't.
> A.  I'm not sure I could have requested it. It's the bank's ledger. It's not my bank account.

Ex. P46 at 247:14-22.

**Response:** The Defendant denies Paragraph 158. The assertion in the paragraph conflicts with the testimony set forth below it.  Thus, the is paragraph is objectionable because the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

159.    The Debtor failed to even ask Bode for the back of the so-called 710,000 AED check which contained Plaintiffs' money and was supposedly paid to Damac. Ex. P46 at 14-22.

**Response:** The Defendant objects to Paragraph 159 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

160.    The Debtor's excuse for failing to provide (or even ask for) the purported bank check from Emirates Bank was that it was not drawn on Bode's personal account, but the purported check from Bode was drawn on Bode's personal account. *Id.* The Debtor provided no rationale for why he failed to ask Bode for the bank of the so-called check.

**Response:** The Defendant objects to Paragraph 160 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

161.    The Debtor stated under oath that even though he claims the accounts were in "default," he could not explain why he did not ask Plaintiffs for an additional investment to stave off the default, thereby allowing all the money to be lost. Ex. P38, Ans. 20.

**Response:**  The Defendant objects to Paragraph 161 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  There is no Exhibit 38 identified and labeled in the filings in support of the motion.  Additionally, to the extent Plaintiffs intend to use proposed trial exhibit P38 without expressly so stating in the motion, answer 20 in said exhibit does not purport to request any explanation for any action or inaction by the Defendant.

162.    The Debtor failed to produce *any* letter from Damac reflecting a default (or even that a payment was owed) on any of the four contracts that the Debtor contends he entered into with Damac.

**Response:**  The Defendant objects to Paragraph 162 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

163.   There is no Paragraph 163.

164.    On page 2 of his Bankruptcy Petition, Debtor falsely stated to the Court that he has not used any business names or EINs within the last 8 years. Ex. P67, Debtor's Bankruptcy Petition, *In re Richard Simone*, No. 18-21993, dated December 5, 2018, at 2.

**Response:**  The Defendant objects to Paragraph 164 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 164 within issues framed in this case by the

pleadings. The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 164. Fed. R. Evid. 402 bars this Paragraph.

165.    However, this is false. At a minimum, the Debtor used the EINs of Buckingham Realty Advisors, LLC ("Buckingham") and Windsor Realty Advisors, LLC ("Windsor") both of which have EINs. Ex. P55, 17, Business Bank Account Application for Buckingham Realty Advisors LLC, dated May 2, 2017; Ex. P55, 18, Business Bank Account Application for Windsor Realty Advisors LLC, dated April 26, 2016.

**Response:**    The Defendant objects to Paragraph 165 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs. The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss. Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 165 within issues framed in this case by the pleadings. The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 165. Fed. R. Evid. 402 bars this Paragraph.

166.    The Debtor is listed as a signer on the application for the business accounts for both Buckingham and Windsor, making the corresponding section of his bankruptcy petition materially false.

**Response:**    The Defendant objects to Paragraph 166 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs. The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss. Absolutely

no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 166 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 166.  Fed. R. Evid. 402 bars this Paragraph.

167.    On Page 31 of his Bankruptcy Petition, under paragraph 4 of his Statement of Financial Affairs for Individuals Filing for Bankruptcy, the Debtor stated as follows under oath:

- $0.00 in gross income for calendar year 2018;

- $20,0000.00 in gross income for the calendar year 2017; and

- $0.00 in gross income for the calendar year 2016.

Ex. P67 at 31.

**Response:**    The Defendant objects to Paragraph 167 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 167 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 167.  Fed. R. Evid. 402 bars this Paragraph.

168.    However, the Debtor earned a $158,000.00 commission fee on December 21, 2017

in connection with the sale of a property wherein via Buckingham (the Debtor's company) served as a broker. Response to Subpoena by Lightsey & Associates, P.A ("Lightsey"); *see also* Ex. P55 at 32. This $158,000.00 commission fee from Lightsey is considered gross income for Debtor in the calendar year 2017.

**Response:**   The Defendant objects to Paragraph 168 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 168 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 168.  Fed. R. Evid. 402 bars this Paragraph.

169.    Within two months of receiving his $158,000.00 commission, the Debtor made an in-person cash withdrawal on February 8, 2018 from his Wells Fargo account ending in 7962 in the amount of $116,973.00. Ex. P55 at 40. The Debtor failed to explain this to the Court and failed to disclose this to the Court.

**Response:**   The Defendant objects to Paragraph 169 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 169 within issues framed in this

case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant

has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims

to deny the discharge based on the matter alleged in Paragraph 169.  Fed. R. Evid. 402 bars this

Paragraph.

170.     In addition, Debtor answered "No" when asked if he made any of the two previous

calendar years, despite earning the gross income described above. Ex. P67 at 31.

**Response:**   The Defendant objects to Paragraph 170 on the following grounds: there are

absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims

in this adversary proceeding are about the failed acquisition transaction and the loss of the

plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely

no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the

complaint, which could bring the matter alleged in Paragraph 170 within issues framed in this

case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant

has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims

to deny the discharge based on the matter alleged in Paragraph 170.  Fed. R. Evid. 402 bars this

Paragraph.

171.     Under Schedule A/B of his Bankruptcy Petition, Debtor answered "No" to whether

he had any "trusts, equitable or future interests in property . . . and rights or powers exercisable of

your benefit." *Id.* at 12.

**Response:**   The Defendant objects to Paragraph 171 on the following grounds: there are

absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims

in this adversary proceeding are about the failed acquisition transaction and the loss of the

plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely

no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 171 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 171.  Fed. R. Evid. 402 bars this Paragraph.

172.    However, Debtor's parents both testified under oath during their respective depositions that Debtor is a beneficiary of the family trusts. Ex P74, Irene Simone Dep. 36:16-20; 153:4-8, November 15, 2019; *see also* Ex. P75, Richard R. Simone Dep. 43:31-22, November 15, 2019.

**Response:**    The Defendant objects to Paragraph 172 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 172 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 172.  Fed. R. Evid. 402 bars this Paragraph.

173.    The Debtor attested under oath in his bankruptcy petition that his parents made "loans" to him, however, the Debtor produced no documentation of the loans and he does he recall the amount of any of the loans. *Id.* at 64:23-65:8.

**Response:**   The Defendant objects to Paragraph 173 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 173 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 173.  Fed. R. Evid. 402 bars this Paragraph.

174.    However, the Debtor's parents both testified under oath that any money given to the Debtor was not a loan, nor had they ever made loans to the Debtor. Ex. P74 at 108:17-18; *see also* Ex. P75 at 36:4-37:15. The Debtor's father confirmed that he never asked the Debtor to pay him back for any money he gave (and apparently continues to give). Ex. P75 at 36:10-17.

**Response:**   The Defendant objects to Paragraph 174 on the following grounds: there are absolutely no allegations in the Complaint relating to this contention of the Plaintiffs.  The claims in this adversary proceeding are about the failed acquisition transaction and the loss of the plaintiffs' money in connection therewith, including the circumstances of that loss.  Absolutely no claim has been made by the plaintiffs, under any reasonable reading of the allegations of the complaint, which could bring the matter alleged in Paragraph 174 within issues framed in this case by the pleadings.  The bar date for filing claims objecting to the discharge of the Defendant has long since passed, meaning that there no longer is subject matter jurisdiction to assert claims to deny the discharge based on the matter alleged in Paragraph 174.  Fed. R. Evid. 402 bars this Paragraph.  Additionally, the Debtor denies Paragraph 174 and maintains that he is indebted to his parents for substantial sums of money.  Simone Decl. ¶ 55.

175.    The Debtor also produced a document entitled "Mortgage Enquiry Form" from Damac, dated April 12, 2008, listing Bode as the sales agent for the 19th Floor of the Burjside Building. Ex P10 at 27.

**Response:** The Defendant objects to Paragraph 175 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

176.    On this purported mortgage form, the Debtor represented that he was, and had been, a salaried employee with "Global Capital Partners" for four years and earned a *monthly* salary of $100,000 after taxes and a bonus between $500,000 and $1 million. *Id*

**Response:** The Defendant objects to Paragraph 176 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.  The Defendant also denies Paragraph 176.  Simone Decl. at ¶ 58.

177.    The Debtor admitted that he actually never worked for "Global Capital Partners" at all, and therefore his statements on the Mortgage Enquiry Form are false. Ex. P13, Interrogatory No. 19; Ex. P14, Ans. 19.

**Response:** The Defendant objects to Paragraph 177 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Specifically, the plaintiffs have not filed with their motion and documents identified and labeled as Exhibit P13 and P14.  The Defendant Denies Paragraph 177.  Simone Decl. at ¶ 58.

178.    These false statements pertain to Plaintiffs because the Investment was predicated on obtaining financing.

**Response:** The Defendant objects to Paragraph 178 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Additionally, the Defendant denies that the Mortgage Enquiry Form should be attributed to him.  Simon Decl. ¶ 58.

179.    The Debtor testified that, by 2008, he was tapped out of money, which included his "investment monies." *Id.* at 341:23-343:17.

**Response:** The Defendant objects to Paragraph 179 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  The next preceding citation is not a deposition transcript, but requests for admission and responses thereto in another legal proceeding.

180.    The Debtor further testified that he put the last of his money in the Burjside Boulevard deal. *Id.* at 337:18-20.

**Response:** The Defendant objects to Paragraph 180 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in

violation of L.Civ.R. 56(a)(3).  The next preceding citation is not a deposition transcript, but requests for admission and responses thereto in another legal proceeding.

181.    The Debtor then admitted that $2 million was due under the Burjside contract by January 2008. *Id.* at 322:22-323:9.

**Response:** The Defendant objects to Paragraph 181 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  The next preceding citation is not a deposition transcript, but requests for admission and responses thereto in another legal proceeding.

182.    The Debtor also then (astoundingly) testified that Bode gave the Debtor "all the money that we had wired to him." *Id.* at 229:13-17. This conflicts with the Debtor's testimony regarding Bode as an escrow and the 710,000 AED check that was supposedly written by Bode containing Plaintiffs' money.

**Response:** The Defendant objects to Paragraph 182 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  The next preceding citation is not a deposition transcript, but requests for admission and responses thereto in another legal proceeding.

183.    The Debtor asserted that, regardless of where Plaintiffs' money traveled, it "all came out in a wash." *Id.*

**Response:** The Defendant objects to Paragraph 183 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). The next preceding citation is not a deposition transcript, but requests for admission and responses thereto in another legal proceeding.

184.    The Debtor failed to previously assert that the money went to him personally, as he denied knowing whether Chang even wired Plaintiffs' money to Bode. *Id.* at 273:6-16.

**Response:** The Defendant objects to Paragraph 184 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3). The next preceding citation is not a deposition transcript, but requests for admission and responses thereto in another legal proceeding.

185.    Moreover, as of August 22, 2018, the Debtor also failed to indicate in his interrogatory answer that the money went directly to Bode, or to the Debtor. Ex. P12, Ans. 1.

**Response:** Defendant objects to Paragraph 185, as the stated answer in the document referred to stated, in sum and substance, that at that time the Defendant was unable to state the exact path of plaintiff Katz's funds. To the extent that Paragraph 185 may be construed to assert that plaintiff Katz' money was not invested in Damac Properties, the same is denied. Simone Decl. ¶¶ 32-35, 39, 41, 42, 48, 51-52 and Exhibit O (at pp. 2, 3, 4, 5, 7, 8), Exhibit S (at p. 1), Exhibit Z (at p. 1) and Exhibit AA (at pp. 1-2) thereto; Defendant's Proposed Trial Exh. 33 (Testimony of Elena Vagnerova at pp. 64-65) and Exhibit O (at p. 1) thereto; and Defendant's Proposed Trial Exhibit 29 (Testimony of Andrew Woolf) at 19, 20, 31-34, 75-76) and Exhibit B (at p. 1) thereto;

186.    When asked where Vagnerova's investment funds were sent, Debtor claimed to not remember whether Vagnerova's money was sent to Chang or anywhere else for that matter. Ex. P46 at 140:8-16.

**Response:**  The Defendant objects to Paragraph 11 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

187.    On May 23, 2016, the Debtor represented to Plaintiffs that he believed Chang wired directly to Damac and that he had a banker set up in Belize. Ex. P62 at 4.

**Response:** The Defendant objects to Paragraph 187 on the following grounds: First, there is no Exhibit 62 filed with the motion for summary judgment.   Therefore this paragraph violates L.Civ.R. 56(a)(3).  To the extent that the Plaintiffs mean to refer to proposed trial Exhibit 62, the recording of the conversation violated the Florida Security of Communications Act, Fla. stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard.   Simone Decl. at ¶ 47.   Therefore, the recording is inadmissible as evidence.

188.    The Debtor later admitted that he also provided Bode's account number to Chang and that he knew it was Bode's account that he was providing. *Id.* at 274:5-7; 275:1-4.

**Response:** The Defendant objects to Paragraph 188 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

189.    The email showing the Debtor provide Bode's bank account to Chang was produced by Chang, and not the Debtor. The Debtor admitted he did not produce the email between him and Chang wherein he directed Chang to wire money directly to Bode, and the Debtor testified that the same email was not deleted. *Id.* at 267:3-22.

**Response:** The Defendant objects to Paragraph 189 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

190.    When asked why he said Plaintiffs' money was "wired to Damac" when none of Plaintiffs' money was wired to Damac, the Debtor testified that he used the term "wired" loosely." When asked why he used the term "wired," Debtor stated he did not know. Ex. P47 at 292:17-293:15.

> Q. All right. The first statement you make
>    on page 3 under where it says "Richard Simone," you
>    state as follows, "Okay, since day one, if you remember,
>    there was an attorney in the middle. His name was Tony.
>    And I think you wired him the money and then we wired
>    that money -- you wired that money to Dubai. The money
>    was wired to DAMAC." Do you see that? Do you see where
>    it says that at the top of page 3?
> A. I'm on page 2. Sorry.
> Q. You just said page 3. So you do see that?
> A. Yes.
> Q. And that was a lie; correct?
> A. I think I use the term "wired" loosely. I
>    meant it was sent to DAMAC.
> Q. Why would you use the term "wired"
>    loosely? Can you explain that?
> A. I don't know.
> Q. Why would you use -- it's a specific
>    situation where people's money is missing. It's gone;
>    right? According to your testimony.
>    MR. GILMORE: Objection.
>    Foundation.
> Q. Mr. Woolf's money is gone; correct?
> A. Correct.

*Id.*

**Response:**  The Defendant objects to Paragraph 190, as it does not properly and fully capture the testimony rendered in the text above. Therefore, the Defendant objects on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

191.    Serious inconsistencies within the Debtor's document productions also exist. The Debtor purportedly produced the same email twice, but the content changed.

<table>
<tr>
<td>
> From: m.wael@damacgroup.com<br>
> To: richsimone@hotmail.com<br>
> Subject: FW: ARF<br>
> Date: Tue, 10 Jul 2007 17:23:07 +0400<br>
><br>
> Dear Rich,<br>
><br>
> Kindly find attached the reservation forms for each unit.<br>
><br>
> Please sign them and send it by fax.><br>
> ><br>
> Please treat this issue very important.<br>
><br>
> Best regards,<br>
> Mohammed<br>
>
</td>
<td>
> From: m.wael@damacgroup.com<br>
> To: richsimone@hotmail.com<br>
> Subject: FW: ARF<br>
> Date: Tue, 10 Jul 2007 17:23:07 +0400<br>
><br>
> Dear Rich,<br>
><br>
> Kindly find attached the reservation forms for each unit.<br>
><br>
> Please sign them and send it by fax.<br>
><br>
><br>
><br>
><br>
><br>
> Best regards,<br>
> Mohammed
</td>
</tr>
</table>

*Compare* Ex. P9 at 1 *with* Ex. P9 at 69.

**Response:**  The Defendant objects to Paragraph 191 as characterizing inconsistencies as serious, and without any foundation as to how emails might come to have multiple copies with some missing text in one copy.

192.    The same emails produced on different occasions contain different signature blocks:



*Compare* Ex. P9 at 68 *with* Ex. P10 at 13.

**Response:**  The Defendant objects to Paragraph 192 as suggesting any impropriety by how one representation of an email might have different font and another email, containing the exact same language, might have a different representation of the character font (for a sender's name). Further, Defendant denies that there is any irregularity in his emails.  Paragraph 192 is without

foundation of an admissible nature to make such a claim and therefore fails to comport with

Fed.R.Civ.P. 56. Defendant's Expert Report of James Whitehead (Trial Exhibit 2, Declaration 1

at ¶¶ 10-19 and Declaration 2 at ¶¶ 10-22.

193.    The Debtor's emails as produced contain irregular margins that often jut outward

to the left in a manner different from the usual way an email is reflected on a page:



*See, e.g.*, Ex. P10 at 29.

**Response:** The Defendant objects to Paragraph 193 as suggesting any impropriety by how the

email's text is structured or formatted. Further, Defendant denies that there is any irregularity in

his emails. Paragraph 193 is without foundation of an admissible nature to make such a claim and

therefore fails to comport with Fed.R.Civ.P. 56. Defendant's Expert Report (Trial Exhibit 2,

Declaration 1 at ¶¶ 10-19 and Declaration 2 at ¶¶ 10-22.

194.    The Debtor failed to produce a single original contract or piece of paper or evidence

in this entire case. Ex. P46 at 34:15-17; Ex. P47 at 306:4-6.

**Response:** The Defendant admits that he has copies only of documents (electronically stored and/or physical copies).

195. The Debtor produced only one purported email communication with an alleged real estate agent named "Sabine" who was supposedly helping the Debtor find a lawyer in Dubai during 2011. *Id.* at 236:5-7; 248:6-14.

**Response:** The Defendant admits Paragraph 195.

196. Another inconsistency manifested itself within an email purportedly from the Debtor's then-secretary, Monica Karpinsky (perhaps rhyming with Monica Lewinsky), whose last name the Debtor could not even remember when first asked at his deposition. *Id.* at 235 at 15-21.

**Response:** The Defendant objects to Paragraph 196 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

197. In the purported email from May 31, 2011, the Debtor's secretary signs her name "Monika" but her email address is listed as monica_01_02@yahoo.com:

Date: Tue, 31 May 2011 02:44:21 -0700
From: monica_01_02@yahoo.com
Subject: Ocean Heights
To: sbnwalter@yahoo.com
CC: richsimone@hotmail.com

Dear Sabine,

As per Richard's request please find enclosed documents related to Richard's Ocean Heights Property. Documents on Burj Side Boulevard will be sent to you shortly.

Best regards,

Monika

Ex. P10 at 40.

**Response:** The Defendant denies that the different spelling cast doubt on the validity of the email. Defendant's expert has rendered an opinion essentially validating the email. Defendant's Trial Exhibit 2 (Trial Exhibit 2, Declaration 1 at ¶¶ 10-19 and Declaration 2 at ¶¶ 10-22.

198. Also exemplified in this email is one of multiple examples where the "Cc" field in the heading contains two capital "Cs" which is inconsistent with other emails in the Debtor's production and the uniform standard of only one capitalize letter (i.e., "Cc").

**Response:** The Defendant denies that the difference casts doubt on the validity of the email. Defendant's expert has rendered an opinion essentially validating the email. Defendant's Trial Exhibit 2 (Trial Exhibit 2, Declaration 1 at ¶¶ 10-19 and Declaration 2 at ¶¶ 10-22.

199. This email is also one of many examples from the Debtor's document productions wherein attachments are referenced (i.e., "please find enclosed documents"), but then the attachments are missing and not produced by the Debtor to Plaintiffs.

**Response:** The Defendant objects to Paragraph 199 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

200. Likewise, the Debtor has not produced any other emails from any of his purported assistants or secretaries during the material times for this lawsuit or while the Debtor lived in Dubai.

**Response:** The Defendant objects to Paragraph 200 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

201.    The Debtor has not produced any meaningful emails between he and Bode, the person who handled all of Plaintiffs' money before apparently giving it all to the Debtor. Moreover, the Debtor produced no text messages or other forms of communication with Bode during the 2007/2008 era when the Debtor acquired Plaintiffs' $495,000.

**Response:** The Defendant objects to Paragraph 201 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence; nor have the plaintiffs specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

202.    Regarding his poolside signing session with Vinod Kumar and Mohammed Hegazi, the Debtor stated that he went to the pool to present a credit card as payment to Damac, but he has not produced any receipts or documents to verify payment via credit cards. *Id.* at 251:21-25.

**Response:** The Defendant denies Paragraph 202.  Tr. Simone Depo. Oct. 9, 2019 at pp. 254-56. Each of the 9 Unit Reservation Contracts for the 16th Floor denotes a 1,111.11 AED credit for the deposit.  Simone Decl. ¶¶ 17-19 and Exhibit F (at pp. 2, 6, 10, 14, 18, 22, 26, 30, 34) thereto.

203.    The Debtor reiterated that Hegazi was not at the pool and claimed Hegazi did not sign the contract that day (even though Hegazi's name is on the purported contract). *Id.* at 254:17-255:2.

**Response:** Paragraph 203 is admitted.

204.    The Debtor stated that he ereceived two signed versions from Damac at a later point in time, with the version that was "stamped" by Hegazi being the operative version. *Id.* at 254:16-21. However, the third page is substantively different between Contract 1 and Contract 2. Ex. P4 at 3; Ex. P5 at 3.

**Response:** With respect to Paragraph 204, the first sentence is admitted and the second sentence is denied.  Simone Decl. at ¶¶ 14-16 and Exhibit D (at p. 1-3) and Exhibit E (at p. 1-5) thereto.

205.    On multiple occasions during his deposition testimony, the Debtor authenticated himself, Katz, and Woolf on the recorded call.   He again confirmed the voices on the call as himself, Katz, and Woolf. *Id.* at 280:17-281:23; Ex. P48 at 291:8-22. Debtor also confirmed that nobody was forcing him and he made the statements freely. *Id.*

**Response:** The Defendant objects to Paragraph 205 on the following grounds: First, there is no Exhibit 62 filed with the motion for summary judgment.   Therefore this paragraph violates L.Civ.R. 56(a)(3).  To the extent that the Plaintiffs mean to refer to proposed trial Exhibit 62, the recording of the conversation violated the Florida Security of Communications Act, Fla. stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard.   Simone Decl. at ¶ 47.   Therefore, the recording is inadmissible as evidence.

206.    The Debtor further stated that he was not truthful to Plaintiffs about their investments for over 12 years: "I said I wasn't truthful with the plaintiffs." Ex. P46, at 313:1-13.

**Response:**   The Defendant objects to Paragraph 206, as the plaintiffs have failed to specify evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).   **Further,** the Defendant denies Paragraph 206.   Simone Decl. ¶ 59.

207.    The Debtor testified on April 9, 2018 that he bought a property in the Ocean Heights building, but the Debtor failed to produce any proof of payment. *Id.* at 366:9-14.

    A.  I bought -- I bought a place in another
        building called Ocean Heights; has nothing to do with
        Mr. Katz.

Ex. P44, 61:14-16.

**Response:** The Defendant admits paragraph 207.

208.    However, on November 12, 2019, the Debtor testified that he did not purchase Unit 7602 in Ocean Heights because he defaulted on that. Ex. P4, 422:20-22.

**Response:** The Defendant objects to Paragraph 208, as the plaintiffs have failed to specify

evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).


    209.    The Debtor stated that he never closed on any of his investments or real estate

purchases. *Id.* at 435:10-24.

        Q   What units of DAMAC did you close on?
        A   I didn't close.
        Q   You never closed on anything?
        A   No.
        Q   All you were doing is just getting into contracts
            and then defaulting; is that your testimony?
        A   I went into certain contracts. There was
            defaults on them. There was another market in Dubai
            which was buying and selling presale units.
        Q   Did you flip this?
        A   I didn't flip it.
        Q   What -- describe that, "buying and selling
            presale units."
            Were you involved in any of that?
        A   I was not.
        Q   Was Bode?
        A   Not that I know of.
        Q   So Bode was your good friend, right?
        A   Yes.
        Q   And he was a very wealthy person, as you said
            earlier?
        A   Yes.
        Q   And he loaned you money, correct?
        A   There was a point where I was behind on payments
             to DAMAC and he loaned me some money.
        Q   Did you pay him back?
        A   Yes.
        Q   With what?
        A   Paid him back with money that -- there was -- I
            think there was a time when I was behind with DAMAC and
             I got -- and at that point, I think he lent me some
            money pending my father sending some money.
        Q   You paid him back with what? With what money?
            From who?
        A   I believe I paid him back with my father's --
            some of my father's money.
        Q   Okay. So your father's money went to paying back
             Bode; is that right?
        A   Some.
        Q   What about plaintiffs' money?
            How much did you borrow from Bode?

A Can't remember.

Ex. P48, 435:8-436-24.

**Response:**  The Defendant objects to Paragraph 209, as the plaintiffs have failed to specify

evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

210.    The Debtor testified in his November 12, 2019 deposition that he paid "probably

10 percent" of the purchase price for the purported Oceans Heights transaction but he told Tarek

Lawyer that he paid 20 percent. *Id.* at 413:16-414:1.

> made 20 pct deposit in Ocean Heights (OH) 9.4 million x 20% paid 1.8 million
> Payments total 4.5 million AED

Ex. P10 at 39.

**Response:** The Defendant objects to Paragraph 210 on the ground that it violates Fed. R. Civ.P.

56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that

have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and,

accordingly, the contents of Exhibit 10 are inadmissible on this motion.

211.    The Debtor stated that, prior to 2008, Bode purchased a condo in Ocean Heights

before the Debtor visited Dubai and that he did not know which unit he purchased or whether Bode

ever sold the property. *Id.* at 367:4-9.

**Response:**  The Defendant objects to Paragraph 211, as the plaintiffs have failed to specify

evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

212.    The Debtor denied that he had any financial role in Bode's purchase of the Ocean

Heights. *Id.* at 370:16-19.

**Response:**  The Defendant objects to Paragraph 212, as the plaintiffs have failed to specify

evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

213.    The Debtor also made inconsistent statements about which unit in Ocean Heights

he was purportedly buying. In his purported email to Damac's then-CEO Peter Riddoch on April 16, 2008, the Debtor stated: "Stefan and I started negotiating an apartment in Oceans Heights and bought a duplex **7601/7701**." Ex. P10 at 28 (emphasis added).

**Response:** The Defendant objects to Paragraph 213 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.   Additionally, the Defendant denies Paragraph 213.  Simone Decl. ¶¶ 31, 60 and Exhibit T (at p. 1) thereto.

214.    However, the contract for Ocean Heights that the Debtor produced on November 12, 2019 (for the first time) dated February 26, 2008 reflected unit **7602** (which was not a duplex). Ex. P7.

**Response:** The Defendant objects to Paragraph 214 on the ground that the plaintiffs have not specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  Specifically, the plaintiffs have not filed with their motion documents identified and labeled as Exhibit P7.

215.    In the same purported April 16, 2008 email to Mr. Riddoch (Damac's CEO), the Debtor failed to mention any of these issues:

- any alleged "disputes" concerning the price of the 16th floor or Damac's refusal to put the investment "in a corporate name;"
- the Tribeca Partners entity in Belize;
- any defaults under the purported agreement for the 16th floor of Burjside Boulevard;
- any installment payments he purportedly made to Damac prior to default;
- the $274,000 amount purportedly paid to Damac that was supposedly recognized by Wael as "transfers" in September 2007; and
- whether there were any issues with his installment payment under his contract for the 19th Floor of Burjside that was due on April 23, 2008, just one week after the date of his email (April 16, 2008).

Ex. P10 at 37.

**Response:** The Defendant objects to Paragraph 215 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be

admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.  Further, the Defendant denies Paragraph 215.  Simone Decl. ¶ ¶ 31-33, 61 and Exhibit O (at pp. 2, 3, 4, 5, 7, 8), Exhibit T (at p. 1), and Exhibit S (at p. 1).

216.    Also in this email, the Debtor (who now claims he defaulted on all the contracts) supposedly told Damac's CEO that he was "setting up a substantial fund that will invest in real estate in Dubai and Abu Dhabi" but the Debtor failed to produce any evidence to corroborate any "substantial fund."

**Response:** The Defendant objects to Paragraph 216 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

217.    The Debtor also purportedly asserted to Mr. Riddoch that "the bottom line is if you do the right thing here….the right as spelled out in your policy book…we are in a position to do a lot more business if both sides play both morally and legally correct." *Id.* The Debtor, however, has not explained what he meant by "the right thing" nor has he produced Damac's "policy book."

**Response:** The Defendant objects to Paragraph 217 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion. The Defendant objects further to Paragraph 217, as the plaintiffs have failed to specify evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

218.    Around this same time, the Debtor also supposedly corresponded with Hegazi on April 23, 2008—the same day his first $738,199.85 installment payment was due under the purported contract for the 19th floor of the Burjside building. *Id.* at 29-30.

**Response:** The Defendant objects to Paragraph 218 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

219.    In this correspondence with Hegazi (who the Debtor contends signed the operative contract for the 16th floor or maybe the 19th floor purchase, as the 19th floor document was not countersigned), the Debtor does not mention the installment payment at all, nor seek any extension for the payment that Debtor claims he ultimately failed to pay, defaulted on, and on which he subsequently lost all of Plaintiffs' money. *Id.*

**Response:** The Defendant objects to Paragraph 219 on the ground that it violates Fed. R. Civ.P. 56(c) in that the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence.  In particular Plaintiff's Exhibit 10 is a hodgepodge of documents that have not been authenticated or otherwise proven to be admissible by the Plaintiffs, and, accordingly, the contents of Exhibit 10 are inadmissible on this motion.

220.    The Debtor also identified a third different Ocean Heights unit during his deposition: "It's of the unit **7601** – this one right here." Ex. 46 at 200:4-5.

**Response:** Paragraph 220 is admitted.

221.    The Debtor later asserted that he defaulted on the actual unit he supposedly attempted to purchase, Ocean Heights Unit 7602. *Id.* at 422:20-22.

**Response:** The Defendant objects to Paragraph 221 on the ground that the plaintiffs have not specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).  That said, the Defendant does not deny that he defaulted on the contract to acquire said unit in Ocean Heights.

222.     The Debtor admitted that he never told Plaintiffs about the Ocean Heights deal and

that he was too "embarrassed" to tell his "friends" that the Burjside deals never closed (even though

he had just recently been convicted a second time of a financial theft crime, for stealing money

from his clients, while on probation and had gone to prison for over a year, the Debtor claimed he

lied because of his embarrassment regarding the loss of Plaintiffs' money). *Id.* at 373:18.

**Response:** The Defendant objects to Paragraph 222 on the ground that the plaintiffs have not

specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

223.     The Debtor also admitted that he did not tell Plaintiff Vagnerova about any defaults

on the Burjside Boulevard building, expressly stating: "I didn't tell her about the default." Ex. P48,

at 401:1-16.

**Response:**   The Defendant objects to Paragraph 223 as being in violation of L.Civ.R. 56(a)(3),

inasmuch as there is no Exhibits P48 identified and labeled as such in the Plaintiffs' filings in

support of the motion.  That said, the Defendant does not deny that he did not tell Elena about the

default on the Burjside Boulevard pooled acquisition transaction.

224.     The Debtor claimed that there were emails between him and Wael discussing that

the Burjside Boulevard transaction for the 16th floor was cancelled, but the Debtor failed to produce

any such emails. *Id.* at 404:23:405:2.

**Response:** The Defendant objects to Paragraph 224 on the ground that the plaintiffs have not

specified evidence that fully supports the statement, in violation of L.Civ.R. 56(a)(3).

225.     In May 2016, the Debtor told Plaintiffs that he was planning a future trip to Dubai

in "maybe a month" to obtain information on Plaintiffs' investment and that Plaintiffs should plan

to take a trip in July 2016. *Id.* at 27.

**Response:** The Defendant objects to Paragraph 225 on the following grounds: First, there is no

Exhibit 62 filed with the motion for summary judgment.  Therefore this paragraph violates

L.Civ.R. 56(a)(3).  To the extent that the Plaintiffs mean to refer to proposed trial Exhibit 62, the

recording of the conversation violated the Florida Security of Communications Act, Fla. stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard.   Simone Decl. at ¶ 47.   Therefore, the recording is inadmissible as evidence.

226.    While the Debtor was represented by counsel in 2017 (attorney #2 of the seven different attorneys the Debtor hired since 2016, six of whom withdrew or otherwise stopped representing the Debtor in court proceedings), the Debtor purported to have drafted by himself (without counsel) a "power of attorney" to purportedly transmit to a person named Mahmoud Bedir ("Bedir"), a non-lawyer who was supposedly in Dubai to get information from Damac or RERA. Ex. P46 at 181:7-10.

**Response:** The Defendant objects to Paragraph 226 on the ground that the plaintiffs have not specified evidence that fully supports the statement, in violation of L.Civ.R. 56(a)(3).

227.    The result was no information from Damac (that was provided to Plaintiffs). *Id.* at 196:8-20.

**Response:** The Defendant objects to Paragraph 227 on the ground that the plaintiffs have not specified evidence that fully supports the statement, in violation of L.Civ.R. 56(a)(3).   That said, the Defendant does not deny that Mr. Bedir did not obtain documentation from Damac.

228.    Regarding RERA, in Whatsapp text messages between Bedir and the Debtor, Bedir informed the Debtor that his name is not reflected in RERA, which is the UAE database for property ownership. Ex. P29 at 33.

**Response:** Defendant objects to Paragraph 228, as any statements by Mr. Bedir in Whatsapp messaging are hearsay.   Fed.R.Evid. 802.

229.    The so-called power of attorney the Debtor drafted for Bedir expired on December 31, 2017. Ex. P46 at 181:16. Apparently, the Debtor did not pay Bedir's fee and the Debtor never

hired a lawyer or anyone else to "get documents from Damac." *Id.* at 190:2-16; Ex. P29 at 34.

**Response:** The Defendant objects to Paragraph 229 on the ground that the plaintiffs have not specified evidence that fully supports the statement, in violation of L.Civ.R. 56(a)(3). Defendant objects further on the ground that any statements by Mr. Bedir in Whatsapp messaging are hearsay. Fed.R.Evid. 802. Further, the Defendant denies Paragraph 229. Simone Decl. ¶ 63.

230.    There is no evidence of the Debtor having retained counsel in Dubai at any time between 2007 and 2020, despite the so-called disappearance of over $1 million of investor money on his watch. Ex. P47 at 359:8-25. The Debtor claims to have "tried to contact other lawyers" during that time, but cannot remember any of their names. *Id.* at 359:19-25.

**Response:** The Defendant objects to Paragraph 230 on the ground that the plaintiffs have not specified evidence that fully supports the statement, in violation of L.Civ.R. 56(a)(3). Further, the Defendant denies paragraph 230. Simone Decl. ¶ 42.

231.    When he was questioned at his deposition on November 12, 2019, the Debtor admitted that he had *himself* personally traveled to Dubai in September 2019. Ex. P48 at 192:16-25; Ex. P29 at 24. And the Debtor failed to produce any documents from this trip from Damac, from RERA or that corroborate any of the Debtor's statements about Plaintiffs' money.

**Response:** The Defendant objects to Paragraph 231 on the ground that the plaintiffs have not specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

232.    According to the Debtor's testimony, he arrived in Dubai on September 27, 2019, but he did not get around to purportedly meeting with Damac until September 30, 2019. The Debtor claimed to have met with someone from Damac (though he does not identify who), and contends that he got "snubbed" when trying to collecting more information. Ex. P48 at 193:1-6.

**Response:** The Defendant objects to Paragraph 232 on the ground that the plaintiffs have not specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

233.    Although he purports to be a bankruptcy debtor, the Debtor managed to obtain

internal airfare and stayed at The Dukes (a five-star hotel) while in Dubai. Ex. P29 at 24.

**Response:** The Defendant objects to Paragraph 233 on the ground that the plaintiffs have not

specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

Notwithstanding, the Defendant admits that he stayed at The Dukes.

234.    While the Debtor's alleged "plan" for his trip to Dubai was "to collect more

evidence from Damac, from Emirates Bank, [and] from [the] real estate regulatory authority," the

Debtor failed to produce a single piece of paper from his Dubai journey. *Id.* at 24.

**Response:** The Defendant objects to Paragraph 234 on the ground that the plaintiffs have not

specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

235.    Despite being in Dubai for five days, the Debtor failed to produce a scintilla of

evidence to corroborate a single aspect of his testimony regarding the disappearance of Plaintiffs'

money, Damac, Burjside Blvd, Ocean Heights, Bode, or anything else material to this case.

**Response:** The Defendant objects to Paragraph 235 on the ground that the plaintiffs have not

specified evidence that supports the statement, in violation of L.Civ.R. 56(a)(3).

## ADDITIONAL MATERIAL FACTS

The following constitutes the Defendants Statement of Additional Material Facts, filed pursuant to

L.Civ.R. 56(a)(2) and in accordance with the requirements of L.Civ.R. 56(a)(3):

1.    Prior to June of 2007, the defendant, Richard P. Simone ("Simone")

began learning about the economy of Dubai, United Arab Emirates ("UAE"), including

learning about the Dubai real estate market.  In the spring of 2007, Simone traveled

to Dubai as part of that learning process.  Through this learning process, it became

apparent to Simone that the Dubai real estate market was experiencing a boom, with

significant increases in value over short periods of time.  Based upon what he learned

about the Dubai real estate market, Simone concluded that the acquisition of real

estate in Dubai could be a productive and profitable venture and he began to look for

acquisition opportunities. Simone Decl. at ¶ 2.

2.      One of the opportunities that Simone learned about and evaluated was

a project known as Burjside Boulevard.  Burjside Boulevard was a project of Damac

Properties ("Damac") (although title may have been in one of their affiliated entities).

Simone's understanding is that Damac is a large real estate development company

that had a good reputation in the community.  Units (i.e. apartments/condominiums)

in Burjside Boulevard were being marketed and sold, pre-construction.  Simone's

understanding of pre-construction marketing is a concept and process by which, prior

to the commencement of construction and/or before construction is substantially

undertaken, units within a proposed building are marketed and sold by the developer.

Simone Decl. at ¶ 3.

3.      Simone was introduced to officers and/or managers of Damac by Stefan

Bode in the spring of 2007, when he traveled to Dubai to further his understanding of

the real estate market and of opportunities within said market.  The Burjside

Boulevard building project was for the development of a luxury service apartment

building.  In the spring of 2007, the Burjside Boulevard project was then proposed for

development and the projection was that construction would be an approximately two

year cycle. Simone Decl. at ¶ 4.

4.      Simone's understanding is that one of the advantages of acquiring an

interest in a unit, pre-construction, is that the pricing is more favorable to the

purchaser than the pricing would be for a fully constructed, ready to occupy unit

(although as a building project garners more and more interest, price escalations can

and do occur in the pre-construction phase of a project).  With respect to the Burjside

Boulevard project, there was presented to Simone the opportunity to acquire an entire

floor of the building, pre-construction, at what Simone understood to be discounted pricing over the sales price of individual units.  Simone Decl. at ¶ 5.

5.        What Simone understood to be one of the attractions of a luxury service apartment building is that it has the service level comparable to a hotel, which presents good opportunities to rent units in the building for short and extended stays in Dubai.  The location of the Burjside Building project also was considered to be very attractive.   The location of the Burjside Building project is proximate to (being approximately 1 kilometer from) the Dubai Mall, which mall, in the spring of 2007, was well under construction.  The Dubai Mall opened on November 4, 2008 (according to Wikipedia).  Simone was living in Dubai at the time and recalls the opening of the Dubai Mall.  The Dubai Mall was envisioned to be, and became, a major part of a new business center in Dubai.  The projected success of the Dubai Mall has been borne out.  According to Wikipedia, the Dubai Mall "is part of the 20-billion dollar Downtown complex (called Downtown Dubai) and includes over 1,200 shops.  In 2011, it was the most visited building on the planet, attracting over 54 million visitors each year."  See, Wikipedia article attached hereto as Exhibit A (at pp. 1-4).  The statistics section for the Wikipedia page on the Dubai Mall provides the following:

> The Dubai Mall recorded 61,000 tickets sold for the Dubai Aquarium and Discovery Centre in the first five days, following its opening.  The Dubai Mall hosted over 37 million visitors in 2009, and attracts more than 750,000 visitors every week.  In 2010, it hosted 47 million visitors, and saw an increase in foot traffic by about 27 percent over 2009, despite the economic crisis (a consequence of real estate bubble burst).  In 2012, Dubai Mall continued to hold the title of the world's most-visited shopping and leisure destination, and attracted more than 65 million visitors, an increase of more than 20 percent compared to the 54 million recorded in 2011.  It attracted more visitors than New York City which welcomed over 52 million visitors in 2012, and Los Angeles which had 41 million visitors.

Simone Decl. at ¶ 6.

6.      In addition to the proximity of the Burjside Boulevard project to the Dubai Mall, it likewise has proximity to the businesses of Business Bay.  Business Bay was established in the early 2003 (per Wikipedia) and its infrastructure was well under construction in 2007, when Simone visited Dubai for the purpose of investigating further the prospect of acquiring real estate in Dubai.  According to Wikipedia, Business Bay was envisioned to be "a new city within the city of Dubai," the same "being built as a commercial, residential and business cluster."  See Exhibit B hereto (Wikipedia article on Business Bay).  Wikipedia remarks further about Business Bay:

> Business Bay is part of the vision of His Highness Sheikh Mohammed Bin Rashad Al Maktoum, UAE Vice President, Prime Minister, Minister of Defence, and Ruler of Dubai…. [O]nce completed [Business Bay] will be composed of office and residential towers set in landscaped gardens with a network of roads, pathways and canals.  It will become the region's business capital as well as a freehold city.

Simone Decl. at ¶ 7.

7.      The promise and potential of the Burjside Boulevard project was buttressed by Simone's understanding that one of the most successful hotels in Dubai at the time was next to the Emirates Mall, and the design and intent of the Dubai Mall was to be bigger and better than the Emirates Mall in every way.  Based on what was said to Simone, and what he saw in marketing materials, Simone did believe at the time that the Emirates Mall was the largest mall in the world and that the Dubai Mall was designed to outclass the Emirates Mall in every respect.  However, what was most significant about the Emirates Mall was not whether it technically had the most area; rather, what was important about the Emirates Mall was that it was grand and beautiful, and then was the major attraction in the Dubai area.  This, in turn, meant that it received a lot of visitors.  The fact that one of the most successful hotels at the

time was proximate to the Emirates Mall and that the Dubai Mall was designed to be superior to the Emirates Mall, meant that the targeted real estate acquisition held much promise.  A Wikipedia article on the Mall of the Emirates states that "[i]n November 2005, it was named the World's Leading New Shopping Mall at the World Travel Awards in London.  The Emirates Mall also provides "family leisure activities including Ski Dubai (the Middle East's first indoor ski resort and snow park)" according to the Wikipedia article on the Emirates Mall.  See, <u>Exhibit BB</u> hereto, at p. 1.  Simone Decl. at ¶ 8.

8.      Simone is familiar with the convention used by Damac in 2007 and 2008 for the designation of email addresses for officers and/or employees of Damac. Simone became so familiar because he received email correspondence from, and corresponded with, people who he came to know as officers and/or employees of Damac when evaluating and documenting the Burjside Boulevard project for acquisition.  The domain name used by Damac officers and employees is damacgroup.com.  The mailbox name of the email address for a respective officer or employee of Damac is either the person's first name or the first letter of the person's first name, followed by a period, which, in turn, is followed by the person's last name.  For example, Simone came to know Mohammed Wael of Damac Properties in 2007.   Mohammed Wael's email address at Damac, at the time, was <u>m.wael@damacgroup.com</u>.  Simone met with both Mohammed Wael and Mohamed Hegazi during his spring 2007 trip to Dubai and learned that they were officers and/or employees of Damac in the sales arm of the Damac group of companies.   The first person who Simone met at Damac was Mohamed Hegazi, and during his first meeting with Mohamed Hegazi Simone also met Mohammed Wael.  Simone Decl. at ¶ 9.

9.      During Simone's stay in Dubai in the spring of 2007, and resulting from dialogue with officers and/or employees of Damac (whether acting on behalf of Damac or on behalf of one of the companies within the Damac group), Simone was afforded an opportunity to reserve for purchase all of the units on what would be an entire floor of the Burjside Boulevard project, on a pre-construction basis.  The proposed floor was the 16th floor of the planned Burjside Boulevard building, which floor was designed to be composed of 9 apartment units.  The price at which Simone was offered the units, on a reservation basis, was the sum of 1,900 Dirham (AED) per square foot, for a total acquisition price of 18,646,600 Dirham (AED). Simone accepted the proposal and agreed to reserve the entire 16th floor of the Burjside Boulevard project on those price terms.  Simone does remember that, during his stay in Dubai, he made, by credit card, a modest deposit with Damac to demonstrate my interest in so reserving that floor.  Simone Decl. at ¶ 10.

10.      Among Simone's email records is an email thread that consists of the following: (a) an email from Mohammed Wael to Simone at his richsimone@hotmail.com email address dated May 31, 2007 with a subject header Reservation Form; (b) a reply email from Simone to Mohammed Wael dated June 04, 2007; and (c) a reply email from Mohammed Wael (from his m.wael@damaacgroup.com email address) to Simone at his richsimone@hotmail.com email address dated June 04, 2007.  A true and accurate of that three-email thread, composed of each of the three emails described above, is attached to the Simone Declaration as Exhibit C (at pp. 1-2).   Simone Decl. at ¶ 11.

11.      This being almost 13 years later, Simone does not have a present memory of the actual sending and receiving of the three-email thread referenced in the immediately preceding paragraph.  The emails from Mohammed Wael do,

however, comport with the Damac group domain and mailbox naming convention for email addresses, they were correctly addressed to Simone's Hotmail email account. Simone Decl. at ¶ 12.

12.   The May 31, 2007 email from Mohammed Wael refers to an attached reservation form, and requests that Simone print it and send it back by fax with a copy of my passport. Id. In Simone's response email to Mohammed Wael dated June 4, 2007, Simone informed Mohammed that the property will be held in a corporate name. Id. The last email in that three-email thread is a reply back from Mohammed Wael, in which he informed Simone that "the reservation form [I] have now is the Manuel one and this is only to confirm the booking and later we can issue the system reservation under whatever name you decide.

So please send me the one you have by fax to confirm the sale." Id. Simone Decl. at ¶ 13.

13.   A true and accurate copy of a unit reservation contract for the entire 16th Floor of the Burjside Boulevard project, pre-construction, is attached to the Simone Declaration as Exhibit D (the "Manual Contract") at pp. 1-3.   The Manual Contract contains the pricing terms to which Simone agreed: 1900 AED (Dirham) per square foot for all of the units of the 16th floor.  The unit details and price details – all of which are handwritten – are not made in Simone's handwriting.  Simone does not know in whose handwriting his name and address are printed on the form, but he presume that it is not his handwriting because of his remark in his June 4, 2007 email that [the property] "will b held in a corp name", and Mohammed Wael's response to that statement later that day, to the effect that "as I told you the reservation form you have now is the Manuel one and this is only to confirm the booking and later we can issue the system reservation under whatever name you decide.

So please send me the one you have by fax to confirm the sale." Simone Decl., Exhibit

C at p.1.  That email exchange tells Simone that someone at Damac likely filled in his

name and address and not Simone himself.  Simone would note that the person who

wrote Simone's name and address appears to be a different person from the one who

wrote the unit and pricing details, as the A's are made very differently.  See the A's in

Richard and Murray that are made the same way, and which differ markedly from

how the A's are made in the writing of AED.   Simone Decl. at ¶ 14.

14.    In 2020, some 13 years later, Simone does not remember the act of

signing the Manual Contract.  It does, however, bear Simone's signature on all three

pages of the document.  There is a date next to each of Simone's three signatures on

the document, with each date being June 6, 2007, although the date is expressed

differently on page one of the document than it is expressed on pages two and three of

the document.  Since Simone doesn't remember signing the document, he likewise

does not remember placing a date next to his signature on the document.  It would be

Simone's custom and practice, however, where a date of signature is specified to be

given, as it is on this Manual Contract by each place where he signed, to write the

date of the document where the date is not provided.  In endeavoring to deduce a

reason as to why the date was expressed differently on page one of the document than

on pages two and three of the document, it would seem that likely would have been

due to the more confined space in the box with which to write the date on page one

(even expressing the date as 6/6/07 did not quite fit within the box).  Simone does not

think that Damac would have placed the date by his signature before sending the

document to him, because the email from Mohammed Wael in which he states that he

has attached the reservation form was dated May 31, 2007, and Damac would not

have anticipated a signing of the document six days later.  We also know that, from

the June 4, 2007 follow-up email, that the Manual Contract was unsigned on June 4, 2007.   While Mohammed Wael does not expressly ask Simone to sign the Manual Contract, that is the obvious import of the correspondence.   This version of the Manual Contract was apparently countersigned by Mohamed Hegazi, although Simone is not personally familiar with Mr. Hegazi's signature.   It does purport to bear the seal of Damac Star Properties.   The date by the signature line to the right of the printed name M Hegazi, with a designation of DOS, is 11/6/07.   In the United Arab Emirates, dates are expressed with the day of the month being the first number, followed by the month in the middle, and then the year on the end, such that 11/6/07 denotes June 11, 2007.   This indicates that the Manual Contract was countersigned on behalf of a Damac entity on June 11, 2007.   Simone's understanding is that, at the time, Mr. Hegazi was the Director of Sales for the Damac group of companies.   Simone Decl. at ¶ 15.

15.    There is a second version of the Manual Contract that has the exact same terms (the entire 16th Floor of the Burjside Boulevard project at 1900 AED per square foot for a total price of AED 18,646,600) that was prepared by the exact same hand writers and which appears to be the very same document, but with different signatures, a different singing date by Simone, and with no execution date for the signature by the Damac representative.   A true and accurate copy of that version of the Manual Contract is attached to the Simone Decl. as <u>Exhibit E</u> (at pp. 1-4).   This version of the Manual Contract also was signed by Simone three times.   However, contrary to Simone's custom, there is no date by his signature on the first page of the document.   The date by his signature on Page 3 of the document (below paragraph 17), which page is second in order on the exhibit, is 10/7/07.   If this followed the dating convention used in the United Arab Emirates, the date of Simone's signing this

version of the Manual Contract was July 10, 2007.  The countersignature by the

Damac representative is unsigned.  This version of the Manual Contract does not bear

a seal of the company (unlike the other version of the Manual Contract).  This version

of the contract also bears facsimile transmission data dated October 29, 2007, with

Simone's name and facsimile number printed at the top of the document.  Simone does

not remember signing this version of the Manual Contract but it his signature on the

document.  Also, although the document was prepared for signature by Mohamed

Hegazi, Director of Sales, it does not appear to have been signed by him and instead

appears to have been signed by Mr. Vinod Kumar.  The same person who signed this

document on behalf of Damac also appears to be the same person who signed one of

the payment receipts (relating to the 19th floor, as discussed hereinafter).  Simone did

come to know Mr. Vinod Kumar and knew him to be an officer and/or employee with

the Damac group.  Simone Decl. at ¶ 16.


16.    Simone would be speculating as to why the second version of the Manual

Contract was signed.  Simone does note that on July 10, 2007, he received an email

from Mohammed Wael, forwarding to Simone the system reservation forms – one

separate form for each of the 9 units for the 16th Floor of the Burjside Building

Project.  A true and accurate copy of the July 10, 2007 email from Mohammed Wael to

Simone at his Hotmail email account, together with the attached 9 unit reservation

forms, with a subject matter of FW: ARF, is attached to the Simone Declaration as

Exhibit F (at pp. 1-37).    That email, in addition to forwarding the aforesaid

attachments, also forwarded an email from Mr. Vinod Kumar to Mohammed Wael

dated July 10, 2007.  This being almost 13 years later, Simone does not have a present

memory of the actual receipt of the Mohammed Wael email forwarding the individual

unit reservation forms for the 9 units, or the forwarding of Vinod Kumar's email to me.  The email from Mohammed Wael to Simone, and the email from Vinod Kumar to Mohammed Wael, do, however, comport with the Damac group domain and mailbox naming convention for email addresses, and the forwarding email from Mohammed Wael was correctly addressed to Simone's Hotmail email account.  Simone also notes that email document records produced in this litigation show that he forwarded the email thread and the 9 unit reservation forms attachments to his then attorney, Tony Chang, three months later on October 16, 2007.  Simone Decl. at ¶ 17.

17.     It is possible that Damac might have misplaced the earlier dated Manual Contract and requested re-execution of the same (in order to have it for their records), although Simone has no recollection of Damac having done so all these years later. Damac did earlier advise, however, that the Manual Contract is "only to confirm the booking and later we can issue the system reservation under whatever name [I] decide."  Exhibit C (at pp. 1-2).  So, the Manual Contract, although a binding agreement to Simone's understanding, is a first step in the process.  Individual system reservation forms are a following step in the process after the Manual Contract, according to Mohammed Wael at Damac.  Id.  The Manual Contract did not supply the date by which the initial deposit was required to have been paid in full (the date was left blank on both versions).  The 9 unit reservation forms that accompanied the July 10, 2007 email from Mohammed Wael, all are dated 25-Jun-07, and all call for a ten percent deposit to have been made by July 2, 2007, one week after their stated preparation date, but 8 days before they were sent to Simone.  Simone Decl. at ¶ 18.

18.     The 9 unit reservation forms all reflect that Simone made an initial interest deposit of 10,000 AED, as it credited 1,111.11 AED as a deposit on each of the 9 unit reservation forms.  Simone Decl. at ¶ 19.

19.     Simone had some concerns about the 9 unit reservation forms for the 16th

Floor of the Burjside Boulevard project.  He was concerned about the pricing set forth

in these contracts and the fact that they call for placement of the units in his name.

At some point in time in 2007, Simone was also concerned that he was not being

credited with having made as much in payments as I believe to have made. Simone

Decl. at ¶ 20.

20.     On or about September 20, 2007, Simone received two emails from

Mohammed Wael at Damac, both of which were sent to his Hotmail account.  True

and accurate copies of those emails are attached to the Simone Declaration as <u>Exhibit</u>

<u>G</u> (at p. 1). This being almost 13 years later, Simone does not have a present memory

of the actual receipt of the two emails on that day, but he does remember receiving the

emails.  The emails from Mohammed Wael comport with the Damac group domain

and mailbox naming convention for email addresses, they were correctly addressed to

Simone's Hotmail email account, and this email chain, including my forwarding of the

emails to Attorney Catherine Gill, is among Simone's records relating to his email and

was produced (in litigation) from his Hotmail email account records.  Simone also had

a working relationship with Mohammed Wael at Damac, and others at Damac (on the

Burjside Building project) during this period of time.    Simone Decl. at ¶ 21.

21.     The September 20, 2007 Emails from Mohammed Wael are noteworthy

for a couple of things.  First, in the earlier September 20th email Mohammed Wael

acknowledges that Damac has received two transfers of money concerning the project

– one transfer in the amount of $200,000 and another transfer in the amount of

$74,000.  Second, Mohammed Wael claims that the outstanding amount, defined by

him as the "balance on the first 10% + the second 10%) is 4,464,396.17 AED or round

1,223,122 $."  Third, Mohammed Wael states that Damac "need[s] this amount to be

- 49 -

transferred ASAP as the units are under cancellation and please send me the proof of payment when it's done."   Fourth, Mohammed Wael asks to be provided with "the name of your company which you want it to be on the agreement with all of the legal documents."   Id.   In the second email on September 20, 2007, Mohammed Wael acknowledges that he made a mistake on the amount due, and that the "correct amount you should transfer is 2,767,194 AED or approximately $758,136 $." Simone Decl. at ¶ 22.

22.     Within a few short days after receiving the September 20, 2007 Emails from Mohammed Wael, Simone contacted Attorney Catherine Gill.  Simone sought out Catherine's legal advice and obtained from her a "high level" review of the 9 Unit Reservation Contracts provided to him by Damac on July 10, 2007 (which, to Simone's understanding, remained unsigned by Simone).   A true and accurate copy of that email is attached to the Simone Declaration as Exhibit H (at pp. 1-2).  Simone was provided with Catherine's email address at Clyde & Co, he sent email to Catherine at her email address at Clyde & Co from his Hotmail account on September 25, 2007, and she corresponded back to him at his Hotmail email address on September 26, 2007.  Catherine's "high level" advice to Simone was the following: (a) to not sign the 9 Unit Reservation Contracts, and to not pay Damac any more money, until Simone first obtains and reviews the Agreement for Sale (which the 9 Unit Reservation Contracts say is the next transaction documentation step after them); and (b) Catherine remarks on Damac's termination rights under the 9 Unit Reservation Contracts and the right thereunder to retain any monies paid to them if they terminate the contract by reason a default in the making of any required installment payments or if Simone does not timely sign an Agreement for Sale.  Simone is sure that he would have had a follow-up discussion with Catherine to that email advice

correspondence, although now almost 13 years later, he does not recall the sum and substance of any such conversation.    For example, Catherine was under the impression that Simone had not signed any documentation with Damac when Simone had signed the Manual Contract (of which there are two versions), which suggests to Simone that he sent to Catherine the "next step" system 9 Unit Reservations Contracts that Damac had put before Simone in July, and was focusing on trying to resolve outstanding issues with Damac and move the transaction forward.    Simone Decl. at ¶ 23.

23.    Simone does know from his Emirates Airlines Skymiles account, which he accessed recently, that he traveled to Dubai from JFK (New York) on October 20, 2007 and returned to New York on October 23, 2007. Simone Decl. at ¶ 24.

24.    Simone dord recall a fall 2007 trip to Dubai following his consultation with Catherine, and that the purpose of the trip was to try and resolve outstanding issues with Damac on the acquisition of the 16th Floor of the pre-construction Burjside Building project.    Simone does recall that there were significant substantive discussions with Damac during that trip, although he does not presently recall the details of that meeting; nor does he recall that a definitive resolution had been reached.  Simone Decl. at ¶ 25.

25.    Simone can only conclude that he would have had reason for optimism in advance of the meeting, and would have concluded following the meeting that there was at least a reasonable pathway towards resolving outstanding issues with Damac. Looking at the information that he has available today that he also had available back then, Simone would have had reason for optimism in advance of the meeting, for a couple of reasons.  One, Simone would not have authored and sent out the Term Sheet if he had not been confident that all outstanding issues with Damac were capable of

resolution and reasonably likely to be resolved.  Attached to the Simone Declaration as Exhibit I (at pp. 1-4) is a true and accurate copy of the email dated October 15, 2007, sent from Simone Hotmail account to Andy Katz, together with the Term Sheet attachment thereto.  Two, by studying the September 20, 2007 emails from Mohammed Wael (Exhibit G at p. 1 hereto) and the 9 Unit Reservation Contracts sent to Catherine Gill and that were attached to the July 10, 2007 Email from Mohammed Wael (Exhibit F at pp. 1-37 hereto), a certain understanding can be derived.  It is apparent that there are inconsistencies within each of the 9 Unit Reservation Contracts themselves, and the September 20th emails give some insight to those inconsistencies and how they might be capable of a reasonable resolution.   The inconsistencies in each of the 9 Unit Reservation Contracts themselves is that when one divides the respective unit's contract price by the square footage for the unit, one derives a per square foot price that is significantly higher than 1,900 AED per square foot, yet in the remarks section of each of the 9 Unit Reservation Contracts is the following statement: "1900 AED/sq ft approved by CEO/ the client might change the floor under his company name."  See, Exhibit F at p. 1 of each of the Unit Reservation Contracts (Exhibit F at pp. 2, 6, 10, 14, 18, 22, 26, 30, 34).  For example, if one reviews ARF No. 13223, the first page of which is page 2 of Exhibit F, the per square foot unit price of that unit (Unit 1605) is 2385 AED/sq. ft. (2,257,000.00 ÷ 946 = 2385).  Reviewing ARF No. 13227, the first page of which is page 6 of Exhibit F, the per square foot unit price of that unit (Unit 1608) is 2361 AED/sq. ft. (1,903,000.00 ÷ 806 = 2361).  That does not jibe with the remarks section statement that the CEO approved a price of 1900 AED/sq. ft.  By repeating this process for each of the remaining 7 units on the 16th Floor, one sees that the per unit square foot price is well above 1900 AED/sq. ft.  Simone Decl. at ¶ 26.

26. Turning to the two September 20, 2007 Emails from Mohammed Wael, when Mr. Wael first makes a demand for 4.4 Million AED, but a little later that day the figure (with an apology) is revised down to 2.76 Million AED. Factoring in the $274,000 that Mr. Wael states that Simone paid, and since Mr. Wael specifies that Damac is looking for the balance of the first 10% and the second 10%, it appears that the total price that Damac is working with is an 18,646,600 AED total floor purchase price. This is made evident by converting the $274,000 into Dirham (AED) (at the exchange rate of 3.65 AED per U.S. Dollar) and subtracting that number from 20% of 18,646,600 Dirham, which yields a number that is very close to the 2,767,194 AED that Damac stated in the second September 20, 2007 email that Simone then owed. The figure is off by two-tenths of one percent of the total purchase price, which could be explained by fees, perhaps (the difference roughly $10,000). The math works out this way: 274,000 x 3.65 = 1,000,100. 18,646,600 x .20 = 3,729,320. 3,729,320 - 1,000,100 = 2,729,220. The claimed balance in the September 20, 2007 second email is 2,767,194, a difference of 37,974 AED, or $10,403. 37,974 ÷ 18,646,600 = 0.002. Simone still thinks that maybe at that time he had put down more than the $274,000 that Damac recognized in the September 20th email, but he believed that such would have been capable of an accurate determination and resolved. The third reason that Simone was optimistic is that the Damac representatives agreed to meet with him about our differences. Simone Decl. at ¶ 27.

27. While Simone does not recall, over 12 years later, the details or any definitive results of the October 2007 meeting with Damac, the information that he then had, and which he still has access to today, leads him to conclude that following the meeting there was at least a reasonable pathway towards resolving outstanding issues with Damac concerning the acquisition of the 16th floor of the Burjside Building

project.  One is that in early November of 2007, Simone's then Attorney, Tony Chang,

authored a letter acknowledging Andrew Woolf's wire transfers and checks, in the

collective amount of $150,000 and requested that Andrew Woolf countersign the letter

to consent to the transmittal of those funds to Damac Properties "in connection with

the Burjside Blvd. floor 16 real estate deal."   Simone is familiar with Attorney

Chang's signature and letterhead.  Exhibit J (at p. 1) to the Simone Declaration is a

true and accurate copy of correspondence from Attorney Chang addressed to Andrew

Woolf dated November 2, 2007.  Simone would not have had his Attorney send such a

letter, requesting such consent, if he had not then held a belief that there was at

reasonable path to resolving issues with Damac, such that it made sense to get into

position to proceed with the transaction. Simone Decl. at ¶ 28.

28.     Further indicia that, despite complications with Damac, Simone believed

there was at least a reasonable path to resolution, inheres in the fact that we were

proceeding to seek out financing for the portion of the purchase price that would not

be composed of the equity stake (per the terms of the Term Sheet, the amount to be

financed was the sum of $3,500,000.00).  In January of 2008, Simone received email

correspondence from Barclays Bank, in Dubai, responding to an inquiry that he made

at Barclays about obtaining mortgage financing.  Simone had a follow-up question for

Barclays, which he posed by a reply email to the Barclays Bank representative.  The

initial email was received by Simone at his Hotmail email address and he responded,

by reply, from that Hotmail account to the Barclays Bank representative, who

responded further, answering his question.  It being presently over twelve years later,

Simone does not have a present recollection of receiving those emails and replying to

them; however, the emails among the chain addressed to me were correctly addressed

to Simone's Hotmail email account, and this email chain, is among his records

relating to his email and was produced (in litigation) from his Hotmail email account

records (which, as evidenced on the document, Simone forwarded to his then attorney

eight years later).  A true and accurate copy of this email thread with Barclays Bank

is attached to the Simone Declaration as <u>Exhibit K</u> (at pp. 1-6).   Simone's

understanding from the communication with Barclays was that Barclays only

provides mortgage financings to purchase property from a select group of developers,

and that Barclays did not then provide mortgage financing for purchasing property

from Damac.  Days later, Simone forwarded to Stefan Bode the email thread with

Barclays, to get Stefan's take on Barclay's position.  A true and accurate copy of that

email inquiry, and of Stefan Bode's response thereto, is attached to the Simone

Declaration as <u>Exhibit L</u> (at pp. 1-5).  Stefan Bode's opinion, as stated in his reply,

was that Barclay's downplayed the merits of Damac developments because,

apparently, Barclays was permitted to make mortgage lending only for state-owned

developers and not private developers.  Simone Decl. at ¶ 29.

29.    Simone authored and sent email correspondence to Antonia Kulmann at

the National Bank of Abu Dhabi ("NBAD") on January 23, 2008, which email he sent

from his Hotmail email account.  It being presently over twelve years later, Simone

does not have a present recollection of sending that email; however, the email was

sent from Simone's Hotmail email account and is among his records relating to his

email and was produced (in litigation) from his Hotmail email account records.  A true

and accurate copy of the email to Antonia Kulmann is attached to the Simone

Declaration as <u>Exhibit M</u> (at p. 1).  As evidenced by the terms of the Email, in late

January of 2008 Simone inquired of NBAD about getting mortgage financing for, *inter

alia*, the 9 unit floor of the Burjside Blvd. project.  As that email also indicates, in his

investigation of mortgage financing for the acquisition of the floor in the Burjside

Blvd. project, Simone was learning that certain banks deal with certain developers –
in essence, that every bank finances the purchases from government owned
developers, but that when it comes to private developers (such as Damac), banks have
their own approved lists. As Simone also found out, the way it works in Dubai (or then
worked) is even more granular than that, as banks would not just have an approved
list of private developers; they also would have, among each such approved developer,
approved projects of that developer for which they would provide mortgage financing.
Simone Decl. at ¶ 30.

30.     Sometime in or around February or March of 2008, Simone was informed
by Damac that the master developer for the Burjside Blvd. project was taking back
the project and that the 16th Floor was no longer available for acquisition by me (for
the intended pooled investment project).  Simone drafted a letter to Mohammed Wael
at Damac, inquiring further about this to learn exactly what happened and what
could be done to put Simone in as good of a position as Simone would have been in
with the floor of the Burjside Blvd. project.  A true and accurate copy of that letter is
attached to email correspondence authored by Simone dated March 18, 2008 (for some
reason the "to" field is blank, and the email was blind copied to Simone and Stefan
Bode), and a true and accurate copy of that email correspondence, together with the
letter, are attached hereto as <u>Exhibit N</u> (at pp. 1-3).  Simone subsequently learned
shortly thereafter that the Burjside Blvd. project was not, in fact, taken back by the
master developer, and that Damac had planned another launch of the Burjside Blvd.
project.  Simone reference this in correspondence by me to Djamel, a person who then
worked with a realty company known as Murano Real Estate.  Simone Decl. at ¶ 31.

31.     Simone confronted Damac about the fact that he had learned about
another launch of the Burjside Blvd. project and that, therefore, the master developer

had not taken back the project from the company.  Simone pressed them to renew

their commitment to him for the 16th Floor of the project.  They informed Simone that

the 16th Floor was no longer available for acquisition.  Damac stated, however, that

the 19th Floor of the building was available for acquisition.  Simone's chief concern

was not a particular floor – at that level, he would consider them to be equivalent.

His concern was preserving the pricing at which Damac agreed in the spring of 2007

to sell an entire floor of units to me (for my pooled investment) – 1900 AED per square

foot (perhaps with a minor adjustment for a higher floor).  Email correspondence from

my Hotmail account to Peter Riddoch at Damac, with a BCC to Stefan Bode, dated

April 16, 2008 references the issues about the then-supposed taking back of the

building by the master developer, my lack of belief about such an occurrence, the

invitation to a launch on Burjside Blvd., and how ultimately Simone was able to

contract for that floor (which is the aforesaid 19th Floor manual contract).  A true and

accurate copy of that email is attached to the Simone Declaration as <u>Exhibit T</u> (at p.

1).  For some reason, Peter Riddoch's email address does not follow what Simone

understands to have been the naming convention on email mailboxes, as only his first

name, with no period and last name, being part of the mailbox.  Perhaps it is because

of his position within the company. Simone Decl. at ¶ 32.

32.    The manual (filled in by hand) contract for the 19th Floor of the Burjside

Boulevard project was at a price that was then posited to be a 10% discount off the

then current pricing, which was substantially higher than 1900 AED per square foot.

Damac knew that Simone's stated objective was to get back to the 1900 AED per

square foot level.  Mohammed Wael stated that they could get me that earlier, 2007

pricing, given some time, but that it was important first to reserve the 19th Floor and

make a further deposit (towards the acquisition of that floor), with the adjustment to

come later. Damac also promised that my prior payments on the 16th Floor would be credited toward fulfilling the purchase price on the 19th Floor. That was obviously an important point. Based on those oral representations of Damac, Simone signed the manual contract for the 19th Floor of the Burjside Boulevard project. A true and accurate copy of the first page of that manual contract for the 19th floor is attached to Exhibit O as page 2 of that document. The document bears Simone's signature and the date to the right of his signature is written by his hand. Simone dated the document on the date that he signed it, and the document bears the date of March 23, 2008 (expressed as 23/03/2008). Email correspondence with Damac, referencing the execution of that manual contract and the making of the 10% payment, is dated April 8, 2008 from my Hotmail account to agent@damacgroup.com, a true and accurate copy of which is attached to the Simone Declaration as Exhibit S (at p. 1). This email is in Simone's Hotmail sent items, with a subject ARF's and referencing Burjside Blvd floor 19. It also should bear emphasis that Damac repeatedly had advised me that they would assist me in securing financing for the acquisition. Simone Decl. at ¶ 33.

33.     The same day that Simone signed the manual contract for the 19th Floor of the Burjside Project, he obtained a bank check from Emirates Bank payable to the order of Damac Properties in the amount of 2,000,000.00 AED. Page 3 of Exhibit O is a true and accurate copy of the application for that Bank Check, which application was approved, the money was debited from Simone's account at Emirates Bank, and the Bank Check was issued. Simone delivered the Emirates Bank Check (Check No. 00555) to Damac. Simone received back from Damac Properties a signed receipt for the 2,000,000 AED check, with the following remarks "BOOKINGS TOWARDS BURJ SIDE BOULEVARD 19TH FLOOR FROM MR. RICHARD SIMONE". Simone was present when the Damac Properties representative provided the receipt, as it was

prepared upon my physical delivery of the check to Damac Properties. A true and accurate copy of the Damac Properties receipt for the check is attached to <u>Exhibit O</u> and is page 5 of that Exhibit. A true and accurate (but hard to read) copy of what is stated on the document as "Customer Advice" is on page 4 of <u>Exhibit O</u>. Simone delivered a second check to Damac Properties on or about April 3, 2008. The check was written on the account of Stefan Bode at Standard Chartered Bank Dubai, payable to Damac Properties in the amount of 710,000 AED and dated on or about 31 March 2008. A true and accurate copy of that check is attached to <u>Exhibit O</u> of the Simone Declaration and is the page 7 of that Exhibit. When Simone physically delivered that check to Damac Properties, Damac issued a receipt for that check, its representative signed the receipt and gave the receipt to Simone. A true and accurate copy of that receipt is attached to <u>Exhibit O</u> to the Simone Declaration and is the page 8 of that Exhibit. Simone did come to know Vinod Kumar, who was with Damac, and he is the person who signed and gave me the receipt. This receipt, which references the 710,000 AED check, includes the following remarks: "Burjside Boulevard 19th Floor BSB/19/1901 to 1909 Cheque # 106767 Stand Chart AED 710000/- (31.03.2008). Simone Decl. at ¶ 34.

34.    Stefan Bode had a strong relationship with Damac and he is the person who introduced Simone to Damac. Plaintiff Elena Vagnerova sent her $120,000 directly to Stefan Bode on or about March 10, 2008 (for use in making the Dubai pooled real estate investment) and Andrew Woolf likewise authorized Attorney Chang, in writing, to send at least a substantial portion of his funds to Stefan Bode. Attached to the Simone Declaration as <u>Exhibit P</u> (at p. 1) is a true and accurate copy of a letter on Attorney Chang's letterhead, dated February 6, 2008, signed by Attorney Chang, and addressed to Andrew Woolf. The letter is for the counter-signature of

Andrew Woolf and asks that, by countersigning the letter, Andrew Woolf "confirm [his] consent and instruction for [Attorney Chang] to wire this $75,000 USD amount to Stefan Bode in connection with the Burjside Blvd., Floor 16 real estate deal." The collective sum of $195,000 is equal to 711,750 AED. Given the timing of Elena Vagnerova's and Andrew Woolf's sending of these monies to Stefan Bode, which funds are only $479 greater in amount than the payment made by the Bode 710,000 AED check towards the acquisition of the 19th Floor of the Burjside Blvd. project, it is believed that the Bode check is composed of those respective funds of Andrew Woolf and Elena Vagnerova. Simone Declaration at ¶ 35.

35.     With respect to the 2,000,000 AED bank check to Damac Properties, that sum equates to $547,945. It is Simone's understanding and belief that those funds came from the following root sources: (a) $150,000 from Andrew Katz; (b) $150,000 from Andrew Woolf; and (c) the balance from my parents or a combination of my funds and my parents' funds. When one adds the two checks to the $274,000 acknowledged by Damac to having been paid in connection with the 16th Floor in the summer of 2007, the total monies paid to Damac on the Burjside Blvd. project for the acquisition of an entire floor (for the pooled group acquisition) are not less than $1,016,465 (or 3,710,097.25 AED). Simone Declaration at ¶ 36.

36.     In addition to the manual contract for the 19th Floor, Simone also signed 9 individual unit reservation contracts for each of the units of the 19th Floor. To the best of my knowledge, Simone only had in his possession the first page of each such contract, a true and accurate copy of which first pages are attached to Exhibit O of the Simone Declaration as the last nine pages thereof. Each of those documents bears Simone's signature and was dated by him. Simone does acknowledge that they were signed at a point in time that is two months following the launch at which the manual

contract was signed, and that these documents do not reflect the promised 2007 pricing from Damac (the individual contracts have a printed date of 24 March 2008, signifying that they were prepared one day after the launch event). That does not mean that Simone did not then still have an expectation of obtaining 2007 pricing at a later stage in the process (such as in connection with an Agreement for Purchase, which never materialized). Page 1 of Exhibit O to the Simone Declaration is a true and accurate copy of correspondence from Damac Properties to Simone dated 15 April 2008, confirming that the "purchase on Burjside Boulevard BSB/19/1901-1909 conforms to the provisions of Law No 8 of the Emirate of Dubai and regulations of the Real Estate Regulatory Agency (RERA) relative to property purchase in Dubai." Simone Decl. at ¶ 37.

37.    Simone did recently (within the past week) conduct a further search of my Hotmail account and he did locate one unsigned Unit Reservation Contract concerning the 19th Floor of Burjside Blvd. It was attached to an email to Stefan Bode dated April 1, 2008, which email was a forwarding of an email from Mohamed Haridy at Damac Properties to me dated 1 Apr 2008. A true and accurate copy of that email to Stefan Bode, inclusive of the attachment, is attached to the Simone Declaration as Exhibit Q (at pp 1-5). The three page attachment bears a later printed creation date 31-MAR-08, instead of 24-MAR-08, and indicates that the project was introduced to me by Murano Real Estate. There was a dispute at that time over who introduced the project to Simone, and who would be entitled to a commission: Stefan Bode or Murano Real Estate. Simone Decl. at ¶ 38.

38.    After the manual contract and deposit transaction relating to Floor 19 of the Burjside Blvd. project, Simone continued to seek mortgage financing for the acquisition. Simone reached out to and met and or interviewed with many banks

and/or mortgage companies about financing the acquisition project.   During this period of time when Simone was seeking mortgage financing for the acquisition, Simone was unable to find a bank or mortgage company that had the Burjside Blvd. project as an approved project for financing, even if they were, in general, a lender for whom Damac was on their approved list of developers.   Therefore, Simone was unable to secure mortgage financing for the project.   Over 12 years later, Simone is not sure of the exact point in time when he had at least suspended efforts to seek mortgage financing.   However, Simone did recently (within the past week) conduct a further search of my Hotmail account and he found a document dated November 9, 2008 with respect to an apparently then pending resolution of a commission dispute between Stefan Bode and Murano Real Estate over the introduction to Damac with respect to my group/pooled acquisition project.   A true and accurate copy of that email, sent by Simone from his Hotmail account to Stefan Bode at his aol.com email account (with which address Simone is familiar) is attached to the Simone Declaration as <u>Exhibit R</u> <u>(at pp. 1)</u>.   Given the tenor of that correspondence, it would not seem plausible to that Simone's efforts to secure mortgage financing would have been deemed concluded without a favorable resolution as of the date of that letter; otherwise, it seems to Simone that there would have been no sense in addressing any further the commission dispute or its apparently pending resolution.   Although Simone does not have a present recollection of that email, it is resident in his Hotmail email account, and was sent by Simone to Stefan Bode at his email address.   Simone does realize that in deposition testimony he believes that he testified that he had concluded at an earlier point in time that he would be unable to procure mortgage financing for the project.   Simone now believes that he was mistaken about the point in time when those mortgage financing efforts were concluded without success.   Simone now

believes it would have been sometime after that November 9, 2008 email.  Simone Decl. at ¶ 39.

39.      During a period of time that Simone believed to be in 2009 (or perhaps in 2010), he was informed by Damac that Damac was declaring a default on the floor acquisition project, and that Damac was terminating its agreement with Simone and retaining all funds paid on the Burjside Blvd. floor acquisition project.  Simone understood this to include all monies paid with respect to both Floor 16 and Floor 19, as Floor 19 had been substituted in the place and stead of Floor 16 and Damac had agreed at the time of substitution that the funds paid on Floor 16 would be transferred to the acquisition of Floor 19.  Simone Decl. at ¶ 40.

40.      To the best of Simone's knowledge, matters never progressed with Damac to the point of the execution of an Agreement for Purchase of Floor 19.  Simone Decl. at ¶ 41.

41.      Unfortunately, the default and termination notice (or notices, as there could have been more than one notice), are not among documents that Simone now has with respect to the project.  Simone Decl. at ¶ 42.

42.      Simone did seek out the advice of counsel proximate in time to when he learned of this (default and termination) action by Damac, as well as seeking to work things out with Damac personally. He recalls meetings in person at three or four law firms in Dubai, seeking their advice and evaluation of my situation, and whether he had a good claim to endeavor to recover the monies that had been paid to Damac on the group/pooling floor acquisition project with the plaintiffs (and my parents), or to otherwise try and find a workable solution with Damac.  Included among such counsel sought by Simone, and with whom Simone met, was an attorney with the law firm Al Tamimi (in Dubai).  Each one of the attorneys with whom Simone met advised that it

would be a costly and uphill battle, going against a prominent developer like Damac. None of them provided encouragement that it would have been a feasible to pursue litigation with Damac.  Simone also does not recall any of them positing to him a workable solution to the problem.  Simone Decl. at ¶ 43.

43.   A significant part of the problem in trying to resolve things with Damac may have been related to the severe reversal in the Dubai real estate market, which, unfortunately, Simone personally witnessed.  As confirmed by this article in The Guardian entitled "Dubai's ix-year building boom grinds to halt and financial crisis takes hold, dated 13 Feb 2009, a true and accurate copy of which is attached to the Simone Declaration as Exhibit U (at pp. 1-7), as of the writing of that article, it is remarked that "half of the UAE's construction projects, totaling $582 billion, had by then either been put on hold or canceled, leaving a trail of half-built towers on the outskirts of the city stretching into the desert."  The article remarks further that "banks have stopped lending." It seems likely that the lack of project approval by banks for mortgage financing of purchases of project units in the Burjside Blvd. project was due, in material part, to delays in the Burjsid Blvd. project.  There was a re-design of the project where the number of floors was substantially increased, and the project became known as the Signature Building.  That re-design could have led to the delays, or it could have been that Damac had stretched itself with the number of projects that it then had.  But for whatever reason, there were substantial delays with that project, and Simone was unable to find a bank or mortgage lender with whom the project had been approved for mortgage financing.  Another article published in the Gulf News on 3 Jul 2008, entitled, "Outlook to deter property buyers," speaks to how "property prices in Dubai increased a massive 78 per cent in the last year, with a 42 per cent increase in between the last quarter of 2007 and the first quarter of 2008

alone."  A true and accurate copy of that article is attached to the Simone Declaration

as <u>Exhibit V</u> (at p. 1)  The article speaks further to how "sales are still dominated by

short-term investors.  This results in huge price increases, as units are sold on two or

three times with huge premiums."  The article also speaks to how "the construction

boom in buildings is about to peak in 2009, with $3 billion worth of real estate either

on the drawing board or under construction."  It is possible that lenders became

nervous about delayed projects and whether the boom could be sustained and sideline

delayed projects.  The rapid increase in prices also could have made lenders nervous

about sustainable values.  Simone Decl. at ¶ 44.


44.    About a year or so later, a broker named Sabine had an idea of a

different tack that Simone might be able to take in order to effectively pursue matters

with Damac.  Simone was put in touch with another attorney and had substantive

communications with that attorney.  In connection therewith, Simone sent an email

with attachments that contained a sampling of documents that could be a working

starting point in that dialogue.  Simone's then assistant, Monica, assembled the

package of documents, which would have been at his direction, and sent them to

Sabine, and copied Simone on the email, inclusive of attachments, which email simone

then forwarded to a person named Tarek.  A true and accurate copy of that email,

including the forwarding of the same by me to Tarek, is attached to the Simone

Declaration as <u>Exhibit W (at pp. 1-18)</u>.  Simone does remember that the address of the

sender was Monica's email address, and he did receive the "carbon copy" at his

Hotmail email address.  The email was received by Simone on May 31, 2011, as

indicated by his Hotmail account record.  On June 4, 2011, Simone forwarded

Monica's email, inclusive of the attachments, to Tarek.  Simone sent a second email to

Tarek on June 4, 2011, and provided some information to him. A true and accurate copy of that email is attached to the Simone Declaration as part of <u>Exhibit X (at pp. 1-2)</u>. <u>Exhibit X</u> has the second June 4, 2011 email embedded in it, and on June 8, 2011, Simone sent that embedded email, with another, follow-up email, to Tarek. <u>Exhibit X</u> is in his Hotmail sent bin for his Hotmail email account. The attorney who Tarek put me in touch with was Ahmed Nofal. Simone corresponded with Attorney Nofal by email dated June 9, 2011 with the subject: DAMAC case. A true and accurate copy of that email is attached to the Simone Declaration as <u>Exhibit Y (at pp. 1-3)</u>. That email was sent by Simone in connection with seeking out legal advice and possible representation concerning the possibility of bringing a case against Damac. Unfortunately, that initiative also failed to bear fruit, and the dialogue did not lead Simone to believe that there was a pathway to productively engage counsel to attempt to resolve matters with Damac. Simone Decl. at ¶ 45.

45.      The documentation that Simone has for this project is less than ideal. He has endeavored to procure more documents. Simone has tried in person (personally visiting Damac and Emirates Bank) and, to date, he has not succeeded in getting more documentation from either entity. Simone Decl. at ¶ 46.

46.      In 1998, Simone pled guilty to grand larceny in the second degree, receiving a $5,000 fine and 5 years of probation. The transaction that was the subject matter of the guilty plea is believed by Simone to have been an "unauthorized trade" done by the chairman (Andrew Bressman) of the brokerage firm at which I worked, with respect to a client account for which I Simone had managerial responsibility (but without discretion to buy or sell).      Simone Decl. at ¶ 47.

47.      The telephone call that occurred on May 23, 2016 between the Plaintiff Katz, his wife Josette Wys-Katz, Plaintiff Woolf and Simone was recorded without

Simone's knowledge and consent. Simone was with Andrew Woolf at an establishment in New York and his understanding is that that Katzes were in Florida. Simone does see from the transcript that there is an automated voice that states "This call is now being recorded." However, Andrew Woolf distracted Simone at the beginning of the call, grabbing his attention, and he did not hear the automated voice. If you notice, before the automated voice, on the transcript Andrew Woolf says "Yo" and then says Yo five more times, with the transcript reflecting the automated voice intervening. Why would Andrew Woolf be repeatedly saying "Yo" six times, if he was not trying to distract Simone from hearing that the telephone conversation was being recorded. The recording of a phone call, without Simone's consent, Simone believes does not respect his privacy and invades it. People whose spoken words are going to be memorialized in a recording, if they are not in a setting where that is the expectation – such as a radio interview – should be entitled to know beforehand that it will be recorded. Simone Decl. at ¶ 48.

48.     To Simone, the means of transmission of funds is not material; it is the fact of payment that is important. Therefore, in the May 23, 2016 phone conversation wherein Simone respond "yeah" to the question: "So, okay, so you were saying that the money – the money was wired to DAMAC, right?", what is significant to Simone is that he takes it that the questioner is really asking him if the money was paid to DAMAC, and it was paid to Damac. A couple of lines later, when Simone is speaking again about money going to Damac, and using the term wired, he is really speaking to the fact that the money was paid to Damac. Simone Decl. at ¶ 49.

49.     Catherine Gill's high level advice to Simone (Exhibit H) did not opine on the validity and enforceability of the clause permitting the retention of all payments made on the agreement as damages in the event of a default and termination of the

agreement; nor does it speak to whether there would be any bases in equity by which

such a retention may be legally impermissible.  Simone did not take her high level

view as being an exhaustive opinion on the matter, as that was not the nature of the

engagement.  Simone Decl. at ¶ 50.

50.    Plaintiffs' claim that Simone should have requested, in connection with

this litigation, a copy of the back (endorsement side) of a 710,000 AED check written

by Stefan Bode in 2008 (eleven years before this adversary proceeding was

commenced), with respect to which check he obtained a receipt from Damac Properties

in partial payment of a deposit or installment requirement on the 19th Floor when

said check was tendered by Simone in person to Damac Properties in April of 2008,

seems unreasonable and unworkable, and, given the Damac receipt, not something

that reasonable should have been sought, nor would it likely be obtainable given the

substantial passage of time.  Simone likewise obtained from Damac, a receipt for the

2,000,000 AED bank check referenced hereinabove, and further produced the

approved application for said check and the customer advice documentation that

accompanies the issuance of the check.  Simone Decl. at ¶ 51.

51.    In a May 14, 2008 email communication from Simone to Mido Mezqueldi,

Simone remarked that in late March of 2008 that he was in a position to provide a

same day bankers cheque, on the date of the relaunch of the Burjside Boulevard

project, with his bank and present it then for cash.  A true and accurate copy of that

email is attached to the Simone Declaration as Exhibit Z (at p. 1)  That email was sent

by Simone from his Hotmail account to Mido Mezqueldi at Damac.  Mido's email

address – including mailbox and domain name – uses the Damac email convention in

use at the time.  This document was part of Simone's email records for his Hotmail

account.  The bank check to which Simone was referring, and the bank account to

which Simone was referring, was Emirates Bank and his ability to apply for and obtain a bank check from Emirates Bank based on the funds then on deposit in his Emirates Bank account (as discussed above in Paragraphs 32, 33 of the Simone Declaration) and pages 3-5 of Exhibit O thereto).  Simone Decl. at ¶ 52.

52.    On May13, 2008, Simone was "carbon copied" on an email from Stefan Bode to Mido Mezqueldi@damacgroup.com, a true and accurate copy of which email is part of the email thread attached to the Simone Declaration as Exhibit AA (at pp. 1-2).  In Stefan Bode's email he references "2 substantial checks" that were debited in March from his account – one of which is in the amount of AED 3.473.072.  As to that check, Stefan Bode states that part of that check "is shortly afterwards been used with a bankers check from rich's account to make a downpayment on burjside blvd 19th floor directly to DAMAC."  The reasonable reading of this email is that the AED 3.473.072 was transferred to Simone, deposited into Simone's Emirates Bank account, and then part of that (2,000,000 AED) was used by Simone to apply for and obtain the bank check from Emirates Bank for 2,000,000 AED that is referenced in Paragraphs 32 and 33 of the Simone Declaration, and in Exhibit O thereto (at pages 3,4,and 5). Simone Decl. at ¶ 53.

53.    Simone disagrees with the Plaintiffs' assertion that it should have been known to him that the intended, pooled acquisition of a floor in Burjside Boulevard would not be amenable to mortgage financing. Simone expected that with the pooled investment funds and with a favorably-priced acquisition cost for a Floor in Burjside Boulevard, an appropriately structured acquisition transaction would qualify for mortgage financing.  Simone Decl. at ¶ 54.

54.    When Simone was unable to obtain mortgage financing for the pooled acquisition project, he did not request additional monies from the plaintiffs, as he did

not think a $3,500,000 additional investment over and above their collective $495,000.00 investment would have been within their capabilities. Simone Decl. at ¶ 55.

55.     Simone did live in Dubai during a time when he was not earning income, and he did so by incurring debt. Simone has borrowed substantial sums of money from his parents, in the approximate amount of $700,000. This indebtedness amassed over a number of years. Simone Decl. at ¶ 56.

56.     Simone disagrees with plaintiffs' contentions that he did not explain the sources of my money with which he invested. As he has stated previously in this litigation, Simone has a good profit on the sale of a condo on Miami Beach (about $400,000 to $500,000). Simone invested that money into a trading business with Steve Friedman. Simone and Firedman pooled money together in a company Friedman controlled (named Oakwood Partners). Simone took money out of Oakwood and invested it in the Dubai property market. Simone Decl. at ¶ 57.

57.     There were multiple reasons for using Stefan Bode as an escrow agent with respect to the monies that ultimately were paid to Damac relating to the pooled investment in the Burjside Blvd. project floor acquisition. Including among those reasons, but not exclusively so, were that Stefan Bode had a strong relationship with Damac, and it is and was believed that Damac had confidence in Stefan Bode. Simone Decl. at ¶ 58.

58.     To the best of Simone's knowledge, information and belief he never signed, produced or made use of the Mortgage Enquiry Form referred to in Plaintiffs' Exhibit P10 at 27. Simone Decl. at ¶ 59.

59.     For a period of years after Damac declared a default under the agreement, terminated the agreement and retained all prior payments as contract

damages, Simone did lead the plaintiffs to believe that his and their collective investment for the acquisition of the floor in the development project was progressing and at some point in time closed.  The period of time during which Simone made such misleading statements was substantially less than the 12 years claimed by the plaintiffs.  The reason that Simone was not honest with the plaintiffs, and did not tell them about the default, the termination by Damac, and Damac's retention of all prior payments as contract damages, was that Simone was greatly embarrassed by these events.  A part of Simone also still held out some hope, for a significant period of time, that perhaps there would be a way to rectify the situation or otherwise minimize the loss.  Simone does not believe that he ever told the plaintiffs that the project was successful for any of them.    Simone Decl. at ¶ 60.

60.    With respect to <u>Exhibit T</u> – Simone's email to Peter Riddoch at Damac – Stefan Bode was negotiating as an agent, and not as one who would be purchasing the unit in Ocean Heights referenced therein.  Simone has never purchased property jointly with Stefan Bode.  Simone Decl. at ¶ 61.

61.    At the time when Simone authored <u>Exhibit T</u>, he believed that, based on oral representations made to him in connection with the signing of the manual contract on for the 19th Floor of Burjside Blvd., that Damac would honor the 1900 AED per square foot pricing from 2007, that all payments made with respect to the 16th Floor would be credited as payments towards the 19th Floor, and that the 19th Floor deal had only prospective installment payments, such that the schedule of payments that previously existed with respect to the 16th Floor were no longer applicable or an issue between the parties.  Simone Decl. at ¶ 62.

62.    Although in prior testimony and/or in emails Simone stated different unit numbers in Ocean Heights that he targeted for acquisition, he only signed a

contract with respect to one such unit, which contract was produced in this litigation. Simone Decl. at ¶ 63.

63.    With respect to the services of Mr. Bedir, although he did do work on Simone's behalf in attempting to procure documents from Damac, he was not successful in attempting to do so.   Further, initially Mr. Bedir did  not ask for any money up front, and later he sought a fee amount that Simone thought was excessive and they were unable to agree upon terms moving forward.  Simone Decl. at ¶ 64.

64.    In the Muslim World, of which Dubai is a part, the workweek is Sunday through Thursday.   September 27 and 28, 2019 were a Friday and Saturday, respectively.  Simone Decl. at ¶ 65.

65.    When Simone stayed at The Dukes while in Dubai last September, he prepaid for his hotel stay and the approximate cost of his hotel room for the five-day stay was approximately $750.  Simone Decl. at ¶ 66.

66.    Stefan Bode acted as an agent in Simone's dealings with Damac.  What Simone meant in the phone conversation when he stated that Stefan had nothing to do with it, he meant that Stefan was not among the group as a purchasing party with respect to the floor in the Burjside Blvd. project.  Simone Decl. at ¶ 67.

67.    Stefan Bode lives in the Country of Monaco.  Simone Decl. at ¶ 68.

68.    Post commencement of suit, Simone was informed by banks (at least in America) that their record-keeping goes back only 7 years. Simone Decl. at ¶ 69.

69.    The standard form agreements with Damac all have provisions whereby if the buyer defaults, Damac may terminate the agreement and retain all payments made on the agreement.   That provision is in the Manual Contract (Exhibit D at p. 1-3), on the system Unit Reservation Contracts for the 9 16th floor units (Exhibit F at p. 1-37), and on the form Unit Reservation Contract for units on

the 19th Floor (Exhibit Q at 2-5).  Although Simone only has page one signed for each

of the 9 Unit Reservation Contracts for Floor 19 (Exhibit O at pp. 9-18), and Damac

generated two sets of system Unit Reservation Contracts for Floor 19, one with

Murano as the broker and the other with N/A for the broker, and Simone only has in

his possession one such document relating to the 16th floor with all 3 pages, they are

the same standard terms as with the 16th Floor – the standard form contract's

"boilerplate" terms did not change). Simone Decl. at ¶ 70.

70.    Simone made numerous efforts to obtain more documentation relating to

these transactions, including the activities and actions of Damac with respect thereto.

Proposed Trial Exhibits 35-43 and 45, all of which are attached hereto, provide some

insight into those efforts.  Simone Decl. at ¶ 71.

**DEFENDANT,**
**RICHARD P. SIMONE**


By:_____/s/ Paul N. Gilmore_____
    Paul N. Gilmore, Esq.
    Federal Bar No. ct03347
    UPDIKE, KELLY & SPELLACY, P.C.
    100 Pearl Street
    P.O. Box 231277
    Hartford, Connecticut 06123-1277
    Tel. (860) 548-2641
    Fax (860) 548-2680
    pgilmore@uks.com
    *His Attorney*