**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE No. | 18-21993 (JJT) |
| | ) | | |
| RICHARD P. SIMONE, | ) | CHAPTER | 7 |
|     Debtor. | ) | | |
| | ) | | |
| ANDREW WOOLF, ANDREW KATZ, | ) | | |
| and ELENA VAGNEROVA, | ) | ADV. PRO. NO. | 19-02005 |
|     Plaintiffs | ) | | |
| V. | ) | RE: ECF Nos. | 106, 107, 233, 236, |
| | ) | | 237, 241, 383 |
| | ) | | |
| RICHARD P. SIMONE, | ) | | |
|     Defendant. | ) | | |
| | ) | | |

**MEMORANDUM OF DECISION ON**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I.    INTRODUCTION

Andrew Woolf, Andrew Katz, and Elena Vagnerova (collectively, "Plaintiffs")

commenced this Adversary Proceeding on March 15, 2019 against Richard P. Simone (the

"Debtor" or "Defendant"). Plaintiffs' six-count complaint (ECF No. 1, the "Complaint") seeks to

have this Court deem certain debts owed to them non-dischargeable under 11 U.S.C. §§

523(a)(2)(A)–(B), (a)(4), and (a)(6), and to deny the Debtor's discharge pursuant to 11 U.S.C. §§

727(a)(3) and (a)(4)(A). The essence of Plaintiffs' claims boils down to an allegation that the

Defendant induced the Plaintiffs to collectively invest $495,000 in a fraudulent, fake, and non-

existent real estate transaction, and that for years the Defendant lied and misled Plaintiffs as to

where their money went and for what purpose it was deployed. Plaintiffs have since amended

their Complaint to add a seventh Count seeking the entry of a liquidated civil judgment against the Defendant (ECF No. 359).[1]

Now pending before the Court is the Plaintiffs' Motion for Summary Judgment on Counts I–VI of the Complaint (ECF No. 107, the "Motion"), the Defendant's objections thereto (ECF Nos. 236, 241), and the Plaintiffs' reply (ECF No. 383). Initial argument on the Motion was set for February 28, 2020 but was subsequently rescheduled and thereafter continued without date so as to allow the parties to proceed with various discovery and document production matters that may have potentially impacted the Motion. A hearing on the Motion was then scheduled for August 18, 2020. After receipt of the Plaintiffs' Reply to the Defendant's Objection to the Motion, the Court took the matter under advisement.

After surveying all of the core and material undisputed facts, the Court finds that it must grant summary judgment as to Counts I, II, III, IV, V and VI. These core and material facts demonstrate that there is no genuine dispute as to the Defendant's liability, however, because Plaintiffs did not move for summary judgment as to Count VII, the Court will reserve entry of a final judgment on Count VII pending the outcome of a hearing in damages. Accordingly, for the reasons that follow, the Plaintiffs' Motion is hereby GRANTED as to Counts I, II, III, IV, V and VI, and the Defendant's Objection is hereby OVERRULED.

II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to

---

[1] The Court granted the Plaintiffs' Motion to Amend Complaint (ECF No. 413). Pursuant to the Court's Order at ECF No. 413, and based on the discussion herein, a final determination as to Count VII will be dependent upon the facts adduced at a hearing in damages. Specifically, Plaintiffs' Count VII seeks treble damages under Fla. Stat. 772.11 and/or Conn. Gen. Stat. § 52-564, punitive damages under Fla. Stat. 501.201 and/or Conn. Gen. Stat. § 42-110g(a), and reasonable attorneys' fees and costs under Fla. Stat. 501.201 and/or Conn. Gen. Stat. § 42-110g(d).

hear and determine this matter on reference from the District Court under 28 U.S.C. §§ 157(a)

and (b)(1) and the General Order of Reference of the United States District Court for the District

of Connecticut dated September 21, 1984. This Adversary Proceeding constitutes a core

proceeding under 28 U.S.C. §§ 157(b)(2)(I) and (J).

III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal

Rule of Bankruptcy Procedure 7056, directs that "[t]he court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a); *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists if 'the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's

Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (*quoting

Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Upon consideration of a motion for summary judgment, "all reasonable inferences are to

be drawn, and all ambiguities resolved, in favor of the non-moving party." *In re Bak*, 2013 WL

653073, at *3 (Bankr. D. Conn. 2013) (citations omitted). Additionally, "the judge's function is

not . . . to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial." *Liberty Lobby, Inc.*, *supra,* 477 U.S. at 249.

"The moving party bears the initial burden of informing the court of the basis for its

motion and identifying the admissible evidence it believes demonstrates the absence of a genuine

issue of material fact." *Boland v. Wilkins,* 2020 WL 4195740, at *1 (D. Conn. 2020) (*citing

Celotex, supra*, 477 U.S. at 323). While the evidence relied upon at the summary judgment stage

need not be presented in admissible form, it must, however, be capable of being presented at trial

in admissible form. *In re Soundview Elite Ltd.,* 543 B.R. 78, 100–01 (Bankr. S.D.N.Y. 2016)

("[Rule 56(c)(2)] provides for the exclusion of matter that cannot be presented in a form that

would be admissible in evidence—not that is *not* so presented." (emphasis in original)). The

moving party may satisfy its burden "by showing . . . that there is an absence of evidence to

support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d

Cir. 2002) (per curiam) (internal quotations and citations omitted).

If the movant successfully demonstrates that there is no genuine issue of material fact,

then the burden shifts to the non-movant to "set forth 'specific facts' demonstrating that there is

'a genuine issue for trial.'" *Official Comm. of Unsecured Creditors of Affinity Health Care*

*Mgmt., Inc. v. Wellner (In re Affinity Health Care Mgmt., Inc.)*, 499 B.R. 246, 251 (Bankr. D.

Conn. 2013) (*quoting Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)). The "mere existence

of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Liberty Lobby, Inc.*, *supra,* 477 U.S. at 247–48 (emphasis in original).

Importantly, the non-movant may not defeat a properly supported motion for summary

judgment by relying on self-serving and conclusory statements concerning the true nature of the

facts, *see Wyler v. U.S.*, 725 F.2d 156, 160 (2d Cir. 1983), but rather, it "must offer some hard

evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of N.Y.*,

426 F.3d 549, 554 (2d Cir. 2005) (*quoting D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir.

1998)). Further, "a party may not create an issue of fact by submitting an affidavit in opposition

to a summary judgment motion that, by omission or addition, contradicts the affiant's previous

deposition testimony." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996). "When no rational jury could find in favor of the nonmoving party because the evidence

to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    THE UNDISPUTED FACTS

Local Rule 56(a)(1) of the Local Rules of Civil Procedure of the United States District Court for the District of Connecticut requires that a party moving for summary judgment file a Local Rule 56(a)(1) Statement of Undisputed Material Facts. D. Conn. L. R. 56(a)(1). Local Rule 56(a)(2) requires that a party opposing a motion for summary judgment file a Local Rule 52(a)(2) Statement of Facts in Opposition to Summary Judgment. D. Conn. L. R. 56(a)(2). Each material fact set forth in a movant's statement and supported by the evidence "will be deemed to be admitted (solely for the purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule . . ." *See* D. Conn. L. R. 56(a)(1); *see also Parris v. Delaney (In re Delaney)*, 504 B.R. 738, 746–47 (Bankr. D. Conn. 2014). A party that denies an asserted fact by stating supplementary information rather than denying the asserted fact and proffering factual evidence to controvert it "frustrate[s] [Local] Rule 56(a)'s purpose of clarifying whether a genuine dispute of material fact exists." *In re Curtis James Jackson III*, 630 B.R. 700, 709 (Bankr. D. Conn. 2021) (*quoting Dingwell v. Cossette*, 2020 WL 5820363, at *3 n. 2 (D. Conn. Sept. 30, 2020)).

At the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The evidence relied upon at this stage, however, need not be presented in

admissible form, but rather, it must be capable of being presented at trial in admissible form. *In re Soundview Elite Ltd.*, *supra*, 543 B.R. at 100–01.[2]

Based upon the review of the parties' extensive summary judgment submissions, in addition to the Complaint, the Defendant's Answer and Special Defenses (ECF No. 31), and this Court's independent examination of that record, the Court finds the following material facts to which there is no genuine dispute:[3]

### The Debtor's Background

1. The Debtor was a stockbroker in the 1990s. After being arrested in 1997 and prosecuted by the Manhattan District Attorney's office, the Debtor "admitted stealing more than $800,000 from one client from the firm. He pleaded guilty to one count of Grand Larceny in the Second Degree and was sentenced to serve five years of probation and to pay a $5,000 fine."

2. For these actions and others, the Debtor was sanctioned by regulators, disbarred by the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") and, as of 1997, was prohibited from associating with any broker dealer that sells securities to the public.

---

[2] A majority of the Defendant's objections to the Plaintiffs' statements of undisputed facts state that "the Plaintiffs have not submitted materials in support thereof in a form that would be admissible in evidence" and that the documents "have not been authenticated or otherwise proved to be admissible." With regard to these objections, "[w]hile *bona fide* evidentiary objections can and should be considered at the summary judgment stage . . . as to authenticity there is no basis for concluding that any of the documents [upon which the Plaintiffs rely] is anything other than what it purports to be." *In re Soundview Elite Ltd.*, *supra*, 543 B.R. at 101.

[3] To the extent that either party raised an objection in response to a statement of uncontested material fact that is, nonetheless, included herein, the inclusion of said fact represents the Court's implied overruling of the objection, whether the grounds for doing so be that the objection was unsupported by the record, the prior admissions of the Defendant indicate otherwise, the controverting allegations were legally insufficient, or that it was not well–founded according to the Federal Rules of Evidence.

3.      While on probation, the Debtor again stole money from his clients (this time his wealthy uncle's trustees) through a "sleight of hand" by sending bank wires to offshore bank accounts that he controlled.

4.      After another criminal indictment and a violation of probation proceeding on his 1997 case, on February 10, 2004, the New York Supreme Court resentenced the Debtor to 18 to 54 months in state prison. On April 15, 2004, the Debtor pled guilty to new charges and was convicted of Attempted Grand Larceny Third Degree. On March 31, 2005, the Debtor was sentenced to a prison term of 18 to 36 months pursuant to the new charges.

5.      In parts of 2005 and 2006, the Debtor was incarcerated for approximately one year, for a total of 15 months of incarceration including time in 2003.

6.      The Debtor was released from prison in 2006 on parole.

**Upon Release from Prison, the Debtor collects money from Plaintiffs for the "Investment"**

7.      The Debtor had never visited the United Arab Emirates ("UAE") until 2007.

8.      In 2007, the Debtor represented to Plaintiff Woolf, his friend from college, that the Debtor knew about a very lucrative real estate investment in Dubai, UAE. In 2007 and 2008, the Debtor solicited and obtained an investment of $225,000.00 from Plaintiff Woolf, $150,000.00 from Plaintiff Katz and $120,000.00 from Plaintiff Vagnerova. The Debtor solicited Plaintiff Woolf to invest his money with the Debtor in what the Debtor described as a joint or pooled purchase of units in a pre-construction building in Dubai.

9.      As represented by the Debtor, the building was called "Burjside Boulevard" and the developer was Damac Properties ("Damac" or the "Developer"), a well-known and reputable UAE real estate developer.

10.     In the latter part of 2007, the Debtor represented to Plaintiff Woolf that the "investment" consisted of the entirety of Floor 16, comprised of nine units of one, two, and three-bedroom layouts, of the pre-construction Burjside Boulevard building (the so-called "Investment").

11.     On or about October 11, 2007, the Debtor circulated a term sheet ("Term Sheet") to all Plaintiffs setting forth the proposed Investment.

12.     The Debtor made the following representations in that Term Sheet:

a.   The Investment is approximately **11,000** square feet per floor.
b.   The Developer is currently offering these apartments out at **2500 to 2900** (AED) per square foot if purchased individually.
c.   The Emirates Mall is the **largest** shopping mall in the world.
d.   The property is currently **under construction**; the property is in the **construction phase.**
e.   The purchase price will be approximately **$5.0 million USD.**
f.   Investors will invest 30 percent or $1.5 million USD. **We will finance 70%** or $3.5 million USD.
g.   Monies will be **wired to my US attorney** but may be sent upon instruction from time to time **directly to Developer.**

13.     In this Term Sheet, the Debtor falsely represented material terms to induce Plaintiffs' Investment.

14.     The Term Sheet's misleading representation that the Emirates Mall is the "largest shopping mall" in the world was provably false at the time, as it was not even among the top 10 largest malls in the world as of October 11, 2007.

15.     On or around October 31, 2007, at the Debtor's direction, Plaintiff Katz wired $150,000.00 to the Debtor's attorney Tony Chang in New York to hold in escrow for the Investment.

16.     The Debtor told Plaintiff Katz that his money would be tendered to the Developer for the Investment by Chang.

17.     On or about November 2, 2007 and on February 6, 2008, Plaintiff Woolf sent Chang a wire and checks totaling $225,000.00, with $150,000.00 paid on November 2, 2007 and $75,000.00 paid on February 6, 2008.

18.     The Debtor told Plaintiff Woolf that his Investment monies would be tendered to the Developer for the Investment by Chang.

19.     On November 2, 2007, the Debtor directed his attorney Chang to obtain Woolf's written consent to wire Woolf's $150,000.00 to "Damac Properties Co., LLC."

20.     However, on the same day, November 2, 2007, the Debtor directed his attorney Chang in an email to wire Woolf's $150,000.00 to a bank account that did not belong to Damac. Instead, the Debtor directed Chang to wire Plaintiff Woolf's funds to Standard Chartered Bank New York Account No. xxxx-xxxx-78011, of Standard Chartered Bank Dubai Account No. xxxx-xxx-2701, which belonged to a German friend of the Debtor named Stefan Bode.

21.     In this November 2, 2007 email from the Debtor to Chang, the Debtor did not state that Bode was the account holder of the recipient bank, rather the Debtor stated that the wire to Bode's account was to "reference Bode/for Burjside Blvd floor 16."

22.     The New York Supreme Court had previously made an express finding that the Debtor had engaged in this "sleight of hand" conduct with international bank accounts.

23.     In 2007, the Debtor told Plaintiff Katz and Plaintiff Woolf that their Investment monies would be pooled with other investors for a $4 million or $5 million purchase of the entire "16th floor" in a preconstruction building in Dubai called "Burjside Boulevard" that was to be built by "Damac."

24.     On or about March 10, 2008, Plaintiff Vagnerova wired $120,000.00 directly to the Stefan Bode per the Debtor's instructions.

25.     By early 2008, the Debtor effectuated the transfer or direct payment of the entirety of Plaintiffs' $495,000.00 to *Bode's* Standard Chartered Bank account and not to any account of Damac.

26.     For the next nine years, the Debtor lied to Plaintiffs about their Investment monies, claiming that the Investment was successful; however, the Debtor now claims that there was a so-called "default" and all of Plaintiffs' money is supposedly gone.

27.     On May 23, 2016, Plaintiff Woolf, Plaintiff Katz and Plaintiff Katz's wife Josette Wys-Katz conducted and recorded a call with the Debtor, and the Debtor did not say anything about a "default."[4]

28.     On the May 23, 2016 call, the Debtor stated as follows:

a.  The money was wired to Damac, wired "directly" from "Tony to Damac."

b.  "Tribeca Partners" is the official owner of Burjside 16th Floor.

c.  "Stefan [Bode] had nothing to do with it."

d.  The Debtor personally owns the 16th floor "with you guys [Plaintiffs]."

e.  The Debtor personally owns the 19th floor by himself "alone."

---

[4] The Defendant objects to the admissibility of any information relied upon by Plaintiffs obtained through this phone call, on the basis that "the recording of the conversation violated the Florida Security of Communications Act, Fla. Stat. § 934.03(2)(c)-(d) as it was recorded without the Defendant's consent and was made in disregard of his expectation of privacy in that regard." However, the Defendant admits that, during the call, "[he] was with [Plaintiff] Andrew Woolf at an establishment in New York . . . [and] does see from the transcript that there is an automated voice that states 'This call is now being recorded.'" Under New York's recording statutes, an individual who is a party to either an in-person or telephonic conversation or electronic communication, or who has the consent of one of the parties to the communication, can lawfully record it or disclose its contents. *See* N.Y. Penal Law § 250.00; *see also Sharon v. Sharon*, 558 N.Y.S.2d 468, 470 (N.Y. Sup. Ct. 1990) (holding that the law applies to cellphones and cordless phones). The Court finds that it is the New York statute that applies in this instance, rather than the Florida statute upon which the Defendant relies, because the Defendant, if proven injured, was injured in New York. *See Michael Krauss v. Globe Int'l, Inc.*, no. 18008-92 (N.Y. Sup. Ct. 1995). Accordingly, the Defendant's objections to the Plaintiffs' facts adduced from the May 23, 2016 phone call are overruled.

     f.   The 16th floor is owned "by Tribeca."

     g.   Maybe the building is called "the Signature" instead of "Burjside."

     h.   The contract "could be in storage, it could be—I don't know. It could still be in Dubai…In a storage in my friend's apartment. In storage downstairs from my friend's apartment."

     i.   The price of the property that we own is "Um, about four and a half [million]."

     j.   Four and a half million in cash was given to Damac.

     k.   "We sent them a check. Remember I told you about that? . . . That was one of the payment. Remember I told you we wired it?"

     l.   "I wired him [Bode] a lot of money."

     m.   The last payment to Damac was "probably sometime in 2011 or 2012."

     n.   When asked when he was going to Dubai to find out more information, the Debtor stated, "I don't know. Maybe in a month?"

     o.   The Debtor stated that he would call Damac "tomorrow."

     p.   Tribeca has "got equity from all of us in it."

29.    The above-referenced statements made by the Debtor on the recorded call are all false as discussed herein.

30.    Following the May 23, 2016 call, the Debtor failed to follow up with Plaintiffs or to provide substantive information pertaining to Damac's receipt of Plaintiffs' Investment.

**Plaintiff Katz sues the Debtor**

31.    On June 22, 2016, Plaintiff Katz sued the Debtor in Miami-Dade Circuit Court.

32.    Even though the Debtor claims that Bode received all of Plaintiffs' money, in the Debtor's April 26, 2017 Answers to Plaintiff Katz's First Set of Interrogatories, the Debtor

failed to identify Bode as a person who "may have facts, documents, or information relating to the claims and allegations made by Plaintiff or defendant in this manner."

33.     In the Debtor's deposition, upon questioning, the Debtor was very reluctant to discuss his communications with Bode. Eventually, on October 23, 2019, 13 days *after* his deposition, the Debtor produced WhatsApp messages with Bode, showing consistent communications dating back from July 2, 2013 through October 5, 2019.

34.     In the communications the Debtor produced, the Debtor did not ask Bode for any paperwork related to Plaintiffs' money, Damac, Dubai, Ocean Heights, Burjside Boulevard or the Signature.

35.     Moreover, this time frame includes the period from June 22, 2016 to November 2019, wherein the Debtor was engaged in litigation with Plaintiffs. Bode failed to produce an affidavit, a single email, a single document, or any phone records. Nothing Bode provided (as he provided nothing despite being in consistent communication with the Debtor) corroborated the Debtor's story/stories in any way.

36.     Regarding the so-called Burjside Blvd "transaction/transactions," the Debtor stated in his First Set of Interrogatory answers on April 26, 2017, that he had a so-called "future ownership interest" from "summer of 2007 until we defaulted to Damac" on an unknown date, even though the Debtor previously claimed (up through 2016) that he actually owned floor 16 and floor 19 of the Burjside Boulevard building in his statements to Plaintiffs.

37.     The Debtor stated that "Tony Chang set up a company named Tribeca" and "Tony received the monies from investors. Monies were sent to the developer."

38.     "I believe he [Plaintiff Katz] wired it to Tony Chang. I believe these funds were sent to the developer, Damac Properties. Damac Properties kept our monies for default."

39.     The Debtor stated "[a]ll other documents in my possession or under my control that may be construed as being an agreement between myself and the developer have been produced to Plaintiff." At this time, the Debtor had produced just one contract, which was a three-page "Unit Reservation Contract" dated June 6, 2007 (and 11/6/07) ("Contract 1").

40.     Although the Debtor later asserted that hundreds of thousands of dollars of Plaintiffs' money actually went into his personal bank account at Emirates Bank in Dubai, and that he purportedly made a payment to Damac with Plaintiffs' money, in his April 26, 2017 sworn interrogatory answers, the Debtor stated, "I did not handle plaintiff's [Katz's] investment funds so I did not make any payments on his behalf."

41.     Although the Debtor now claims that Damac is supposedly in possession of all of the $495,000.00 belonging to Plaintiffs, the Debtor never told Plaintiffs about any purported "seizure" until 2017 *after* he was sued, and yet the Debtor never hired a lawyer to attempt to recover Plaintiffs' money, or any of the other "investors'" money, or his own money.

### The Contracts

42.     Although the Debtor later said that he signed at least four contracts with Damac, and the Debtor produced three of the four contracts, Debtor testified under oath on April 9, 2018 that "there's only one contract" that he signed that "he was able to find" and that Contract 1 is the "full scope" of the contract he signed for Burjside.

43.     Although the Debtor later said that he defaulted on multiple Damac contracts, hundreds of thousands of dollars of investor money disappeared, the Debtor never closed on, or actually purchased, *any* real property in Dubai, the Debtor testified under oath on April 9, 2018 that he "bought a place in another building called Ocean Heights; has nothing to do with Mr. Katz."

13

44.     While the Debtor produced only Contract 1 in discovery, he had provided Plaintiff Woolf with a different contract years ago that the Debtor failed to produce ("Contract 2").

45.     The Debtor never produced Contract 2 or even acknowledged its existence until after the Plaintiffs produced it in discovery.

46.     In trying to explain why there are two similar contracts for the same real property, both supposedly signed by the Debtor, and yet signed on different dates with different countersignatures, by different countersignature parties, and a different page 3, in the Debtor's Interrogatory answers dated July 31, 2019, the Debtor claimed that Contract 1 was "not countersigned" when he signed it, and that he subsequently received a countersigned version (undated) that was "unsigned by me" but signed by "Vinod Kumar" (even though the name "Mohamed R. Hegazi" was typed into the signature area where "Vinod Kumar" signed). (Contract 2).

47.     The Debtor claims that he then subsequently signed Contract 2 (apparently failed to return it to anyone) and purportedly dated it "10/7/07" (but only on the third page rather than all three pages like Contract 1). The date would be either July 10, 2007 or October 7, 2007.

48.     The Debtor claims that "around this time" (July 10, 2007 or October 7, 2007) he also received a copy of the contract that he "previously signed" (Contract 1) (ostensibly by mail since no emails corroborate this) purportedly countersigned by "Moha_mm_ed" (aka "Moha_m_ed") (two mm's versus one m) Hegazi, Director of Sales of Damac dated "11/6/07." The date would likely be June 11, 2017, although it could be November 6, 2007.

49.     The Debtor failed to produce a single original document, contract, purported "receipt" or anything else, in this litigation or in any other litigation with Plaintiffs, dating back to 2016.

50.     The Debtor did not explain, *inter alia*, how June 11, 2007 and July 10, 2007 are "around the same time," why Damac would sign two different contracts by two different people (on a three-page document, marked with white-out, purportedly for millions and millions of dollars, which does not even contain the word Damac anywhere on it), why there are no originals, or emails with attachments, or faxes reflecting receipt of any of these documents from their purported original source, or why page 3 of the Unit Reservation Contract is actually a different document.

51.     The Debtor failed to explain why this three-page contract looks like white-out was used on it, and yet this supposedly relates to a $5 million+ dollar (AED 16,646,600.00/USD $5,077,469.18) purchase of the entire 16th floor of the preconstruction Burjside Boulevard building.

52.     However, neither contract references Damac or Damac Properties, specifies where to send money, or how to make it payable, and no paper trail shows actual payment of money.

53.     The actual date of execution (whenever that happened, if that happened – given the two different dates in Contract 1 and undated for the purported "seller" in Contract 2) should be noted, among other things, because of the payment schedule, whereby pursuant to both contracts, 10% of the purchase price ($507,746.92) is due "on reservation" and then the first four payments must be made pursuant to the following schedule:

| | |
|---|---|
| June 6, 2007 (on reservation): | $507,746.92 (10%) |
| July 6, 2007 (within 30 days): | $507,746.92 (10%) |
| October 6, 2007 (within 120 days): | $507,746.92 (10%) |

15

January 6, 2008 (within 180 days):    $507,746.92 (10%)

**Total:**                           **$2,030,987.67**

54.     The Debtor contends that June 6, 2007 is the date of reservation and that Contract 1 is the operative contract.

55.     The Debtor has not produced any letters of default from Damac, or any invoices pursuant to any actual payment plan.

56.     When asked if there were two different contracts, the Debtor admits he never said anything to Plaintiffs about two different "versions" of the contracts.

57.     Contract 1 and Contract 2 (which have different dates yet are supposedly for the same 16th floor of Burjside Blvd) provide that a "detailed Agreement of Sale" must be signed within one week of reservation.

58.     Contract 1 and Contract 2 further provide that if any payments are not made pursuant to the schedule or if the Agreement of Sale is not signed within a week, then the Developer can retain all money paid up through that time.

59.     When asked if he made the four $507,746.92 progress payments owed before January 6, 2008, the Debtor first testified: "I think I paid close to that number, somewhere between 4 and 500."

60.      The Debtor could not point to any documentation reflecting even one $507,746.92 payment (let alone four payments), or anything in that range, and as the only evidence of any payment before March 23, 2008 (that date will be discussed later), the Debtor referred to a purported September 20, 2007 email from "Mohammed Wael" where Wael purportedly "checked the transfers" and "found out" that "we" have received two transfers, one with "200,000 $ and one with 74,000 $."

61.     In this same purported email, Wael asked the Debtor for the name of his company, apparently the Debtor did not respond to this purported email or send the $758,136 that was apparently owed.

62.     Debtor reiterated that he has no other evidence to support making payments to Damac other than the email from Wael, alleging "transfers" totaling $274,000.

63.     On September 26, 2007 at 9:04 AM, the Debtor supposedly forwarded this email (pertaining to the Debtor's purported $274,000 in payments) to a lawyer named Catherine Gill at Clyde & Co.

64.     The documents reflect a reply from Ms. Gill on September 26, 2007 at 14:38 +0400, noting that she reviewed "the reservation contracts," i.e., the typed-up versions of each individual unit on the 16th floor (and not any signed contract).

65.     On September 26, 2007, more than three months after the purported June 6, 2007 reservation was signed (Contract 1) and two months after July 10, 2007 when Contract 2 was supposedly signed, Ms. Gill remarked "you have already paid a holding sum of US $2,500 and a further sum of US $ 100,000 to Damac **but have not yet signed any agreement**."

66.     Ms. Gill referenced that $102,500.00 in payments had been made, and this conflicts with the Debtor's reference to a document reflecting Wael's assertion of $274,000 in (unspecified person's so-called) "transfers." Either the Debtor did not reply to this email or he otherwise failed to produce his response.

67.     Ms. Gill stated that she could further review the matter for an estimated AED 10,000 ($2,723). Despite referencing Ms. Gill 23 times in his deposition, the Debtor testified that he did not actually retain her services:

> Well, Kathy Gill was involved in 2008, and when I say -- when
> you say hired, I'm not sure I even hired her. I looked at the e-mail

> to her, and at the end of the e-mail she requested like a 10,000
> dirham, or something, retainer fee to go forward with something.
> I'm not sure I retained her or not. I may have paid her something to
> do the review, but I can't remember.

68.     However, the Debtor previously testified on April 9, 2018 that he *had* hired Ms. Gill.

69.     He then admitted that he "was not truthful" given the fact that he lied to people for over a decade.

70.     Specifically, the Debtor admitted that he lied to Plaintiffs multiple times for over a decade and that he had falling outs with many more people over the years.

71.     Additionally, the Debtor failed to produce any of his bank statements, or any documentation showing that he requested any statements from his banks.

72.     The Debtor admitted that he failed to make any of the $507,746.92 progress payments to Damac.

73.     The Debtor then asserted that his failure to make the four $507,746.92 progress payments to Damac was due to a so-called "dispute."

## The "Dispute"

74.     The Debtor's reference to "the 18.6 million versus the 23 million" is his assertion that the nine individual, typed "ARF" unit reservation contracts (free of white-out) purportedly emailed to him on July 10, 2007 (the day the Debtor signed Contract 2), one for each of the nine units on the 16th floor (and that he didn't sign), totaled AED 23,483,000 ($6,394,420.90) rather than the AED 18,464,600 ($5,077,469.18) as reflected in Contract 1 and Contract 2. Although the Debtor referenced this so-called "dispute," the Debtor produced no documentation reflecting correspondence with Damac in an attempt to resolve (or even raise, or reference) this so-called dispute on the millions of dollars of purported real property. The

18

Debtor admitted that the so-called "price dispute" was never resolved.

75.     In the Term Sheet that the Debtor sent to Plaintiffs, the Debtor represented that "[t]he developer is currently offering these apartments out at **2500 to 2900** (AED) per square foot if purchased individually." However, per the ARF contracts, each unit was priced at between **2361** and **2435** per square foot for an average price of **2402** per square foot.

76.     Furthermore, the so-called price issue, which was the Debtor's purported "dispute" in the so-called 16th floor Burjside Blvd deal (whereby the Debtor objected to purchasing 9,814 square feet for 23,483,000 AED rather than 18,646,600 AED) vanished as an issue, given that the so-called price of the 19th floor (which the Debtor then contended that he bought) was much higher at 27,109,800 AED.

77.     The 19th floor Burjside "purchase" price (which the Debtor now says corresponds to Plaintiffs' money, amid his shifting stories) was 27,109,800 AED—45% higher than the purported original 16th floor amount and 15% higher than the 23,483,000 AED amount that the Debtor claimed was too high and therefore in "dispute."

78.     The difference in US dollars between 27,109,800 AED (19th  floor) and 23,483,000 AED (higher 16th floor contract) (3,626,800 AED) is $987,577.64.

79.     The difference in US dollars between 27,109,800 AED (19th  floor contract) and 18,646,600 AED (lower 16th floor contract) (8,463,200 AED) is $2,304,529.36.

80.     The 19th floor Burjside contract was for $2,775.94 per square foot—46% higher than the quoted price of $1,900 per square foot that the Debtor represented to Plaintiffs in the Term Sheet dated October 12, 2007.

81.     Moreover, the 19th floor Burjside transaction was for $7,381,998.54—a price 48% higher than the "approximately $5.0 million USD" price that the Debtor represented to

Plaintiffs.

82.    And yet the Debtor maintains that the 27,109,800 AED was apparently such a good deal (as offered by Mohamed Wael, who had supposedly just recently lied to him) that the Debtor felt "pressured" and he supposedly rushed to obtain a cashier's check (which he never produced and which is the least traceable form of purported payment) in order to close (which he never did). The Debtor's only explanation for why it was supposedly done this way (in lieu of, for example, sending a wire, which could be traced and confirmed) was that there is supposedly "more than one way to skin a cat."

83.    The second so-called "dispute" was the Debtor's assertion that Damac was supposed to have "put it [the contract?] in [a] corporate name."

84.    But the Debtor could have "put it in a corporate name" himself since he filled out his own customer information in Contract 1 and Contract 2 himself and he does not recall ever asking for an agreement of sale.

85.    The Debtor testified that he was aware of the requirement, per the unit reservation contract, that he enter into an Agreement of Sale within one week following his purported execution of a unit reservation contract. Despite the Debtor's admitted knowledge of the requirement that the buyer must enter into an Agreement of Sale within one week or else the buyer would forfeit any money paid to Damac, (dating back to at least September 26, 2007, in writing, before any of the Plaintiffs invested money), the Debtor failed to enter into any Agreement of Sale for either the 16th or the 19th floor of the Burjside Boulevard building, thus virtually ensuring that anything paid would be lost.

86.    Not only did the Debtor fail to enter into any Agreement of Sale for the Burjside Boulevard building, but the Debtor could not even state that he *requested* an

Agreement of Sale from Damac for the Burjside Boulevard building (even for the 19th floor, which the Debtor now claims is supposedly the transaction corresponding to Plaintiffs' money, months after the Debtor was well aware of the Agreement of Sale requirement).

87.     The Debtor's quasi-explanation for failing to request an Agreement of Sale was his so-called "dispute" regarding the price of the 16th floor of the Burjside Boulevard building.

88.     But despite this so-called "dispute" about the price, which dated back to July 2007 (supposedly), the date on the Term Sheet provided to Plaintiffs is October 11, 2007, four months after he purportedly entered into the unit reservation sheet and subsequently failed to sign (or even request) an Agreement of Sale.

89.     The Debtor did not explain why he would have undisputedly known about the requirement to enter into an Agreement of Sale as of September 26, 2007 as of his email with Ms. Gill, and yet then supposedly fail to enter into (or even ask for) an Agreement of Sale pertaining to the 19th floor of the Burjside Boulevard six months after he purportedly entered in to the 19th floor contract on March 23, 2008, and yet pay money that was sure to be lost because the Debtor failed to enter into, or even request, an Agreement of Sale.

90.     The purported 19th floor Burjside contract—about which the Debtor inexplicably produced only one of three pages, and which did not contain a single signature of any purported seller or any person associated with any seller—is the contract pursuant to which the Debtor claims that he paid 2,000,000 AED ($544,600) with a purported (and untraceable) so-called "bank check" (which he failed to produce) and a 710,000 AED ($193,333) purported personal check from Bode (the back of which the Debtor did not produce or even request from Bode, despite being in regular contact with Bode through at least October 2019).

21

91.     Moreover, as previously noted, the so-called payment amounts of 2,000,000 AED (March 23, 2008) and 710,000 AED (March 31, 2008) asserted by the Debtor conflict with the so-called payment amounts asserted by Bode in an email on May 13, 2008, whereby Bode referenced March 2008 checks of 3,473,072 (so-called "bankers cheque from Rich's [Debtor]'s account") and 776,166.17 (supposedly from Bode's account) as set forth in Bode's purported email to Ms. Mezqueldi on May 13, 2008 (the amounts in Bode's purported email do not even match the amounts in the purported checks).

92.     Yet on May 14, 2008, the Debtor purportedly emailed Ms. Mezqueldi and stated "Now that we have proved that **all monies in this deal just came through Stefan's account,** [except the Debtor now claims that a 2,000,000 AED/$544,600 phantom bank check came from his personal account] I would like to explain to you the story behind djamels non cashable cheque . . . ." (the Debtor failed to explain the definition of a "non-cashable check").

### The Defendant's Financial State

93.     Meanwhile, the Debtor was aware of the difficulty (or, more accurately,  the impossibility) in obtaining a purported "mortgage" for the purported millions and millions of dollars of investments with Damac as early as January 23, 2008, when he told Antonia Kulman (antonia.kulmann@nbad.ae) in an email entitled "mortgages" that he "saw several banks yesterday" and is running out to see other mortgage cos at the moment."

94.     The notion of the Debtor telling Plaintiffs that he intended to obtain a "mortgage" for $5 million, $6 million, or $7 million in a foreign country where he had never been, with no actual property ownership, no legitimately signed contract free of white-out markings, no Agreement of Sale, no proof of a single payment made as it was supposed to be made (or likely

at all), no legal occupation, no business, no established residence, no verifiable income, likely no income at all, two felony convictions for fraud and theft from investors, and recent parole from a 15-month prison sentence is indeed interesting. The Debtor further admits that he has not paid any income taxes, or even filed any income tax returns dating back to at least 2007.

95.      In fact, the Debtor cannot recall the last year he actually filed a federal or state tax return, or whether he ever filed a tax return after the year 2000.

96.      The only reason the Debtor could advance for why he failed to file tax returns for all those years is that he was not receiving income for all those years.

97.      Yet the Debtor never asked Plaintiffs for any additional investment money before or after supposedly paying all their money to Damac on March 23, 2008 and March 31, 2008.

98.      Since the Debtor was supposedly "tapped out" by early 2008, he apparently had no plan for paying the next (or the original, or any) $738,199.85 tranche due to Damac within 30 days on April 23, 2008 and the next $738,199.85 tranche 90 days after that. And somehow the Debtor managed to stay in Dubai for the next three years until 2011.

99.      The Debtor testified that, while living in Dubai, he rented multiple apartments, had an office space, and employed two different secretaries.

100.     Since the Debtor was not filing tax returns since at least 2007, and the Debtor testified that the only reason he does not file tax returns is because he has no income, it follows that the Debtor would have had no income since at least 2007.

101.     Nonetheless, the Debtor failed to explain how he afforded to pay his apartment's rent in an expensive city like Dubai, his office rent (for whatever he was supposedly doing in an office), and his secretary's salary (and he produced no emails from or

to any of his secretaries in Dubai, or anywhere else) after he was "tapped out" of Investment money in 2007 or 2008.

102.    The Debtor stated that he had "between 100 and 150 grand" in funds in "various other accounts," but failed to explain the sources of these purported funds or which "accounts" at which banks or institutions. When asked where these purported funds came from, the Debtor responded, "I had money."

103.    When asked how he supported his lifestyle in Dubai after he was "tapped out" of money in 2008, the Debtor responded by saying that he "had funds that were loaned to [him] by [his] parents."

104.    However, the Debtor's parents both testified under oath that they never made any loans to their son. The Debtor's father confirmed at his deposition that he never asked his son to pay him back for any money.

105.    The Debtor has not explained why he did not ask his parents for additional contributions to avoid defaulting on his investments. The Debtor also has not explained why he did not ask his parents to help with any credit or mortgage applications once he learned in January 2008 that he would be unable to obtain financing for his investments and was at risk of default.

106.    Moreover, the Debtor failed to disclose to Plaintiffs that he could not obtain a mortgage, which he knew (or should have known) at least as early of January 23, 2008 (if not long before); and yet the Debtor continued collecting money from Plaintiffs after that time ($75,000.00 from Plaintiff Woolf on February 6, 2008 and $120,000.00 from Plaintiff Vagnerova on March 10, 2008).

## **A New Story Emerges**

107.    The Debtor's "Plan A" scheme (whereby he would claim that Tony Chang
wired money to Damac but the money really was wired by Chang to Bode – as the Debtor
provided Chang with the bank account number for Bode but made it seem like it was
Damac's account) was foiled when Plaintiffs obtained the Standard Chartered Bank records
of Bode and the emails of Chang and matched it up- showing that the Debtor was lying when
he was telling Plaintiffs (up through 2016) that Chang "wired the monies to Damac." In fact,
Chang had not wired any of Plaintiffs' money to Damac, it was all wired to Bode.

108.    Once the cover was blown on "Scheme A," engulfed in "Scheme B," the
Debtor attempted to explain why Bode was acting as the purported "escrow" agent in late
2007 and early 2008 when the Investment money should have been sent to Damac – since
after all – the Debtor's current fable is that Damac "seized" Plaintiffs' money due to a default
in the payment plan.

109.    In trying to justify the faux so-called "escrow" with Bode, the Debtor had to
admit that he never told Ms. Gill *or Damac* about a so-called escrow with Bode (thus
defeating the entire point).

110.    The Debtor theorizes that Bode "may have" verbally told Damac that he was an
escrow agent, however the Debtor produced no documents reflecting that.

111.    The Debtor attempted to explain Bode's purported role as an "escrow" agent
(instead of the normal thing which would have been Plaintiffs' money having been sent to
Damac like the Debtor falsely claimed it had for nine years through 2016) the Debtor spun a
yarn that, due to Dubai's "strict" banking laws, he had to be a "resident" in Dubai (where he
moved in January 2008) for some (varying and shifting) period of time before he could open

a "checking account."

112.    The Debtor failed to explain the connection that his timeframe for obtaining a checking account has with his decision to tell Chang to wire the money to Bode instead of Chang wiring the money to Damac as the Debtor said for nine years.

113.    In addition, the Debtor claims (without any corroboration) that he purportedly wired money to Damac from his domestic Bank of America account or his domestic "Oakwood" account.

114.    Moreover, regarding the "checking account" rationale for Bode's role as an escrow, the Debtor had a savings account at Emirates Bank in Dubai, from which he can send a wire, and he purports to have sent a wire to Damac from a domestic account; therefore the checking account would have no effect on the Debtor's ability to send bank wires.

115.    Furthermore, the Debtor purported to have obtained a "manager's cheque" from his Emirates Bank savings account (which he failed to produce, or apparently even request), and so therefore because the Debtor could send wires and obtain checks for issuance, the need for a checking account is patently absurd.

116.    The Debtor collected the final $120,000.00 from Plaintiff Vagnerova on March 10, 2008 and the Debtor diverted the funds directly to Bode. This was long after these unresolved "disputes" with Damac were in full bloom, so it is unclear why the Debtor would still be soliciting Investment money from Plaintiffs when he claims that he was at loggerheads with Damac over the price and the other various rationales.

117.    As the Debtor's story marched on, he next claimed that on or around February 25, 2008, a person or persons at Damac told him that the Burjside "floor 16 deal had been cancelled."

118.     The Debtor then stated that Damac told him that they were no longer planning to build the Burjside building because supposedly "the master developer took back the plot."

119.     The Debtor then testified under oath that, in March 2008, he negotiated with Mohammed Wael, the person who he claims had just recently lied to him about a cancellation of Burjside (which apparently was not cancelled), for the purchase of all nine units on floor 19 (not floor 16) of the Burjside Boulevard building.

120.     The Debtor testified as follows:

> Here's what had happened after that. I got a call -- I either saw it in the paper or got a call from DAMAC inviting me to a prelaunch party on a new building. I think I saw it in the paper, called DAMAC, and then somebody called me back, or DAMAC knew my name and somebody just called me and they said there's a prelaunch party, and I said, "What building?" They said Bird Side [Burjside] Boulevard.

> At that point I got back to Waiel. I said to him, "Listen, this property was not canceled. They just invited me to a prelaunch party." Okay? So at that point was March 2008, and I said to him, "That's the building I want. I don't want this portfolio of properties that you're proposing to me. I want this Bird Side Boulevard and you should guarantee me the price of -- excuse me, we should build in the profits that I would have had from my purchase of last year." He said, "Let's put in a reservation for that," and **that's when I gave him the two checks for two million and 700,000**.

121.     As the Debtor was advancing the referenced explanation above at his October 9, 2019 deposition segment [insisting and imploring- "Burjside- *That's the building I want*"], he had not yet produced the "Ocean Heights" contract which he had been withholding and concealing and which he finally produced on November 12, 2019. As he described the vigor with which he expressed how his "heart was set" on Burjside Blvd in March 2008, the Debtor seemingly forgot that the date of his so-called Ocean Heights contract was February 26, 2008 (of course, the Debtor claims he made some payments pursuant to this contract too, and then defaulted. His appetite for

27

getting into huge contracts, and then supposedly squandering a few hundred thousand dollars here, and a few hundred thousand dollars there—absent legitimate proof of the payments—appears to be endless).

122.     Inconsistent with the above testimony, the Debtor represented in a 2011 email to a purported person named "Tarek Lawyer" (who the Debtor did not actually hire) that it was *Hegazi* (not *Wael*) who informed him that the deal for the 16th floor of Burjside had purportedly been cancelled in 2008.

123.     In the same email from 2011, the Debtor claimed that Mohamed *Haridy* informed him via phone on March 2, 2008 that the "deal had been cancelled because the master developer Dubai properties had taken back the plot." The Debtor failed to explain why, if the Burjside project really was cancelled, he never asked for his investment funds to be returned or sought legal recourse.

124.     The Debtor also did not provide any explanation or produce any documentation of the so-called "nonbinding check" that a person named Djamel supposedly said "he would make" on the Debtor's behalf when Djamel and the Debtor had one of their "meetings" with Damac in March 2008 (the purported "escrow," Bode, was missing from the meeting).

125.     Moreover, the Debtor further stated as follows to "Tarek Lawyer" in 2011:

1) *I purchased both properties* in the spring of 2008
2) made 10 pct deposit on Burjside Blvd (BSB) 27 million x 10% paid 2.7 Million AED
3) made 20 pct deposit in Ocean Heights (OH) 9.4 million x 20% paid 1.8 million Payments total 4.5 million AED

126.     To the Debtor, "purchase" apparently means "sign purported contract, make purported payment (likely not), never sign Agreement of Sale, then default, and

tell Plaintiffs that all is well until 2016). In this email, the Debtor failed to mention that he purportedly "purchased" the 16th floor of the Burjside Boulevard building in June 2007, as he had represented to Plaintiffs. He also stated that he purchased the unit in Ocean Heights, but has not produced a signed agreement by all parties to that sale nor evidence that he made *any payment whatsoever* for the Ocean Heights property.

127.    In "2008-ish," the Debtor claimed that *Bode made a loan* to the Debtor, on a "short term basis," while the Debtor was "waiting for some money to come from the states."

128.    Although the Debtor "can't remember" the amount, he testified "yeah" to a question of whether the loan amount was for "hundreds of thousands of dollars."

129.    According to the Debtor, the loan outlay was Bode having "made a check to Damac" (ostensibly on the Debtor's behalf) "pending money coming from the states."

130.    When asked if it was the AED 710,000 check that the Debtor said contained Plaintiffs' money, the Debtor stated: "I think it was a different one," but the Debtor did not ask Bode for a copy of the unknown purported check and the Debtor otherwise could not provide any information or details.

131.    Although the Debtor says Bode fronted him money, the Debtor denied partnering with Bode on any Damac transactions, including in Ocean Heights where Bode purchased a unit.

132.    The Debtor stated later that he "split" the cost of his "two-man" office and his purported assistant with Bode.

133.    The Debtor says the original documents "would have been in Dubai" as no

original documents were produced.

134.    The Debtor stated that the timing of Bode's loan to him was after he fell behind on payments, but the Debtor could not recall how much money he borrowed from Bode.

135.    Regarding a unit reservation contract for Ocean Heights, the Debtor stated that there "probably would have been" a contract, but he "hasn't looked for it."

136.    The 24 pages of the Debtor's WhatsApp communications with Bode do not whatsoever corroborate the Debtor's assertion that: (a) the Debtor borrowed money from Bode; (b) the Debtor paid money back to Bode; (c) Plaintiffs' money was transferred from Bode to the Debtor; or (d) the Debtor's money was paid by Bode to Damac. Moreover, the communications do not indicate which contract (or building) corresponds to Bode's so-called payment on the Debtor's behalf.

137.    The "two checks" that the Debtor referred to in connection with the prelaunch party are (1) the front (only the front) of an AED 710,000 ($193,333.00) check purportedly signed by Bode from Bode's Standard Chartered Bank account ending in 2701, and (2) an AED 2,000,000 ($544,600.00) "customer advice" referencing the Debtor's Emirates Bank account (no check).

138.    The Debtor's emails indicate that the "prelaunch party" was Monday, March 24, 2008.

139.    Debtor stated that he brought **both checks** with him to the prelaunch party.

140.    The Debtor's story again falls apart because the 710,000 AED check is dated **<u>March 31, 2008</u>**, seven days **<u>after</u>** the prelaunch party.

141.    In an email to Mido Mezqueldi on May 14, 2008, the Debtor stated that he

30

"could do a bankers cheque the same day of the relaunch." (March 24, 2008).

142.    But the receipt for the 2,000,000 AED "check" (which was never produced) is dated March 23, 2008, which conflicts with the Debtor's testimony that he handed the check to "somebody at Damac" at the prelaunch party, which did not take place until March 24, 2008.

143.    The purported receipts for each check are also inconsistent, as they are signed by different people from Damac and dated more than a week apart.

144.    While the Debtor submitted alleged receipts for the 2,000,000 AED check and 710,000 AED check from March/April 2008, he failed to produce any receipt for the purported $274,000 in "transfers" to Damac that Wael supposedly acknowledged nearly six months earlier.

145.    As to the 710,000 AED check, the back was never produced and the Debtor says he never requested it; the other paper is not even a check (although the Debtor testified that it was a check, for some reason), as no front or back was produced and supposedly this "check" came from the Debtor's bank account:

> Q. Where's the back of the check?
> A. The back of the check? It's a bank check, cashier's check from the bank's ledger. I do not get the back of a check.
> Q. Could you have requested it?
> A. Probably.
> Q. You just didn't.
> A. I'm not sure I could have requested it. It's the bank's ledger. It's not my bank account.

146.    The Debtor failed to even ask Bode for the back of the so-called 710,000 AED check which contained Plaintiffs' money and was supposedly paid to Damac.

147.    The Debtor's excuse for failing to provide (or even ask for) the purported bank check from Emirates Bank was that it was not drawn on Bode's personal account, but the

purported check from Bode was drawn on Bode's personal account. The Debtor provided no rationale for why he failed to ask Bode for the back of the so-called check.

148.     The Debtor stated under oath that even though he claims the accounts were in "default," he could not explain why he did not ask Plaintiffs for an additional Investment to stave off the default, thereby allowing all the money to be lost.

149.     The Debtor failed to produce *any* letter from Damac reflecting a default (or even that a payment was owed) on any of the four contracts that the Debtor contends he entered into with Damac.

## The Defendant Files for Bankruptcy

150.     On page 2 of his Bankruptcy Petition, Debtor stated to the Court that he has not used any business names or EINs within the last 8 years.

151.     However, this is patently false. At a minimum, the Debtor used the EINs of Buckingham Realty Advisors, LLC ("Buckingham") and Windsor Realty Advisors, LLC ("Windsor") both of which have EINs.

152.     The Debtor is listed as a signer on the application for the business accounts for both Buckingham and Windsor, making the corresponding section of his bankruptcy petition materially false.

153.     On Page 31 of his Bankruptcy Petition, under paragraph 4 of his Statement of Financial Affairs for Individuals Filing for Bankruptcy, the Debtor stated as follows under oath:

- $0.00 in gross income for calendar year 2018;

- $20,0000.00 in gross income for the calendar year 2017; and

- $0.00 in gross income for the calendar year 2016.

154.     However, the Debtor earned a $158,000.00 commission fee on December 21, 2017 in connection with the sale of a property wherein Buckingham (the Debtor's company) served as a broker. This $158,000.00 commission fee from Lightsey is considered gross income for Debtor in the calendar year 2017.

155.     Within two months of receiving his $158,000.00 commission, the Debtor made an in-person cash withdrawal on February 8, 2018 from his Wells Fargo account ending in 7962 in the amount of $116,973.00. The Debtor failed to explain this anywhere in his bankruptcy filings.

156.     In addition, the Debtor answered "No" when asked if he made any income during any of the two previous calendar years, despite earning the gross income described above.

157.     Under Schedule A/B of his Bankruptcy Petition, Debtor answered "No" to whether he had any "trusts, equitable or future interests in property . . . and rights or powers exercisable of your benefit."

158.     However, Debtor's parents both testified under oath during their respective depositions that Debtor is a beneficiary of the family trusts.

159.     The Debtor attested under oath in his bankruptcy petition that his parents made "loans" to him, however, the Debtor produced no documentation of the loans and he does not recall the amount of any of the loans.

160.     However, the Debtor's parents both testified under oath that any money given to the Debtor was not a loan, nor had they ever made loans to the Debtor. The Debtor's father confirmed that he never asked the Debtor to pay him back for any money he gave.

161.     The Debtor also produced a document entitled "Mortgage Enquiry Form" from

Damac, dated April 12, 2008, listing Bode as the sales agent for the 19th Floor of the Burjside Building.

162.    On this purported mortgage form, the Debtor represented that he was, and had been, a salaried employee with "Global Capital Partners" for four years and earned a *monthly* salary  of $100,000 after taxes and a bonus between $500,000 and $1 million.

163.    The Debtor admitted that he never actually worked for "Global Capital Partners" at all, and therefore his statements on the Mortgage Enquiry Form were patently false.

**Probative Inconsistencies**

164.    The Debtor testified that, by 2008, he was tapped out of money, which included his "investment monies."

165.    The Debtor further testified that he put the last of his money in the Burjside Boulevard deal.

166.    The Debtor then admitted that $2 million was due under the Burjside contract by January 2008.

167.    The Debtor also then testified that Bode gave the Debtor "all the money that we had wired to him." This conflicts with the Debtor's testimony regarding Bode as an escrow and the 710,000 AED check that was supposedly written by Bode containing Plaintiffs' money.

168.    The Debtor asserted that, regardless of where Plaintiffs' money traveled, it "all came out in a wash."

169.    The Debtor failed to previously assert that the money went to him personally, as he denied knowing whether Chang even wired Plaintiffs' money to Bode.

170.    Moreover, as of August 22, 2018, the Debtor also failed to indicate in his

interrogatory answer that the money went directly to Bode, or to the Debtor.

171.    When asked where Vagnerova's Investment funds were sent, Debtor claimed to not remember whether Vagnerova's money was sent to Chang or anywhere else for that matter.

172.    On May 23, 2016, the Debtor represented to Plaintiffs that he believed Chang wired directly to Damac and that he had a banker set up in Belize.

173.    The Debtor later admitted that he also provided Bode's account number to Chang and that he knew it was Bode's account that he was providing.

174.    The email showing the Debtor provided Bode's bank account to Chang was produced by Chang, and not the Debtor. The Debtor admitted he did not produce the email between him and Chang wherein he directed Chang to wire money directly to Bode, and the Debtor testified that the same email was not deleted.

175.    When asked why he said Plaintiffs' money was "wired to Damac" when none of Plaintiffs' money was wired to Damac, the Debtor testified that he used the term "wired loosely." When asked why he used the term "wired," Debtor stated he did not know.

176.    Serious inconsistencies within the Debtor's document productions also exist. The Debtor purportedly produced the same emails twice, but the content changed.

177.    The same emails produced on different occasions contain different signature blocks.

178.    The Debtor's emails as produced contain irregular margins that often jut outward to the left in a manner different from the usual way an email is reflected on a page.

179.    The Debtor failed to produce a single original contract or piece of paper or evidence in this entire case.

180.    The Debtor produced only one purported email communication with an alleged

real estate agent named "Sabine" who was supposedly helping the Debtor find a lawyer in Dubai during 2011.

181.    Another inconsistency manifested itself within an email purportedly from the Debtor's then-secretary, Monica Karpinsky, whose last name the Debtor could not even remember when first asked at his deposition.

182.    In the purported email from May 31, 2011, the Debtor's secretary signs her name "Monika" but her email address is listed as monica_01_02@yahoo.com.

183.    Also exemplified in this email is one of multiple examples where the "Cc" field in the heading contains two capital "Cs" which is inconsistent with other emails in the Debtor's production and the uniform standard of only one capitalize letter (i.e., "Cc").

184.    This email is also one of many examples from the Debtor's document productions wherein attachments are referenced (i.e., "please find enclosed documents"), but then the attachments are missing and not produced by the Debtor to Plaintiffs.

185.    Regarding his poolside signing session with Vinod Kumar and Mohammed Hegazi, the Debtor stated that he went to the pool to present a credit card as payment to Damac, but he has not produced any receipts or documents to verify payment via credit cards.

186.    The Debtor reiterated that Hegazi was not at the pool and claimed Hegazi did not sign the contract that day (even though Hegazi's name is on the purported contract).

187.    The Debtor stated that he received two signed versions from Damac at a later point in time, with the version that was "stamped" by Hegazi being the operative version. However, the third page is substantively different between Contract 1 and Contract 2.

188.    On multiple occasions during his deposition testimony, the Debtor authenticated himself, Katz, and Woolf on the recorded call. He again confirmed the voices on the call as

himself, Katz, and Woolf. Debtor also confirmed that nobody was forcing him and he made the statements freely.

189.    The Debtor further stated that he was not truthful to Plaintiffs about their Investments for over 12 years: "I said I wasn't truthful with the plaintiffs."

190.    The Debtor testified on April 9, 2018 that he bought a property in the Ocean Heights building, but the Debtor failed to produce any proof of payment.

191.    However, on November 12, 2019, the Debtor testified that he did not purchase Unit 7602 in Ocean Heights because he defaulted on that.

192.    The Debtor stated that he never closed on any of his investments or real estate purchases.

193.    The Debtor testified in his November 12, 2019 deposition that he paid "probably 10 percent" of the purchase price for the purported Oceans Heights transaction but he told Tarek Lawyer that he paid 20 percent.

194.    The Debtor stated that, prior to 2008, Bode purchased a condo in Ocean Heights before the Debtor visited Dubai and that he did not know which unit he purchased or whether Bode ever sold the property.

195.    The Debtor denied that he had any financial role in Bode's purchase of the Ocean Heights.

196.    The Debtor also made inconsistent statements about which unit in Ocean Heights he was purportedly buying. In his purported email to Damac's then-CEO Peter Riddoch on April 16, 2008, the Debtor stated: "Stefan and I started negotiating an apartment in Oceans Heights and bought a duplex **7601/7701**."

197.    However, the contract for Ocean Heights that the Debtor produced on November

12, 2019 (for the first time) dated February 26, 2008 reflected unit **7602** (which was not a duplex).

198.    In the same purported April 16, 2008 email to Mr. Riddoch (Damac's CEO), the Debtor failed to mention any of these issues:

- any alleged "disputes" concerning the price of the 16th floor or Damac's refusal to put the investment "in a corporate name;"
- the Tribeca Partners entity in Belize;
- any defaults under the purported agreement for the 16th floor of Burjside Boulevard;
- any installment payments he purportedly made to Damac prior to default;
- the $274,000 amount purportedly paid to Damac that was supposedly recognized by Wael as "transfers" in September 2007; and
- whether there were any issues with his installment payment under his contract for the 19th Floor of Burjside that was due on April 23, 2008, just one week after the date of his email (April 16, 2008).

199.    Also in this email, the Debtor (who now claims he defaulted on all the contracts) supposedly told Damac's CEO that he was "setting up a substantial fund that will invest in real estate in Dubai and Abu Dhabi" but the Debtor failed to produce any evidence to corroborate any "substantial fund."

200.    The Debtor also purportedly asserted to Mr. Riddoch that "the bottom line is if you do the right thing here….the right as spelled out in your policy book…we are in a position to do a lot more business if both sides play both morally and legally correct." The Debtor, however, has not explained what he meant by "the right thing" nor has he produced Damac's "policy book."

201.    Around this same time, the Debtor also supposedly corresponded with Hegazi on April 23, 2008—the same day his first $738,199.85 installment payment was due under the purported contract for the 19th floor of the Burjside building.

202.   In this correspondence with Hegazi (who the Debtor contends signed the operative contract for the 16th floor or maybe the 19th floor purchase, as the 19th floor document was not countersigned), the Debtor does not mention the installment payment at all, nor seek any extension for the payment that Debtor claims he ultimately failed to pay, defaulted on, and on which he subsequently lost all of Plaintiffs' money.

203.   The Debtor also identified a third different Ocean Heights unit during his deposition: "It's of the unit **7601** – this one right here."

204.   The Debtor later asserted that he defaulted on the actual unit he supposedly attempted to purchase, Ocean Heights Unit 7602.

205.   The Debtor admitted that he never told Plaintiffs about the Ocean Heights deal and that he was too "embarrassed" to tell his "friends" that the Burjside deals never closed (even though he had just recently been convicted a second time of a financial theft crime, for stealing money from his clients, while on probation and had gone to prison for over a year, the Debtor claimed he lied because of his embarrassment regarding the loss of Plaintiffs' money).

206.   The Debtor also admitted that he did not tell Plaintiff Vagnerova about any defaults on the Burjside Boulevard building, expressly stating: "I didn't tell her about the default."

207.   The Debtor claimed that there were emails between him and Wael discussing that the Burjside Boulevard transaction for the 16th floor was cancelled, but the Debtor failed to produce any such emails.

208.   In May 2016, the Debtor told Plaintiffs that he was planning a future trip to Dubai in "maybe a month" to obtain information on Plaintiffs' Investment and that Plaintiffs should plan to take a trip in July 2016.

209.     While the Debtor was represented by counsel in 2017 (attorney #2 of the seven different attorneys the Debtor hired since 2016, six of whom withdrew or otherwise stopped representing the Debtor in court proceedings), the Debtor purported to have drafted by himself (without counsel) a "power of attorney" to purportedly transmit to a person named Mahmoud Bedir ("Bedir"), a non-lawyer who was supposedly in Dubai to get information from Damac or RERA.

210.     The result was no information from Damac (that was provided to Plaintiffs).

211.     Regarding RERA, in Whatsapp text messages between Bedir and the Debtor, Bedir informed the Debtor that his name is not reflected in RERA, which is the UAE database for property ownership.

212.     The so-called power of attorney the Debtor drafted for Bedir expired on December 31, 2017. Apparently, the Debtor did not pay Bedir's fee and the Debtor never hired a lawyer or anyone else to "get documents from Damac."

213.     There is no evidence of the Debtor having retained counsel in Dubai at any time between 2007 and 2020, despite the so-called disappearance of over $1 million of investor money on his watch. The Debtor claims to have "tried to contact other lawyers" during that time, but cannot remember any of their names.

214.     When he was questioned at his deposition on November 12, 2019, the Debtor admitted that he had *himself* personally traveled to Dubai in September 2019. And the Debtor failed to produce any documents from this trip from Damac, from RERA or that corroborate any of the Debtor's statements about Plaintiffs' money.

215.     According to the Debtor's testimony, he arrived in Dubai on September 27, 2019, but he did not get around to purportedly meeting with Damac until September 30, 2019. The

Debtor claimed to have met with someone from Damac (though he does not identify who), and contends that he got "snubbed" when trying to collect more information.

216.    Although he purports to be a bankruptcy debtor, the Debtor managed to obtain international airfare and stayed at The Dukes (a five-star hotel) while in Dubai.

217.    While the Debtor's alleged "plan" for his trip to Dubai was "to collect more evidence from Damac, from Emirates Bank, [and] from [the] real estate regulatory authority," the Debtor failed to produce a single piece of paper from his Dubai journey.

### The Dispositive, Undisputed Material Facts

Notwithstanding the Debtor's claimed controversy over the facts which the Court has addressed by its findings, the record unequivocally establishes the core, dispositive, material facts not subject to genuine dispute that support the relief adjudicated herein.

Many of the above facts and subordinate elements here are merely loud background noise and distractions enhanced by the Debtor's quibbling, recharacterizations and inconsistencies. The Court's "distilling" of the core and material undisputed facts in the paragraphs referenced below further establish the requisite findings by the Court required to grant summary judgment as to all Counts. Succinctly, those core, critical and material undisputed facts that are independently dispositive of this Motion are as follows:

1.    The Defendant solicited and procured money, through false pretenses and false representations, both oral and written, totaling $495,000, from the Plaintiffs, inducing them to invest in a certain specified building in Dubai allegedly being developed by a well-known and reputable real estate developer. The Defendant's knowing, willful and intentional conduct and representations from the time he solicited the Plaintiffs' Investment monies, to when he diverted the Investment monies at variance with what the Plaintiffs agreed to, through his failure to inform

the Plaintiffs of, and continue to lie about, the reality of the Investment constitutes a pattern of knowing, fraudulent and deceptive conduct. *See* ¶¶ 8–26, 30, 116, 173,  205–206

2.      The Plaintiffs justifiably relied on the Debtor's personal representations regarding the Investment, as well as those materially false representations made, *inter alia*, in a written Term Sheet concerning, among other things, the Defendant's financial condition. Based upon his role, influence, power, alleged experience and control, the Debtor acted as their Investment fiduciary. *See* ¶¶ 8–15, 23, 24, 37, 75, 94, 116

3.      While acting in such a capacity, the Debtor, demonstrating an extreme recklessness with the Plaintiffs' Investment monies he was entrusted with, deployed the Plaintiffs' funds at material variance with the purpose of the stated Investment, diverting money to either himself, colleagues, or other investors. *See* ¶¶ 16–25, 40, 41, 70, 107, 112, 116, 167–175

4.      By the Debtor's own unequivocal admissions, he lied, on multiple occasions, to the Plaintiffs for years regarding the reality of their Investment and failed to faithfully account for the use of their money or to produce any reliable documentation demonstrating the path the Plaintiffs' money took or any assets purchased with Plaintiffs' money. *See* ¶¶ 26, 30, 36, 40, 49, 55, 60, 62, 70– 73, 106, 149, 189, 192, 205– 207, 209, 214

5.      Through the constancy of lies, misleading statements, evasions, diversions, inconsistent explanations, astounding fairy tales, and the absence of any corroborating documents, in addition to the failure to justify the absence of any such documentation, the Debtor committed a defalcation while acting as the Plaintiffs' Investment fiduciary. The Defendant's failure to preserve and produce any corroborating documents related to the Investment was unjustifiable, and made it impossible to reliably trace both the path the Plaintiffs' Investment

monies took and to discern the Defendant's true financial condition. *See* ¶¶ 39, 41– 45, 49, 55, 60, 62, 70–73, 85, 86, 109, 133, 148, 149, 179, 189, 217, 220

6.      These acts, omissions, diversions, and distractions of the Debtor, directed to the Plaintiffs' Investment and their reasonable reliance, were patently fraudulent, misleading, conscious, deliberate, willful, and malicious. *See* ¶¶ 25, 26, 69, 70, 171–173, 189, 205, 206

7.      The Debtor fraudulently acquired and retained the Plaintiffs' Investment monies, and as a direct result of the Debtor's actions and omissions, the Plaintiffs lost the entirety of their collective $495,000 Investment. *See* ¶¶ 15, 17, 24, 25, 41, 116, 205, 206

8.      Statements in the Debtor's Petition and schedules were made under oath and contained a series of untrue statements and omissions. The Defendant knowingly, and with the intent to defraud, made these false statements and omissions when completing and filing his Bankruptcy Petition. These false statements were material and unjustifiable, as they pertained to assets that were property of the estate and could have been used to pay creditors. *See* ¶¶ 150–60, 189

The Debtor would have these core facts buried in this extraordinary, but painful, contorted narrative of this case. These discernable and distilled facts are material, not subject to material dispute, and dispositive as set forth herein.

V.      DISCUSSION

1.  Dischargeability of Plaintiffs' Debts

"One of the fundamental principles of bankruptcy law is that a bankruptcy discharge enables the 'honest but unfortunate' debtor to receive a fresh start." *In re Golden,* 587 B.R. 414, 426 (Bankr. E.D.N.Y. 2018) (*quoting Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (internal quotation marks omitted)). The "discharge is the paramount tool used to

effectuate the central goal of bankruptcy: providing debtors a fresh financial start." *Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 390 (2d Cir. 2018). To effectuate this goal, Congress adopted § 523 of the Bankruptcy Code "to discourage fraudulent conduct and to ensure that relief intended for honest debtors does not inure to the benefit of the dishonest." *Starr v. Reynolds (In re Reynolds)*, 193 B.R. 195, 200 (D. N.J. 1996) (citation omitted).

Here, Plaintiffs move for summary judgment on Counts I–IV of the Complaint which seek to have the Court find that Defendant's Debt owed to Plaintiffs is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A)–(B), (a)(4) and (a)(6). Plaintiffs contend that their claims against the Debtor are non-dischargeable under 11 U.S.C. § 523 "because the Debtor fraudulently acquired and retained Plaintiffs' investment money through false representations made in writing, in a fiduciary capacity and in a willful and malicious manner." ECF No. 106, p. 3. In support of their arguments, the Plaintiffs principally rely on the Debtor's own unequivocal statements, his inconsistencies, admitted lies, and the various documents he has advanced to effectuate this fraudulent scheme.

### a. Dischargeability under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides, in relevant part, that a "discharge . . . does not discharge an individual debtor from any debt . . . for money . . . to the extent obtained by . . . false pretenses, a false representation or actual fraud . . ." 11 U.S.C. § 523(a)(2)(A). "The three terms used in § 523(a)(2)(A) embody different concepts, and Congress' 'use of the disjunctive "or" evidences [an intent] to deny a discharge under any [such term]. . . .'" *In re Chase*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007) (citations omitted).

i. False Pretenses

For purposes of § 523(a)(2)(A), the term "false pretenses" is defined as "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property." *In re Chase*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007) (citations omitted). False pretenses have also been held to "include implied misrepresentations or conduct intended to create or foster a false impression . . . and are defined as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. . . .
>
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re DePinna*, 450 B.R. 337, 359–60 (Bankr. D. Conn. 2001) (*quoting Deady v. Hanson (In re Hanson),* 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010)). "Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute." *In re Hambley*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005) (citation omitted).

In order to prevail on their Section 523(a)(2)(A) claim and establish that the Debt owed to them by the Defendant is nondischargeable "as a debt for money obtained by false pretenses, the [P]laintiffs must establish (1) an implied misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money . . . to the defendant." *Id.* (citation omitted).

45

Here, the Court finds that the Plaintiffs have clearly and convincingly met their burden, and the material facts not in dispute further support a finding, that the Defendant obtained the Investment monies, which constitute the debt owed to the Plaintiffs, through false pretenses. The Defendant, through a series of knowing and willful events, activities, and communications, created a false and misleading understanding of the purported Investment by which the Plaintiffs were wrongfully induced to advance money.

The Defendant, through his conduct, his oral and written misrepresentations, and his failure to disclose material facts, knowingly created a false and misleading impression of the Investment by misrepresenting (1) that the Investment was for a joint or pooled purchase of the entirety of the 16th floor of the Burjside Boulevard (when he later claimed the Investment related to the 19th floor and, in fact, the Burjside was never built); (2) material terms in the written Term Sheet (*i.e.*, price per square foot of each unit, financing 70% of the Investment, the property was already under construction); (3) where and to whom the Plaintiffs' Investment monies were being sent (telling Plaintiffs their money was wired to Defendant's attorney or to the Developer when it was in fact being sent to the Defendant's friend, Stefan Bode); (4) his ability to obtain a mortgage for, or otherwise finance a significant portion of, the Investment (while being recently released from jail and having no known, disclosed, or verifiable source of income); (5) that he entered into various Contracts and/or unit reservations and was making the requisite progress payments under those Agreements (later admitting this was a lie); and (6) that the Investment was successful (later admitting this was a lie and that Damac purportedly seized the Investment monies).

This series of deceptive and misleading events and communications on the part of the Defendant caused the Plaintiffs to tender their collective $495,000 into the accounts of the

Defendant or his agents. The Defendant provided no properly responsive or controverting evidence to raise any genuine issue of material fact. As such, the Court finds that the material facts not in genuine dispute establish that the Plaintiffs' Investment monies, which constitute the debt owed to the Plaintiffs, was a debt created through false pretenses, and is therefore nondischargeable under Section 523(a)(2)(A).

### ii. False Representation

To prevail on their claim for false representation under Section 523(a)(2)(A), the Plaintiffs must establish that: (1) the Defendant made a false representation; (2) at the time the representation was made, the Defendant knew it was false; (3) the Defendant made the representation with intent to deceive the Plaintiffs; (4) the Plaintiffs justifiably relied on the representation; and (5) the Plaintiffs sustained loss or damage as a proximate consequence of the false representation. *See In re Deutsch*, 575 B.R. 590, 599 (Bankr. S.D.N.Y. 2017).

"For the purposes of section 523(a)(2)(A), a false representation means that (1) the defendant made a false or misleading statement (2) with intent to deceive (3) in order for the plaintiff to turn over money or property to the defendant." *In re Ferati*, 2020 WL 6811464 at *5 (Bankr. D. Conn. 2020) (internal quotation marks and citations omitted). Omissions of fact may also qualify as false representations: "[a] false representation can be shown through either an express statement or through an omission where the circumstances are such that disclosure is necessary to correct what would otherwise be a false impression." *Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 574–75 (Bankr. N.D.N.Y. 2012).

Generally, issues involving intent and state of mind are inappropriate for summary judgment. *See Coan v. Andersen (In re Andersen),* 166 B.R. 516, 528 (Bankr. D. Conn. 1994). However, "the mere incantation of intent or state of mind [does not] operate as a talisman to

defeat an otherwise valid [summary judgment] motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985). Relevant to the Court's analysis here, intent to deceive may be established through circumstantial evidence and inferred from the totality of the evidence presented. *Clements v. Nassau County*, 835 F.2d 1000, 1005 (2d Cir. 1987) ("The state of mind exception [at the summary judgment stage], however, is appropriate only where solid circumstantial evidence exists to prove plaintiff's case."); *see also In re Shaheen*, 111 B.R. 48, 53 (S.D.N.Y. 1990) ("[I]ntent to deceive may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the [creditor]."). Further, "[i]ntent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act." *In re Duggan*, *supra,* 169 B.R. at 324.

Here, the Court further finds that, based on the material facts not in dispute, as well as the Defendant's numerous omissions of fact that are riddled throughout this record, that the Plaintiffs' Investment monies were also obtained by the Defendant's false representations, and that the totality of the circumstances demonstrates an indisputable intent to deceive on the part of the Defendant. Plaintiffs argue that the Defendant made false representations "before he stole their money, while he was stealing their money and after he stole their money to cover it up." Motion, at p. 7. This Court agrees.

The Defendant's actions from the time he solicited the Plaintiffs to invest their money with the Defendant in the joint purchase of the entire floor of units in the Burjside Boulevard property, to when he diverted the Investment money to Stefan Bode's bank account after telling Plaintiffs it was wired to his attorney or Damac, through his failure to inform the Plaintiffs of the "defaults" and "price disputes" and the subsequent lies about the reality of the Investment (lies

which then persisted for nearly a decade later)–and all of the many other false and deceptive representations made in between–constitutes a pattern of knowing and deceptive conduct. The totality of the circumstances, and those material facts not in dispute, demonstrate that the Defendant intended to deceive the Plaintiffs by making false statements.

Again, the Defendant provided no properly responsive or controverting evidence to raise any genuine issue of material fact. As such, the Court finds that the material facts not in genuine dispute establish that the Plaintiffs' Investment monies constitute a debt created through false representations and is therefore non-dischargeable under Section 523(a)(2)(A).

Accordingly, having determined that the Plaintiffs have met their burden by clear and convincing evidence and demonstrated an absence of material fact in dispute under two separate prongs of Section 523(a)(2)(A), summary judgment is granted as to Plaintiffs' Count I, finding that the debt owed to Plaintiffs was one obtained by both false pretenses and false representations, and a judgment shall enter pursuant to 11 U.S.C. § 523(a)(2)(A), declaring as non-dischargeable the indebtedness of the Defendant to Plaintiffs arising from the original Investment in the amount of $495,000.[5]

### b.  Dischargeability under 11 U.S.C. § 523(a)(2)(B)

Bankruptcy Code Section 523(a)(2)(B) excepts from discharge a debt for an extension of money or credit to the extent that it was obtained by "use of a statement in writing that is . . . materially false [with respect to] the debtor's . . . financial condition on which the creditor . . . reasonably relied and that the debtor . . . made with intent to deceive." 11 U.S.C. § 523(a)(2)(B). Plaintiffs argue that the Debtor's obligation to them is non-dischargeable under Section 523(a)(2)(B) because "[t]he Debtor drafted a term sheet full of false statements and represented

---

[5] Consistent with the setting of a hearing in damages with respect to Count VII, the Plaintiffs shall have the opportunity to file supplemental briefing and submit evidence in support of the current calculation of their damages.

to Plaintiffs that he was going to finance 70% of the multi-million dollar transaction. . . . [yet he] never informed Plaintiffs that [he] could not, and did not, obtain any financing." Plaintiffs' Motion, pp. 7–8.

The elements of a nondischargeability claim under Section 523(a)(2)(B) are that "for money, property, services, or an extension, renewal, or refinancing of credit," the Debtor executed a statement in writing "(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive." 11 U.S.C. § 523(a)(2)(B). In order to prevail on their Section 523(a)(2)(B) claim for false pretenses, the Plaintiffs must prove each element by a preponderance of the evidence. *See In re Furio*, 77 F. 3d 622, 624–25 (2d Cir. 1996).

To satisfy the first element under Section 523(a)(2)(B), the Plaintiffs must establish that the Defendant obtained their Investment monies by the use of a writing. With respect to the "writing" element of § 523(a)(2)(B), "[i]t is sufficient that [the Defendant] either wrote, signed, or adopted such statement to find that the documents were 'written' by them." *In re Boice*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992). Here, both the Term Sheet and the various Contracts satisfy this requirement. The Defendant admits that he drafted the Term Sheet and signed various versions of the Contracts which he later provided to Plaintiffs. Based on this record, the Court finds that the Plaintiffs have established that there is no genuine dispute as to a material fact as to the first element of its Section 523(a)(2)(B) claim, that the Defendant executed a statement in writing in connection with the debt at issue.

Next, Plaintiffs must prove that the statement was materially false. A statement is materially false if it "paints a substantially untruthful picture of the debtor's financial condition

by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Boice*, 149 B.R. at 45. Further, "writings containing pertinent omissions may qualify as 'materially false' for purposes of a section 523(a)(2)(B) violation." *In re Launzel-Pennes*, 191 B.R. 6, 11 (Bankr. E.D.N.Y. 1996).

The Court previously addressed the false representations contained in the Term Sheet and in the Contracts, and with respect to this prong of Plaintiffs' § 523(a)(2)(B) claim, the Court further finds that these same misrepresentations were of the type that would affect the Plaintiffs' decision to advance the Investment monies (*i.e.*, the favorable pricing terms, the ability/intention to obtain financing for 70% of the Investment, deadlines by which the Defendant was to make payments under the Contracts). The Court finds that Plaintiffs have shown that there is no genuine dispute as to a material fact that the Term Sheet and the Contracts contained statements that were materially false. Accordingly, Plaintiffs have satisfied the second element of their Section 523(a)(2)(B) claim.

The third element of Section 523(a)(2)(B) is that the statement must concern the Defendant's financial condition. The Second Circuit has articulated that "[i]n determining whether a statement relates to a debtor's financial condition, courts agree the term is not limited to formal financial statements." *Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F. 3d 104, 112 (2d Cir. 2002). As the Second Circuit articulated in *Bogdanovich,* courts are split on whether to apply a broad or narrow interpretation of Section 523(a)(2)(B)'s exception. *Id.* "A broad interpretation would include any statement that reflects the financial condition of the debtor. On the other hand, a narrow interpretation would find that a statement relates to financial condition only when it provides information 'as to [a debtor's] overall financial health." *Id.* (internal citations omitted). Several courts have addressed whether certain statements speak to the overall

financial health of the debtor sufficient to satisfy the narrow interpretation of the exception. *See id.* at 113 (*citing In re Alicea*, 230 B.R. 492, 504 (Bankr. S.D.N.Y. 1999) (holding that statement about debtor lacking present ability to pay was essentially statement of insolvency); *In re Sansoucy*, 136 B.R. 20, 23 (Bankr. D.N.H. 1992) (holding that representation as to financial solvency of partnership was statement of financial condition because it reflected overall economic condition of partnership)).

Here, even under a narrow interpretation, the record shows that the Term Sheet and the Contracts contained materially false statements related to the Defendant's overall financial health. Specifically, the Term Sheet contains representations related to the Defendant's ability and intention to obtain financing for a significant portion of the Investment, and the Contracts contain information related to the Defendant's obligation and ability to make initial deposits and continuing progress payments within a specified timeframe.

With respect to the Term Sheet and the Contracts, the Defendant failed to produce any evidence demonstrating that there is a genuine issue of fact. Rather, the Defendant objected to Plaintiffs' statement of material fact related to representations made in the Term Sheet "to the extent the Plaintiffs contend that all of the statements contained therein constitute, and rise to the level of, a representation on which a decision-maker should base his or her decision." As for the Contracts, Defendant admits that "[t]he Manual Contract contains the pricing terms to which Simone agreed" and that the unit reservation Contracts "all call for a ten percent deposit to have been made by July 2, 2007." Accordingly, based on this record, the Plaintiffs have established that there is no genuine dispute as to a material fact as to the third element of the Section 523(a)(2)(B) claim, and that the Term Sheet and the Contracts contain information that concerns the Defendant's financial condition.

The Plaintiffs must next establish that they relied on the false statements and that their reliance was reasonable. "An objective standard by which to measure 'reasonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them." *Waterbury Community Fed. Credit Union v. Magnusson*, 14 B.R. 662, 668 n.1 (Bankr. N.D.N.Y. 1981). "Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith. Reasonableness is therefore a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith. . . . The reasonableness of reliance requires the fact finder to consider the totality of the circumstances." *In re Bonnanzio*, 91 F.3d 296, 305 (2d Cir. 1996).

Having previously found that there is no genuine dispute as to a material fact that the Term Sheet and the Contracts contained statements that were materially false, the Court now finds, and the record further demonstrates, that the Plaintiffs have cleared the "low hurdle" of showing that they acted reasonably in relying on the Term Sheet and the Contracts furnished by the Defendant in advancing their Investment monies. In support of this finding, the Plaintiffs produced the Defendant's sworn responses to interrogatories wherein the Defendant responded with his belief "that [Plaintiff] Katz made his investment based upon the terms proposed in a term sheet." Again, the Defendant did not produce any evidence to create a genuine issue of material fact. Accordingly, Plaintiffs have established that there is no genuine dispute as to a material fact as to the fourth element of the Section 523(a)(2)(B) claim, and that the Plaintiffs reasonably relied, as is customary, on the written representations in the Term Sheet and the Contracts.

Finally, the Plaintiffs must establish the Defendant's intent. "Proving the element of deceptive intent under [Bankruptcy] Code § 523(a)(2)(B)(iv) is often difficult, as one will rarely admit to such intent." *In re Boice*, 149 B.R. at 47. Given this difficulty, courts recognize that "[i]ntent to deceive may be inferred when the totality of the circumstances depicts deceptive conduct by the debtor." *Id.* "To this end, Plaintiff must prove that Debtors made the statement knowing either that it was false, or that it was made with such reckless disregard for the truth so as to be the 'equivalent of intent to defraud.'" *Id.* (*quoting Town North Nat'l Bank v. Biedenharn*, 30 B.R. 342, 345 (Bankr. W.D. La. 1983)). Further, a "debtor acts with fraudulent intent 'if he knows or believes that his statements [regarding his financial ability to perform] are false at the time the statements are made.'" *In re Dunnett*, 2013 WL 2352244, at *11 (Bankr. N.D.N.Y. 2013) (citations omitted). "Under the totality of the circumstances approach, the court may infer fraudulent intent from various kinds of circumstantial evidence, including, but not limited to, the levels of experience and financial sophistication of the debtor." *Id.* (citation omitted).

Here, the Defendant, an experienced businessman, acted, at a minimum, with reckless disregard for the truth when he drafted the Term Sheet and signed and provided the Plaintiffs with the various Contracts. At the time he circulated the Term Sheet, the Defendant had no known, disclosed, or verifiable source of income, yet he provided that he (with the Plaintiffs) would invest $1.5 million and finance $3.5 million for the Investment. Further, the Defendant knew or should have known that the price per square foot listed in the Term Sheet conflicted with the actual price per square foot listed on the Contracts/unit reservations—the Defendant even admits as much. *See* ECF No. 384, p.80. Accordingly, the Court finds that the Defendant provided the Plaintiffs with the Term Sheet and Contracts knowing there were materially false

statements contained therein, or at least acting with reckless indifference as to the truth of the information therein, with the intent to deceive the Plaintiffs.

As such, the Court finds that the material facts not in genuine dispute establish by clear and convincing evidence that the Plaintiffs' Investment monies constitute a debt for money obtained by a materially false and intentionally deceptive written statement of financial condition upon which the Plaintiffs reasonably relied and is therefore nondischargeable under Section 523(a)(2)(B). Accordingly, having determined that the Plaintiffs have met their burden and demonstrated an absence of material fact in dispute under Section 523(a)(2)(B), summary judgment is granted as to Plaintiffs' Count II, finding that the debt owed to Plaintiffs was one obtained by a materially false written statement concerning the Defendant's financial condition, and a judgment shall enter pursuant to 11 U.S.C. § 523(a)(2)(B), declaring as non-dischargeable the indebtedness of the Defendant to Plaintiffs arising from the original Investment in the amount of $495,000.

### c.  Dischargeability under 11 U.S.C. § 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that an individual will not be discharged from any debt arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).  "In order to prevail on its section 523(a)(4) claims, the Plaintiff[s] must show that the Defendant's debt arose from defalcation while acting in a fiduciary capacity *or* from embezzlement *or* from larceny." *In re Veneziano*, 615 B.R. 666, 675 (Bankr. D. Conn. 2020) (emphasis in original).

### i.    Defalcation While Acting in a Fiduciary Capacity

Under Section 523(a)(4), a claim of fiduciary defalcation requires a showing of: "(i) the existence of a fiduciary relationship between the Plaintiff and Defendant; and (ii) a defalcation

committed by the Defendant in the course of that relationship." *In re Fritzon*, 590 B.R. 178, 191–92 (Bankr. D. Conn. 2018) (*quoting In re Fox*, 2017 WL 564499, at *3 (Bankr. D. Conn. Feb. 10, 2017)). "The question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a fiduciary capacity has been made." *Andy Warhol Found. v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir. 1999).

While the Bankruptcy Code does not define "fiduciary," *id.* at 167, the term's scope is generally a matter of federal law. *In re Fritzon*, *supra*, 590 B.R. at 192. For purposes of Section 523(a)(4), a fiduciary relationship "generally involve[es] express trusts, technical trusts or statutorily imposed trusts." *Grow Up Japan, Inc., v. Yoshida (In re Yoshida)*, 435 B.R. 102, 108 (Bankr. E.D.N.Y. 2010). "An express trust is initiated by one entity's transfer of property to another entity coupled with a manifestation of an intention to create a trust." *First American Title Ins. Co. v. Eberhart (In re Eberhart)*, 283 B.R. 97, 100 (Bankr. D. Conn. 2002), *aff'd*, 124 Fed. App'x. 672 (2d Cir. 2005). "The fiduciary relationship must exist prior to the act creating the debt; a trust relationship cannot be said to arise merely from the wrongful conduct itself." *Parklex Assoc. v. Deutsch (In re Deutsch),* 575 B.R. 590, 600 (Bankr. S.D.N.Y. 2017).

"Although a fiduciary relationship under Section 523(a)(4) is usually limited to the trust relationships noted above . . . [i]n the context of Section 523(a)(4), the Second Circuit has indicated that two parties are in a fiduciary relationship when there is 'a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter,' *Hayes*, [*supra*], 183 F.3d at 167." *In re Fritzson*, *supra*, 590 B.R. at 192. And while "the precise scope of the defalcation exception is a question of federal law, its application frequently turns upon obligations attendant to relationships governed by state law. For example,

state law can be an important factor in determining whether someone acted in a fiduciary

capacity under Section 523(a)(4)." *In re Hayes*, *supra*, 183 F.3d at 166.

"Under Connecticut law, a fiduciary relationship is a relationship that is characterized by

a unique degree of trust and confidence between the parties, one of whom has superior

knowledge, skill or expertise and is under a duty to represent the interests of the other."

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 429 (2d Cir. 1999). "In

the seminal cases in which [the Connecticut Supreme Court] has recognized the existence of a

fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a

relationship of dependency, or was under a specific duty to act for the benefit of another."

*Dennis v. Hall (In re Hall)*, 483 B.R. 281, 292 (Bankr. D. Conn. 2012) (*quoting Hi–Ho Tower,*

*Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 38 (2000)).

From the material facts not in dispute, the Court finds that an express trust was created.

The Defendant solicited Plaintiffs to invest money with him as their trusted advisor,[6] in what he

described as a joint or pooled purchase of the entirety of the 16th floor, consisting of nine units,

in a pre-construction building in Dubai being developed by a well-known and reputable real

estate developer. The Defendant then provided Plaintiffs with a written Term Sheet setting forth

the proposed Investment and indicating that the Investment "[m]onies will be wired into an

escrow account with [Defendant's] US attorney but may be sent upon instruction from time to

time directly to developer." Soon thereafter, at the Defendant's direction and pursuant to, and in

justifiable and reasonable reliance on, the representations made in the Term Sheet, Plaintiffs sent

their money to hold "in escrow" for the Investment. When Plaintiffs transmitted, and the

---

[6] Whether this Investment qualifies as a security under Connecticut law and the sale transaction by the Debtor was prohibited thereby has not been raised nor is it determined herein. *See* Conn. Gen. Stat. §§ 36b-3(19) and 36b-4.

Defendant, through his agent/attorney, accepted the monies that were agreed by all parties to be used towards the acquisition of the 16th floor units, an express trust was created.

Additionally, it is abundantly clear from the record that the relationship between the Plaintiffs and the Defendant was one "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Martinelli, supra.* 196 F.3d at 429. The Defendant's relationship with the Plaintiffs also falls within the federal definition of "fiduciary capacity" as it involved a "difference in knowledge and power" which gave the Defendant "a position of ascendency over the [Plaintiffs]." *Hayes, supra,* 183 F.3d at 167.

The Defendant's background as a former securities and real estate broker, his self-professed understanding of the Dubai real estate market, his knowledge of and discussions surrounding the alleged Investment property for months prior to the Plaintiffs' involvement, and his purported direct communications with individuals/officers at Damac and other agents involved in the real estate transactions gave him superior knowledge of the alleged investment opportunities relative to the Plaintiffs, thereby allowing the Defendant to occupy "a position of ascendency" in their business transactions. Plaintiffs entrusted the Defendant[7] with a collective $495,000 of their money with the understanding that the Defendant was to deploy the money towards a "joint or pooled purchase of units in a pre-construction building in Dubai" (and no other purpose) and that the Defendant was to secure financing for the portion of the purchase price that would not be composed of the Plaintiffs' equity stake. As part of the pooled asset acquisition project, in addition to exercising authority and control over the Plaintiffs' money by

---

[7] The Defendant's relationship with Plaintiff Woolf dates back over 30 years when they both attended college together at Boston University. Defendant and Plaintiff Vagnerova have been friends since 2002 and, at times, have been romantically involved.

making contributions towards the "progress payments," the Defendant, who was physically present in Dubai, was to enter into sales agreements and sign purchase contracts on the Plaintiffs' behalf, under the guise of the purported company, Tribeca. Accordingly, this Court holds that, as a matter of both federal and state law, the Defendant was a fiduciary of the Plaintiffs, and this element of Plaintiffs' Section 523(a)(4) claim has been resoundingly satisfied.

Having determined that the Defendant acted in a fiduciary capacity for the purposes of Section 523(a)(4), the Court now examines whether the Defendant's acts constitute defalcation under Section 523(a)(4). "As described in Section 523(a)(4), 'defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud, embezzlement or misappropriation." *Fritzon, supra,* 590 B.R. at 194 (quotations and citation omitted). Defalcation does, however, require a "'a culpable state of mind' in the form of intentional, knowing, or reckless conduct. Where actual knowledge of wrongdoing is lacking, courts 'consider conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty.'" *Id.* (quoting *Bullock*, *supra*, 569 U.S. at 274). "The risk that the debtor must consciously disregard is 'the risk [that] the conduct might violate a fiduciary duty, rather than [the risk] of a resultant injury, loss or harm to the beneficiary.'" *In re Kakareko*, 575 B.R. 12, 27 (Bankr. E.D.N.Y. 2017) (quoting *In re Chidester*, 524 B.R. 656, 661 (Bankr. W.D. Va. 2015).

The Second Circuit has also held that for purposes of Section 523(a)(4), defalcation "require[s] a showing of conscious misbehavior or extreme recklessness—a showing akin to the showing required for scienter in the securities law context." *In re Hyman*, 502 F.3d 61, 68 (2d Cir. 2007). This requisite "intent can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit

fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.2d 1124, 1128 (2d Cir. 1994)).

Here, the Plaintiffs argue that the Defendant gained access to their money by leveraging his knowledge as a former securities and real estate broker and by relying on his personal relationships with each Plaintiff—a scheme, the Plaintiffs argue, that is not new to the Defendant. After the Plaintiffs sent their money to the Defendant, they claim he lied about where and to whom the money went, leading the Plaintiffs to believe that their collective Investment was put towards the acquisition of the 16th floor of the Burjside project, which at some point in time successfully closed. Years later, and only after Plaintiff Katz sued the Defendant, did he claim that he actually defaulted on the payments and that, as a result, Damac terminated their agreement and retained all payments as contract damages. The Defendant was still unable to account for, produce, or show the path of the Plaintiffs' money. The Plaintiffs claim that these, and other record facts demonstrate that the Defendant had the motive, opportunity, and intent necessary to prevail on their Section 523(a)(4) defalcation claim. The Court agrees.

The Plaintiffs have provided this Court with sufficient and undisputed, undeniable material facts that present a picture of the Debtor's deceptive conduct, his extreme recklessness with the Plaintiffs' Investment monies, and his conscious failure to produce and account for such monies entrusted to him. The Defendant's inconsistent tales and everchanging explanations as to what happened to Plaintiffs' money are wholly unsupported, illogical and patently inconsistent. Whether the Defendant claims that the Investment was successful or that Damac "seized" Plaintiffs' money after defaulting under the purported contracts, no corroborating evidence or

specific and material controverting facts were presented that support any of the Defendant's claims or that demonstrate that there is a genuine issue of material fact for trial regarding the Defendant's misconduct in exercising his fiduciary duties with respect to the Plaintiffs' money. *See Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (*quoting Liberty Lobby, supra*, 477 U.S. at 257)) ("To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'"). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby, supra*, 477 U.S. at 248.

Rather, the Defendant's own statements support a finding to the contrary. The Defendant admitted, after years of leading the Plaintiffs to believe otherwise, and only after he was sued, that the Investment did not close, that he knew of and failed to enter into an Agreement of Sale within the requisite time frame, and that he did not make any progress payments required under the purported contracts, thereby all but assuring that the Plaintiffs' Investment monies would be lost. What's more, after being entrusted with the Plaintiffs' monies and while under a duty to return or deploy those monies consistent with the purpose of the stated Investment, the Defendant admitted to lying to the Plaintiffs for years regarding the reality of their Investment. At best, the Defendant was reckless in deploying the Plaintiffs' money in the manner(s) in which he alleges. At worst, the Defendant conducted a conscious scheme to misappropriate the Plaintiffs' money.

The Defendant claims that the Plaintiffs' money, regardless of the route it traveled, ultimately ended up with Damac. For whichever story the Defendant wishes this Court to believe and whatever path Plaintiffs' money took, even when drawing all inferences and resolving all

ambiguities in his favor, the core material facts are not in genuine dispute, and the Defendant has simply failed to present any specific, substantiated, and controverting material facts, supported by verifiable and credible evidence, that would defeat the Plaintiffs' properly supported claim and demonstrate to this Court that there is a genuine material issue for trial. Consequently, the Court determines that the Defendant's conduct constituted a defalcation within the meaning of Section 523(a)(4).

Accordingly, having found that all elements of Section 523(a)(4) have been met by clear and convincing evidence, summary judgment is granted as to Plaintiffs' Count III and a judgment shall enter pursuant to 11 U.S.C. § 523(a)(4), declaring as non-dischargeable the indebtedness of the Defendant to Plaintiffs arising from the original Investment in the amount of $495,000.

### d.   Dischargeability under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides that a debtor will not be discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To succeed on their § 523(a)(6) claim, the Plaintiffs must prove: (1) the Debtor acted willfully; (2) the Debtor acted maliciously; and (3) the Debtor's "willful and malicious actions caused injury to the [Plaintiffs] or the [Plaintiffs'] property." *In re Salvatore*, 586 B.R. 371, 377 (Bankr. D. Conn. 2018) (*citing In re Powell*, 567 B.R. 429, 434 (Bankr. N.D.N.Y. 2017)). "While neither 'willful' nor 'malicious' conduct is defined by the Bankruptcy Code, the United States Supreme Court has clarified that § 523(a)(6) renders non-dischargeable 'only acts done with actual intent to cause injury,' not merely 'acts, done intentionally, that cause injury.'" *Hamrah v. Couloute (In re Couloute)*, 538 B.R. 184, 190 (Bankr. D. Conn. 2015) (*citing Kawaauhau v. Geiger*, 523 U.S. 57 (1998)).

With respect to Section 523(a)(6)'s "willful injury" prong, the Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau*, 523 U.S. at 57–58. "Moreover . . . the (a)(6) formulation triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *Id.* at 61–62.

As to the malicious injury prong,

> [t]he United States Court of Appeals for the Second Circuit has defined and interpreted "malicious" as meaning "wrongful and without just cause or excuse, even in the absence of personal hatred, sprite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 88 (2d Cir. 1996). Further, the Second Circuit found that malice could be constructive or implied. *Id.* However, where a debtor seeks profit or some other benefit, "the underlying conduct, however deplorable, would not give rise to liability under Section 523(a)(6) in the absence of some additional, aggravating conduct on the part of the debtor of sufficient gravity to warrant an inference of actual malice under the Second Circuit decision in [*Stelluti*]." *Syncom Indus., Inc. v. Wood (In re Wood)*, 488 B.R. 265, 279–80 (Bankr. D. Conn. 2013) (*quoting Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)).

*In re Carrano*, *supra,* 530 B.R. at 559. "Even absent personal malevolence, a person will be found to have acted maliciously when that person acts in conscious disregard of his or her duties or without just cause or excuse." *In re Marcella*, 463 B.R. 212, 221 (Bankr. D. Conn. 2011) (*quoting In re Wentland*, 410 B.R. 585, 600 (Bankr. N.D. Ohio 2009)).

The record here is clear, and the material facts not in dispute establish, that the Defendant intended to deprive the Plaintiffs of their collective $495,000 Investment by employing the same tactics and engaging in the same criminal behavior as the Defendant previously pled guilty to. The Plaintiffs have shown by a preponderance of the evidence that the Defendant engaged in

willful and malicious behavior, causing injury to the Plaintiffs, and the Defendant has failed to come forward with any controverting evidence demonstrating that there is a genuine issue for trial.

In addition to the undisputed facts previously discussed by the Court with respect to Plaintiffs' Counts I–III, establishing myriad false, fraudulent, misleading, and intentional statements, acts, and omissions, and which are further incorporated herein, the core material facts not in dispute establish that the Defendant acted voluntarily, intentionally, and deliberately to induce the Plaintiffs to wire the Investment monies, not to the Defendant's attorney to hold in escrow or directly to the Developer as represented in the Term Sheet, but instead to his friend Stefan Bode, by supplying Bode's account number, in the same manner as the New York Supreme Court previously found the Defendant to employ when he pled guilty to Attempted Grand Larceny in the Third Degree. Further, given the insurmountable amount of evidence Plaintiffs have provided underscoring the extent of the Defendant's fraud and misconduct, as previously discussed herein, the Court finds that the material facts not in dispute establish that the Defendant's conduct was purposefully designed to deprive the Plaintiffs of their Investment monies when he planned and carried out his fraudulent scheme. Accordingly, the Court finds that the Plaintiffs have met their burden by clear and convincing evidence, and the Defendant has failed to provide evidence to demonstrate a genuine issue, in establishing that the Defendant acted willfully with respect to Plaintiffs' §523(a)(6) claim.

Turning now to the issue of malice, the Court also finds that Plaintiffs have met their burden in establishing that the Defendant acted maliciously for purposes of § 523(a)(6). The weight of the uncontroverted evidence in this case tips heavily toward a finding that the Defendant's actions were taken in conscious disregard of his duties and without just cause or

excuse. As previously discussed with respect to Count III, *infra*, after being entrusted with the Plaintiffs' monies and while under a duty to return or deploy those monies consistent with the purpose of the stated Investment, the Defendant admitted to lying to the Plaintiffs for years regarding the reality of their Investment. Whether it was deploying the Plaintiffs' monies at variance with the purpose of the stated Investment, diverting money to either himself, colleagues, or other investors, or later lying about the reality of the Investment and stringing the Plaintiffs on for nearly a decade, the Defendant has wholly failed to present any specific, substantiated, and controverting material facts, supported by verifiable and credible evidence, that would defeat the Plaintiffs' properly supported claim and demonstrate to this Court that there is a genuine material issue for trial. As such, the Court finds that the debt owed to Plaintiffs is also one arising as the result of the Defendant's willful *and* malicious actions.

Accordingly, having found that all elements of Section 523(a)(6) have been met by undisputed facts, summary judgment is granted as to Plaintiffs' Count IV and a judgment shall enter pursuant to 11 U.S.C. § 523(a)(6), declaring as nondischargeable the indebtedness of the Defendant to Plaintiffs arising from the original Investment in the amount of $495,000.

For the reasons stated above, the Court finds that there is no genuine dispute as to any material fact as to Plaintiffs' claims that the debt owed to them by the Defendant is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B), (a)(4), and (a)(6), and the Plaintiffs are entitled to judgment as a matter of law on Counts I–IV. Accordingly, the indebtedness of the Defendant to Plaintiffs in the principal amount of $495,000 arising from the Investment is hereby declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) as a debt obtained by both false pretenses and false representations; pursuant to 11 U.S.C. § 523(a)(2)(B) as a debt obtained by a materially false written statement concerning the Defendant's financial

condition; pursuant to 11 U.S.C. § 523(a)(4) as a debt obtained through defalcation while the Defendant was acting in a fiduciary capacity; and pursuant to 11 U.S.C. § 523(a)(6) for a debt obtained through the Defendant's willful and malicious actions.

2.   Denial of the Debtor's Discharge

The Plaintiffs also move for summary judgment on Counts V and VI of the Complaint which seek to deny the Debtor's discharge under 11 U.S.C. §§ 727(a)(3) and (a)(4)(A). The denial of a debtor's discharge is an extreme remedy that "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the [debtor].'" *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (*quoting Bank of Pa. v. Adlman*, 541 F.2d 999, 1003 (2d Cir. 1976)). Still, "a bankruptcy discharge is a privilege, not a right, and may only be granted to the honest debtor." *In re Antoniou*, 527 B.R. 71, 78 (Bankr. E.D.N.Y. 2015) (citation omitted). Plaintiffs contend that denial of the Debtor's discharge is warranted based on his "failure to preserve records and his false oaths." Plaintiffs' Motion, p. 1.

a.   *Denial of Discharge under 11 U.S.C. § 727(a)(3)*

Section 727(a)(3) of the Bankruptcy Code provides that a debtor shall be granted a discharge unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). Section 727(a)(3) functions "to insure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." *In re Sethi*, 250 B.R. 831, 837 (Bankr. E.D.N.Y. 2000) (citations omitted); *see also In re Underhill*, 82 F. 2d 258, 260

(2d Cir. 1936) ("The purpose and intent of [§ 727(a)(3)] of the Bankruptcy Act is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs.").

"The party objecting to discharge has the burden of proof to show that the debtor has failed to keep and maintain adequate books and records, and that such failure renders it impossible to discern the debtor's true financial condition and identify material business transactions." *Id.*, at 838 (*citing Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 98 (Bankr. E.D.N.Y. 1997)). Once the objecting party has shown the absence or inadequacy of records, the burden shifts to the debtor to justify his failure to maintain or produce them. *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2005). The debtor's explanation must consist of "more than vague and general assertions that assets or records are no longer available." *Desiderio v. Devani (In re Devani)*, 556 B.R. 37, 41 (Bankr. E.D.N.Y. 2016).

In the Second Circuit, the standard for evaluating the adequacy of a debtor's record keeping

> does not require that [the debtor's books and records] . . . be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of a discharge, and if such disclosure is not possible, without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.

*In re Underhill*, *supra*, 82 F.2d at 259–60. "[T]he test is whether there is available written evidence made and preserved from which the debtor's present financial condition, and his recent business transactions for a reasonable period in the past, may be ascertained with substantial completeness and accuracy." *In re Sethi*, *supra*, 250 B.R. at 838 (citations omitted).

"The court has broad discretion in determining whether the records produced by the debtor are sufficient under the standard set forth in *Underhill*." *In re Frommann*, 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993). When examining the adequacy of a debtor's record-keeping, courts consider:

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
2. The amount of the debtor's obligations;
3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
4. The debtor's education, business experience and sophistication;
5. The customary business practices for record keeping in the debtor's type of business;
6. The degree of accuracy disclosed by the debtor's existing books and records;
7. The extent of any egregious conduct on the debtor's part; and
8. The debtor's courtroom demeanor.

*Sethi*, *supra*, 250 B.R. at 838. "Once the court determines that the records produced by the debtor are insufficient to enable the court, the trustee or the creditors to determine the debtor's financial affairs and business transactions, the burden shifts to the debtor to justify any deficiencies." *Id.* at 838–39.

The Court finds that the Plaintiffs have met their initial burden in regard to § 727(a)(3). An analysis of the *Sethi* factors weighs heavily against the Debtor and the adequacy of his record-keeping. While the Debtor indicates that he was unemployed at the time of filing, he is a former securities broker, sophisticated investor, and commercial real estate broker, and graduated from Boston University with a degree in finance. The Court need not even weigh the Debtor's prior employment or business acumen, because even applying the lowest threshold for personal record-keeping, the Debtor's record-keeping fails abysmally.

The Debtor admits that he has not produced a single *original* document in this Adversary Proceeding, whether that be a contract, bank statement, check, credit card statement, sale agreement or any other document. He has produced no letters of default from Damac or any invoices pursuant to any payment plan. He has not produced any bank records that reflect where or how the Plaintiffs' money was spent, nor any documentation that identifies any assets purchased with Plaintiffs' monies. Even given the recent opportunity during his September 2019 visit to Dubai to *personally* request documents from Damac, from RERA, or from Emirates Bank that corroborate any of the Debtor's claims regarding the path of Plaintiffs' money, the Debtor failed to produce any documents or evidence.

The Defendant's contorted and inconsistent explanations for the disappearance of the Plaintiffs' money—after years of leading the Plaintiffs to believe that their Investment had been tendered to Damac and that they closed on the Burjside property—is that Damac declared a default and terminated the sale agreements, and retained all prior payments as contract damages, resulting in a loss, based on the numerous defaults, in excess of $1 million. The Defendant's sole explanation for failing to produce any documents reflecting any default is that "none could be found."

What little and cryptic documentary evidence the Debtor has produced is wholly insufficient for this Court, the Plaintiffs, or any other creditor to ascertain the Debtor's financial condition or business transactions, and it provides no assistance in understanding what truly happened to the Plaintiffs' money, due in large part to the inconsistencies between the documents themselves and the shifting explanations the Defendant has provided related to these documents. The dispute between the parties centers largely around the existence (or lack thereof)

of certain legal and dispositive documents, *i.e.* real estate contracts, checks, proof of payments, and bank statements, yet the evidence presented by the Defendant is almost entirely unsubstantiated testimonial explanations for the disappearance of the Plaintiffs' money set forth in a self-serving declaration.[8] *See* ECF No. 237.  In a multi-million dollar real estate transaction for an entire floor of a pre-construction building in Dubai, it is reasonable and customary to expect the Defendant, as a dutiful and prudent fiduciary, to produce critical records of deposits, transfers, signed agreements, and other transactions related to the Investment. Further, the Defendant's exercise of control over the Plaintiffs' Investment monies requires him to reliably and consistently account for the flow of funds. Accordingly, the Court finds that the Plaintiffs have satisfied their burden under § 727(a)(3) by showing that the Defendant failed to produce sufficient records from which his financial condition or business transactions might be ascertained.

With that finding, the burden now shifts to the Debtor to justify his failure to maintain or produce records. Under § 727(a)(3), "whether a debtor's failure to keep books is justified is 'a question in each instance of reasonableness in the particular circumstances.' *Underhill*, 82 F.2d at 259–60; *see also Meridian Bank*, 958 F.2d at 1231 (stating that '[t]he issue of justification depends largely on what a normal, reasonable person would do under similar circumstances')." *In re Cacioli*, *supra*, 463 F.3d at 235. "A debtor's stated justification will satisfy § 727(a)(3) if enough evidence exists to

---

[8] On September 24, 2020, the Plaintiffs filed a Motion for Sanctions pursuant to Spoliation of Evidence (ECF No. 394), wherein they reference 125 categories of "missing evidence" which Plaintiffs' allege encompasses spoliated, nonexistent, or concealed evidence that the Defendant "destroyed, failed to preserve, lied about, concealed and otherwise deprived Plaintiffs" of. For the reasons stated in the Motion for Sanctions, in addition to the undisputed material facts herein, the Court concludes that there is cause to grant the Motion for Sanctions. The Defendant's intentional conduct has impaired, impeded, frustrated, and delayed the Plaintiffs' pursuit of their rights and remedies. Accordingly, the Court will entertain adverse evidentiary inferences that the Defendant consciously failed to keep or produce material records that should have been preserved under these facts and circumstances, and that he indisputably suffers fundamentally impaired credibility. A Ruling on the Motion for Sanctions shall enter herewith.

convince the court of the debtor's good faith and businesslike conduct." *In re Antoniou*, *supra*, 527 B.R. at 80 (internal quotation marks and citations omitted). "The explanation of loss must be more than just vague and general oral assertions that assets or records are no longer available. . . . Moreover, the debtor may not, by oral testimony, supplement that information which is absent from the actual records." *Sethi, supra*, 250 B.R. at 839 (citations omitted).

"Debtors have a duty to preserve those records that others in like circumstances would ordinarily keep. Hence, the debtor's honest belief that he does not need to keep the records in question, or that his records are sufficient, or his statement that it is not his practice to keep additional records, does not constitute justification for failure to keep or preserve records under §727(a)(3)." *Id.* (internal citations omitted). "If the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, then [the debtor] must show more than that '[he] did not comprehend the need for them and must carry [his] explanation by way of justification to the point where it appears that because of unusual circumstances [he] was under no duty to keep them.'" *Frommann, supra*, 153 B.R. at 698 (citation omitted).

Here, the principal "justification" offered by the Defendant for the lack of records, as it pertains to communications with Damac, is that the Debtor regularly engaged in in-person, or otherwise oral communications with Damac, as opposed to written correspondence for which there would be a traceable record.[9] The Defendant admits that he produced no letters of default from Damac because "none could be found." ECF No.

---

[9] In a declaration from the Defendant dated October 23, 2020, he stated that, in regard to communications with Damac, "I did not habitually send confirming or follow-up emails – that was not a regular practice for me." ECF No. 419, Ex. A at ¶ 9.

384, p. 67. As for any other material documentary evidence corroborating the Defendant's explanations, there is little to none; rather, the Defendant attempts to supplement the information absent from any actual records with speculation proffered in his self-serving declaration, which in large part is void of any citation to corroborating evidence.

As the Court previously noted, in a multi-million dollar real estate transaction in a foreign county, where a significant amount of money has allegedly been tendered and then "seized"—including an alleged significant amount of the Defendant's own money— it would be reasonable for a sophisticated businessman and former securities and real estate broker to maintain records of these transfers of money, of executed contracts, and of communications related to these transactions. *See Sethi*, *supra*, 250 B.R. at 839 ("A sophisticated debtor is generally held to a higher level of accountability in record keeping, and the more complex the debtor's financial situation, the more numerous and detailed the debtor's financials should be.") (citation omitted). These abject failures support a compelling and indisputable inference of the Debtor's conscious desire to conceal his conduct.

Further, to the extent that the Defendant claims that the Plaintiffs are seeking documents and records from an unreasonable lookback period, § 727(a)(3) does not set "forth any specific time period for which a debtor is required to account for his pre-petition financial condition. . . . The determination of what constitutes a reasonable period prior to the filing must be measured on a case-by-case basis, taking into account all of the circumstances of the case." *In re Racer*, 580 B.R. 45, 53 (Bankr. E.D.N.Y. 2018) (citations omitted). What's more, "[c]ourts have extended their inquiry under §

727(a)(3) to as far as ten years before the commencement of the case." *Id.* (citation omitted).

While Section 727 imposes an "extreme penalty for wrongdoing, which must be construed against those who object to the debtor's discharge and liberally in favor of the bankrupt," *Underhill*, *supra*, 82 F.2d at 260, even under this strict standard, it is apparent from the undisputed material facts that the Debtor's discharge must be denied under §727(a)(3). These facts establish that the Debtor did not produce a single original document in this case, no letters of default from Damac, no invoices pursuant to any payment plan, no bank records reflecting where or how the Plaintiffs' money was spent, no signed sales agreements, and no documentation identifying any assets purchased with Plaintiffs' money. The Defendant has not offered sufficient "justification" for his failure to do so.

In light of the foregoing, the Court finds that there are no genuine issues of material fact as to the Defendant's justification and reasonableness regarding his failure to maintain and produce records. Accordingly, the Plaintiffs have established by clear and convincing evidence that, as a matter of law, the Defendant is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(3) and summary judgment shall enter in favor of the Plaintiffs as to Count V.

### b. Denial of Discharge under 11 U.S.C. § 727(a)(4)(A)

Under § 727(a)(4)(A), a debtor shall be granted a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). In order to prevail on their § 727(a)(4)(A) claim, the Plaintiffs must establish by a preponderance of the evidence that: (1) the Debtor made the

statement under oath; (2) the statement was false; (3) the Debtor knew the statement was false; (4) the statement was made with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Casa Investments Co. v. Brenes (In re Brenes)*, 261 B.R. 322, 334 (Bankr. D. Conn. 2001). "Once the objecting creditor meets its burden of proof and has produced persuasive evidence of a false statement, the burden of production shifts to the debtor to come forward with some credible explanation for a false statement on the schedules. *See In re Maletta*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993).

"Statements made by a debtor on his petition and schedules fall within the purview of § 727(a)(4) as statements made under oath." *In re Boyer*, 367 B.R. 34, 45 (Bankr. D. Conn. 2007) (citations omitted). A "statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made without belief in its truth, or made with reckless disregard for the truth." *In re Maletta*, 159 B.R. at 112. "Fraudulent intent may be inferred from a series of incorrect statements and omissions contained in the schedules." *In re Singh*, 585 B.R. 330, 340 (Bankr. E.D.N.Y. 2018). Court's may also consider a debtor's education and business experience when evaluating knowledge of a false statement. *In re Garcia*, 260 B.R. 622, 631 (Bankr. D. Conn. 2001). Lastly, a statement is considered material if it is pertinent to the discovery of assets. *In re Maletta*, 159 B.R. at 112.

Plaintiffs contend that the Defendant "made numerous false statements under oath in this record [when he] lied in his schedules, concealed income and falsified loans that don't exist." Motion, at p. 9. Specifically, Plaintiffs argue, and provide substantiating evidence, that, while indicating on his Petition that he did not use any business names or EINs within the last 8 years, the Defendant, in fact, used EINs for both Buckingham and

Windsor. With respect to Buckingham, Plaintiffs provided a Business Account Application with Wells Fargo signed by the Defendant and dated 5/2/2017, listing Buckingham's EIN, identifying the Defendant as the "Key Executive with Control of the Entity," and listing annual gross sales of $800,000. Additionally, on his Petition, the Defendant listed $20,000 in gross income for the calendar year of 2017, yet Plaintiffs provided evidence of the Defendant earning a $158,000 commission on 12/21/2017 in connection with the sale of a property whereby Buckingham served as a broker.

Further, Plaintiffs argue, and again provide substantiating and persuasive evidence, that the Defendant made a false oath when, on his Petition, he answered "No" to whether he had any "trusts, equitable or future interests in property . . . and rights or powers exercisable of your benefit." However, deposition testimony from both the Defendant's mother and father indicate otherwise. The November 15, 2019 deposition testimony from Irene and Richard Simone confirms the Defendant's beneficiary interest in the family trusts.

Because these statements the Defendant made in his Petition qualify as statements under oath, the first element of Plaintiffs' § 727(a)(4)(A) claim is satisfied. The Plaintiffs have also provided ample, persuasive, and uncontroverted evidence of these statements being false, and as such, the second element is satisfied. Considering the Defendant's education and business experience—in addition to numerous admitted lies, misleading statements, evasions, and inconsistent explanations already addressed herein—the Court finds that the Plaintiffs have met their burden in establishing that the Defendant made these statements with knowledge of their falsity and with the requisite fraudulent intent. Finally, the statements at issue here are clearly material as they pertain to assets that were

property of the estate and could have been used to pay creditors, and as such, the final element of Plaintiffs' § 727(a)(4)(A) claim is satisfied.

In his Response, the Defendant produced no evidence to properly respond to or contradict the material facts relied upon above, but rather simply raised objections to such facts under Fed. R. Evid. 402. As such, the Court finds that there are no genuine issues of material fact as to the Defendant's justification for making false statements on his Petition. Accordingly, the Plaintiffs have established as a matter of law that the Defendant is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and summary judgment shall enter in favor of the Plaintiffs as to Count VI.

For the reasons stated above, the Court finds that there is no genuine dispute as to any material fact as to Plaintiffs' claims that the Defendant should be denied a discharge and the Plaintiffs are entitled to judgment as a matter of law on Counts V and VI. These Counts have been established by compelling clear and convincing evidence. Accordingly, the Debtor's discharge is hereby DENIED pursuant to 11 U.S.C. § 727(a)(3) based on his failure to produce and maintain adequate financial and business records, and pursuant to 11 U.S.C. § 727 (a)(4)(A) based on the Defendant's numerous false oaths made in connection with his Bankruptcy case.

VI.    LEGAL CONCLUSIONS, ORDERS AND JUDGMENTS

For all of the foregoing reasons, the Count finds that there is no genuine issue of material fact to be tried with respect to Plaintiffs' Counts I, II, III, IV, V and VI, and summary judgment should be entered declaring as non-dischargeable the indebtedness of the Defendant to Plaintiffs pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B), (a)(4), and (a)(6) and denying the Debtor a discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(4)(A).

Accordingly, it is hereby:

**ORDERED:** That the Plaintiffs' Motion for Summary Judgment is GRANTED as to Counts I, II, III, IV, V and VI; it is further

**ORDERED:** That, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B), (a)(4), and (a)(6), the indebtedness of the Defendant to Plaintiffs in the principal amount of $495,000 arising from the Investment is hereby declared non-dischargeable; it is further

**ORDERED:** That within thirty (30) days hereof, the Plaintiffs shall file in this Adversary Proceeding such motion(s) and supporting affidavits as address the current calculation of their damages hereunder, and the Court will thereafter promptly set such matter for a hearing; it is further

**ORDERED:** That, pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(4)(A), the Debtor's discharge is DENIED; it is further

**ORDERED:** The Court will defer entry of a separate and final judgment on all Counts pending the outcome of the further proceedings on the current calculation of the Investment damages and on Plaintiffs' Count VII referenced herein; and it is further

**ORDERED:** The Court will hold a Status Conference on March 30, 2022 at 11:00 AM to discuss the timing of any further proceedings, including on Count VII, as to whether the entry of civil judgment for treble and/or punitive damages should enter in favor of Plaintiffs and against Defendant.

**IT IS SO ORDERED** at Hartford, Connecticut this 8th day of February 2022.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut