**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| IN RE: ) | Case No. 18-21993 (JJT) |
| ) | |
| RICHARD P. SIMONE, ) | |
| ) | Chapter 7 |
|     Debtor. ) | |
| ) | |
| ANDREW WOOLF, ANDREW KATZ ) | |
| and ELENA VAGNEROVA ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | Adv. Pro. Case No. 19-02005 (JJT) |
| v. ) | |
| ) | |
| RICHARD P. SIMONE, ) | Re: ECF No. 514, 515, 600, 604 |
| ) | |
|     Debtor. ) | |

**MEMORANDUM OF DECISION ON DEBTOR'S ABILITY TO PAY SANCTIONS**

## I. INTRODUCTION

This proceeding involves an examination of whether the Court must, or in the exercise of its discretion should, reduce or relieve the Debtor of a monetary sanction totaling $92,330.92 (the "Sanctions"). Various circuits, including this Circuit, hold that a litigant's ability to pay monetary sanctions should be considered in making such a determination. *See, e.g.*, *Oliveri v. Thompson*, 803 F.2d 1265, 1281 (2d. Cir. 1986) ("[I]t lies well within the . . . court's discretion to temper the amount to be awarded against an offending [party] by balancing consideration of his ability to pay."); *see also Haynes v. City and Cnty. of S.F.*, 688 F.3d 984, 987–88 (9th Cir. 2012); *Doering v. Union Cnty. Bd. of Chosen Freeholders*, 857 F.2d 191, 195–96 (3d. Cir. 1988). To better inform its decision, the Court ordered the Debtor to produce certain financial records, including recent tax returns. ECF No. 607. The Debtor at first flouted the Court's

order, and only when threatened with civil contempt (ECF No. 622) did he belatedly produce the requested documentation (ECF No. 627).  Shortly thereafter, the Court held three separate hearings (collectively, the "Show Cause Hearing"), wherein the Debtor testified as to his alleged financial wherewithal to pay the Sanctions.  Throughout his testimony, the Debtor once again littered the record with untrustworthy testimony and scattershot memories; in particular, the Debtor waxed tales of his current apparent self-imposed inability to generate income, despite his professional training and experience, history of sophisticated financial dealings and income derived therefrom, and ostensibly wealthy family who have repeatedly aided and supported him.  At the conclusion of the Show Cause Hearing, the Court requested proposed findings of fact from the parties and took the matter under advisement.

## II. THE COURT'S FINDINGS OF FACT

Having considered those proposed findings of fact, the prior factual record of the Court's Memorandum of Decision on Plaintiffs' Motion for Summary Judgment (ECF No. 515, the "SJ Decision") and its Ruling on Plaintiffs' Motion for Sanctions and Motion to Supplement the Record with Discovery Violations (ECF No. 514, the "Sanctions Order"), and relevant portions of the transcript of the Show Cause Hearing, including the Debtor's testimony, the Court makes the following factual findings as to the Debtor's inability to pay the Sanctions:

### A. The Debtor's Background and Litigation with Plaintiffs

1. The Debtor is a middle-aged and ostensibly healthy professional businessman.

2. The Debtor currently resides in Southington, CT, and previously resided in locales such as Miami, FL; Boca Raton, FL; New York City, NY; and Dubai, United Arab Emirates.  BR-ECF No. 1, Case No. 18-21993.

3. The Debtor graduated with a degree in finance from Boston University in 1985. While attending Boston University, he became good friends with Plaintiff Woolf. SJ Decision at 58 n.7.[1]

4. The Debtor was a licensed stockbroker purportedly in the 1980s and assuredly in the 1990s at various Wall Street investment banks. SJ Decision at 6 ¶ 1.

5. However, after being arrested in 1997 and prosecuted by the Manhattan District Attorney's office, the Debtor admitted to stealing more than $800,000.00 from one client. He pled guilty to one count of Grand Larceny in the Second Degree and was sentenced to serve five years of probation and to pay a $5,000.00 fine. SJ Decision at 6 ¶ 1.

6. For these actions and others, the Debtor was sanctioned by regulators, disbarred by the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") and, as of 1997, was prohibited from associating with any broker dealer that sells securities to the public. SJ Decision at 6 ¶ 2.

7. While on probation, the Debtor again stole money from his clients (this time his wealthy uncle's trustees) through a "sleight of hand" by sending bank wires to offshore bank accounts the Debtor controlled. SJ Decision at 7 ¶ 3.

8. After another criminal indictment and a violation of probation proceeding on his 1997 case, on February 10, 2004, the New York Supreme Court resentenced the Debtor to eighteen to fifty-four months in state prison. On April 15, 2004, the Debtor pled guilty to new charges and was convicted of Attempted Grand Larceny in the Third Degree. On March 31, 2005, the Debtor was sentenced to a prison term of eighteen to thirty-six months pursuant to these new charges. SJ Decision at 7 ¶ 4.

---

[1] Facts derived from the Court's SJ Decision were all deemed undisputed facts therein.

9. The Debtor was released from prison on parole in 2006. SJ Decision at 7 ¶ 6.

10. In 2007, the Debtor represented to Plaintiff Woolf that he knew of a very lucrative real estate investment in Dubai (the "Dubai Project"). In 2007 and 2008, the Debtor solicited and obtained investments of $225,000.00 from Plaintiff Woolf, $150,000.00 from Plaintiff Katz, and $120,000.00 from Plaintiff Vagnerova (collectively, the "Investment"). The Debtor solicited Plaintiff Woolf to invest his money with the Debtor in what the Debtor described as a joint or pooled purchase of units in a pre-construction building in Dubai. SJ Decision at 7 ¶ 8.

11. The Debtor falsely represented material aspects of the Dubai Project to induce the Plaintiffs' Investment (SJ Decision at 8 ¶ 13) including but not limited to material terms of the relevant term sheet and the Debtor's ability to obtain financing for the Dubai Project (SJ Decision at 46).

12. For the next nine years, the Debtor lied to the Plaintiffs about the status of their Investment, among other material falsehoods. SJ Decision at 10–11 ¶¶ 26–29.

13. The Debtor later claimed that DAMAC Properties ("Damac"), the ostensible developer of the Dubai Project, seized the Plaintiffs' Investment due to the Debtor's defaults on real estate purchase contracts with Damac. SJ Decision at 13 ¶ 43, 25 ¶ 108.

14. In May 2016, the Debtor ceased to further update the Plaintiffs as to the status of their Investment. SJ Decision at 11 ¶ 30.

15. On June 22, 2016, Plaintiff Katz sued the Debtor in Miami-Dade Circuit Court to recover his portion of the Investment. SJ Decision at 11 ¶ 31.

16. Over the course of that litigation, it emerged that the Debtor never told the Plaintiffs about any purported "seizure" of the Investment until 2017, long after he was sued. SJ Decision at 13 ¶ 41.

17. On December 5, 2018, the Debtor filed for protection under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code"). BR-ECF No. 1, Case No. 18-21993.

18. On March 15, 2019, the Plaintiffs commenced this Adversary Proceeding against the Debtor to deny the Debtor's discharge of the Plaintiffs' Investment, primarily on the basis that the Plaintiffs' Investment and the Debtor's inducement thereof was fraudulent, and that the Debtor repeatedly lied and misled the Plaintiffs as to where the Plaintiffs' Investment was ultimately deployed. Compl., ECF No. 1 (the "Complaint").

19. On February 8, 2022, the Court issued the SJ Decision and granted the Plaintiffs' motion for summary judgment on Counts I–VI of the Complaint, all of which rendered the Plaintiffs' Investment a non-dischargeable debt to the Plaintiffs under the Bankruptcy Code. SJ Decision, ECF No. 515.

20. The Debtor appealed that SJ Decision, which is currently pending before Judge Omar A. Williams of the United States District Court for the District of Connecticut (Case No. 3:22-cv-00560-OAW).

21. Concurrent with the SJ Decision, the Court also issued the Sanctions Order, finding, *inter alia*, that the Debtor engaged in a scheme of "well calculated shedding, non-preservation and/or spoliation of documents [which] impeded the administration of [the] case, heightened discovery costs, and served to obfuscate critical issues." Sanctions Order, ECF No. 514. Accordingly, the Court also entered, as part of its Sanctions Order, an adverse evidentiary inference to be used in any trial that "the Debtor indisputably lacks fundamental credibility on the facts and circumstances related to Plaintiffs' claims." *Id.* at 4–5.

22. Pursuant to the Sanctions Order, the Court awarded the Plaintiffs' attorneys fees and expenses (i.e., the Sanctions) "for the incremental harm reasonably attributable to the

[Debtor's] discovery abuses and ordered the Debtor to show cause as to his inability to pay the Sanctions. Suppl. Ruling on Pl.'s Mot. for Sanctions, Including Attorney's Fees and Expenses at 7–8 (ECF No. 600, the "Supplemental Ruling").

**B. The Debtor's Current Purported Financial Status**

23. The Debtor testified as to his alleged current financial condition and inability to pay the Sanctions as follows:

   a. The Debtor has no savings. Def.'s Ex. 1 (Sub-Ex. A–C), ECF No. 650.

   b. The Debtor owns no real property. Def.'s Ex. 1 (Sub-Ex. B–C), ECF No. 650.

   c. The Debtor depends on loans from his parents for rent, living expenses, and legal fees. Def.'s Ex. 1 (Sub-Ex. B), ECF No. 650; Tr. Oct. 26, 2022, 84:5–14, 85:11–12, 93:10–13, ECF No. 655; Tr. Nov. 8, 2022, 68:22–23, ECF No. 654.

   d. The Debtor owns no personal property of significant value. Def.'s Ex. 1 (Sub-Ex. B–C), ECF No. 650; *see* Tr. Oct. 26, 2022, 32:11–17, ECF No. 655.

   e. The Debtor has potentially over $1,800,000.00 million in liabilities with no means to repay them. Def.'s Ex. 1 (Sub-Ex. B), ECF No. 650; *see* Tr. Nov. 8, 2022, 78:19, ECF No. 654.

   f. The Debtor has not had any success in recent business endeavors and lacks ready means to fully support himself. *See* Tr. Oct. 26, 2022, 42:23–25, 121:22–25, ECF No. 655.

24. The Debtor currently maintains a Florida real estate broker's license and a Connecticut license to sell mortgage protection insurance. Tr. Oct. 26, 2022, 111:12–13, 112: 5–10, 13–15, ECF No. 655.

25. The Debtor claimed no inability to work or to pursue business endeavors, including those supported by his family's resources.

**C. The Debtor's History of Revenue Generation and Significant Transactions**

26. The Debtor had "liquidity of about . . . half a million dollars around 2006." Tr. Oct. 26, 2022, 83:19–22, ECF No. 655.

27. The Debtor has had months where his various business endeavors earned between $50,000.00 to $100,000.00 a month. Tr. Nov. 8, 2022, 45:20–21, ECF No. 654.

28. On June 14, 2007, the Debtor wired $352,652.00 of his money from an account under the name "Oakwood Partners" to an account under the name "Penham Ltd.", an account in the Isle of Man at a financial institution whose name the Debtor claimed he could not recall. Tr. Nov. 18, 2022, 15:21, 16:15, ECF No. 653.

29. On December 28, 2007, the Debtor wired $160,000.00 of his money from the Oakwood Partners account to a Penham Ltd. account in the Isle of Man at a financial institution whose name the Debtor claimed he could not recall. Tr. Nov. 18, 2022, 18:7, ECF No. 653.

30. The Debtor provided no documents or records of a subsequent transfer of the $352,652.00 and $160,000.00 tranches (totaling $512, 652.00) which he wired to the Penham Ltd. account in the Isle of Man. The Debtor could not testify that he ever closed the Penham Ltd. account which received the $512,652.00 that the Debtor wired. Tr. Oct. 26, 2022, 116:2–117:4, ECF No. 655.

31. The Debtor stated "it may have been" when asked if his Bank of America account, not his Penham Ltd. account, purportedly transmitted $400,000.00 to $500,000.00 to Damac. Tr. Oct. 26, 2022, 80:19–22, ECF No. 655.

**D. The Debtor's Current Financial Accounts and Support from Family**

32. The Debtor reported $210.00 of taxable income in 2021 and $3,167.00 of taxable income in 2020. Def.'s Ex. A, ECF No. 650.

33. The Debtor's uncle was Welsh billionaire Albert Gubay ("Gubay") who "had over a hundred million [dollars]" at his disposal. Tr. Oct. 26, 2022, 72:14–23, ECF No. 655.

34. The Debtor admitted that Gubay set up multiple companies in the Isle of Man, though the Debtor could not recall all their names during the Show Cause Hearing. Tr. Oct. 26, 2022, 118:3–119:8, ECF No. 655

35. One such company established for the Debtor's benefit was Penham Limited, which the Debtor used to "trade the markets." Tr. Oct. 26, 2022, 94:4, ECF No. 655.

36. The Debtor has regularly relied on his family for other financial assistance. The Debtor testified that, each time he has asked his parents for money "they ultimately said yes." When the Debtor asked his parents for money to pay his legal fees, the Debtor testified that he could not "think if there were any instances where they didn't end up with a yes." Tr. Oct. 26, 2022, 89:14–90:3, ECF No. 655l

37. The Debtor stated that his parents made an additional $647,966.00 in ostensible "loans" to him, which the Debtor used to pay other attorneys. Def. Ex. 1 (Sub-Ex. B), ECF No. 650; Tr. Oct. 26, 2022, 66:25–67:13, ECF No. 655.

38. The Debtor listed his parents as nonpriority unsecured creditors on his bankruptcy schedules, who at the time of filing had a claim of $756,000.00 for monies "lent for [D]ebtor's support and attorney's fees." BR-ECF No. 1, Case No. 18-21993.

39. The Debtor could not identify an occasion where he has repaid a "loan" from his parents and characterized them as a "family arrangement". Tr. Oct. 26, 2022, 84:3–85:8, ECF No. 655.

40. The Debtor's parents recently paid the Debtor (or his attorneys directly) $208,938.00 in post-petition attorneys' fees. Tr. Oct. 26, 2022, 34:25–35:11, ECF No. 655

41.     The Debtor testified that his parents have paid the Debtor $200,000.00 for "trading."  Tr. Oct. 26, 2022, 34:2–4, ECF No. 655

42.     The Debtor claims that he has not asked his parents to pay the Sanctions ordered by the Court.  Tr. Oct. 26, 2022, 90:4–11, ECF No, 655; Tr. Nov. 8, 2022, 22:22–23:5, 24:14–16, ECF No. 654.

43.     The Debtor is in possession of three years of bank statements from three banking institutions, namely People's Bank/M&T Bank, Wells Fargo, and Ion Bank.  However, the Debtor did not provide those bank records to the Court or to the Plaintiffs.  Tr. Oct. 26, 2022, 39:25–43:24, ECF No. 655.

44.     The Debtor has dominion over, access to, and is a signatory of an Ion Bank account in the name of "DFL, LLC" which is a company owned by his brother, Wayne Simone.  Tr. Oct. 26, 2022, 43:11,44:3, ECF No. 655.

45.     The Debtor has made loans to and received loans from Wayne Simone.  Tr. Nov. 8, 2022, 16:19, 17:17, ECF No. 654.

46.     The Debtor currently has a debit card for his use in his brother's name.  Tr. Nov. 8, 2022, 16:10–13, ECF No. 654.

47.     The Debtor currently has a credit card for his use in his father's name, which is also "Richard Simone".  Tr. Oct. 26, 2022, 52:12–54:21, ECF No. 655.

48.     The Debtor has expended amounts far exceeding the principal amount of the Plaintiffs' claims to defend himself against those same claims.

49.     Based on the factual findings herein, while allegedly both rich and poor over the last decade, the Debtor has closed significant commercial real estate transactions generating

hundreds of thousands of dollars in profits, traded various investment instruments, consorted with businessmen in Dubai, and otherwise maintained business relationships across the globe.

50. Based on the totality of the facts and circumstances herein, the Court concludes that the Debtor's alleged limitations or inability to generate income is intentional and self-imposed. His financial affairs are structured, not unlike his past fraudulent schemes, to obfuscate, conceal, and mask his abilities to legitimately generate financial resources to repay his debts. He can earn or secure, however, monies for his purposes at his convenience.

51. Based on the factual findings herein and the long record of this Adversary Proceeding, and as the Court has repeatedly concluded and the Debtor has admitted in deposition testimony, the Debtor is essentially an unabashed liar, a scam artist, and an incorrigible conman.

### III. THE COURT'S CONCLUSIONS OF LAW

A litigant's claimed inability to pay "what [a] court would otherwise regard as an appropriate sanction . . . [is] reasonably akin to an affirmative defense . . . ." *White v. General Motors Corp.*, 908 F.2d 675, 685 (10th Cir. 1990). As such, the burden falls "[on] the parties being sanctioned to come forward with evidence of their financial status." *Id.*; *see also Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 658 (2d. Cir. 2004) ("A [litigant] may be excused [from a sanction] if it lacks the financial capacity to [pay]; but the [litigant] bears the burden of production in raising such a defense."). Based on the factual findings made herein, it is indisputably clear that the Debtor has failed to meet his burden and show that he genuinely lacks the financial capacity or prospects to pay the Sanctions. On the contrary, the Debtor's own testimony reveals he has ample means and skills to potentially do so.

Throughout the course of this Adversary Proceeding and before, the Debtor has marshalled funds to retain various legal counsels and pay them hundreds of thousands of dollars. Based on those factual findings alone, the Court concludes that the Debtor's assertions that he cannot pay the Sanctions (a paltry amount relative to his legal bills) are both galling and wholly unconvincing.  As though the Court required additional facts to reach its finding, the Debtor testified that he has "at times" earned $50,000.00 to $100,000.00 per month; that he has access to his father's credit card and his brother's debit card; and that he has financial support from his family that is seemingly without end.  The Debtor cannot recall a single occasion where he paid back his family any of the putative "loans" they have extended to fund both his legal fees and lifestyle, a lifestyle that appears quite comfortable given his apparently meager earnings.  Given the Debtor's fundamental lack of credibility throughout this Adversary Proceeding, there is no evidence whatsoever that these "loans" are in fact loans — it stands to reason that they are in fact either monetary gifts, conduits from concealed family assets, or other unspecified family arrangements.

## IV.    CONCLUSION

This Court concludes that any inability of the Debtor to pay the Sanctions is self-imposed, calculated, and simply not credible.  Based on the record of this Adversary Proceeding, the Debtor clearly has no intention of ever repaying the Plaintiffs and certainly no intention of responding to the Court's Sanctions.  He historically has been able to generate income for himself and his lifestyle, and he has regular reliable access to financial assistance from his family.  The Debtor has failed to satisfy his burden of demonstrating a cognizable inability to pay the Sanctions that calls for judicial relief.  Were the Court to exercise its discretion and exonerate him of the responsibility to pay these Sanctions on this deficient record, it would unfairly vitiate its Sanctions Order in the face of the Debtor's egregious and persistent

misconduct. Accordingly, the Court orders and directs the Debtor to pay the Sanctions to the Plaintiffs, in full, within forty-five (45) days hereof.

Pursuant to the Court's Supplemental Ruling, this Sanctions award of $92,330.92 is reaffirmed, without modification, and shall also be set forth in connection with any final judgment sought from or issued by this Court in this case.

**IT IS SO ORDERED** at Hartford, Connecticut this 17th day of February 2023.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut